IN THE UNITED STATES DISTRICT COURT

OF WESTERN PENNSYLVANIA

MICHAEL BURCHIK, WAYNE            CIVIL DIVISION
EDDY, JASON LETT, ROBERT
PICKEL,                          No. 15-529

       Plaintiffs,

     vs.

OIL STATES ENERGY SERVICES,
LLC. f/k/a SPECIALTY TANK
SUPPLY; OIL STATES
INTERNATIONAL, INC.,

       Defendants.
     _____

Transcript of JURY TRIAL held on October 16, 2017
United States District Court, Pittsburgh, Pennsylvania
  BEFORE:  HONORABLE MARK A. KEARNEY, DISTRICT JUDGE

<u>APPEARANCES</u>:

For the Plaintiffs:        Zachary K. Warren, Esq.
                           Samuel Davidoff, Esq
                           Michelle Hood, Esq.
                           Williams & Connolly
                           725 Twelfth Street, N.W.
                           Washington, DC 20005

For the Defendants:        William R. Stukenberg, Esq.
                           William L. Davis, Esq.
                           Jackson Lewis
                           Wedge international Tower
                           1415 Louisiana Street
                           Houston, TX 77002

Court Reporter:            Karen M. Earley, RDR-CRR
                           6260 U.S. Courthouse
                           700 Grant Street
                           Pittsburgh, PA 15219
                           412-201-2660

Proceedings reported by mechanical stenography.
Transcript produced by computer-aided transcription.

I  N  D  E  X

PAGE

Preliminary Jury
 Instructions                    3


Opening Statement by
 Mr. Warren                      16

Opening Statement by
 Mr. Davis                       49

| PLAINTIFFS' WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Michael Burchik | 64 | 182 | 203 | -- |

```
 1                   P R O C E E D I N G S
 2     (October 16, 2017, 11:05 a.m.)
 3    (In open court, jury present.)
 4              THE COURT:  All right, ladies and gentlemen,
 5    congratulations.  The United States Constitution has now
 6    imbued you with all the powers of an Article III judge.
 7              Madam Deputy, please swear these good
 8    citizens.
 9              DEPUTY CLERK:  Yes, Your Honor.
10              Kindly stand and raise your right hand.
11        (Whereupon, the jurors were first duly sworn.)
12              THE COURT:  Thank you.
13              Ladies and gentlemen, I'm now going to tell
14    you how the trial works, all right.  You have not done
15    this before and you never sat in such an important
16    position in someone else's life, maybe another family
17    member.
18              I'm going to tell you how this works so you
19    can see what to look forward to and not look forward to
20    and how it happens.
21              You and only you are the judges of the facts,
22    not me, not the lawyers, certainly not the witnesses.
23    You have to decide what happened here.
24              See, there's two good sets of lawyers, and
25    earnest clients have a different view of what happened
```

1   here.  You know that happens every day of your life.

2   Two well-meaning people have a different view of how

3   something happened.  The role for you now is to decide

4   what happened.

5          The great dynamic of eight persons is you are

6   all part of the same brain.  What that means is at the

7   end of the day, you are going to have to come up with a

8   unanimous verdict.  This is not majority rule.  It's

9   unanimous.  So, all eight of you must come to the same

10   decision, which makes it's a fascinating group dynamic

11   because you are all hearing the same thing by my rules,

12   and none of you can talk about what's happening until

13   you get back for deliberations.

14          So, for a few days now you are going to sit

15   here and listen and you are not going to talk to anybody

16   about it.  Isn't that the most curious dynamic?  You sit

17   there, are talked to for hours, documents shown to you

18   and you can't go home and tell your family what you are

19   seeing.

20          Now, you can say generally, come on down and

21   see us.  We're in a very interesting trial about

22   employment law, whether people are entitled to overtime

23   under the law.  You don't ask them for their advice.  In

24   fact, you just swore not to.

25          See, everybody in the United States today,

1    everybody in our over 200 years of jurisprudence is now

2    relying on jurors.  A couple moments ago when I said

3    this is because juries now define the law.

4            So, over the course of this trial, you are to

5    avoid any contact with witnesses or lawyers or anybody

6    in the outside who could influence you.

7            That means you are going to come into the

8    courtroom in the morning and you are going to see the

9    lawyers and they're fine people and fine gentlemen and

10   ladies and they are going to nod to you or not nod to

11   you.

12           Don't take any moment from it.  You are the

13   judges and if they don't nod to you, that means they

14   know you are the judges.  Part of the downside of my job

15   is I have to remove myself from a lot of social

16   converse.  Now, you do as well, at least in this room

17   because you are judges now.  You can't -- so don't take

18   any moment if they don't say hello to you.

19           You are not to discuss the case with anyone.

20   This is not an open book -- excuse me.  This is an open

21   book test that you cannot go research outside of this

22   room.  All the answers will come from that box and

23   that's it.

24           I don't want you going home tonight or at

25   lunch or on your phones or otherwise looking up anybody

1  in the room, Googling anything.  It's not evidence.  In

2  a minute, I'm going to talk about what evidence is.

3          The entire test, your entire decision here

4  will be answered for you from that box six feet away

5  from you.  That's the test.  Don't go home, don't ask

6  your friends, family.  Just listen to the evidence, and

7  thus, don't form any opinion until all the evidence is

8  in.  That's why I prohibit you from talking to each

9  other about the case.

10          If you see someone else talking to one of your

11  fellow jurors about the case or someone is saying what a

12  silly tie the judge is wearing or something like that,

13  talking about the evidence, I need to know about it

14  because it's not fair to these parties.  They are

15  placing a considerable amount of faith in you.

16          See, you and I have different jobs here now.

17  My job is to make sure the trial moves forward in an

18  efficient way and rule on the questions of law.  Your

19  job is to decide the questions of fact.

20          I can't challenge what you do, okay.  I can't

21  say how crazy a decision that is.

22          Conversely, you can't challenge the law.  You

23  can't say, Judge, that's just bad law.

24          Unfortunately, you and I don't set the law.

25  The law is given to us by Congress in this case and by

1    administrative agencies.

2          So, we are applying the law.  My job is to

3    give you the law, your job is to apply it.  I don't

4    challenge you.  You don't challenge me on that issue.

5          It's also a very interesting dynamic because

6    for the first time in your lives, you are in a class and

7    you don't get to ask questions.  You don't get to raise

8    your hand and say, Judge, I want to ask a question about

9    that.

10         No, that's not how it works.

11         You get to take notes as much as you wish but

12   don't take any comfort or any kind of reliance on

13   somebody else because they take notes.

14         We all have been in places where people take a

15   lot of notes and don't know anything, and we all have

16   been in places where people who have never taken notes,

17   they know everything.  It's just a memory aid for you.

18   It's permitted but it's not required.

19         So, here is what you decide.  Here is why the

20   Framers in Philadelphia gave you this role because you

21   have to decide the evidence.

22         What is evidence?  Evidence is what comes from

23   that witness stand.  I'm a spatial learner, maybe you

24   are, too.  If you are looking towards me, you are

25   getting evidence.  If you are looking to lawyers or to

1   the middle of the well of the court, you are not getting

2   evidence.

3          Evidence is what witnesses tell you, what

4   documents tell you, or what I tell you.  That's

5   evidence.  Nothing else is evidence.

6          So, for example, the arguments these good

7   lawyers are going to make to you is not evidence.

8   Believe me they are paid to be persuasive and I'm sure

9   they are but it's not evidence.  Evidence is what you

10  hear from the witness stand and that is it.

11         Now, from time to time, I'm going to sustain

12  an objection.  That means don't go any further.  That

13  means just ignore it.  It's not evidence.  I'm deciding

14  on the law.  I have to do what I need to do like you

15  need to do what you need to do.

16         Now, there are different types of evidence and

17  this is something I want to clarify for you.

18         The evidence is what's heard in the room.  No

19  where else.  It's heard from that stand.  There really a

20  couple types, direct and circumstantial are two types.

21         Everybody always says on the street, oh,

22  that's circumstantial evidence, like they give it the

23  back of the hand.  I'm telling you now this is first

24  year law school.  They are exactly the same as they

25  report to you.

1            The difference is the direct is the witness

2    gets on the stand and tells you I was just outside and

3    it's raining today.  Okay.  You can look at the witness,

4    measure her tone, her demeanor, all the things you would

5    measure any witness with, do you know what I mean?

6            If you met a person for the first time on the

7    street and they started telling you a story, you would

8    evaluate their credibility based on whether you think

9    they are telling the truth or not, and you do that

10   frequently.  Boy, I would really get in trouble if I

11   wasn't a lawyer.  I'm sorry.  I know better than that.

12           So, you have to evaluate the witnesses the way

13   you think they are.  Look at their demeanor, how well

14   they know what they are talking about, if you think they

15   are guessing, all the things that your intuition tells

16   you, that is your game now, that is your role.

17           The Framers wanted citizens to apply their

18   common sense.  Your most important job is to apply your

19   common sense.  So, whether the witness comes up and

20   directly tells you, yeah, it's raining outside.  You can

21   look at her and say okay, I believe her, I don't believe

22   her.  She hasn't been outside for two days, how does she

23   know it's raining outside or she just came in.

24           Circumstantial evidence is to be believed the

25   same way as direct evidence.  Here is what

1    circumstantial is.  The witness walks in the room, comes

2    forward before you, her raincoat is soaked, her umbrella

3    is wet, her hair is wet and she never mentions it's

4    raining, you just look at her.  That's weird.  She

5    either got a shower in the hallway with her raincoat on

6    and an umbrella or she was outside in the rain.

7           The lawyers can argue from circumstantial

8    evidence.  Even though she didn't say it was raining, we

9    all know it was raining.  You just decide each piece of

10   evidence for its own merit, each piece of evidence on

11   its own merit, you got it.

12          You listen to a witness.  I'm going to give

13   you a little secret that I tell all jurors.  Many judges

14   don't.  What I like to see you do at times is make a

15   note of who the person is that is testifying, Mr. Jones,

16   because when you get back there later this week, you are

17   going to have a tough time remembering all these

18   witnesses, maybe.

19          So, maybe you write Mr. Jones, devilishly

20   handsome, auburn hair man, you write that there, and you

21   say, oh, I remember him or I remember that young lady,

22   she comes in, she works for Human Resources, she was

23   wearing a blue top, green eyes.  I remember her.

24   Because you are not going to remember, guys.  Even if

25   you are correct, you are going to remember.  You want to

1    keep something in your mind.  That is what is going to

2    tell you which way to come out.

3           It's like the old great Parker Brother game of

4    Clue.  You are going to get pieces of evidence and at

5    the end of the day, you have to come up with an answer.

6    If you don't remember what you have in your deck, it's

7    going to be awful hard to do that, and you are all sworn

8    to do that to the very best of your ability.  I want to

9    make sure you try to do that.

10          This is a civil case, I told you that.  It

11   involves whether some four gentlemen are entitled under

12   the law to overtime.  That depends on what their job

13   roles are and you will hear all about that.

14          The evidence here has to be established by a

15   preponderance of the evidence.  It's a fancy legal word.

16   All it really means is the person who is trying to

17   convince you of something has to show you by a

18   preponderance, 51/49 percent, that something is more

19   likely so than not so.

20          That's what preponderance means.  So, for the

21   plaintiff -- for the four plaintiffs, the employees,

22   each one of them must show you by a preponderance of

23   what they're saying is true.

24          The defense is going to come forward and say

25   it's not true and try to weigh on that.  We all know the

1    lady scale of justice.  That's exactly what it is, two

2    sides.  Each side puts pebbles of evidence on and you

3    see which way it comes out.  For you, you have four

4    different employees, you have to figure each one of

5    them, and the employer will have different issues.

6              So, I want you to keep out of your mind what

7    you heard on Law and Order.  This is not beyond a

8    reasonable doubt.  That's really because you are taking

9    away somebody's liberty, putting them in jail.  That's a

10   very high standard of proof.  This is preponderance,

11   51/49.

12             Now, a couple things very briefly.  These are

13   good lawyers.  We have been through this.  They know not

14   to do this, but there may be from time to time I have to

15   go to the side like I did with the jurors.

16             Don't take any moment from the fact I go to

17   the side to ask a question.  That's only so I don't get

18   something into evidence which I really shouldn't get.

19             The last thing you want to hear about in this

20   week of your jury service is something that has nothing

21   to do with the question.  We're wasting as much time as

22   we are with my talking.  I don't want to hear about a

23   football game or I don't want some witness to talk about

24   where they want to grade school.  It has nothing to do

25   with your decision.

1          So, what I do ahead of time is make sure we

2     focus our case on your decision.  I know your decision,

3     I know the questions you are going to be asked so I can

4     make sure the test is focused on your schooling.  Got

5     it.  I have to make sure we have given you the

6     information and only the information you need to make a

7     decision.

8          Here is how the trial works.  In a moment or

9     so the plaintiff is going to go forward.  The plaintiff

10    is the employees in this case.  They are going to come

11    forward and they are going to make an opening statement.

12    This is not evidence.  This is a roadmap, a preview.

13    You are going to a movie.  You are in a theater in some

14    sense, what Shakespeare called a theater, the biggest

15    theater in the world, a trial.

16         They are going to go over what is going to

17    happen in the next few days, what they think they can

18    prove to you.  You can take a note.  Oh, yeah, I

19    remember this.  Oh, yeah, there is going to be another

20    witness that talks about that, too, just like you see a

21    preview in the movie.  I see her.  Oh, yes, she is the

22    protagonist.  She is going to be back later on.

23         Then the defense gets to get up and tell you

24    their side of the story.  Remember, no decision is made.

25    The reason we don't let you talk about this is no

1    decision is made until after you hear all the evidence

2    and after I give you the law.

3            Now, some people say to me, jurors especially

4    say to me afterwards, Judge, why didn't you give us the

5    law ahead of time.  That would be a little bit like

6    telling you medicine before you have the illness.  You

7    would be thinking, Judge, I don't know what you are

8    talking about.

9            I don't want to waste your time talking about

10   things that have nothing to do with you to understand

11   them.  You need to hear the evidence, then you will have

12   a context but I think I told you enough.

13           You have to focus on whether these four

14   individuals are qualified to receive overtime under the

15   law.  That depends on what the job responsibilities are,

16   what they did.  I can't decide that.

17           The Framers told me I can't decide that unless

18   they tell me to.  They instead asked you to decide that.

19   So, that's where you keep your focus.

20           After the plaintiffs and defendant finish

21   their opening statements, we'll get some lunch and then

22   Madam Deputy will help you.  Again, make sure you tell

23   Madam Deputy, hey, how much we want to work here.  I

24   don't want to be here, meaning you, don't want to be

25   here longer than I have to.

1          Some of you are coming distances, I appreciate

2   that.  I'm coming a distance, too.  So, I understand.

3   So, if you wish to stay later to get things done, tell

4   me.  If you wish to come earlier because you are an

5   early riser, I'm willing to come early.  I'm right

6   across the street.  I'll do whatever you wish to do.

7          So, we are going to rise when you leave and

8   rise when you come in, including the judge because you

9   are now the judge.

10          Article III of the Constitution places that

11   authority in you.  Washington was so scared that he gave

12   his authority to men at that time, men to be judges that

13   he made us swear at the end of our oath, "so help me

14   God" because he thought it was scary that men were

15   sitting in judgment of other men, at that time men.

16          So, we rise for you.  We answer to you.  We

17   won't answer your questions during the trial but we'll

18   answer to you.  If you want to come in early, stay late,

19   we'll do whatever you wish to do.

20          The plaintiff will then present their case.

21   Then the defense will get to present their case.  There

22   will be cross-examination, which is absolutely

23   permitted.  I will run all that, and then you will hear

24   closing arguments at the end which is really argument.

25   It's really trying to persuade you and then I will give

1   you the law.

2          Then I'll give you the questions but before I

3   give you the law -- when I give you the law, I'll give

4   you the questions so you can follow along.

5          Can you imagine a test like that?  I give you

6   the questions and then I give you the answers except the

7   answers only you know because the answers only tell you

8   the parameters.  They don't tell you who is right or who

9   is wrong.

10          I don't know what happened here, ladies and

11   gentlemen.  I don't.  You and I are going to learn

12   together.  They know what happened.  I don't and you

13   don't.

14          So, I thank you again.  That completes my

15   preliminary instructions.

16          Now, I'm going to call upon the plaintiff to

17   present a brief opening statement.

18          MR. WARREN:  Thank you, Your Honor.

19          Good morning, ladies and gentlemen.

20          This is a case about whether blue collar

21   workers who spend their days operating large, industrial

22   cranes are entitled to overtime under federal law when

23   they work more than 40 hours in a workweek.  That's the

24   question that you will be asked to decide at the end of

25   this week.

```
 1              Now, your decision is being made a little
 2  easier in this case because the company's own Human
 3  Resources Department said the answer to that question is
 4  yes.  The company's own Human Resources Department has
 5  said these employees are entitled to overtime pay when
 6  they work more than 40 hours in a week, but the evidence
 7  this week will show that the company did not pay
 8  overtime to the crane operators when they worked more
 9  than 40 hours.  The company ignored its obligations
10  under federal law even though the Human Resource
11  Department was aware of its obligations.
12              My name is Zach Warren and together with my
13  colleagues Sam Davidoff and Michelle Hood, we represent
14  the four plaintiffs in this case.
15              You are going to hear from all three of us
16  over the course of the next few days, and the four
17  plaintiffs we represent are the gentlemen seated on the
18  bench over here (indicating).
19              On the end is Robert Pickel, next to him is
20  Jason Lett, next to him is Mike Burchik, and next to
21  Mike is Wayne Eddy.
22              Now, these four gentlemen worked as crane
23  operators for Oil States.  Crane operators, that was
24  their job title, that's what they were hired to do,
25  that's what they applied to, that's what they were told
```

1    they were doing.

2            We are going to show you some internal Human

3    Resources paperwork and company emails that described

4    these gentlemen as crane operators.

5            Their job was straightforward.  They operated

6    large, industrial cranes and they used these cranes to

7    lift massive steel pipes and valves, and they did this

8    work at natural gas fracking sites in the mountains of

9    Ohio, West Virginia, and throughout Pennsylvania.

10           During the trial, you'll hear each of these

11   four plaintiffs testify.  They're going to describe the

12   work they did and they will describe this work as manual

13   labor.

14           They rigged up heavy, industrial cranes and

15   then they used those cranes to lift these big valves and

16   these big pipes that were used as part of the fracking

17   process.

18           They spent their days sitting in the cab of

19   the crane operating the foot pedals and the hand

20   controls that make the crane rotate, that extend the

21   boom of the crane, that drop the block of the crane.

22   These are some crane terms that you are going to hear

23   over the next couple of days, and the plaintiffs will

24   explain to you what they mean.

25           Now, I said that Oil States does fracking

1   work.  Now, let's discuss what that means.  The evidence

2   will show a fracking site looks a lot like a large

3   construction site.  It's maybe the size of five football

4   fields stacked together.  It's dirty, it's greasy, there

5   is grime everywhere and it can get pretty loud.

6          You will see, the evidence will show there are

7   large trucks everywhere on these sites.  Some of these

8   trucks have massive jet engines on the back of them.

9   Those are the engines they use to pump down the fracking

10  fluid that they use to extract natural gas.

11         When these trucks are fired up, you'll see

12  that it can get pretty loud out there.  You can't hear

13  pretty much going on.

14         The fracking sites also have enough steel at

15  them to build an entire Navy.  Now, there's steel pipes

16  running in every direction.  It's a tangled knot of

17  steel, a spider's web of steel, tubing running

18  everywhere, and that's how they do the fracking work.

19         You'll see that there are work trucks

20  everywhere, cranes, box containers, aerial lifts, all

21  sorts of heavy equipment scattered around the wellsite.

22  It's not the kind of place where you show up to work in

23  a suit and tie.  They don't look like me.  They show up,

24  they wear thick, greasy coveralls to work, they wear

25  hard hats, gloves, safety goggles, work boots.  It's a

1    worksite, and you are going to see a lot of evidence

2    about what it looks like.

3            There can be anywhere from 20 to 80 people who

4    are working on a fracking site, and the person who runs

5    that operation you'll see is called the company man.

6            The company man works for a company called

7    Chevron, Shell, Range Resources, companies you may be

8    familiar with, and the company man represents that

9    company and he oversees this entire operation.  He is

10   essentially the general contractor at the wellsite.

11           Under the company man, you got a bunch of

12   different contractors.  Remember, I said the evidence

13   will show this looks like a construction site.  Just as

14   at a construction site you might have a few

15   electricians, you might have some plumbers, some

16   carpenters, some heavy equipment operators, the evidence

17   will show the same is true at a fracking site.

18           You also have laborers, you have engineers,

19   you have people operating equipment, but they're not

20   called plumbers and electricians.  They are called

21   wireline contractors, pressure control contractors,

22   through tubing contractors, flowback contractors.  These

23   are the types of contractors who work at a wellsite.

24           Now, I'm not going to make you sit through a

25   lesson on fracking because I'm definitely not the person

1  who is qualified to give you that lesson, but I do want

2  to go over briefly a couple of the main contractors that

3  are at these wellsites so you can picture what is going

4  on at the wellsite and so you can understand how the

5  crane operators fit into that operation.

6           One of the contractors is called the wireline

7  company.  The wireline work is done by a team of four to

8  eight people and they send a big metal tube about four

9  to eight feet long and that tube is called a gun or a

10 perforating gun and inside of that tube is packed a lot

11 of explosives.

12          They pump this gun down into the bottom of the

13 well.  These wells can be 15,000, 20,000 feet deep.

14 They send the gun all the way down into the bottom of

15 the well and they fire off explosives, and those

16 explosives create little cracks in the shale rock that

17 is surrounding the well.  This work is done in the

18 Marcellus Shale formation.

19          There is natural gas that is trapped in that

20 shale rock.  When they blow up these explosives, it

21 creates little fissures in that rock.

22          Now, like I said, it's about 15,000, 20,000

23 feet deep.  The evidence will show once they fire off

24 these explosives, this gun is attached to a long steel

25 cable, a very long steel cable and that's called a

1    wireline.  That's why the company is called the wireline

2    contractor.  They pump that gun in.  When they fire the

3    explosives, they pull the gun back out of the well.

4    That is step one of this process.  Okay.

5          Step two of the fracking process is called

6    fracking and it's the process of pumping liquids and

7    sand, a mixture, into a well at a very high pressure.

8    That's done by a different company, different

9    contractor.  That's the fracking company.

10          Now, these fluids are pumped down anywhere

11    between 8,000, 10,000, 12,000 pounds per square inch,

12    incredibly high pressure.  To give you some sense of

13    what that is like, it's about equal to the pressure at

14    the bottom of the ocean.

15          These fluids are pumped all the way down into

16    the very bottom of the well.  Remember those little

17    cracks that are created by the wireline gun, the fluids

18    get into those cracks and it's at such a high pressure

19    that it opens those cracks up a little bit more and then

20    as those cracks open up, the gas that is trapped in that

21    rock, they flow through the cracks into the well and get

22    pumped to the surface.

23          Okay.  So, that's what the wireline contractor

24    does and that's what the fracking contractor does.

25          Oil States, which is the defendant in this

1  company, they don't do either of those processes.  They

2  help with, as far as it's relevant in this case, they

3  help with one small aspect of that operation.  That's

4  called pressure control.

5         Pressure control basically means you got all

6  of these highly pressurized fluids that are inside of

7  the well and when you try to put the wireline in the top

8  of the well, those fluids want to come spewing out the

9  top.  The easy way to imagine this is if you take a

10 bottle of Coke and you shake it up as much as you

11 possibly can and then you decide, hey, I want to put a

12 straw in that bottle.

13        Now, if you take off the top of the bottle,

14 the Coke is going to go spraying everywhere, so you got

15 to figure out how to create a seal around that bottle of

16 Coke so that you can get the straw in.

17        That is what pressure control is.  Their job

18 is to creat a seal around the top of the well so that

19 when the wireline is being put into the well, you can

20 pump those explosives down, that all of the fluid that

21 has been pumped in the well doesn't come spraying out

22 the top.

23        Now, you'll hear a lot about and you'll see

24 pictures of this pressure control equipment.  It's

25 really big steel pipes 40, 80, 100 feet long, big steel

1    pipes with tubes inside of those pipes, and the way

2    pressure control works basically, the evidence will show

3    that grease is pumped through the tubes.  The thick

4    grease that is pumped through the tubes is at a very

5    high pressure.  It is pumped at a higher pressure than

6    the fluids in the well.

7            So, if the well is at 10,000 pounds per square

8    inch, the grease is pumped at 12,000 pounds per square

9    inch.  That grease creates a seal around the wireline as

10   the wireline is going into the well.  Basically that

11   grease seal prevents the fluids in the well from coming

12   out the top and spraying everywhere.

13           Now, the evidence will show there were

14   employees at the wellsite who worked for Oil States,

15   they are called field service supervisors.  Their job is

16   to operate this equipment that holds the pressure in the

17   well, the pressure control equipment.

18           You might hear the plaintiffs refer to them as

19   grease operators, pressure control operators.  It's all

20   the same position, grease operator, pressure control

21   operator, field service supervisor, they are the people

22   who operate this pressure control equipment.

23           Now, the plaintiffs are crane operators and

24   they were not at the job site to operate this pressure

25   control equipment but they were there to assist the

1   grease operator.

2          There is one grease operator at the wellsite,

3   he works for Oil States.  There is also one crane

4   operator at the wellsite.  The crane operator's job is

5   to hold the pressure control equipment on top of the

6   well.

7          So, you will recall I said the evidence will

8   show that this pressure control equipment is an 80-foot

9   long steel pipe and it basically attaches onto the top

10  of the well and it sticks straight up into the air while

11  the wireline crew is doing its work.  So, it has to be

12  held there somewhere and it has to get there somehow and

13  the only way you can get it there is with a crane.

14         The evidence will show these crane operators

15  would operate large, industrial cranes.  They would pick

16  up the pressure control equipment, move it over to the

17  well, set it on the well and wait while they did the

18  wireline work and they would pick it up, bring it over,

19  set it down and wait for the fracking work.  They would

20  do that on the same well over and over and over.

21         Now, you can imagine that this work can get

22  pretty repetitive and you are going to hear the

23  defendant's managers describe this work as pretty

24  repetitive.  You are going to hear the crane operators

25  describe this work as pretty repetitive. We are going to

1   show you some documents to maybe give you a sense as to

2   how repetitive this work will be.

3            When the crane operators were working at a

4   wellsite, they would keep a notepad and it kept track of

5   what kind of work they were doing at the well just so

6   they knew, they had some record of the activities they

7   were performing.

8            You'll hear these come in, in different forms,

9   you will hear different names for them.  Some are called

10  tally books, job logs, daily reports, but all of these

11  documents are a record of what you are doing every day

12  at the well.

13           We are going to show you some of these

14  documents.  You'll see it says arrive at the wellsite

15  5:30 in the morning, stab equipment onto the well 6:30

16  in morning, take equipment off the well 7:30 in the

17  morning, stab equipment on the well 10:30 in the

18  morning, and you'll see entries like this for a lot of

19  days and you'll get a sense of what the crane operators

20  are doing on these wellsites on a daily basis.

21           Now, a crane operator's job, these jobs at the

22  wellsites, they can last anywhere from one to four weeks

23  and sometimes it depends.  These wellsites, you'll hear

24  evidence, there are several wells at most of these

25  wellsites, sometimes one well, sometimes two, sometimes

 1   a whole lot more.  So, how long the job lasts depends on

 2   how many different wells are at that location.  So,

 3   that's why the jobs can last from one to four weeks,

 4   sometimes even longer.

 5         When the jobs are over, sometimes the crane

 6   operators would go straight to the next job.  They would

 7   get sent directly to the next well pad.  If they are in

 8   Ohio, they might be sent to West Virginia.  If they are

 9   in the mountains of Western Pennsylvania, they might get

10   sent to Ohio.

11         Sometimes there wasn't another job for them to

12   go on, so they would go back and work at the shop.  The

13   evidence will show when the crane operators were not

14   working on a wellsite, they were required to work in the

15   shop.

16         The shop is a garage.  It's located in

17   Canonsburg, Pennsylvania, down in Washington County, not

18   too far from here, and the shop, it looks like a Jiffy

19   Lube on steroids.  Its overhead cranes, wash bays, heavy

20   equipment everywhere, spare parts.  It's where the

21   company takes care of its equipment, maintains the

22   equipment between every job, where they store their

23   equipment.

24         The evidence will show when the crane

25   operators came back from a job, their first priority was

```
 1    to maintain the equipment that they were using, to take
 2    care of their cranes.  Right, like any company you can
 3    imagine Oil States wants their equipment to stay in good
 4    condition.
 5           When the crane operators come back from a job,
 6    these cranes are covered in dirt, they're covered in
 7    oil, they have been used for maybe several weeks in a
 8    row so they got to get the crane back in working
 9    condition.
10           The evidence will show they pressure washed
11    the crane, cleaned it out and got all the dirt out of
12    the cab of the crane, probably threw away a lot of
13    McDonald's bags and got the crane ready to go, and they
14    would have to grease up the different parts of the
15    crane, they would have to make sure there weren't any
16    mechanical issues, kick the tires, check the fluids, do
17    the kind of work you would expect to get a crane ready
18    for the next job.
19           They weren't rebuilding transmissions or
20    rebuilding the engine.  You'll see that type of work was
21    outsourced.  They were just doing basic work on the
22    crane.
23           Now it doesn't take days and days to do that
24    type of work on the crane.  They can get that done in
25    maybe a day.  So, the evidence will show when the crane
```

1   operators were working at the shop, they were also

2   assisting the pressure control operators, the field

3   service supervisors, they were helping them take care of

4   their equipment because that takes a lot more time.

5          So, all of these steel types and tubes and big

6   equipment that are coming back from the wellsite, that

7   all has to get completely broken down at every single

8   job.  That gets taken apart.  There are little seals in

9   that equipment called O-rings.  The O-rings have to get

10  cut out.  You have to get all the grease out of there,

11  you got to scrub the equipment down.  You got to find

12  whether there is any dings, any problems with the

13  equipment, and you got to fix that.

14         You usually repaint the equipment, you put in

15  new O-rings, you rebuild it, and you run pressure

16  through it to make sure it's going to be ready to go for

17  the next job.

18         That process took more time than taking care

19  of the crane.  So, the evidence will show when these

20  guys were working in the shop, they spent a lot of time

21  helping out the pressure control operators rebuilding

22  that equipment.

23         Now, you'll hear that this is kind of basic

24  quintessential manual labor, right.  These guy aren't

25  walking around the shop in a suit and tie.  They are

1    walking around the shop, they are in work clothes, they

2    got their work gloves on, getting in there, they are

3    using their hands, and they are getting dirty.

4            So, let me pause for one second because you

5    might be wondering why I spent so much time talking

6    about the work that these crane operators are doing.

7    This is an overtime case and I haven't yet mentioned

8    what their hours were or how much they got paid.

9            Whether an employee is entitled to overtime

10   pay under federal law depends in part on what job duties

11   they are performing.

12           You heard the judge tell you that a minute ago

13   and the judge is going to give you a lot more

14   information about that at the end of the week.  So, I'm

15   not going to discuss what the law is right now.

16           So, I'll tell you very generally what the law

17   says is that employees who perform kind of blue collar

18   manual labor, generally speaking they are entitled to

19   overtime pay; and employees who do kind of white collar

20   administrative, executive work, those type of employees

21   are generally exempt from overtime laws and not entitled

22   to overtime pay.

23           So, one of the questions you'll be asked to

24   decide at the end of this week is whether these crane

25   operators were doing blue collar manual work or whether

 1    they were doing executive, administrative, more white

 2    collar functions.

 3          Here is what the evidence is going to show on

 4    that point.  Of course, the crane operators weren't

 5    doing executive, administrative functions.  They are

 6    crane operators.  Their job was to operate the cranes.

 7    They are spending their days at wellsites, picking up

 8    pressure control equipment and putting it on the well,

 9    taking it off, doing work in the shop.  That's the type

10    of work that these guys were doing.

11          They weren't interviewing job applicants.

12    They weren't hiring people.  They weren't sitting at a

13    desk.  They didn't have a computer or printer.  They are

14    not doing spreadsheets.  They are not filling out the

15    company's taxes.  They are not doing the kind of back

16    office work that you would imagine a more white collar

17    employee might do.

18          These guys are working on the garage floor

19    using their hands, doing that kind of manual labor.

20          Now, the evidence is going to show that the

21    crane operator is the lowest person on the totem pole at

22    the company.  If you picture an organizational chart at

23    the company, they're at the bottom of the organizational

24    chart.

25          So, let's talk about what that organizational

1    chart will look like over the course of this week.  Oil

2    States is a Texas company and they divide their

3    operations into different regions around the country.

4    The Canonsburg shop where these folks work, that's in

5    the northeast region.  That covers all of Pennsylvania

6    and West Virginia.  There is a northeast regional

7    manager who is in charge of that region.  He is in

8    charge of strategy.  The evidence will show he is making

9    big decisions about running the company, whether to buy

10   new equipment, whether to hire certain types of

11   employees, those type of decisions.

12            Under him is a district manager.  The district

13   manager is in charge of the Canonsburg shop.  That is

14   his domain, his fiefdom, and he oversees everything

15   that's going on there.

16            If the regional manager decides whether to

17   hire someone, the district manager is the person who is

18   doing the hiring.  He is running operations.  He is

19   overseeing all of the different people who are working

20   at the Canonsburg shop.

21            Underneath him is an assistant manager.  The

22   assistant manager is the district manager's right hand

23   man.  He is helping out with these administrative tasks.

24   He is supervising people.  He is doing a lot of the

25   administrative supervisory tasks that the district

1    manager doesn't have time to do.

2            So, you got a regional manager, a district

3    manager, and an assistant manager.

4            Under the assistant manager at the relevant

5    time, you had a field service manager.  The field

6    service manager was the person who oversaw people like

7    the crane operators, the field employees on a day-to-day

8    basis.

9            The field service manager would travel to the

10   wellsite, travel to these gas wells, and he would make

11   sure everything is running smoothly, he would make sure

12   the equipment was operating properly.

13           If something happened in a wellsite, the crane

14   operators would call that guy and say here is what is

15   going on, can you come out and tell me what you want me

16   to do.  He is the fourth level of supervision at the

17   Canonsburg shop.

18           Under the field service manager, you got

19   another layer.  There is an operation supervisor.  They

20   are called dispatchers.  The operation supervisors, when

21   one of Oil States' customers, Shell, Chevron, those type

22   of companies, when they want to hire Oil States, they

23   call the company and say hey, we're going to frack this

24   well in Ohio in two weeks, we would like Oil States to

25   do pressure control work, can you give me a crane, crane

1   operator, and some pressure control equipment.

2           Those calls go into the operation supervisors

3   and they're the people who make the decision about which

4   crane operator is going to go on which job, which crane

5   will be used on which job.  They are kind of dealing

6   with logistical issues.

7           So, you got the regional manager, the district

8   manager, the assistant manager, the field service

9   manager, and the operations supervisor.

10          At the bottom of this chart you got a crane

11  operator.  Crane operator, the evidence will show, he is

12  not -- no one is reporting to him.  No one is coming to

13  him and saying can you sign off on my hours.  He is not

14  directing the work of anyone.  He is not telling anyone

15  else what to do.  He is the guy that goes and does the

16  work.

17          There are all these other people doing

18  executive and administrative tasks.  The crane operator

19  is the guy, when Oil States gets hired to do a job, he

20  gets sent out and he operates the crane.  He is not

21  overseeing anyone's work and you are going to hear a lot

22  of evidence about that this week.

23          Let me take a second and talk about the

24  vehicles that the plaintiffs use to do their work.  Now,

25  you might wonder why I would possibly want to sit here

1    and talk about the trucks they use.

2            Strangely enough, one of the issues in this

3    case is whether the plaintiffs, whether the crane

4    operators were using work trucks for their work.

5            Now, the evidence is going to show, and I

6    don't think anyone is going to dispute this, that each

7    of these four crane operators had an assigned company

8    pickup truck.  Like you would imagine a construction

9    worker might have a company truck, these crane operators

10   had a company truck.

11           Three of them had a Ford F-150, lightweight

12   truck.  One of them had a Ford F-250.  These are all

13   pretty small, standard work trucks.  The evidence will

14   show they used these trucks to do their work.  They used

15   these trucks to carry the chains and slings and

16   screwdrivers and hammers and wrenches, the stuff they

17   needed to operate a crane at a wellsite.

18           They drove these trucks to and from the

19   wellsites.  They used these trucks to go buy parts.

20   They used these trucks -- when you park a crane at a

21   wellsite, once it's parked, you can't just get it out of

22   there, you have to bring the fuel to the crane.  So,

23   they had a spare diesel tank in their pickup trunk.

24   They would go fill up that diesel tank and bring the

25   diesel to the worksite and every couple of days, they

1    would refill the crane, typical work truck.

2           You are also going to hear evidence that the

3    plaintiffs typically stayed in hotels when they were

4    working on these jobs.  These jobs, like I said, they

5    can be off in the mountains of Ohio, West Virginia,

6    remote parts of Pennsylvania.  They are not close enough

7    to be driving home every day, especially when you are

8    working a 12-hour shift every single day.

9           So, they would typically work and they would

10   typically spend their nights at whatever the closest

11   motel was.  The evidence will show these are remote

12   places, they are not close to cities or towns, so the

13   nearest hotel oftentimes was 45 minutes or an hour away,

14   and they would use their work trucks to get from the

15   work site to the hotel and back every single night.

16          So, over the course of the next couple of days

17   you are going to hear from the crane operators and they

18   are going to tell you about the different kind of tricks

19   that they used their work trucks to do.  I just want you

20   to think as you are listening to that evidence, whether

21   those are work duties, whether they are performing work

22   when they are using those trucks.

23          Okay.  Hopefully, I have given you some

24   overview of what the evidence will show about the

25   plaintiffs' job duties, now let me talk a little bit

1  about their compensation structure.

2        The compensation that the crane operators

3  received, it varied from year to year, person to person,

4  but generally speaking, during the relevant time

5  periods, these crane operators received total

6  compensation of between $90,000 and $120,000 a year.  In

7  busier years, it could be a little bit higher but it was

8  generally in the relevant time period around $100,000 a

9  year.

10        Now, there were two components to that pay.

11  First, there was a salary.  Now, the evidence will show

12  that the salary is a fixed salary.  It's a salary that

13  you might imagine what a salary is.  It didn't vary from

14  month to month or from week to week, it was the same

15  salary every single two weeks.  That's how often they

16  got paid.

17        The evidence will show they didn't get more

18  salary when they worked 60 hours versus 40 hours, they

19  didn't get more salary when they worked 80 hours or 100

20  hours.  The salary was the same no matter how many hours

21  they worked.

22        The other component of their pay was something

23  called a job bonus.  A job bonus basically means if the

24  company charges Shell or Chevron for one day of renting

25  the crane, the crane operators got paid a cut of that.

1    They got paid a bonus based on the work that had been

2    done.

3            You're going to hear the amount of the job

4    bonus, it varied depending on the size of the crane

5    you're operating but generally speaking, it was about

6    $450 per day for the smaller crane and about $480 for a

7    larger 100-, 110-ton crane.

8            Now, the plaintiffs don't deny they received

9    these job bonuses.  In fact, when they testify, they are

10   going to tell you all about the job bonuses, but the

11   evidence is going to show these job bonuses were not

12   overtime payments.  They didn't get a higher job bonus

13   when they worked 80 hours.  The amount of the job bonus,

14   like I said, it was always $450 to $480 depending on the

15   type of crane you operated.

16           So, the crane operators never received time

17   and a half overtime when they worked more than 40 hours

18   a week.

19           Here's the thing.  The evidence will show Oil

20   States knew it was supposed to be paying overtime

21   instead of these job bonuses.

22           The company knew that it was required to treat

23   the crane operators as nonexempt employees.  It knew

24   that when they worked more than 40 hours in a week, it

25   had to be paying them time and a half overtime.

1           The evidence will show that Oil States

2    disregarded these obligations.  The company decided it

3    would stick with its own pay system even if that system

4    violated federal labor laws.  You are going to see a lot

5    of evidence of this.

6           Let me describe what it is.  You are going to

7    see the videotaped testimony of a fellow named Terry

8    Woodall.  Mr. Woodall was under oath when he gave this

9    testimony.

10          In that testimony you'll see Mr. Woodall

11   describe that he is the vice president of Human

12   Resources for Oil States.  He is the head of all HR for

13   the company, overseeing all of the regions, all of the

14   districts.

15          Mr. Woodall is going to tell you the type of

16   work the crane operators did, picking up a valve or a

17   stack, putting it on the well, setting it down, picking

18   it up, taking it off, setting it down.  You will hear

19   him say that type of work is nonexempt work, meaning the

20   employees are entitled to receive overtime under federal

21   law.

22          You will also hear Mr. Woodall say he was the

23   final person, he made the decision of which employees

24   were entitled to overtime.  No one us at Oil States was

25   allowed to overrule him if he decided an employee should

1    get overtime.  You'll hear him say that these crane

2    operators were supposed to be getting overtime.

3            It's not just Mr. Woodall you are going to

4    hear from, you'll also see the videotaped testimony of

5    Jill Curry.  Jill Curry had Mr. Woodall's job before he

6    did.  She was the vice president of Human Resources for

7    the whole company from about April of 2011 until July of

8    2013.

9            Ms. Curry is going to tell you the same thing

10   that Mr. Woodall did.  She was there when all four of

11   these crane operators were there, and she is going to

12   tell you that it was her understanding that the crane

13   operators were getting paid overtime.  She is going to

14   tell you it was her understanding that these were

15   nonexempt employees and that if the Human Resources

16   Department decided an employee should be getting paid

17   overtime, no one had the authority to overrule her on

18   that point.

19           Okay.  The third piece of evidence you are

20   going to see on this is a job description for the crane

21   operator job position, the job these four gentlemen did.

22   You are going to see at the top of this job description

23   there is a box describing what the job is when it was

24   created.  One of those boxes says FLSA status.

25           Now, the evidence will show the FLSA -- that's

1    the federal labor law -- so the evidence will show that

2    this box says essentially does this employee -- are they

3    entitled to overtime under federal law.

4            You will see on this job description it

5    describes the crane operator job as a nonexempt

6    position.  You will hear evidence nonexempt means -- you

7    heard the judge say there are exemptions involved in

8    this case.  If you are nonexempt, the evidence will show

9    you are entitled to overtime.

10           You will see a job description that says the

11   crane operators were nonexempt employees who were

12   entitled to overtime compensation.  Okay.

13           You are going to hear from Mr. Woodall, you

14   are going to hear from Ms. Curry and see the job

15   description, all of which says, hey, crane operators

16   need to be getting paid time and a half overtime.

17           That's going to be the most important evidence

18   you might hear all week is that evidence.  The company

19   knew what it was doing and decided to do something else.

20           So, the next thing, the last thing I want to

21   discuss is the hours that these crane operators were

22   working at the wellsites.

23           Between 2012 and 2015, that's the time period

24   we're focused on in this case, between 2012 and 2015,

25   the crane operators worked something called a 30 and 10

schedule.  A 30 and 10 schedule means you work for 30

straight days and then you get ten days off.  You don't

have a standard five-day workweek.  You work 30 straight

days and then ten days off.

During those 30 days on, the evidence will

show that the crane operators worked incredibly long

hours.  Now, their hours varied from year to year, even

month to month because the evidence will show that

business slowed dramatically towards the end of 2014 and

early 2015 as the oil price decreased.  So, you'll see

the crane operators generally were working fewer hours

during that time period.

During all of these periods, all of 2012,

2013, 2014, the evidence will show the crane operators

are working extremely long hours.

We're going to show you some documents that

show Mr. Pickel, for example, worked four or five

straight 24-hour shifts nonstop, wasn't allowed to leave

the wellsite, had to be ready to work all the time.

Mr. Pickel will tell you that he could catch

an hour or two of sleep here and there but that he

couldn't go to sleep because at any time the company man

can bang on his window and say it's time to go.

Now the evidence is going to show that these

fracking operations, they are 24-hour jobs, 24/7

1    fracking work is going on.  Normally, the operators,

2    they worked 12-hour shifts.  They would split it up.

3    They would be in teams of two and someone had the

4    dayshift and someone had the nightshift.  They were

5    working 12-hour shift, 12-hour shift, 12-hour shift, but

6    sometimes, as I said, they didn't have relief and so

7    they would just work the entire 24-hour shift.

8              You're going to see evidence that Mike

9    Burchik, for example, the third gentleman in,

10   Mr. Burchik had a stretch in early 2013 when he worked

11   42 out of 43 days at a wellsite, averaging 12 hours a

12   day for 42 out of 43 days.  That's not even the worst.

13   I will show you documents that show Mike Burchik later

14   in 2013 worked 70 out of 72 straight days at a wellsite,

15   average of 12-hour shifts each of those days, sleeping

16   in a hotel, didn't get to see his wife, didn't get to go

17   home, working that entire time.

18             Now, during the ten days off, the crane

19   operators could watch football, they could hang out with

20   their kids, they could do what they wanted to do.  They

21   would do what you and I might do on a weekend.

22             The evidence will show they didn't get to

23   always take their days off.  I just described a

24   situation where Mr. Burchik had to work 42 out of 43

25   days.  Another time Mr. Burchik worked 70 out of 72

1    days.  If you missed your days off, you didn't get to

2    make them up when that job ended.  If you worked through

3    the days off, you would work straight into the next 30

4    days on.

5              So, you can work 30 days on, you work through

6    your days off and you're back to 30 days on, 70 days in

7    a row of work and then maybe you would get the next days

8    off.

9              Now, these crane operators, a couple of them

10   tried to take their days off so they could get home to

11   see their families.  Some of them preferred the money

12   and they wanted to work through the days off.

13             The plaintiffs will be the first to tell you

14   they weren't always complaining about the long hours,

15   sometimes they were, sometimes they weren't, but the

16   evidence will show that they were working on these

17   wellsites an average of 12 hours for days and days and

18   days on end.

19             Now, these work hours are important to this

20   case because aside from the question of whether the

21   crane operators should get overtime, if you decide they

22   should have been paid overtime, as their Human Resources

23   Department said they should have, you will be asked to

24   decide how much overtime they should be paid.

25             At the end of the week, the judge is going to

1    explain how you calculate overtime in a case like this,

2    but basically overtime is based on the number of

3    overtime hours you work.

4          So, one of the things we are going to present

5    to you this week is evidence about the number of

6    overtime hours that each of these plaintiffs worked.

7          Now, that's going to be a little difficult

8    because the evidence will show that Oil States didn't

9    use a time clock.  These guys didn't punch in and punch

10   out when they showed up at the shop, they didn't punch

11   in punch or punch out when they went to the wellsite, so

12   figuring out their overtime hours is not as easy as

13   printing a spreadsheet or printing a time report, adding

14   it up and saying here you go, I worked a thousand

15   overtime hours.

16         So, the evidence will show the plaintiffs have

17   done their best to piece together their overtime hours

18   from a lot of different documents.

19         Remember I said they kept that notepad in

20   their back pocket where they described what kind of work

21   they were doing, and so the plaintiffs will tell you

22   that they have gone through these notebooks and tried to

23   figure out how many hours they worked at the wellsites

24   when they were there and the hours in the shop.

25         The other point, they also had other

1  documents, they had job logs, other documents that the

2  company kept that showed how many days they were working

3  at the wellsites.

4          So, the plaintiffs will tell you they have

5  done their best to kind of figure out and come up with

6  their best estimate of the overtime hours they worked.

7          Now, the plaintiffs also used these documents

8  to come up with an estimate of the hours they worked in

9  the shop and there aren't a lot of documents showing

10 their shop hours because the company generally didn't

11 keep any records of the hours they worked in the shop.

12         They'll tell you they tried to estimate based

13 on the length of a typical shift at the shop, they tried

14 to come up with their best estimate of their shop hours.

15         This has been made a little more difficult

16 because the crane operators, these plaintiffs, they

17 don't have all of these documents.  They turned most of

18 these into Oil States while they worked there and they

19 didn't keep copies of them.

20         So, they have taken what they received from

21 Oil States and have taken what they have themselves, and

22 to the extent they kept any notes, they tried to figure

23 out what their hours were.  You will see evidence for

24 some periods the plaintiffs don't have documents showing

25 what their hours were and no one does.

1            So, the documents that the plaintiffs filled

2    out, the documents the plaintiffs used to keep records

3    of their hours, they don't have those documents anymore.

4            So, the plaintiffs are going to describe for

5    you how they tried to come up with an estimate of their

6    work hours during those time periods when they don't

7    have documents.  They are going to describe for you the

8    process they went through, why they reasoned through it,

9    why they made certain decisions about, well, I think I

10   worked this many hours on this day because of X and they

11   are going to explain that process for you.

12           Now, you are going to see the plaintiffs get

13   attacked for these estimates.  You are going to see the

14   plaintiffs questioned over how accurate these estimates

15   are, whether they are reliable.

16           You are going to see, I believe, the evidence

17   is going to show you the plaintiffs have done their best

18   with the information that's available to them.  They may

19   not be perfect.  The plaintiffs will be the first people

20   to tell you the estimates they came up with aren't

21   perfect.  The plaintiffs are going to tell you they

22   think they're accurate.  If anything, they think they

23   are conservative.  They tried to give the benefit of the

24   doubt to the company because they didn't want to come in

25   here and have you think they were trying to gouge the

1    company.

2              So, they are going to tell you that there was

3    some doubt about whether I was working that day, I tried

4    to give the benefit of the doubt to the company.

5              I believe the evidence at the end of the week,

6    the evidence is going to show that these estimates, they

7    are reliable.  They are pretty accurate.  They were done

8    in good faith.  If anything, they might be a little bit

9    conservative.

10             At the end of this week, I'm going to have an

11   opportunity to come back and talk to you again as Judge

12   Kearney said.  At that time, we'll talk about the

13   specific amount of overtime pay that these crane

14   operators are owed under federal law.

15             We'll talk in more detail about the federal

16   overtime laws and how they apply to the work that these

17   plaintiffs did.

18             I will ask you whether I lived up to the

19   promises that I made to you today.  I'll ask you whether

20   the evidence actually shows what I said it was going to

21   show.

22             Until then, I ask you to please listen closely

23   to the evidence.  Please listen closely to the

24   witnesses, listen to their testimony, look at the

25   documents, look at the evidence we present to you over

1    the next week.

2              I ask you when you listen to these four guys

3    testify, ask whether you think they are honest,

4    hard-working blue collar workers, make that decision for

5    yourself.

6              I ask you to pay attention to the witnesses

7    that Oil States puts on, pay attention to the documents

8    they put on and make your assessment of those documents.

9              I'll ask you to pay attention to whether the

10   company explains why it ignored the Human Resources

11   Department's determination that these crane operators

12   were entitled to overtime.

13             At the end of this week, I'm going to come

14   back to you and I'm going to ask you to award overtime

15   pay to Mike, to Wayne, to Jason, and to Robert for the

16   overtime hours they worked.

17             Thank you very much for indulging me and for

18   listening to me this morning.

19             Thank you very much for serving this

20   incredibly important function.

21             THE COURT:  Thank you.

22             Counsel for the defense, do you wish to

23   provide a statement?

24             MR. DAVIS:  Yes, Your Honor.  I'll need to use

25   the easel as part of my opening.

1                    THE COURT:  Have they seen what you are going

2       to show?

3                    MR. DAVIS:  I was going to draw something.

4                    THE COURT:  No, you're not.

5                    MR. DAVIS:  Okay.

6                    Good morning, ladies and gentlemen.

7                    Again, I'm Bill Davis and I'm here with Adam

8       Fowler who is the manager of the Canonsburg location.

9                    You're going to hear from him about how what's

10      just been described to you is not entirely true.  Adam

11      is a good person to do it because he grew up in the oil

12      field.  He started working in the oil field when he was

13      18 years old in the same job that these guys did and

14      actually worked right alongside them.

15                   He knows a lot about this type of business, a

16      lot about the pay plan and knows what was the right pay

17      plan for this job.

18                   Let me tell you, first, what the case is not

19      about and I think we are all in agreement.  It's not

20      about a situation where somebody was promised some

21      money, promised some pay and didn't get it.

22                   Everyone agrees that when each of these

23      gentlemen came to work for Oil States, they came because

24      of the pay plan.  It was a salary pay plan with very big

25      job bonuses.  They were paid all their salary that they

1   were promised and they were paid every single job bonus

2   they were promised.

3          That salary was paid to them whether they were

4   working or not.  For their ten days off, they got the

5   salary.  When things are slow in the oil fields and

6   there is no work, they get their salary; but the big

7   thing they wanted was this job bonus, $450 for a 12-hour

8   shift but you don't actually have to work the full 12

9   hours, you could be out there as little as five hours

10  and you get the $450.

11         What matters was, was the customer happy with

12  the pressure control services that was performed.  If

13  you could get it done in five hours, you got the $450

14  hour bonus.

15         There was a mention of 24-hour shift.  People

16  didn't actually have to work 24 hours but if they did

17  two shifts, whether they were working or not, they got

18  double the bonus, so as much as $900 for being out there

19  at the wellsite.  That was what they wanted.  That's

20  what they were promised, and that's what they were paid.

21         Now, the one thing Mr. Warren said that really

22  bothered me was saying these guys were low man on the

23  totem pole, and I'll tell you when you hear from Adam,

24  he's going to tell you that's just not true because he

25  worked right alongside them and did that job, and you

1    are not low man on the totem pole because what they are

2    doing out there and what Oil States states is pressure

3    control.

4              Mr. Warren did a good job of describing that

5    but he left out some things.  So, first of all, the

6    customer is someone who has drilled a well and they

7    found some gas down there and through pretty cool

8    technology, they drill down and they bend a bit and make

9    it go into that gas formation but they put in a pipe and

10   the pipe is sealed.

11             When they blow those holes in the pipe, you

12   got as much as 15,000 pounds per square inch of

13   flammable stuff wanting to get out.

14             The only psi I deal with is my car tires.  You

15   put in about 35 psi.  This is 500 times that amount of

16   pressure with flammable stuff getting out.

17             What Oil States sells and what the customer

18   wants is really talented people out there who can

19   control that pressure while this wireline goes down in

20   there and blows holes with explosive in the pipes so the

21   gas can come up.

22             They don't want a low man on the totem pole,

23   they want people who are really good at what they did,

24   and these gentlemen were really good at what they did.

25             Now, let's talk about their job for a minute.

1   They were not the type of crane operators like you would

2   see -- the only cranes I see, I see the big ones down

3   town that are like this (indicating) building stuff.

4   That's not the type of crane.

5          I see the ones that come from Home Depot that

6   have a little arm on them and they pick up a pallet of

7   shingles sort of over here (indicating), not a big deal.

8          These cranes are part of the pressure control

9   operation with very precise computers in them, and as

10  far as manual labor, they have a joy stick and buttons

11  and they extend out 100 feet, at far distances in a

12  dynamic environment where there is a lot of stuff going

13  on.

14         A crane operator for this type of job, No. 1,

15  has to go out there and assess the site.  There are

16  multiple wells that they have to stab this pressure

17  control equipment on that is very tight tolerances.  It

18  is so precise and very difficult it's not something you

19  want a low man on the totem pole crane operator doing,

20  but they're part of a bigger team.  It's a two-man team

21  but it's a team.

22         Now, in addition to this crane that goes out

23  there that has to be very precise, very accurate and

24  move very heavy things from different wells, there is

25  also what they call a grease machine.

1          Now, in the oil patch, I don't know if anybody
2    knows people in the oil patch, they talk in slang.  This
3    machine is a grease injection machine that people just
4    call it the grease.
5          The people who work out there have formal
6    titles.  They are called field service supervisors.
7    When you are going and selling pressure control to a
8    customer, you want to say we are sending our field
9    service supervisor out there, but the slang they have
10   names for each other.
11         Some people call the guy who runs the grease
12   injection the greaser, the grease man.  They call the
13   people who operate the crane the crane operators, but
14   what Oil States is selling and what they're doing out
15   there is for pressure control and the formal title is
16   field service supervisor.
17         When Mr. Warren talks about Human Resources
18   saying, oh, these guys are exempt, well, Human Resources
19   views it just like what the company is selling.  We are
20   selling very important pressure control services and if
21   you get it wrong and this stuff gets out of the ground
22   at 15,000 psi, you can end up with a situation like you
23   saw out there on the Deepwater Horizon.
24         Now, to try to get you to the point of saying,
25   you know what, they should have gotten overtime despite

 1    their $100,000 a year plus compensation, and Mr. Pickel,

 2    I think he was the highest paid, he was over $150,000 a

 3    year one year, what they want to do is reach back in

 4    time to a law that was written in 1938 when things were

 5    a lot different, low pay, people not getting paid what

 6    they were promised, and they want to make this job, a

 7    hundred-thousand-dollar-a-year-plus job sound like

 8    manual labor and sound like low man on the totem pole,

 9    and it was not.

10           We are going to walk you through all of the

11    stuff they do that's not manual labor.  They have job

12    safety meetings, they do a lot of paperwork, and when

13    they're operating the crane, it's a joy stick, it's

14    buttons, and it's a computer doing very precise work.

15    That's not manual labor.

16           Now, in addition, when you only have two

17    people out there on the site and one is operating the

18    machine that is monitoring the pressure and you have to

19    keep making adjustments because what is down in the

20    ground is unpredictable, as we saw with Deepwater

21    Horizon, people think they know what is going on there

22    but they don't, they have to be involved in monitoring

23    this pressure control.

24           If the guy who is operating the pressure

25    control machine has to go to the restroom, has to go do

1    something, the crane operator steps in.  They don't just

2    sit in the crane and say, wow, that's looking like it's

3    about to blow up but I just operate the crane.  They're

4    part of these teams that goes out there.

5              So, listen carefully to the testimony and as

6    you're listening to it, say why were they paid over

7    $100,000 a year.  The reason was Oil States believed

8    that they were part of this professional team going out

9    there, doing the work that Oil States sold to its

10   customers and that's why they were paid that much money.

11             The good news is this 1938 law was updated not

12   long ago and you'll hear about what's called the highly

13   compensated exemption.  Some of you may have heard about

14   it.  It's where you make over $100,000 a year.

15             The judge will instruct you on the law, what

16   it says, but what you'll hear Mr. Fowler and others say

17   that their understanding was if you make over a hundred

18   thousand dollars a year, that's a good indicator that

19   you are doing a thinking job because we are paying you

20   to do something important and think.

21             You don't need to spend a lot of time looking

22   at the details of the job, but the details of the job

23   here are fine.  There is enough of it that is nonmanual.

24   Yeah, sometimes they have to get out there and connect

25   pipes or help connect things or clean the machinery in

1    the shop.  Sometimes they have to do that but their pay

2    takes care of that because they are highly compensated.

3            With respect to the trucks, some of you -- I

4    think someone who came up said they know a little bit

5    about truck drivers and their pay and you can pay them

6    on different pay plans like by the mile, by the load,

7    and it takes care of getting them paid enough money to

8    where they're fairly compensated.  You don't have to

9    include an overtime piece in that because the pay plan

10   makes sense.

11           If someone is driving a lot of miles, they

12   make a lot of money; if they're hauling big loads, they

13   make a lot of money so you don't have to include

14   overtime in there.

15           Well, there is no dispute that Oil States

16   qualifies as a motor carrier, no dispute at all.

17           There is no dispute that a lot of times when

18   they take the cranes or other equipment out there, these

19   guys drive them, and when you are driving heavy

20   equipment in big trucks across state lines, you can use

21   one of these alternative pay plans like Oil States has

22   here.  It doesn't need to include an overtime component.

23           The creative way they are trying to get around

24   that, just like they are going to describe this as

25   manual labor, low man on the totem pole, is to say, hey,

1    hold on a minute.  I agree if I'm driving a big truck

2    that you have to wrestle down the highway, I wouldn't

3    need to get the overtime but when you put me in an F-150

4    that you can drive like this, it blows the exemption so

5    I should get overtime for that.

6              The bottom line on that one is what were they

7    hired to do.  Were they hired -- and they were given

8    these pickup trucks, and Oil States paid for the gas.

9    They could take them home on their days off.  I believe

10   Mr. Eddy lived about 120 miles out.  He drove back and

11   forth, and Oil States paid for his gas because Oil

12   State's view was these were commuting vehicles.  It was

13   a nice perq for the job because they really wanted to

14   keep these guys and gave them this nice perq and now,

15   they are trying to use this perq against the company and

16   say, you know what, if I had to drive my own car back

17   and forth to work, we still would get motor carrier, but

18   since you gave me this pickup truck, my recollection is

19   that was my job to drive the pickup truck and it wasn't.

20   That is not why they paid them so much money.

21              So, listen carefully to that.  It is creative

22   but we don't think it makes them entitled to overtime

23   pay.

24              Mr. Warren mentioned hours.  We don't think

25   it's necessary to get to the hours question in this case

because they were salaried and they agreed to the salary
pay plan that paid them all their salary plus a big job
bonus, but if you do, we're going to take issue with
this notion that because there is no records, they can
go out the deep end in estimating.

There is a very good record out there which
you'll see of how long they were spending working, where
they were working, and whether they were really working
these long stretches with no time off.

In about March of 2014, the company with their
knowledge installed GPS trackers in all of these trucks
and these GPS trackers tell you exactly what time the
truck was turned on, how long it was driven, when it
stopped, where it stopped, and how long it was there.

Although they claim they weren't provided with
those records, they've had them for over a year and a
half.  They just don't want to talk about them because
what these records will show is what I told you early
on, sometimes they would get to the wellsite and nothing
is happening, so they would leave and they would still
get their job bonus.

Sometimes they would get to the wellsite and
they would be there five hours and they would be gone
and get their job bonus.

Sometimes they would be there a lot longer

1   because things go wrong at the wellsite and it will show

2   you they were there a lot longer but that will tell you

3   they weren't working.

4           The most troubling one is when they gave us

5   estimates, they included 12, 12, 12, 12 for several days

6   when their truck was sitting at their home and the GPS

7   shows that.  They also added time for weekends and

8   holidays when the shop was closed.

9           So, we know from the tracking that they

10  weren't at the wellsite, they weren't at the shop, and

11  the GPS says they were either at home or the truck was

12  somewhere else.

13          You know, nobody is criticizing them for using

14  the truck on their days off to go to a restaurant or

15  things like that.  That was fine.  That was one of the

16  perqs and they did it and the tracking will show that.

17          So, if you have to get to the hours question,

18  pay attention carefully to the evidence because we think

19  they really overestimated here.

20          The last one you will have to be deciding is

21  willful, and Mr. Warren mentioned that.  When they say

22  "willful" or "intentionally violating the law," they are

23  going after Adam Fowler, and he really takes offense to

24  that because he worked side by side with these guys and

25  he'll tell you he made more money than he's ever made in

1    his life working side by side with them.

2              In fact, when he got promoted, he took a pay

3    cut.  That's how good this pay plan is.  He never

4    thought either when he was working that that pay plan

5    violated some law.  He loved it.  He made a lot of

6    money.

7              He never thought when he was a manager that

8    the pay plan violated the law because he knew the pay

9    plan, he knew what you did to get it and he, too, felt

10   like these guys, you know, we're happy to pay them that

11   much money because they are good at what they do, and

12   they go out and they perform a professional job and they

13   give us more business and he is happy.

14             He takes issue that there is a notion of an

15   intentional willful violation of the law and he'll tell

16   you about that.

17             So, we believe that -- they get to go first.

18   You'll have to wait to hear from our witnesses but you

19   will hear from Adam Fowler and you will hear from his

20   manager who also believes Adam did the right thing in

21   paying these people like they did.

22             We believe at the end of the testimony, you

23   will find that this is a case about a deal is a deal.

24   You come to work, you agree to the pay plan, it's a good

25   pay plan, it pays you for all your hours worked and it

1    does, in fact, fit within these overtime exemptions.

2            Thank you.

3            THE COURT:  Thank you counsel for your brief

4    statement.

5            Ladies and gentlemen, we're going to take

6    lunch now to a little bit after one o'clock.  Let the

7    deputy know if you need more time or less time.  We'll

8    be hear for you.  We're planning on starting at one

9    o'clock.

10           When we come back, the plaintiff will call

11   their piece of evidence.  Let's stand adjourned to the

12   call of the jury to approximately one o'clock.

13           THE DEPUTY CLERK:  All rise for the jury.

14            (Whereupon, a luncheon recess was taken.)

15   (Afternoon session.  In open court, jury present.)

16           THE COURT:  Thank you.  Please be seated.

17           Ladies and gentlemen, we are now beginning the

18   evidence in the case.

19           I want to give you a couple stipulations.

20   These are facts that the parties have agreed upon.  This

21   is evidence.  You are looking towards the witness box

22   and me, so I'm going to give you a couple pieces of

23   evidence.

24           First, these about the four plaintiffs.

25           Plaintiff Michael Burchik was an employee of

 1   defendant Oil States Energy Services, LLC., between

 2   April 22, 2012 and February 6, 2015.

 3          Plaintiff Wayne Eddy was an employee of Oil

 4   States Energy Services, LLC., between April 22, 2012 and

 5   February 18, 2015.

 6          Plaintiff Jason Lett was an employee of

 7   defendant Oil States Energy Services, LLC., between

 8   April 22, 2012 and July 24, 2013.

 9          Plaintiff Robert was an employee of defendant

10   Oil States Energy Services, LLC., between April 22, 2012

11   and September 9, 2013.

12          Throughout their employment with Oil States

13   Energy Services, LLC., these plaintiffs were engaged in

14   commerce and the defendant Oil States Energy Services,

15   LLC., was an enterprise engaged in commerce.

16          Defendant Oil States Energy Services is

17   covered by and within the meaning of the Fair Labor

18   Standards Act, which is the law I will explain to you

19   later.

20          That is the, if I'm correct, counsel,

21   Plaintiff, from your stipulations, that completes the

22   stipulations for purposes of fact for my stipulation, is

23   that correct?

24          MR. WARREN:  Yes, Your Honor.  Thank you.

25          THE COURT:  If the plaintiff -- I think I

```
 1   incorporated, Defendant, your stipulation as part of the
 2   last section?
 3              MR. DAVIS:  Yes.
 4              THE COURT:  Plaintiff, will you produce your
 5   first piece of witness.
 6              MR. WARREN:  Thank you, Your Honor.
 7              The plaintiff would call Michael Burchik.
 8              THE DEPUTY CLERK:  Sir, please raise your
 9   right hand.
10              MICHAEL BURCHIK, one of the plaintiffs herein,
11   having been duly sworn, testified as follows:
12              THE DEPUTY CLERK:  Please be seated and state
13   and spell your name for the record.  Speak right into
14   the microphone.
15              THE WITNESS:  Michael Alan Burchik,
16   M-i-c-h-a-e-l, B-u-r-c-h-i-k.
17              THE COURT:  You may proceed, counsel.
18              MR. WARREN:  Thank you, Your Honor.
19                        DIRECT EXAMINATION
20   BY MR. WARREN:
21   Q.   Good afternoon, Mike.
22   A.   Good afternoon.
23   Q.   Could you please tell the jurors where you live?
24   A.   I live in Claysville, Pennsylvania.
25   Q.   Where are you originally from?
```

Michael Burchik - Direct

1    A.    Canonsburg, Pennsylvania.

2    Q.    Are you married, Mike?

3    A.    Yes, sir.

4    Q.    How long have you been married?

5    A.    46, 47 years or so.

6    Q.    How did you spend most of your career?

7    A.    I worked on and off in the oil field for five

8    years -- for five years I worked in the oil and gas

9    field and prior to that, I worked down the street at

10   Angelo's Landscaping Company.

11   Q.    How did you begin your career?

12   A.    In Oil State?

13   Q.    No.  In your early career, how did you spend most

14   of your career?

15   A.    I was in the military September of '91.

16   Q.    Have you ever worked for Oil States?

17   A.    No, sir, I haven't.

18   Q.    And you said you have not worked for Oil States?

19   A.    Not before this time, no.

20   Q.    Have you worked for Oil States at some point in

21   your life?

22   A.    Yes, sir.

23   Q.    What was the general time period you worked for Oil

24   States?

25   A.    February 2010 to February 2015.

Michael Burchik - Direct

1    Q.   When you were working for Oil States, what location

2    were you working out of?

3    A.   I worked in the Canonsburg shop.

4    Q.   In case the jurors aren't familiar with where

5    Canonsburg is, can you say where that is?

6    A.   It's about 20, 25 miles south of Pittsburgh.

7    Q.   Did you apply to work at Oil States?

8    A.   Yes, sir, I did.

9    Q.   And did you submit a written application?

10   A.   Yes, sir, I did.

11   Q.   At the time that you applied to work at Oil States,

12   were you working for any other company?

13   A.   Yes.  I was working for Angelo's Supply.

14   Q.   Just give the ladies and gentlemen of the jury a

15   brief overview of the type of work you were doing at

16   Angelo's?

17   A.   I worked in the supply yard, I run heavy equipment,

18   loader, I run a dump truck, forklift, skid steer.  More

19   or less loaded vehicles and I also worked in the office

20   part time.

21   Q.   How did you come to learn about Oil States?

22   A.   Oil States actually was right down the street from

23   Angelo's and they had a job application in the

24   newspaper, which I applied to.

25   Q.   Do you recall which job that they were advertising

Michael Burchik - Direct

1    in that newspaper?

2    A.   They were advertising for crane operators.

3    Q.   You said you filled out a job application for Oil

4    States?

5    A.   Yes, sir, I did.

6    Q.   How long after you saw that newspaper ad did you

7    fill out a job application?

8    A.   I believe it was within a week.

9    Q.   I'm going to ask you to turn in the binder that is

10   in front of you, turn to Tab No. 1.

11          Before you get into too much detail, identify

12   what this document is.

13   A.   Driver application for employment.

14   Q.   Did you fill out that document yourself?

15   A.   Yes, sir, I did.

16          THE COURT:  You may publish.

17          MR. WARREN:  Thank you, Your Honor.

18   Q.   When you filled out this application, did you

19   submit it to Oil States?

20   A.   Yes, sir, I did.

21          MR. WARREN:  I'm going to ask Milly to scroll

22   to Page 2 of this application.

23   Q.   When you filled out this application, does the

24   application reflect the job position you are applying

25   for, for Oil States?

Michael Burchik - Direct

1   A.   Yes, sir, it does.

2   Q.   If you look up at the top, it says, position

3   applied for.  What position is listed on that

4   application?

5   A.   It says crane operator.

6   Q.   Is that, in fact, the job position that you applied

7   for?

8   A.   Yes, sir, it was.

9   Q.   On the last page of the job application, if you

10  could scroll through it.

11       At the bottom of the page, it's a little

12  small, Milly might zoom in toward the bottom.  It says,

13  list special equipment or technical materials you can

14  work with.  Do you see that?

15  A.   Yes, sir.

16  Q.   What did you write in that blank?

17  A.   Straight truck, which was a dump truck.

18  Q.   Had you, in fact, operated a dump truck before?

19  A.   Yes, sir, I did.

20  Q.   I'm going to show -- do you see that arrow there?

21  A.   Yes.

22  Q.   Do you see that blank whether you had operated that

23  certain types of equipment before you applied to work at

24  Oil States?

25  A.   Yes.

1   Q.   What did you write in that spot?

2   A.   Forklift, backhoe, and skid-steer.

3   Q.   Just briefly in case there are some members of the

4   jury who are not familiar with what those things are,

5   can you describe what that equipment is?

6   A.   Basically a forklift is a machine that's used to

7   pick up and move certain types of equipment with forks

8   and there are some different leverages to adjust the

9   height.

10          Backhoe has a front loader bucket used by a

11  hydraulic system and it has a digging hoe on the back of

12  it and it's operated by using levers in order to dig.

13          And the skid-steer is basically a small

14  bucket-type vehicle with a very small turning radius

15  used -- commonly used to load and unload vehicles.

16  Q.   Where had you operated that type of machinery

17  before?

18  A.   At Angelo's -- not only Angelo's but I had worked

19  for a paving company in previous years that I did.

20          MR. WARREN:  Milly, you can take that down.

21  Q.   Mike, I ask you to turn to the second tab in your

22  binder.  Can you just briefly identify what this

23  document is.

24  A.   It's a document requesting information from your

25  previous employer.

Michael Burchik - Direct

1    Q.   Did you fill this out yourself?

2    A.   The top half of the document I did.

3             MR. WARREN:  May I publish, Your Honor?

4             THE COURT:  Please.

5    Q.   If you look in the center of this document, I'll

6    ask Milly to scroll in, do you see the line where I put

7    that arrow, Mike?

8    A.   Yes, sir.

9    Q.   Can you just read for the jurors what that says.

10   A.   It says, above-named individual has made

11   application to this company for a position as crane

12   operator.

13   Q.   Was that, in fact, the position you applied for at

14   Oil States?

15   A.   Yes, sir, it was.

16            MR. WARREN:  Thanks, Milly.  You can take that

17   down.

18   Q.   Mike, when you submitted this application, did you

19   interview with anyone at Oil States?

20   A.   Yes, sir, I did, a supervisor.

21   Q.   Do you recall his name?

22   A.   Wayne Yates.

23   Q.   During your interview with Mr. Yates, did you

24   discuss the work you would be doing at Oil States?

25   A.   Yes, sir.  He in a nutshell described it as picking

Michael Burchik - Direct

1    up valves, setting them aside and kind of repetition in

2    operation.

3    Q.   Did he tell you what type of equipment you would be

4    operating at Oil States?

5    A.   Yes.  He showed me a picture of a crane I would be

6    using.

7    Q.   During that conversation with Mr. Yates, did the

8    subject of pressure control equipment come up?

9    A.   No, sir, it did not.

10   Q.   Did Mr. Yates happen to say anything to you about

11   whether the company would train you on operating

12   pressure control equipment?

13   A.   No, he did not.

14   Q.   At the end of that job interview, did Mr. Yates

15   offer you a position at the company?

16   A.   Yes.

17   Q.   What position did he offer you?

18   A.   Crane operator's position.

19   Q.   And what was your understanding of what your job

20   title was at Oil States?

21   A.   Crane operator.

22   Q.   When you applied to work at Oil States, had you

23   ever worked as a crane operator before?

24   A.   No, sir, I had not.

25   Q.   Had you ever operated a crane?

Michael Burchik - Direct

1  A.   Small little jib crane.

2  Q.   Describe for the ladies and gentlemen of the jury

3  what a jib crane is?

4  A.   A jib crane is just basically an overhead crane

5  that is tethered, remote buttons electrically activate a

6  hook.

7  Q.   Shortly after that interview, did you start working

8  at Oil States?

9  A.   Yes, sir, I started work that Monday morning.

10  Q.   When you first started working at Oil States, for

11  the first few months of your employment, what type of

12  work were you doing?

13  A.   I basically worked in a shop where I was learning

14  the different types of valves within the oil and gas

15  field.

16  Q.   Who was teaching you about the different types of

17  valves?

18  A.   They had the frack people that actually worked with

19  the valves on a daily basis.  They basically tore them

20  down, rebuild them, and send them back out to the field.

21  Q.   What kind of things were they showing you while you

22  were working in the shop?

23  A.   Basically how to tear down, how they work, the

24  different rings, the inside that has to be changed, the

25  gate that showed if it needed repaired or what have you.

Michael Burchik - Direct

1    Q.    When you first started working at Oil States, how

2    much time did you spend in the shop learning how to use

3    this equipment?

4    A.    Approximately two or three weeks.  I'm really not

5    sure at this time.

6    Q.    Once you had finished that process, can you explain

7    to the jurors what you started doing?

8    A.    Basically they had me drive in a boom truck which

9    is a crane truck.

10   Q.    Could you just describe for the jurors what a boom

11   truck looks like?

12   A.    A boom truck, it was a flatbed truck with tandem

13   wheels or triaxial wheels with a tad axle and it had a

14   small crane on the back of it that's used to pick up

15   equipment.

16   Q.    Had you ever operated a boom truck before?

17   A.    No, sir, I have not.

18   Q.    Did anyone teach you how to use that boom truck?

19   A.    Yes, sir.  We had a previous gentleman.  He lost

20   his license and he showed me how to operate it.

21   Q.    Do you happen to remember his name?

22   A.    Only his street name.

23   Q.    What was his street name?

24   A.    Gator.  I didn't know his real name.

25   Q.    How long did Gator spend teaching you how to

Michael Burchik - Direct

1  operate a boom truck?

2  A.   Well, it was fairly simple.  It's only a couple

3  levers.   He operated -- it's more or less you have to

4  get into the manufacturer's book to study the different

5  loads you can pick up at certain distances, and I

6  probably did it for about 30, 40 minutes before I could

7  operate it.

8  Q.   Were you able to operate the boom truck after 30 or

9  40 minutes?

10  A.   Yes, sir.  It was fairly easy.

11  Q.   Once you started operating the boom truck, can you

12  tell the jurors what you were doing with the boom truck?

13  A.   Basically, my job was to pick up valves which were

14  commonly referred to as frack stack.  They would be on

15  skids.  I would pick it up and put it on the flatbed.

16          I normally carried two of them and would drive

17  to a location and I would set them on a well and they

18  would be bolted to the wellhead.

19  Q.   I'm going to ask you if you could in your binder

20  turn to Tab 68.  Could you briefly identify what is

21  shown in that document?

22  A.   It's a picture of a well pad with three, looks like

23  three wellheads and a crane off into the distance.

24  Q.   Is this a fair and accurate representation of the

25  type of scene you were working at for Oil States?

Michael Burchik - Direct

```
 1   A.   Yes, sir, it is.
 2             MR. WARREN:  May I publish that, Your Honor?
 3             THE COURT:  Yes.
 4   Q.   So, just to give the jurors a sense of what this
 5   equipment is, can you go through and if you touch the
 6   screen, it will actually put a pointer on there.
 7             Can you identify for the jurors what this
 8   different equipment is.
 9   A.   These are the different frack stacks.  This is one,
10   this is two, this is three (indicating).  They are
11   already assembled and right up here (indicating), the
12   crane had just set a BOP on top of that third frack
13   stack.
14   Q.   And the frack stacks, are these the valves you were
15   talking about a minute ago?
16   A.   They are referred to as valves, yes.
17   Q.   Is this the equipment that you were bringing to the
18   wellsite with the boom truck?
19   A.   Exactly.
20   Q.   So, describe what you would use that boom truck to
21   do with these frack stacks?
22   A.   Well, when I would bring them with the boom truck,
23   all of this equipment would not be there.  It would be
24   just completely vacant and I would actually take this
25   from the boom truck itself and set it on there and the
```

Michael Burchik - Direct

1   laborers would bolt it down.

2   Q.   How long were you using the boom truck to bring

3   frack stacks to the wellsites?

4   A.   I think I did that about two years.

5   Q.   At some point did you begin operating larger cranes

6   at Oil States?

7   A.   Yes, sir.  I believe it was the first Part of 2012.

8   Q.   And how did it come about that you started

9   operating these larger cranes?

10  A.   I received my certification in the latter part of

11  2011 and we had moved to a new building right down the

12  street and when we moved to the new building, I started

13  using the bigger crane.

14  Q.   Let's talk about that certification.  What did you

15  have to do to obtain that certification?

16  A.   Well, actually, they had a cram course.  They had

17  an instructor hired from I believe a school in

18  California that he come to our location and we went to

19  the local hotel, we had a conference room, and he give

20  us block instructions for a week.

21          We would go to our parking lot and do OJT

22  training, on-the-job training with the crane we would be

23  using.

24  Q.   How long were you in that classroom part of that

25  certification?

**Michael Burchik - Direct**

1   A.   That was only five days.

2   Q.   How long did you spend in the parking lot doing the

3   on-the-job training?

4   A.   I believe it was two or three days.  I'm really not

5   sure now.

6   Q.   Was there some sort of test at the end of that?

7   A.   Well, he give his little test but after he felt we

8   was qualified, we had to go to somewhere in Pittsburgh

9   for the state qualification test.

10  Q.   Did you take that Pittsburgh qualification test?

11  A.   Yes, I did.

12  Q.   Did you pass that test?

13  A.   Yes, sir.

14  Q.   Once you obtained that certification, what type of

15  cranes were you operating at Oil States?

16  A.   I was operating -- well, at that time we had 30-ton

17  and 40-ton.  That's what I started out with and then

18  later, we got a 45-ton and 50 tons that I operated.

19  Q.   What kind of work were you doing with the 30-ton

20  cranes?

21  A.   I would basically pick up those frack stacks and

22  set them on the well as part of the job and then if they

23  were going to frack the well, we would actually work

24  hand in glove with the wireline people to put the

25  appropriate equipment on the well so they could shoot

Michael Burchik - Direct

1   holes in the Marcellus and then they would frack it.

2   Q.   You said you were at various times operating 30-,

3   40-, 45-, 50-ton cranes.  Had you ever operated any

4   crane like that before?

5   A.   No, sir, I did not.

6   Q.   How did you learn to use that crane?

7   A.   Through my individual crane training.

8   Q.   Once you finished that class, did you have the

9   information you needed to operate a crane?

10  A.   Yes, sir, I did.

11  Q.   Once you received that crane training, how, if at

12  all, did your job duties at Oil States change?

13  A.   Well, basically after I was assigned a work truck,

14  the cranes were hot shotted out to a wellsite.  That was

15  a designated driver.  He would take the crane to the

16  site and once the crane was there, I would set it up and

17  we would do what we had to do on the well.

18  Q.   We'll talk about that process in a minute.

19            Once you took that certification class and you

20  started operating these larger cranes, how, if at all,

21  did your job title at Oil States change?

22  A.   It did not change at all.

23  Q.   When you were operating these larger cranes, what

24  was your job title at Oil States?

25  A.   Crane operator.

Michael Burchik - Direct

1   Q.   Did your manager refer to you with that job title?

2   A.   Yes.

3   Q.   While you worked at Oil States, did anyone in

4   management ever refer to you as a field service

5   supervisor?

6   A.   No.

7   Q.   Did anyone refer to you as a grease operator or

8   pressure control operator?

9   A.   No, sir.

10   Q.   Before we described for the jury, before I had you

11   describe how you operate a crane.  When you worked at

12   Oil States, did you work with the three other plaintiffs

13   in this case?

14   A.   Yes, sir, I did.

15   Q.   Where would you work with them?

16   A.   Various positions throughout Pennsylvania, Ohio,

17   and West Virginia.

18   Q.   When you were working with Wayne and Robert and

19   Jason, how did the job duties that they were performing

20   compare to the job duties you were performing?

21   A.   Basically it was all the same.

22   Q.   When you worked at Oil States, what was your

23   understanding of their job titles?

24   A.   They were crane operators.

25   Q.   Did you hear management refer to them as a

**Michael Burchik - Direct**

1    particular title?

2    A.    Other than crane operators, no.

3    Q.    So, when you are operating a crane, where are you

4    seated?

5    A.    Basically, depending on the size crane I used, I

6    would be so many feet off the well that we was going to

7    work on and that would be determined by the company man.

8    Q.    And we'll get to that in a second.

9            Is there -- do these cranes have like a

10   control center on them?

11   A.    Yes, sir.    There is a cab at the very back of the

12   crane.

13   Q.    That's called a cab?

14   A.    Cab.

15   Q.    And if you could, when you are sitting in the

16   crane, in the cab of the crane, what type of controls

17   are you using to operate the crane?

18   A.    Normally, it's a joy stick and feet pedal.

19   Q.    I'm going to ask you to turn in your binder to the

20   very back, to 163.    Can you briefly identify what is

21   shown in that document?

22   A.    That's a joy stick inside a crane cab.

23   Q.    Is that a fair and accurate representation of the

24   type of joy stick that was in the cranes you operated?

25   A.    Yes, sir, it's similar.

Michael Burchik - Direct

1   Q.   Could you just flip quickly to the next tab and

2   identify what is shown in that photograph?

3   A.   That's also a joy stick on the right side of the

4   cab itself.

5   Q.   Is that also a fair and accurate representation of

6   the joy stick in the crane?

7   A.   Yes, sir, it is.

8            MR. WARREN:  Your Honor, may I publish those?

9            THE COURT:  Yes.

10  Q.   Mike, if you would for the ladies and gentlemen of

11  the jury, just go through and again identify what is

12  shown in those photographs?

13  A.   This stick right here (indicating) on the left side

14  of the cab, it would control the left and right movement

15  of the cab itself and also, this particular one would

16  control the auxiliary line, which is the smaller block

17  on the crane.

18            The other one, the right-hand side one, that

19  would be your boom up and down.  That's the stick

20  (indicating) and it would also be controlled by the

21  rocker switch, the main block, that's the bigger block

22  of the two.

23  Q.   A couple of times you used the term "block."  Can

24  you describe for the jurors what the block is?

25  A.   That's basically your whole -- what you are picking

Michael Burchik - Direct

1   up the equipment with.

2   Q.   What about those red buttons at the top, what do

3   they do?

4   A.   Rocker switch.  Normally, they would control the up

5   and down of the block itself.

6   Q.   In the background of these photographs it looks

7   like there is some pedals.  Were there pedals in the

8   cranes you operated?

9   A.   Yes, sir.  That particular pedal is a swing brake.

10  Q.   Describe for the ladies and gentlemen of the jury

11  what that does?

12  A.   Once you depress that pedal, it would lock the

13  crane from going left to right.  If you want to stay in

14  a certain position, you lock it in.

15  Q.   Was there also a pedal on the right side?

16  A.   Depending on which side of the crane.  Normally,

17  they had a foot, a throttle plus a throttle on the

18  dashboard.

19  Q.   Describe for the jurors, if you would, what those

20  pedals do?

21  A.   The throttle -- once you pick up a load, you want

22  full throttle.  You can depress the pedal to a high RPM

23  or on the dashboard you can just pull it out and lock it

24  into a position where you don't have to fool with it no

25  more.

**Michael Burchik - Direct**

1   Q.   You testified earlier that you -- before you

2   started working at Oil States, you operated skid-steers,

3   bulldozers, and different types of equipment.

4          Can you describe for the jurors how the

5   operation of that equipment compared to operating a

6   crane?

7   A.   Basically, a backhoe might be a little bit more

8   complicated as far as operation but the principle is the

9   same, up, down, left, and right.

10  Q.   What about the skid-steer, how did that compare?

11  A.   The skid-steer has basically two laterals which it

12  turns real tight turns.  Pulled to the right, you turn

13  right.  Pull to the left, make a turn left.  You got

14  foot pedals with the bucket up and down.

15  Q.   What did those controls in a skid-steer look like

16  as compared to the controls on a crane?

17  A.   They're basically the same depending on the type of

18  machine.  Sometimes they're longer, sometimes they're

19  smaller but they're basically the same.

20          MR. WARREN:  You can take that down.

21  Q.   Mike, can you tell the jurors what type of cranes

22  you were operating?

23  A.   I normally operated the 45-ton or 50-ton crane,

24  National.

25  Q.   It was a National Crane?

Michael Burchik - Direct

1   A.   National Crane.

2   Q.   Could you turn to Tab 93 of that binder.  Briefly

3   identify what that document is.

4   A.   That right there is a 45-ton National Crane.

5   Q.   Could you identify what the document is.

6   A.   This is a Manitowoc National Crane Production

7   Guide.  It's a guide that's put out by the manufacturer

8   for that particular crane.

9   Q.   Is that the type of crane you operated when you

10  worked at Oil States?

11  A.   Yes, sir, it is.

12  Q.   Would you use this document when you worked at Oil

13  States?

14  A.   Yes, sir, I did.

15           MR. WARREN:  Your Honor, may I publish that?

16           THE COURT:  Yes.

17  Q.   Did you also refer to this as a crane manual?

18  A.   Yes, sir.

19  Q.   Would you have this crane manual with you at the

20  wellsites?

21  A.   Yes, sir.  It comes furnished with the crane

22  itself.

23  Q.   How often would you use the crane manual when you

24  worked at a wellsite?

25  A.   We used it on a daily basis.

Michael Burchik - Direct

1  Q.   So, now that the jurors are able to see a

2  photograph on here, could you just go through and

3  identify the different parts of these cranes.

4  A.   That is your boom, the stick, the boom

5  (indicating), this is your main wench (indicating).

6  This don't have the secondary wench on it.  This is the

7  front stabilizer (indicating).  These are outriggers

8  (indicating), there are four of them, two on each side.

9          So, basically what you want to do is unhook

10  the boom, raise the crane off the ground like

11  approximately an inch to level it out and inside the

12  crane you normally have a level or outside the crane you

13  have a lever, also.

14  Q.   And can you point out in the photograph where you

15  would be seated when you were operating the crane?

16  A.   I would be in the crab itself which would be right

17  there (indicating).

18          MR. WARREN:  Milly, could you go through to

19  Bates Stamp 02450.

20  Q.   Mike, can you identify what this diagram is?

21  A.   That's a chart that's in the crane manual.  It

22  gives you the working range of your boom.  This

23  particular one has a jib sight on it but it will tell

24  you what distance your boom is out, what radius that

25  you'll have, and it will correspond to what another

1    document which would tell you the weight you can pick

2    up.

3    Q.   Would you use this range chart at the wellsites?

4    A.   Yes, sir, I would.

5    Q.   In what circumstances?

6    A.   Normally, when you are setting up the crane and you

7    are determining the equipment that has to be picked up,

8    but normally, it's fairly a tight spot we are working in

9    but yes, you would refer to that.

10         MR. WARREN:  Milly, if you could go to the

11   next page, please.

12   Q.   Mike, can you identify what this is for the jurors?

13   A.   That's a load chart.  It tells you the distance,

14   the feet from the well.  Well, that's the 25-foot there.

15   It will tell you if that radius and if your boom like

16   it's at a certain angle, it tells you the weight you can

17   pick up.  That's all in the computer in the crane

18   itself.  That gives you a general idea if you are so

19   many feet off the well what you can lift up.

20   Q.   Would you use these load charts when you worked at

21   the wellsites?

22   A.   Yes, we would but just to check our data because

23   normally they become kind of basic to you after awhile.

24         MR. WARREN:  Milly, go back to 020442, please.

25   Q.   Mike, could you describe -- there is an image in

Michael Burchik - Direct

1    the bottom right-hand side of that picture.  Can you

2    identify what is shown in that photograph?

3    A.   That is the picture of the computer that's inside

4    the cab.  It's on the right-hand side of your cab.

5    Q.   Is this similar to the computer that was in the

6    cranes you operated at Oil States?

7    A.   Yes, sir, it is.

8    Q.   Let's see if we can look at a larger photograph.

9    Can you go to Exhibit 161 in your binder, Mike.  Can you

10   identify what is shown in the document marked Exhibit

11   61?

12   A.   It has a computer screen itself plus some buttons

13   underneath.

14   Q.   Let me just interrupt you quickly before you go

15   into too much detail.  Is that a picture of a crane

16   computer?

17   A.   Yes, sir.

18   Q.   Is that a fair and accurate representation of the

19   computers that were in your cranes?

20   A.   Yes, sir, it is.

21            THE COURT:  You may publish.

22   Q.   Point out and show the jurors what that is a

23   photograph of.

24   A.   This is a computer screen itself (indicating).

25   Once you set up the crane, you would punch in these

Michael Burchik - Direct

1    buttons and it would bring up the type of crane you're

2    using.

3              Basically, it tells you if you got a two,

4    three, four part line, if your outriggers are all the

5    way extended, and all you got to do is push the button

6    to identify the crane that is being used.

7    Q.   Who programs that information -- so, you said you

8    plug information into the crane?

9    A.   Yes, sir.

10   Q.   What are you plugging in?

11   A.   The data that specifies the crane you're actually

12   using.  You're actually scrolling through to identify

13   the crane that is being used.

14   Q.   So, you are just finding the make and model?

15   A.   That's basically it.

16   Q.   Okay.  Once you program the make and model into the

17   computer, what happens?

18   A.   The computer will tell you at a certain distance,

19   at 100 feet, you could pick up 20,000 pounds and what

20   distance you can do that at.

21   Q.   The computer, those calculations it's making, do

22   you program the data into the computer so that it can

23   make those calculations?

24   A.   No, sir.  That's programmed from the manufacturer.

25   So, everything for that particular crane is in the

Michael Burchik - Direct

1    computer.  All you got to do is read and understand the

2    buttons.

3    Q.   Were you ever involved in determining what the

4    capabilities of these cranes were?

5    A.   No, sir.  That's all the manufacturer.

6    Q.   If the crane is being operated beyond its capacity,

7    what happens?

8    A.   Well, basically it will just shut off like this

9    three wrap right there, if that red light comes on, that

10   means you got too much rope out and it tells you that

11   you are on your third wrap and you can't go anymore.  It

12   will sound an alarm.

13          If you go to pick up the weight in excess of

14   the chart itself, it will automatically cut off.

15   Q.   And, again, are you involved in programming those

16   limitations into the computer?

17   A.   No, sir.  That's all done by the manufacturer.

18          MR. WARREN:  Milly, you can take that down,

19   please.

20   Q.   Mike, can I ask you to turn to the document marked

21   Tab 94 of your binder.

22   A.   I have a 93, not 94.

23   Q.   Don't worry about it.  Now that we had you explain

24   the inside of the crane cab, I would like to talk about

25   what you are actually doing when you get to the

**Michael Burchik - Direct**

1   wellsites.

2           So, when you get to a wellsite at the

3   beginning of the job, what is the first thing you have

4   to do.

5   A.   I would basically pull into the wellsite, the

6   company man would designate what well was going to be

7   worked on, be it multiple wells or a single well.  Then

8   I would spot the crane on that particular well.

9   Q.   Let's go through that in pieces.  First, you used

10  the term "company man."  Can you tell the jurors who the

11  company man is?

12  A.   The company man is a designated representative of

13  the oil services that is going to drill the well itself.

14  He's in charge and responsible for the overall

15  operations of the wellsite.

16  Q.   The company man, would he be an employee of Oil

17  States?

18  A.   No, sir.  He is a separate contractor.

19  Q.   What was his position at the wellsite as compared

20  to your position?

21  A.   He was in charge of the overall supervision and my

22  operation of the crane would be to set up the crane and

23  operate it within the safety boundaries of the

24  manufacturer's book.

25  Q.   Okay.  So, you said, I believe, when you showed up

Michael Burchik - Direct

1   at the wellsite, you would get together with the company

2   man?

3   A.   Yes, sir.   Normally, the company man and the

4   wireline supervisor engineer.

5   Q.   What goes on in that conversation?

6   A.   We basically determined where the equipment is

7   going to set, how the operations are going to be

8   conducted, and certain radiuses of the crane and the

9   wireline.

10  Q.   What information would the company man give you?

11  A.   He would just basically tell us what well we was

12  going to work on.

13  Q.   Once you got that information from the company man,

14  what would you do?

15  A.   Basically, I would spot the crane and depending on

16  what type of crane I would use, that would determine how

17  far off the well I would be, the different radiuses to

18  the wireline for picking the equipment up and setting it

19  on the well itself.

20  Q.   And that process, how would you figure out what the

21  proper distance was?

22  A.   Basically find the type of crane you are using.

23  It's normally the same but you have the manufacturer's

24  book to tell you the different feet from the well and

25  the boom angle that you are allowed to use.

Michael Burchik - Direct

1    Q.   All right.  Then once you got the crane parked in
2    the right spot, what do you do next?
3    A.   We basically start unloading the greasers equipment
4    and assemble.
5    Q.   Would you have to do anything to get the crane
6    ready to operate?
7    A.   As far as punching in all my data, no.  That's
8    basically it.
9    Q.   Okay.  What about those outriggers, at what point
10   do they get set up?
11   A.   When we are spotting the crane, that's basically
12   when I do all that, I would level the crane off, get off
13   my distance.  Once I calculated all that, that's when we
14   start unloading.
15   Q.   How long does it take you to get the crane spotted?
16   A.   10, 15 minutes.
17   Q.   Okay.  Once the crane is spotted, what is the next
18   thing that happens?
19   A.   We would then proceed to unload the pressure
20   control equipment, the various other equipment used to
21   work on the well.
22   Q.   Where is that equipment located when you arrive at
23   the wellsite?
24   A.   It's normally pulled out by a separate trailer.  It
25   has a gooseneck trailer with a cover on it and it's

Michael Burchik - Direct

 1  strapped down.
 2  Q.   Between 2012 and 2015, were you responsible for
 3  bringing these grease trailers to the wellsite?
 4  A.   No, sir.  They normally stand out by the driver,
 5  the designated driver normally referred to as hotshot
 6  driver.
 7  Q.   Who is the employer of that hotshot driver?
 8  A.   Oil States.
 9  Q.   If you could turn in your binder to the document
10  marked as Exhibit 51, please.
11         Before you get into too much detail, can you
12  identify what is shown in that photograph?
13  A.   This is a picture of the equipment sent out to a
14  wellsite that we are going to use to frack a well.
15         MR. WARREN:  Your Honor, may I publish?
16         THE COURT:  Yes.
17  Q.   So, in this photograph, what is all this equipment
18  sitting on?
19  A.   This is a gooseneck trailer, covered trailer which
20  the cover is pulled back all the way to the back.
21  Q.   Is that the type of trailers Oil States used to
22  bring this equipment out?
23  A.   Yes, sir, it is.
24  Q.   If you could go through for the ladies and
25  gentlemen of the jury and before you go through each

**Michael Burchik - Direct**

1    piece of equipment, generally speaking, what type of

2    equipment is this?

3    A.    Pressure control equipment.

4    Q.    And if you could go through and just identify the

5    different pieces of machinery that are sitting on that

6    trailer.

7    A.    This is the machine itself, it has a variety of

8    hoses rolled up on it (indicating).  It's used to

9    actually control the pressure of the equipment itself.

10   Sometimes we will let it sit on the trailer or sit it

11   down on the ground beside it.

12            This is a grease tote (indicating).  It's the

13   grease that's used to -- for the pressure control, and

14   these are lube incarcerators, these long tubes

15   (indicating).  There is -- depending on how many guns

16   are being used which determines the length of the tube

17   itself.

18            This is BOP (indicating) that's going to be

19   used to sit on top of the well.

20            Here is a grease trap (indicating) and there

21   is a grease head (indicating).  Those are items that are

22   set on top of the well itself.  The grease head itself

23   actually has small tubes in it which controls the grease

24   in the tube that actually controls the pressure of the

25   well.

**Michael Burchik - Direct**

1          This right here (indicating) is torque

2    wrenches that are used if need be to torque the valves

3    down to the well.

4    Q.   You used the term "BOP."  What does that stand for?

5    A.   I'm not sure what the technical term is.  It's the

6    valve that is used to control the guns going down into

7    the well and it has certain gates inside where the

8    greaser controls, opens up and closes for the guns to go

9    down.

10   Q.   Who is operating this equipment at the wellsite?

11   A.   It is the greaser at the control of the unit.

12   Q.   Is the greaser the same person as the grease

13   operator, pressure control operator?

14   A.   Yes, grease operator.

15   Q.   While you worked at Oil States, did you ever work

16   as a greaser?

17   A.   No, sir, I did not.

18   Q.   Were you ever responsible for operating this

19   equipment?

20   A.   No, sir.  I might have watched the equipment while

21   he left to go to the bathroom or something like that.

22   All I do is hit the emergency shutoff.  That's about it.

23   Q.   Were you ever trained on how to use this equipment?

24   A.   No, sir, I was not.

25   Q.   Okay.  So once this equipment arrives at the

Michael Burchik - Direct

1   wellsite and it's sitting on this trailer, what do you

2   do with it?

3   A.   Well, after it's unstrapped, we would pull it apart

4   and set it on the ground and the greaser would assemble

5   the lubricators.

6   Q.   How do you get this equipment off the trailer?

7   A.   I use my crane to pick up all the equipment.

8   Q.   Just describe how that process works, please.

9   A.   Well, basically, he'll have stands down on the side

10  that were used to lay down or pick up, so I would swing

11  over with the crane and I would bring in these

12  lubricators and lay them down and he would assemble them

13  together; and all the other various equipment he would

14  put on top of the BOP and when we're finished, we would

15  have the lubricators on top of the BOP.

16  Q.   How did you know what equipment to pick up?

17  A.   That was told to me by the grease operator.  He

18  made the decision what to pick up and when.

19  Q.   How did you know how to put that equipment

20  together?

21  A.   Well, actually, he would put it together.  I have

22  seen it done so many times, it would be automatic.

23  Q.   This may be obvious, but when you are operating the

24  crane, where are you seated?

25  A.   In the cab crane seat.

**Michael Burchik - Direct**

1  Q.   And what are you using to operate the crane?

2  A.   I'm using the joy sticks, my feet pedal, and the

3  boom.

4  Q.   So, you go through this process and you put all

5  this equipment together.  Is there a name for the

6  process of assembling that equipment, a term you use?

7  A.   Rig up.  We normally say rigging up.

8  Q.   Once you got that equipment rigged up, what do you

9  do next?

10  A.   Basically, we coordinate with the company man and

11  the wireline truck what wells -- when we're going down

12  the hole, the guns being used, et cetera, to shoot the

13  well.

14  Q.   All right.  Let's go through and you used a couple

15  terms again, I want to make sure the jurors know what

16  we're talking about.

17          You used the word "gun."  What does that mean?

18  A.   That's the explosive that the grease operator -- or

19  I mean the wireline operator puts together.  There's

20  about four or five of them.  They are the explosives

21  that go down in the well.  It's on the wire that would

22  go up into the tubes and then when I pick up, you would

23  put the guns in the tube and I would pick it up, set

24  over the well and the grease operator would open up and

25  go down a hole.

**Michael Burchik - Direct**

1  Q.   You just used the term "down the hole" the second

2  or third time.   What does that mean?

3  A.   Basically when everything is a go, the well would

4  be open and the guns would just drop down the hole and

5  the grease operator would control the actual pressure so

6  nothing would jump out the top basically.

7  Q.   When you use the term "hole," is the term "hole"

8  the well?

9  A.   The hole is the well, four-inch hole.

10  Q.   A moment ago you described hand signals.   Can you

11  go to Tab 58, please.   Can you just briefly describe

12  what is shown in that photograph.

13  A.   Basically, you got the crane operator bringing the

14  hook down in which the gentleman on the left is giving

15  the hand signals on bringing the hoist down.

16  Q.   Is this a fair and accurate representation of a

17  typical scene at the wellsite you were working at?

18  A.   Yes, sir, it is.

19          THE COURT:   You may publish.

20  Q.   Now that the jurors are able to view this picture,

21  can you describe what is shown in here.

22  A.   This is the crane operator up here (indicating).

23  He is watching this guy and this guy is actually giving

24  a hand signal to drop the hoist.

25  Q.   When you are working in a wellsite, what work are

Michael Burchik - Direct

1    you doing?

2    A.   I'm the crane operator sitting in the seat of the

3    crane.

4    Q.   While you worked at Oil States, were you ever doing

5    the work that these other two gentlemen are doing in

6    this picture?

7    A.   No.

8    Q.   What is that long steel pipe that is shown at the

9    bottom of the photograph?

10   A.   That's the lubricator.  It's already been assembled

11   and it looks like he is going to pick it up.

12   Q.   What is this big thing up here (indicating)?

13   A.   The hoist itself -- the hook.  That's what is going

14   to pick up the lubricator.

15   Q.   What is this hand signal that that gentleman is

16   giving?

17   A.   He is giving a down signal which is down the crane,

18   guys to go down.

19   Q.   Are those industry standard signals?

20   A.   Yes, sir.  They are basic signals which actually

21   has to be posted.  You can see it is posted in the cab

22   itself on the window.

23   Q.   All right.  What is this big thing back here, that

24   big stack (indicating)?

25   A.   That's the well that is going to be worked on.

Michael Burchik - Direct

1    Q.   That's the actual gas well?

2    A.   Yes.  That's the well itself and it has all these

3    pipes here (indicating).  That's where the water and

4    stand will basically be going down.

5    Q.   So, once you've gone through and you got all this

6    equipment rigged up and you're ready to start working,

7    you said you would get together with the company man?

8    A.   Normally, by this time it would be the

9    wireline -- the company man probably already

10   has -- figured out we're working on that well and it's

11   just a matter of timing when we're going to go down the

12   hole.

13   Q.   My mistake.  You get together with the wireline

14   crew, and what are you discussing in that conversation?

15   A.   Basically when he is ready to have everything

16   assembled, the gun is already assembled and when the

17   frack people got the pressure off the well, he will tell

18   the wireline people and he will tell us he is ready to

19   go down the hole.

20   Q.   During that conversation, what are you doing?

21   A.   I'm in a crane waiting for the decisions to be made

22   to pick the lubricator up and get it in position.

23   Q.   While you worked at Oil States, were you ever

24   responsible for making the decision of when the wireline

25   operations would start?

Michael Burchik - Direct

1    A.    No, sir.  I would just be a part of the equation

2    and wait for instructions.

3    Q.    So, once you get instructions to start operations,

4    what do you do?

5    A.    Going back to that particular picture, we're ready

6    to go down the hole, I would hook onto a sling that is

7    on that lubricator and I would pick it up.  The guns

8    would be pulled up into the lubricator itself and get it

9    ready to set on the well.

10   Q.    How do you know how to pick up the lubricator?  How

11   do you know when it's time to do that?

12   A.    Well, the wireline engineer would give the go

13   ahead.

14   Q.    And describe how that equipment is picked up.

15   A.    I would be hooked onto a sling and nine times out

16   of ten, it would be the greaser and he would tell me to

17   pick up, and I would hoist the lubricator up in the air,

18   and then when the wireline is actually ready to go up in

19   the lubricator, they would give me the signal and show

20   it's going up in there and I would actually just watch

21   it go up in there.

22   Q.    What is it that the wireline crew is putting up

23   into the lubricator?

24   A.    That's the gun, the explosives.

25   Q.    Is Oil States involved in those explosives in any

Michael Burchik - Direct

1  way?

2  A.   No.  That's a totally different company.

3  Q.   Once those explosives are pulled up into the

4  lubricator, what happens next?

5  A.   The greaser, he would be at the top of the well and

6  after the frack people tell him the pressure is off the

7  well, he would check the needle valve to verify the

8  pressure is off.

9       He would take a lifting cap off the well

10  itself and then he would indicate to me to swing over

11  and set all the equipment on the well itself.

12  Q.   And, again, where are you seated during this?

13  A.   I'm still in the crane seat of the crane.

14  Q.   And you said the greaser is up in a basket.  Can

15  you describe for the jurors what you mean by that.

16  A.   It's a man basket that he goes up and down, swings

17  over left to right, and he will go over and actually

18  touch the well where he is able to unscrew the lifting

19  cap that is on top of that well.

20  Q.   Mike, can you please turn to Tab 61 in your binder.

21  Again, before we show this to the ladies and gentlemen

22  of the jury, can you just identify what is shown in that

23  photograph?

24  A.   Well, this is the -- you got the crane operator,

25  you got the BOP and the guns are in the BOP because you

1   can see the guns dangling out and the grease operator

2   has already taken the lifting cap off the well and he is

3   getting ready to go on the well.

4   Q.   Okay.   Is this photograph a fair and accurate

5   representation of the scenes of the wellsites you were

6   working on?

7   A.   Yes, it is.

8              MR. WARREN:   Your Honor --

9              THE COURT:   Yes, please publish.

10  Q.   Mike, who is the gentleman who is shown in the

11  center of that photograph?

12  A.   This is the grease operator directing the BOP to

13  set on the well.

14  Q.   And is this thing, is that the man lift you were

15  talking about?

16  A.   That is the man lift that he operates to go up and

17  down on the well.

18  Q.   And what is this big orange thing in the center of

19  the photograph (indicating)?

20  A.   That is the stack itself, the well that is going to

21  be fracked.

22  Q.   All right.   What is the thing that is dangling in

23  the air at the top of the photograph?

24  A.   This here is the BOP and that dangling outside,

25  that is explosives (indicating).

Michael Burchik - Direct

1    Q.   So, what is going on in this photograph?

2    A.   Basically the greaser has got the well uncapped and

3    he is telling the crane operator to swing on the well

4    and they are going to set it on the well itself.

5    Q.   While this is going on, what are you doing?

6    A.   I'm directing the crane, putting that BOP on the

7    well.

8    Q.   Where are you seated?

9    A.   I'm sitting at the crane operator seat.

10   Q.   This equipment at the top, is that attached to your

11   crane?

12   A.   Yes.  I have that picked up in the air.

13   Q.   How do you know what to do with that equipment?

14   A.   Well, actually, the grease operator is directing me

15   by hand signals.

16   Q.   He is telling you where to swing the equipment?

17   A.   He is telling me what to do.

18   Q.   Let's go to Tab 59 of your binder, Mike.  Before

19   you go into too much detail, could you briefly identify

20   what is shown in that photograph?

21   A.   Okay.  The grease operator is fastening -- well,

22   it's already been fastened.  It looks the BOP is already

23   sitting on the well.  It looks like he is fastening the

24   lubricator.

25   Q.   Is this a fair and accurate representation of the

Michael Burchik - Direct

1   scene you have worked at?

2   A.   Yes, it is.

3           THE COURT:   You may publish.

4   Q.   So, again, if you could go through and identify the

5   different equipment that is shown in that photograph.

6   A.   Okay.   Again, this is the man lift that he is over

7   there on the well itself.   This is the BOP (indicating)

8   and it looks to me like he is fastening the lubricator

9   to the BOP.

10  Q.   Which of the things in that photograph is the

11  lubricator?

12  A.   This long pipe is the lubricator (indicating).

13  Q.   What is all the other pipes on the ground, what are

14  those?

15  A.   Basically, iron all hooked together to the trucks,

16  the pump trucks.   They are going to pump water, acid,

17  sand down the hole.

18  Q.   Those pipes, is that part of the fracking process?

19  A.   That's the fracking process but that won't be done

20  until after they shoot the guns.

21  Q.   Okay.   Were you involved in setting up those pipes

22  or anything?

23  A.   No, sir.   I just set the equipment on the well.

24  Q.   Once the equipment is -- how did you say that the

25  grease operator is attaching the equipment to the well?

Michael Burchik - Direct

1    A.    It has a collar which he just fastens and he has a

2    chain wrench that he fastens on.

3    Q.    So, he is doing that by hand?

4    A.    Yes.

5    Q.    If you could, what are these big white canisters in

6    the background (indicating)?

7    A.    They contain sand which actually will go to a

8    conveyor belt which will go to a different piece

9    of -- another piece of machine which will actually be

10   fed down the well.

11   Q.    Once the grease operator has this equipment screwed

12   on to the well, do you unhook it from the crane?

13   A.    No.  Actually, I will cut the power off at this

14   time and my position in the crane is more or less

15   finishing until they are done with the firing of the

16   explosive.

17   Q.    And who is doing the firing of the explosive?

18   A.    It would be the wireline engineer.

19   Q.    Were you involved in that process of firing off the

20   explosive?

21   A.    No, sir.

22   Q.    Were you required to stay in the cab of the crane

23   during that process?

24   A.    No, sir, I was not.

25   Q.    So, what do you do?

Michael Burchik - Direct

1  A.   I basically can get down at that time and I would

2  normally help the greaser.

3  Q.   While the wireline crew is firing the guns, what is

4  the greaser doing?

5  A.   He is controlling the pressure of the well at this

6  time.

7  Q.   And how is he doing that?

8  A.   He is doing it by that unit I showed you, he is

9  operating that equipment to control the pressure.

10  Q.   Again, were you responsible for operating that

11  unit?

12  A.   No, sir.

13  Q.   Were you trained on how to operate that unit?

14  A.   No, sir, I was not.

15  Q.   Once the wireline crew has fired off its explosive,

16  what happens?

17  A.   Once they're complete firing, they'll come back out

18  of the hole which takes a fairly long time to do.

19  Q.   And once they've come back out of the hole, what

20  happens at the wellsite?

21  A.   Once he comes out of the hole, there is a toll trap

22  on it that has a little gate on it and the greaser is

23  telling me once the gun is past that gate and it will

24  turn and that tells me the guns are up in the tubes and

25  at this point, we are ready to come off the well.

Michael Burchik - Direct

1    Q.   Once you are ready to come off the well, what

2    happens?

3    A.   He would uncollar it, loosen it up, and direct me

4    off to the side of the well where we designated as a

5    set-down point or what have you.

6              First of all, I just swing over to that point

7    and go up in the air where they drop the guns down and

8    they put new guns on.

9    Q.   And during that whole process are you operating the

10   crane?

11   A.   I'm operating the crane.

12   Q.   How do you know when it's time to pick up the

13   equipment and lift it off the well?

14   A.   It's all directed to me by the greaser.

15   Q.   Are you ever responsible for making that decision?

16   A.   No, sir.  I'm just waiting for instructions.

17   Q.   Once you pick up the equipment off the well, you

18   said you would set it down?

19   A.   We would go off to the side.  Normally, we would go

20   back up in the air so the guns would come back out where

21   new guns would be put on.

22   Q.   That process of putting in new guns, how long does

23   that take?

24   A.   Depends on the wireline guy.  I guess a good 30, 45

25   minutes or so.

Michael Burchik - Direct

1   Q.   Once the wireline crew has replaced its guns, what

2   happens?

3   A.   Actually, we set down on the side.  The guns are

4   laid down.  They'll move me off to a section to where I

5   actually set the BOP down, probably on a stand, and we

6   wait for them to start fracking the well.

7   Q.   Then the fracking crew, what are they doing

8   generally speaking when they frack the well?

9   A.   Well, once they do that, they fire all their

10  equipment up and they start fracking, they pump

11  everything down in the hole that is supposed to go down

12  there.

13  Q.   Are the crane operators doing anything while the

14  fracking crew is doing its work?

15  A.   Right now we just get out of the way when they're

16  doing that.

17  Q.   So, all this process that you just described, is

18  that a typical day at a wellsite?

19  A.   Yes, that's basically everything we do.

20  Q.   How many times would you go through this process of

21  stabbing on and stabbing off on a typical day?

22  A.   Well, it depends on the stages of the well but

23  four, five, six, one after another, providing there is

24  no mistakes.

25  Q.   So, when you are at the wellsite, what is your main

Michael Burchik - Direct

1  responsibility?

2  A.   Operate the crane.

3  Q.   Mike, are you familiar with the term "stop work

4  authority?"

5  A.   Yes, sir.

6  Q.   What does that term mean to you?

7  A.   That's authority that everyone on the wellsite is

8  designated to stop operations any time they see

9  something unsafe basically.

10  Q.   Who at the wellsite has stop work authority?

11  A.   Everyone on the wellsite.

12  Q.   Are you familiar with the Occupational Safety and

13  Health Administration or OSHA?

14  A.   Yes, sir.

15  Q.   What is your understanding of what that entity is?

16  A.   That's basically a set of rules set up to govern

17  operations of certain things.

18  Q.   As a crane operator at Oil States, were you

19  required to comply with those OSHA rules?

20  A.   Yes, sir.  OSHA does have a rule about everyone

21  having stop authority.

22  Q.   Okay.  Could you turn to Tab 96 in your binder,

23  please.  Before we get into the details, what is that

24  document that you are looking at?

25  A.   It is a Federal Register Rules and

Michael Burchik - Direct

1   Regulations -- it's an OSHA document.

2   Q.   These rules and regulations, were you required to

3   comply with them when you worked at Oil States?

4   A.   Yes, sir.

5   Q.   If you could turn to Page -- at the bottom right

6   there are numbers.  Do you see those numbers, five-digit

7   numbers?

8   A.   Yes, sir.

9   Q.   Could you turn to 03446.  On the left-hand side of

10  that page there is a paragraph that says "authority to

11  stop operations," do you see that?

12  A.   Yes, sir.

13  Q.   Is this a rule that you were required to comply

14  with as a crane operator at Oil States?

15  A.   Yes, sir, it is.

16          MR. WARREN:  Your Honor, may I publish that?

17          THE COURT:  Yes, you may publish it as a

18  regulation of the federal government.  This witness

19  cannot opine what it means but he can certainly identify

20  it.

21          MR. WARREN:  Thank you.  03446, if you could

22  zoom in on the left side, please, Milly.

23  Q.   Mike, I'm going to ask you -- on the left side you

24  see it says Section 1926.1418, Authority to Stop

25  Regulation, do you see that?

Michael Burchik - Direct

1    A.    Yes.

2    Q.    Can you read that paragraph out loud, please.

3    A.    Whenever there is a concern as to safety, the

4    operator must have the authority to stop and refuse to

5    handle loads until a qualified person has determined

6    that safety has been assured.

7    Q.    Was this your understanding of the stop work

8    authority when you worked at Oil States?

9    A.    Yes, sir, it was.

10   Q.    In this paragraph you just read, what was your

11   understanding of who the operator is?

12   A.    Well, the operator being myself, the crane

13   operator, or anyone else responsible for operations of

14   certain equipment.

15   Q.    And later in that same sentence it says until a

16   qualified person determines -- has determined that

17   safety has been assured.

18             What was your understanding of who a qualified

19   person is?

20   A.    A qualified person in my case would be a qualified

21   crane operator.  I would make a decision if something is

22   unsafe.  A person without a certification couldn't do

23   that but the company man has authority to govern the

24   safety potential.

25   Q.    So, when are you deciding what you think is unsafe,

Michael Burchik - Direct

1  what is that based on?

2  A.    My training.

3  Q.    And what type of training was that?

4  A.    That was my crane training.

5  Q.    During that crane training, what did they tell you?

6  A.    If anything is unsafe, to stop operations.

7  Q.    Did they tell you what types of things to look for?

8  A.    Basically, you would know what to look for.  Given

9  my particular job and what I did, there was certain

10 things that would look a certain way and you would know

11 if something was wrong.

12 Q.    So, what types of things were you looking for?

13 A.    Well, for instance, if a bolt wasn't tightened all

14 the way, if it wasn't secured safely to the well itself,

15 the sling was broken or something like that.

16 Q.    How did you know that those are the types of things

17 you should be looking for?

18 A.    There is basically things you work with every day

19 and you know that they cover the safety of the

20 operation.

21 Q.    Were you told things about the weather that you

22 should be looking for?

23 A.    Yes, sir.  We do have in the manufacturer's book,

24 they got a brief, I guess, a summary of the type of

25 weather you look for.  They will tell you if the wind is

Michael Burchik - Direct

1  blowing at a light speed, the leaves on the trees will

2  show a different color and just certain different things

3  to look for to kind of give you an idea of the wind

4  speed.  However, we had wind related things to go on top

5  of the crane.

6  Q.   When you're looking around to see whether things

7  are unsafe, is there common sense involved in that?

8  A.   Yes, basically.

9  Q.   And are you looking around for things that people

10  have told you to look for?

11  A.   Yes.  In your training, you have certain things you

12  want to look for.

13  Q.   So, when you are looking around for things that

14  might be unsafe, are you relying on anything other than

15  the training and what you have been told to look for?

16  A.   No, sir.  It's specifically your training that you

17  are relying on.

18           MR. WARREN:  Let's take that down, please.

19  Q.   Mike, let's change topics and talk about the

20  compensation you received at Oil States.

21           Can you tell the jurors what type of pay you

22  received from Oil States?

23  A.   I received a biweekly salary -- monthly salary

24  every other week.

25  Q.   You got paid every two weeks?

1   A.   Every two weeks, yes.

2   Q.   The amount of salary, was that a fixed amount?

3   A.   Yes, sir, it was.

4   Q.   Did that salary fluctuate from month to month?

5   A.   No.  It remained the same.

6   Q.   Could you please turn back to the very front of the

7   binder and go to Tab No. 3.  Could you identify what

8   that document is.

9   A.   It's a payroll register of myself.

10  Q.   Have you reviewed this document before today?

11  A.   Yes.

12  Q.   Do you believe this document accurately reflects

13  the compensation you received at Oil States?

14  A.   Yes, I do.

15            MR. WARREN:  Your Honor, may I publish that?

16            THE COURT:  Yes.

17  Q.   Do you see in the center of this document there are

18  various pay codes there?

19  A.   Yes.

20  Q.   What is your understanding of what the pay code

21  "REG" stands for?

22  A.   That's a designator for regular salary payment.

23  Q.   Was it your understanding that those are the salary

24  payments you received?

25  A.   Yes, sir.

Michael Burchik - Direct

1   Q.   Have you used this payroll report to go through and

2   calculate the amount of salary you received from Oil

3   States during different time periods?

4   A.   Yes, sir, we did.

5   Q.   Have you gone through and calculated the amount of

6   salary you received from Oil States that you earned from

7   Oil States between August 25th of 2012 and August 24th of

8   2013?

9   A.   Yes, I did.

10  Q.   Could you tell the jurors what number you came up

11  with when you did that calculation?

12  A.   I don't have those figures written down right now.

13  Q.   Is there something you might look at that would

14  help you remember what that number is?

15  A.   That would be the spreadsheet of our pay.

16  Q.   Those are the calculations you did?

17  A.   Yes.

18  Q.   Let me hand you the document to see if this

19  refreshes your recollection.

20        MR. DAVIS:  Your Honor, may we approach.

21        THE COURT:  I want to see it first, too.  Hold

22  on and let's see what this is.  Let me hear a question

23  first.  This is not a spreadsheet.

24        MR. WARREN:  Your Honor, I believe Mr. Burchik

25  has testified he has just gone through and added up

Michael Burchik - Direct

 1   different numbers in this report and he is going to say

 2   what his calculations were.

 3           I was just going to hand this to him to

 4   refresh his recollection of the math he did when he

 5   added these numbers up.

 6           THE COURT:  I think the concern was the

 7   spreadsheet.

 8           MR. DAVIS:  Yes.

 9           THE COURT:  We don't have a spreadsheet.  I

10   understand your objection.  Let's wait until we get

11   there, if we do.

12   BY MR. WARREN:

13   Q.   Mike, are those the notes you took when you were

14   adding up the salary payments you received?

15   A.   Yes.

16   Q.   Does that document refresh your recollection as to

17   the calculations you did of the amount of salary you

18   earned from Oil States from August 25, 2012 to August

19   24, 2013?

20   A.   Yes, it is.

21   Q.   Can you tell the jurors what that number is?

22           MR. DAVIS:  Your Honor, may we see the

23   document first.

24           THE COURT:  In other words, this is his

25   calculation of all the numbers here?

Michael Burchik - Direct

1              MR. WARREN:  He just added up the numbers.

2              THE COURT:  This is a document that he had in

3    his files?

4              MR. WARREN:  No.  This is a document we

5    received from Oil States that he has reviewed.

6              THE COURT:  If looking at it refreshes you,

7    sir, then you may give us that number.

8    A.    $37,239.

9              THE COURT:  I'm sorry?

10             THE WITNESS:  $37,239.

11   Q.   Mike, have you also gone through that same payroll

12   report that you received from Oil States, have you gone

13   through and added up the amount of salary compensation

14   you earned between August 25, 2013 and when you left the

15   company in 2015?

16   A.   Yes, sir.  That was $47,500.

17   Q.   That's the amount of salary compensation you earned

18   in that pay range?

19   A.   Yes, sir.

20             MR. WARREN:  Thank you very much.  I'll take

21   that back from you.

22   Q.   In addition to the salary you received, did you

23   receive another form of compensation?

24   A.   We received bonuses from the jobs we performed.

25   Q.   Could you explain what a job bonus is to the jury.

1    A.    Basically, for every well we worked on, we got a

2    bonus for that particular well.  If it was multiple

3    wells, then we got multiple bonuses but normally, they

4    would have a ticket number and for the number of days we

5    worked, we would be compensated for it.

6    Q.    So, how many bonuses did you receive for each shift

7    that you worked?

8    A.    I wrote that down on another document.  I don't

9    have that.

10   Q.    Before we get to the total number, I want to make

11   sure the ladies and gentlemen of the jury understand how

12   the job bonus worked.

13           What would you have to do in order to earn a

14   job bonus?

15   A.    Basically work on a job, frack the well.  Once the

16   job was complete, we was eligible for a bonus for that

17   well.

18   Q.    Did you receive all the job bonuses that you

19   thought you earned at Oil States?

20   A.    I believe so.

21   Q.    When you worked at Oil States, what was the amount

22   of the job bonus?

23   A.    $450 per job.

24   Q.    For what size crane was that?

25   A.    Any size crane besides the 100-ton.

Michael Burchik - Direct

1    Q.    Would you operate the 100-ton when you worked at

2    Oil States?

3    A.    No, I did not operate that crane.

4    Q.    The amount of bonus, was that $450 for every job?

5    A.    Yes, sir.

6    Q.    Were any of your job bonuses withheld for any

7    reason?

8    A.    No, sir, they weren't.

9    Q.    If you would do a good job at Oil States, would you

10   ever receive a good job bonus?

11   A.    No.  They always remained the same.

12   Q.    If you did a poor job, would you receive a job

13   bonus?

14   A.    Still remained the same.

15   Q.    As a crane operator at Oil States, were you ever

16   paid an hourly wage?

17   A.    No, sir, I was not.

18   Q.    Were you ever paid any overtime pay while you

19   worked at Oil States?

20   A.    No, sir, I was not.

21   Q.    If you worked 40 hours in a workweek and let's

22   start with the salary, did the amount of the salary you

23   received in that two-week pay period, did it go up if

24   you worked more than 40 hours in a workweek?

25   A.    No.  It remained the same.

Michael Burchik - Direct

1  Q.   Did the number of hours that you worked in a week

2  affect the amount of your salary in any way at all?

3  A.   No, it did not.

4  Q.   These job bonuses, would the amount of job bonus go

5  up if you worked more than 40 hours in a workweek?

6  A.   More than 40 hours, no.

7  Q.   So, let me ask it this way.  If you worked three

8  jobs in a row and the fourth job required -- put you

9  over 40 hours for a week, would the amount of the bonus

10  in that job increase?

11  A.   No.  That would stay the same.

12  Q.   So, was the amount of the job bonus, was it tied to

13  working 40 hours in a week?

14  A.   No.

15  Q.   Could you turn to the back of the binder to Tab

16  174.  I think it's at the very end.

17          Do you see that document?

18  A.   Yes, sir, I do.

19  Q.   Is that document you are looking at, is that your

20  IRS Form W2 for 2012?

21  A.   Yes, sir, it is.

22          MR. WARREN:  Your Honor, may I publish?

23          THE COURT:  Yes.

24  Q.   Mike, if you could look at the top of this document

25  and Box 1, does that Box 1 accurately reflect to the

**Michael Burchik - Direct**

1  best of your recollection and understanding --

2  A.   Yes, sir, I believe it does.

3  Q.   You believe it accurately reflects the compensation

4  you received from Oil States in 2012?

5  A.   Yes, sir.

6  Q.   Let me have you flip to the next exhibit, which is

7  175.  Does that appear to be your IRS Form W2 for 2013?

8  A.   Yes, sir, I believe that's it.

9       MR. WARREN:  Your Honor, may I publish?

10      THE COURT:  Yes.

11  Q.   In Box 1, do you see that number there?

12  A.   Yes, sir.

13  Q.   Do you believe that accurately reflects the amount

14  of compensation you earned from Oil States in 2013?

15  A.   I believe so.

16  Q.   Let me have you flip to the next exhibit, please.

17      MR. WARREN:  May I publish?

18      THE COURT:  Yes.

19  Q.   Does that appear to be your IRS Form W2 for the

20  year 2014?

21  A.   Yes, sir, I believe so.

22      MR. WARREN:  May I publish, Your Honor?

23      THE COURT:  Yes.

24  Q.   Once again, Mike, Box 1 on top of that page, do you

25  see that number?

Michael Burchik - Direct

1  A.   Yes.

2  Q.   What number is shown in that box?

3  A.   $97,148.02.

4  Q.   Do you believe that box accurately reflects the

5  compensation you earned from Oil States in 2014?

6  A.   Yes.

7  Q.   One last flip to Tab 177, please.  Does this appear

8  to be your IRS Form W2 for 2015?

9  A.   I believe it is.

10          MR. WARREN:  Your Honor, may I publish?

11          THE COURT:  Yes.

12  Q.   Once, again, in Box 1, could you read the number

13  that is shown in that box.

14  A.   $60,449.59.

15  Q.   Do you believe that number in Box 1 of the document

16  marked Exhibit 177, do you believe that accurately

17  reflects the amount of compensation you earned from Oil

18  States in 2015 up until the time you stopped working for

19  the company?

20  A.   Yes, I believe so.

21  Q.   Mike, I want to discuss the schedule when you

22  worked at the wellsites.

23          When you are working at these gas wells, how

24  many hours per day is something going on on the

25  wellsite?

Michael Burchik - Direct

1   A.   24 hours a day.

2   Q.   How many days a week?

3   A.   Seven days a week.

4   Q.   On a typical crew when you are working on a

5   wellsite, how many Oil States' employees are on each

6   crew?

7   A.   Two people.

8   Q.   Who are those employees?

9   A.   Myself, crane operator, and greaser.

10  Q.   While you worked at Oil States, did you ever work

11  any jobs where there was more than one crane operator

12  assigned to any shift?

13  A.   No, not typically but I did have a guy OJT with me

14  one or two days.

15  Q.   OJT is?

16  A.   On the job.  He basically watched me.

17  Q.   Do you know when that was?

18  A.   No.

19  Q.   Other than those one or two days, did you ever work

20  on any jobs at Oil States where there was more than one

21  crane operator on a job?

22  A.   No, I did not.

23  Q.   Do you recall whether you worked on any job with

24  more than one grease operator on a shift?

25  A.   Maybe if he was OJTing somebody.

Michael Burchik - Direct

1    Q.   If a grease operator was OJTing, were you involved

2    in training that --

3    A.   No, sir, I was not.

4    Q.   Let me finish the question so we make sure we have

5    a clear record.

6              Were you involved in showing that person how

7    to operate the pressure control equipment?

8    A.   No, sir, I did not.

9    Q.   How many crews were typically assigned to each job?

10   A.   Normally two crews.

11   Q.   What was the normal schedule of those crews?

12   A.   12-hour shifts.

13   Q.   What time would those shifts typically start?

14   A.   Normally six a.m. to six p.m.

15   Q.   When you worked at Oil States, would you typically

16   work -- is one of those the day shift, one is the night

17   shift?

18   A.   Yes.

19   Q.   Would you typically work one of those shifts or the

20   other?

21   A.   Yes.

22   Q.   Which one did you normally work?

23   A.   Normally the day shift.

24   Q.   How long was the typical shift that you worked at

25   Oil States?

Michael Burchik - Direct

1    A.    A 12-hour typical shift.

2    Q.    Were some of your shifts shorter than 12 hours?

3    A.    Yes, sir, some were shorter.

4    Q.    In what circumstances would a shift be shorter than

5    12 hours?

6    A.    If something would arise, some kind of problem,

7    pump go down or something of that nature.

8    Q.    Were there circumstances when your shift was longer

9    than 12 hours?

10   A.    Yes, sir.

11   Q.    And in what circumstances might you have to keep

12   working more than 12 hours in a day?

13   A.    If we started the job and we run into the second

14   shift, we would probably stay longer.

15   Q.    How often did that happen?

16   A.    Maybe several times a month or whatever.

17   Q.    But what was the length of your typical shift at

18   Oil States?

19   A.    12-hour shifts.

20   Q.    Would you typically arrive and leave at the same

21   time each day?

22   A.    Yes.

23   Q.    Why was that?

24   A.    Typical shift.

25   Q.    Were you allowed to leave before your relief got

Michael Burchik - Direct

1   there?

2   A.   No, you were not.

3   Q.   When you were working at these wellsites, were

4   there any Oil States employees at the wellsites other

5   than the crane operator and the grease operator?

6   A.   No.  It was normally just two people.

7   Q.   As the crane operator at one of these wellsites,

8   were you ever responsible for supervising anyone else at

9   the wellsite?

10  A.   No, I was not.

11  Q.   Were you ever responsible for overseeing the work

12  that anyone else did?

13  A.   No, I was not.

14  Q.   Were you ever involved in telling anyone else at

15  the wellsite what to do?

16  A.   No, I was not.

17  Q.   What was your role at the wellsite?

18  A.   I operated the crane period.

19  Q.   When you were working at these wellsites, where

20  were they typically located?

21  A.   Normally, in the mountains, in secluded type

22  places, West Virginia, Ohio, or Pennsylvania.

23  Q.   These wellsites, how close were they to cities or

24  towns?

25  A.   Normally, they were quite a distance.

Michael Burchik - Direct

1   Q.   Why is that?

2   A.   Well, they were out in the mountains and naturally

3   the wellsites weren't close to any community.

4   Q.   When you were working at the wellsites, where would

5   you typically sleep at night?

6   A.   Hotel.  Normally the closest hotel we could find.

7   Q.   Normally where were those hotels located?

8   A.   On average 45 minutes or so.

9   Q.   45 minutes each way, hour and a half total?

10  A.   Yes.

11  Q.   A moment ago you said that most of your shifts were

12  about 12 hours long.  Does that include the time that is

13  spent driving to and from the wellsites?

14  A.   No, that did not.

15  Q.   So, that time driving, was that in addition to the

16  12 hours?

17  A.   Yes, it was.

18  Q.   How would you typically travel from the hotel to

19  the wellsite?

20  A.   Our company truck.

21  Q.   If you could just describe for the jurors what kind

22  of truck you had.

23  A.   I had a Ford 150 4x4 pickup and the engine size was

24  5.0.

25  Q.   That truck, who owned that truck?

Michael Burchik - Direct

1   A.   Oil States owned it.

2   Q.   Was that assigned to you?

3   A.   That was assigned to me, yes.

4   Q.   Did you share that truck with anyone else?

5   A.   No, sir, I did not.

6   Q.   Do you recall when Oil States assigned that truck

7   to you?

8   A.   I got that around January of 2012.

9   Q.   Once Oil States assigned that truck to you, was the

10  same truck assigned to you until you left the company?

11  A.   Yes, sir, it was.

12  Q.   Could you go to the document marked Exhibit 72,

13  please.

14  A.   Okay.

15  Q.   There's two pages to that document.  Feel free to

16  look through them.

17           What is that document?

18  A.   It looks like a sticker number from the Ford Motor

19  Company.

20  Q.   And have you seen this document before today?

21  A.   Yes, I have.

22  Q.   And this document, do you know which truck this

23  relates to?

24  A.   Actually, it relates to my truck.  It has the VIN

25  number on it.

1  Q.   Do you recognize the VIN number from your assigned
2  truck?

3  A.   Yes.  Mine was 8861.

4  Q.   If you look through the specifications of that
5  truck, do they appear to match your truck?

6  A.   Yes, they do.

7          MR. WARREN:  Your Honor, I would ask to
8  publish this document.

9          THE COURT:  Yes.

10 Q.   All right.  Let's start with this first page and
11 I'll point out there's a number right there
12 (indicating).  What is your understanding of what that
13 number is?

14 A.   The VIN number was my Vehicle Identification Number
15 assigned to my truck.

16 Q.   That's the VIN number for your company assigned
17 truck?

18 A.   Yes, it is.

19         MR. WARREN:  Milly, go to Page 2, please.

20 Q.   Mike, do you see the VIN number for your truck on
21 this document as well?

22 A.   It's in the center of the page 8861.

23 Q.   That up there (indicating)?

24 A.   That's it, yes.

25 Q.   Does this document describe the specifications for

Michael Burchik - Direct

1   your truck?

2   A.   Yes, it does.

3   Q.   What does this document say the specifications are?

4   A.   It's 2011 Ford 150 4x4 super cab with 5.0 V8

5   engine.

6   Q.   Was this, in fact, the type of truck that was

7   assigned to you by Oil States?

8   A.   That's it exactly.

9   Q.   Mike, are you familiar with the term "gross vehicle

10  weight rating?"

11  A.   Yes.

12  Q.   Do you happen to recall what the gross vehicle

13  weight rating your company assigned to your truck was?

14  A.   Mine was around 7,200 pounds, in that range.

15           Can you turn to Exhibit 77.

16           Before we show this to the jury, could you

17  just identify what this document is.  It's a whole bunch

18  of pages, so feel free to flip through it if you'd like.

19  A.   It just shows the different types of Ford 150.

20  Q.   I'm going to have you turn in your binder -- there

21  are some page numbers at the bottom of the document.

22  There's five digit numbers and regular one and two digit

23  numbers.  Do you see those?

24  A.   Yes.

25  Q.   Can you go to Page 84 with the smaller page

**Michael Burchik - Direct**

 1    numbers.

 2              What is shown on this page of the document?

 3    A.   Weight ratings of certain vehicles.

 4    Q.   Are the weight ratings, did these relate to the

 5    type of truck that was assigned to you at Oil States?

 6    A.   Yes.

 7    Q.   Have you reviewed this document before today?

 8    A.   Yes.

 9    Q.   Do you see your truck in this document?

10    A.   4x4, yes.

11              MR. WARREN:  Your Honor, may I publish this

12    document?

13              THE COURT:  Yes.

14    Q.   All right, Mike.  Now that we got that up on the

15    screen --

16              MR. WARREN:  Milly, could you zoom in on the

17    middle of the document there.

18    Q.   Mike, can you point out where you see your truck on

19    this document?

20    A.   It's a super cab 4x4, 5.0 (indicating).

21    Q.   So, the record reflects the dot is on the super cab

22    4x4 HDC?

23    A.   5.0 liter.

24    Q.   And does this document reflect the gross vehicle

25    weight rating of your truck?

Michael Burchik - Direct

1    A.    Yes, 8,200 pounds.

2    Q.    And is that consistent with your recollection of

3    what the gross vehicle weight rating was of your truck?

4    A.    Yes.

5    Q.    Was there a Department of Transportation sticker

6    number on your truck?

7    A.    No.

8    Q.    Was there any hazardous materials warning on that

9    truck?

10   A.    No.

11   Q.    While you worked at Oil States, what was your

12   understanding of whether that truck was a DOT regulated

13   vehicle?

14   A.    It was not regulated by the DOT.  It didn't fit the

15   weight class.

16   Q.    Were you ever told by any of your managers at Oil

17   States that you needed to take that truck through a

18   weigh station?

19   A.    No, sir, I was not.

20   Q.    Was there anything in the back of your company

21   pickup truck?

22   A.    I had a toolbox and a fuel tank, diesel fuel tank.

23   Q.    What type of tools did you carry in that toolbox?

24   A.    I normally carried tools that related to my job.

25   Q.    Could you give the jurors some examples of stuff

Michael Burchik - Direct

1  that was in there.

2  A.   Basically carried lifting straps, slings that I

3  used on the job.

4  Q.   How often would you need to use the tools that were

5  in your toolbox?

6  A.   I normally used them every time I was on the job.

7  Q.   Did you need to have those tools with you on the

8  job?

9  A.   Yes.

10  Q.   Did you need to have your pickup truck with you on

11  the job?

12  A.   Yes, sir, once I spotted the crane and I couldn't

13  move it no more.

14  Q.   Were you permitted to take your personal vehicle to

15  the wellsites?

16  A.   No, sir, we were not.

17  Q.   I believe you said there was a diesel tank in the

18  back of the truck?

19  A.   Yes.

20  Q.   Was that separate from the diesel tank -- what type

21  of fuel did you use in your pickup?

22  A.   My pickup was regular gasoline.  The fuel tank I

23  had was a diesel fuel that I used for the crane itself.

24  Q.   And so you used that spare tank to refill your

25  crane?

Michael Burchik - Direct

1  A.   Yes, sir.

2  Q.   Do you recall the capacity, how many gallons that

3  spare diesel tank held?

4  A.   I believe between 80 and 90 gallons.

5  Q.   And what equipment did you -- would you use that

6  diesel tank to refill any equipment other than your

7  crane?

8  A.   Maybe the grease unit if something happened to his

9  tank, it was inoperable, whatever.

10  Q.   Did you need to have that spare diesel tank with

11  you at the wellsite in order to perform your job?

12  A.   Yes, I did.

13  Q.   Why is that?

14  A.   Normally, the crane operators operated around the

15  clock and probably had to fill it maybe every couple

16  days to keep it operational.

17  Q.   Between 2012 and 2015, how often did you use your

18  assigned pickup truck?

19  A.   I used it on every job.

20  Q.   You used the pickup on every job?

21  A.   Yes.

22  Q.   How many days a week were you using your pickup

23  truck?

24  A.   Every day.  If we was on a job, it might be two

25  days, it might be 30 days, whatever.

Michael Burchik - Direct

1  Q.   Would you use your pickup truck each day you were

2  on the job?

3  A.   Yes.

4  Q.   At the beginning of the day when you started a new

5  job, where would you typically leave from to travel to

6  that job?

7  A.   We normally left from the Canonsburg shop or we

8  might leave from another job site.

9  Q.   And when you were leaving from the Canonsburg shop

10 or another job site, what vehicle were you using to

11 travel to the wellsite where you were going?

12 A.   My assigned work truck.

13 Q.   When you finish a job, where would you typically

14 travel to?

15 A.   Well, if we wasn't going to another job site, we

16 probably go back to the hotel to pack up and back to the

17 shop.

18 Q.   And you would travel from the hotel back to the

19 Canonsburg shop?

20 A.   Back to the Canonsburg shop.

21 Q.   At the end of the job when you were traveling back

22 to the shop, what vehicle did you use for those trips?

23 A.   My assigned work truck.

24 Q.   Between 2012 and 2015, would you ever work on

25 wellsites outside of Pennsylvania?

Michael Burchik - Direct

1   A.   Yes, sir, I did.

2   Q.   How often were you working at wellsites in other

3   states?

4   A.   I don't recollect but maybe a couple times a year.

5   Q.   A couple times a year you were going to other jobs?

6   A.   West Virginia.

7   Q.   Jobs in other states?

8   A.   Yes, sir.

9   Q.   What states were you traveling to?

10  A.   West Virginia and Ohio.

11  Q.   How long did those jobs typically last?

12  A.   It kind of varied.  It could be 30 days to 50, 60

13  days.

14  Q.   When you went to another state for a job, where

15  would you leave from?

16  A.   Normally the hotel if we was out of state.

17  Q.   When you were at the beginning of the job when you

18  were traveling to the wellsite for the first time, where

19  did you leave from?

20  A.   The company shop in Canonsburg.

21  Q.   What vehicle would you use to get from the

22  Canonsburg shop to the job site in those other states?

23  A.   My assigned work truck.

24  Q.   During the job where you were staying during the

25  middle of the job?

Michael Burchik - Direct

1   A.   Normally at a hotel.

2   Q.   How were you traveling between the wellsites and

3   the hotels?

4   A.   My assigned work truck.

5   Q.   Are you familiar with the term "hotshot?"

6   A.   Yes, sir.

7   Q.   What does that term mean to you?

8   A.   It was basically a title assigned to a driver that

9   carried equipment to a wellsite or another company.

10  Q.   So, when someone is on a hotshot trip, what are

11  they doing?

12  A.   They are normally moving equipment to another

13  location.

14  Q.   When you worked at Oil States, would you ever use

15  your company truck to perform hotshots?

16  A.   Yes, I did.

17  Q.   When you used your company pickup truck to do a

18  hotshot, what were you doing?

19  A.   Moving equipment or something that had to go to

20  another job site or company.

21  Q.   What types of tools or equipment were you

22  hotshoting?

23  A.   Normally small stuff that can fit in a 150,

24  flanges, grease, torque wrenches.

25  Q.   Were you required to perform hotshots as part of

Michael Burchik - Direct

1  your job at Oil States?

2  A.   No, I wasn't.

3  Q.   Did you perform hotshots?

4  A.   I did, yes, I did.

5  Q.   Why would you perform them if you weren't required

6  to do so?

7  A.   I was told to.

8  Q.   What is the difference in your mind between being

9  told to do it and being required to do it?

10  A.   I was required.  It's part of your job title.  If

11  you are just told to do something is because you had to

12  do it.

13  Q.   When you worked at Oil States, did your managers

14  tell you, you had to do hotshots?

15  A.   Yes, sir.

16  Q.   Did you ever refuse to do a hotshot?

17  A.   Yes, sir, I did.

18  Q.   What happened?

19  A.   They normally grounded me from going onto another

20  job.

21  Q.   So, if you said you wouldn't do a hotshot, they

22  said we're not going to let you do another job?

23  A.   That's correct.

24  Q.   When you worked at Oil States, would you keep any

25  records of the hotshots you performed?

Michael Burchik - Direct

1   A.   No, we did not.

2   Q.   Do you know if Oil States kept any records of the

3   hotshots that was performed?

4   A.   I really don't think there was any documents to be

5   maintained.

6   Q.   When you were working in the shop, would you use

7   your truck for any work purposes around town other than

8   hotshots?

9   A.   No, sir.

10  Q.   Were you ever required to purchase any supplies?

11  A.   Yes, sir, from like Advance Auto or something like

12  that.

13  Q.   What type of supplies might you have to purchase?

14  A.   Normally cleaning material for the crane.

15  Q.   Who would ask you or instruct you to go buy those

16  supplies?

17  A.   Well, if I needed cleaning material, I would do

18  that.

19  Q.   Would you do that during business hours?

20  A.   It had to be before or after the job.

21  Q.   Before or after you went to a wellsite?

22  A.   Yes, exactly.

23  Q.   And I'm sorry, what type of stuff were you buying?

24  A.   Cleaning material, WD-40, rags, whatever.

25  Q.   Did you need those materials in order to perform

Michael Burchik - Direct

1   your job?

2   A.   Yes, sir.  Sometimes the grease would get so heavy

3   on the windshield we couldn't see out.

4   Q.   When you purchased those materials, who paid for

5   them?

6   A.   Oil States paid for it.

7   Q.   So, you were buying those materials in the course

8   of your job?

9   A.   Yes.

10  Q.   A moment ago we discussed that spare diesel tank

11  that is in your company assigned pickup truck.

12           What time of day or when would you typically

13  fill up that spare diesel tank?

14  A.   It was normally before a job or after a job during

15  the course of the day.

16  Q.   What types of places would you buy the fuel that

17  you put into the tank, where would you buy it?

18  A.   Regular fuel station or truck stop, whatever.

19  Q.   Would you do that between the hotel and the

20  wellsite?

21  A.   Yes.

22  Q.   And when you purchased fuel to put in the fuel tank

23  to use to refill the crane, how would you pay for that

24  fuel?

25  A.   We had assigned fuel cards.

Michael Burchik - Direct

1   Q.   And can you just describe for the ladies and

2   gentlemen of the jury how that fuel card worked?

3   A.   Each driver was assigned a card, a credit card just

4   for fuel only.  It was specifically assigned to that

5   vehicle.  Then when we went to the truck stop, we used

6   that card to purchase our fuel.

7   Q.   Did you have your own number, a pin number or any

8   sort of number you used?

9   A.   There was a pin number but I can't recollect that

10  number.

11  Q.   Did you share your pin number with anyone?

12  A.   No, sir.

13  Q.   Can I, Mike, ask you to turn to Tab 71 in your

14  binder.

15          THE COURT:  Counsel, let's take a break while

16  the witness is looking at that.

17          Ladies and gentlemen, we'll take a ten-minute

18  break, a comfort break, and we'll come back in about ten

19  after three.

20          Thank you very much.

21  (Whereupon, the jury exited the courtroom.)

22  (In open court, jury not present.)

23          THE COURT:  Sir, you are under oath, so you

24  cannot speak to anyone concerning your testimony during

25  this break.  Do not speak to counsel or anybody during

**Michael Burchik - Direct**

1   your testimony.  Do not speak to anyone.

2            (Whereupon, a break was taken.)

3            DEPUTY CLERK:  All rise.

4    (Whereupon, the jury entered the courtroom.)

5    (In open court, jury present.)

6            MR. DAVIS:  Your Honor, can we approach for

7    one brief second.

8            THE COURT:  Sure.

9            (Sidebar discussion held as follows:)

10           THE COURT:  Yes, counsel?

11           MR. DAVIS:  The reason I was confused by that

12   exhibit he handed him with the annual compensation, the

13   copy he handed him had the numbers on it but my copy did

14   not.

15           THE COURT:  It's not getting introduced.

16           MR. DAVIS:  I know but I'm afraid they are

17   going to do that with the hours worked document as well.

18   That was actually prepared by counsel, not the witness.

19           THE COURT:  That's a fair point.  How are you

20   going to do that?

21           MR. WARREN:  The document is not going to be

22   introduced in accordance with the judge's ruling.

23           I will say on that issue, we conferred with

24   Mr. Davis during the break, it was entirely inadvertent,

25   the last page was pulled off.

Michael Burchik - Direct

1          THE COURT:  Yeah, mine didn't have it either.

2    I just figured you did.

3          MR. WARREN:  I didn't realize that.

4    Obviously, I happy to produce that.

5          THE COURT:  It is not going to be shown.  What

6    does it say about the hours?

7          MR. WARREN:  The witnesses are going to

8    testify about how they calculated their hours, the

9    documents they relied on, the process they went through,

10   and then they're going to testify about the numbers they

11   have come up with and what their calculations are.

12         THE COURT:  This is based on their own

13   knowledge, not show any document?

14         MR. WARREN:  That's right, we are not going to

15   introduce any document.  We are going to talk through

16   the admissible documents they used for the calculation

17   and how that process was done and then they're going to

18   explain they have done a calculation.

19         THE COURT:  Based on those documents.

20         MR. WARREN:  And that's the documents we

21   produced in the case, and we will refresh his

22   recollection of the total number and then they're, of

23   course, free to cross-examine.

24         THE COURT:  You will not introduce it as an

25   exhibit?

Michael Burchik - Direct

1          MR. WARREN:  That's correct, Your Honor.

2          THE COURT:  What's your concern?

3          MR. DAVIS:  Well, counsel prepared --

4          THE COURT:  You can cross-examine on this.

5          MR. DAVIS:  Showing him the document with a

6   number they calculated?

7          THE COURT:  It sounds like pretty good

8   cross-examination, right, if he goes that far.  That's a

9   pretty good cross-examination question.  Is that your

10  number or a number that your lawyer gave you.

11         Let's go.

12         (Sidebar discussion was concluded.)

13         THE COURT:  You may proceed.

14  BY MR. WARREN:

15  Q.   Before we took a break, I believe you were opening

16  up Exhibit 71.  Are you there now?

17  A.   Yes.

18  Q.   Could you please just explain what is shown in this

19  document.

20  A.   I believe this is a fuel document of my vehicle.

21  Q.   And have you had a chance to look through this

22  report before today?

23  A.   Yes, sir.

24  Q.   And do you believe this document accurately

25  reflects the fuel transactions that you performed with

Michael Burchik - Direct

1   your company fuel card?

2   A.   Yes, sir.

3            MR. WARREN:  Your Honor, may I publish?

4            THE COURT:  Yes.

5            MR. WARREN:  Thank you.

6            Milly, for the record, this record includes a

7   lot of other people other than Mr. Burchik.  I'm going

8   to ask you to filter this document so only Mr. Burchik's

9   name is shown.

10           Go over to the left side.  Filter Column E so

11  it only shows Mr. Burchik's name.

12  BY MR. WARREN:

13  Q.   Mike, if you could go through and just explain your

14  understanding of what the different information is

15  that's in this report?

16  A.   Other than my name, it has a date, transaction

17  date, day of the week, odometer of the vehicle, the

18  product name, the fuel I'm getting, the cost of the

19  fuel, how many gallons I got, how much I spent, and the

20  site of where I purchased the fuel at.

21           MR. WARREN:  Milly, if you could scroll down

22  and pick a month in 2013.  If you can scroll down on the

23  document, Column G.

24           That's fine.

25  Q.   Mike, as you are looking at this document, do you

Michael Burchik - Direct

1   believe this document accurately shows the fuel

2   transactions you are doing in 2012, 2013, 2014?

3   A.   Yes, sir, I do.

4   Q.   And how often does it look like you are using your

5   fuel card to fill up -- to purchase fuel?

6   A.   Every other day it looks like.

7   Q.   When you purchased fuel at these fuel stations, did

8   you have a practice of -- would you typically fill up

9   the spare diesel tank at the same time as your work

10  truck or would you do those separately?

11  A.   They had to be done separately because I would have

12  to shut one pump off and do the other one.

13  Q.   Would you typically fill up the diesel tank at the

14  same time you were filling up your work truck, in other

15  words, at the same stop?

16  A.   Yes, sir, normally, I would.

17  Q.   This fuel transaction report, is this consistent

18  with your recollection you were filling up the diesel

19  tank and truck every two or three days?

20  A.   Yes, sir.

21          MR. WARREN:   Thanks, Milly.   You can take that

22  down.

23  Q.   All right, Mike, I would like to have you take some

24  time and explain to the jurors the type of work you were

25  doing when you were working in the shop.

Michael Burchik - Direct

1             Can you say again where was the shop located?

2  A.   Canonsburg, Pennsylvania.

3  Q.   What did the shop look like?  Can you describe it

4  for the ladies and gentlemen of the jury.

5  A.   Basically, a very large garage with several bays, I

6  think it was seven or eight bays.  Some were designated

7  as wash bays, some for receiving equipment, and some for

8  dispatching equipment.  It had an overhead crane and had

9  a tool area, spare parts, et cetera.

10 Q.   When you were working in the shop, what part of the

11 shop were you working in?

12 A.   On the open floor basically.

13 Q.   Did you have an office or a desk in the shop?

14 A.   No, we did not.

15 Q.   Would you do computer work when you were working in

16 the shop?

17 A.   No, sir.

18 Q.   When you were on the open shop floor, what type of

19 work were you doing?

20 A.   Well, if we wasn't working on the crane, we was

21 doing other designated stuff, cleaning equipment,

22 painting lines on the floor.

23 Q.   Let's start with the work you were doing on the

24 crane.  What type of work would you do on the crane in

25 the shop?

Michael Burchik - Direct

1   A.   Well, we'd wash the crane especially after a job,

2   we would grease the crane, any moveable parts we would

3   more or less want to grease.  We would make sure the

4   line, the rope wasn't frayed, everything was good, in

5   good working shape.

6   Q.   Once you finished doing that kind of work, were you

7   ever responsible for heavy maintenance on the crane,

8   engine work, stuff like that?

9   A.   No, sir.  We sourced that out to regular people

10  that maintained cranes.

11  Q.   Would you do light basic maintenance on the cranes?

12  A.   No maintenance whatsoever other than greasing it

13  and washing it.

14  Q.   Once you finished doing the work you just described

15  on the crane, what else would you be doing on the shop,

16  other than painting lines on the floor?

17  A.   Helping the greasers to clean up the equipment,

18  changing O-rings, stacking spare parts.

19  Q.   How did you know how to change the O-rings in the

20  pressure control equipment?

21  A.   Normally, the greaser would show us what to do and

22  what rings had to be changed, what sizes.

23  Q.   Could you just describe in a little bit more detail

24  for the ladies and gentlemen of the jury what you're

25  doing when you are working on the pressure control

1   equipment in the shop.

2   A.   Basically, like the lubricator it has O-rings

3   inside of it.  The old ones you have to cut out and

4   clean the tubes inside and out.

5        It would be real greasy and there are certain

6   size rings that go inside.  You have to put the ones in

7   and grease it down and prepare it for the next job.

8   Q.   While you worked at Oil States, did you ever

9   receive any formal training on how to do that type of

10  work you just described?

11  A.   Training, no.  It was just the greasers showing you

12  what to do.

13  Q.   The pressure control equipment, how does it get all

14  taken apart?

15  A.   The unit itself?

16  Q.   The pieces of the lubricator, the different steel

17  components.

18  A.   Basically, you have an overhead crane and it's all

19  taken off the trailer and broken down.  It's already

20  normally broken down when it's strapped on a trailer for

21  transport.

22        That's taken off the trailer itself and it

23  goes to certain areas within the shop where actually

24  there's room.  Certain types of equipment, the rigs are

25  checked, the hoses are rolled out and cleaned and the

Michael Burchik - Direct

1   units filled with grease, fueled and basically once over

2   the whole packet.

3   Q.   Were there any folks who worked in the shop whose

4   job was to just do this type of work you described?

5   A.   Yes, there were a couple shop hands where that's

6   all they did was take care of the equipment, make sure

7   it was done right if other people were doing it.

8                Once it was all put together, it was normally

9   pressure tested in a certain booth.

10  Q.   And the shop hands, how did the duties that you

11  were performing when you worked in the shop, how did

12  your duties compare to the duties and the work that the

13  shop hands were doing?

14  A.   There wasn't no comparison.  They did hourly shop

15  work and we just operated a crane.  We just helped one

16  another.

17  Q.   When you are working in the shop, how did the work

18  you are doing in the shop compare to the work the shop

19  hands are doing?

20  A.   It's basically the same other than the crane.

21  Q.   When you say "other than the crane," were you

22  operating cranes when you were at the shop?

23  A.   Other than getting it cleaned up, no.

24  Q.   Were you actually picking up pressure control

25  equipment when you were working at the shop?

Michael Burchik - Direct

1    A.    No, not with the crane.  Normally, they had an

2    overhead crane that would do that.

3    Q.    Who operated those overhead cranes?

4    A.    Anyone in the shop is qualified to do it.  You had

5    to be qualified but I believe everyone was.

6    Q.    You believe everyone in the shop was qualified?

7    A.    Yes, sir.

8    Q.    Do you know what was required to be qualified?

9    A.    I don't know if there was a test for non-crane

10   operators but you did have to have a certain amount of

11   instruction on how to operate the crane itself.

12   Q.    When you were working in Oil States, were you ever

13   involved in interviewing job applicants?

14   A.    No, sir, I was not.

15   Q.    Have you ever been involved in the hiring process

16   at all at Oil States?

17   A.    No, sir, I have not.

18   Q.    While you worked at Oil States, had you ever

19   recommended anyone that Oil States hire anyone?

20   A.    No, sir, I did not.

21   Q.    While you worked at Oil States, did you ever make

22   any recommendations or suggestions about whether Oil

23   States should discipline someone?

24   A.    No, sir, I did not.

25   Q.    Did you ever make any recommendations about whether

1  Oil States should fire someone?

2  A.   No, sir.

3  Q.   Were you involved in any aspect of the process of

4  running the company, doing back office work?

5  A.   No, sir.

6  Q.   So, were you involved in any type of office work at

7  all when you were working at the shop?

8  A.   No, sir.

9  Q.   Were you involved in -- other than I believe you

10 said there was one or two days when you did on-the-job

11 training, is that right?

12 A.   For one lad, yes.

13 Q.   Other than those one or two days, were you ever

14 involved in training anyone in Oil States?

15 A.   No, sir.

16 Q.   When you were working in the shop, were you ever

17 supervising anyone?

18 A.   No.

19 Q.   Were you ever telling anyone what type of work they

20 should be doing?

21 A.   No.

22 Q.   Did anyone in the shop report to you?

23 A.   No, sir.

24 Q.   Did you oversee the work that anyone else was

25 doing?

1  A.   No, sir.

2  Q.   Were you ever involved in determining the amount of

3  compensation that should be paid to another employee?

4  A.   No, sir, I was not.

5  Q.   Did you have any involvement whatsoever in the

6  company's budgeting?

7  A.   No, sir, I did not.

8  Q.   Were you involved in stuff like buying new

9  equipment or deciding what equipment to purchase?

10  A.   No, sir.

11  Q.   Were you involved in deciding what equipment Oil

12  States would send out on jobs?

13  A.   No, sir.

14  Q.   Were you ever involved in deciding which employees

15  would be sent out on jobs?

16  A.   No, sir.

17  Q.   Did you perform anything that you considered to be

18  a white collar job duty while you were working in the

19  shop?

20  A.   No, sir, I did not.

21  Q.   What were the shop hours when you worked in the

22  shop?

23  A.   Shop hours were eight to five, minus an hour for

24  lunch.

25  Q.   Would you ever work on the weekends?

Michael Burchik - Direct

1   A.   Yes, sir.  Normally, we worked Saturdays but

2   Sundays we were normally off.

3   Q.   Would you receive overtime pay when you came in and

4   worked on a Saturday?

5   A.   No, sir.

6   Q.   Would you receive any overtime pay when you worked

7   on a Sunday?

8   A.   No, sir.

9   Q.   How strict was the company about shop hours?

10  A.   I believe they had a policy by Brian Victor that

11  designated the shop hours.

12  Q.   Who was Brian Victor?

13  A.   He was a supervisor prior to Adam.

14  Q.   When you say "Adam," who are you referring to?

15  A.   Adam Fowler, the current supervisor.

16  Q.   When you say "supervisor," are you referring to the

17  district manager?

18  A.   Yes, sir.

19  Q.   Did Mr. Brian Victor have Adam Fowler's job before

20  Mr. Fowler?

21  A.   Yes, he did.

22  Q.   Do you recall roughly when Mr. Victor left the

23  company?

24  A.   I believe 2013-'14.  I'm not really sure.

25  Q.   When Mr. Victor was working at Oil States, how, if

Michael Burchik - Direct

1   at all, were the shop hours different than when

2   Mr. Fowler was the district manager?

3   A.   I believe the shop hours were the same.

4   Q.   You believe the shop hours were the same?

5   A.   Yes.

6   Q.   Do you recall whether Mr. Victor was -- what was

7   his attitude toward shop hours?  Do you recall anything

8   about that?

9   A.   Well, he was adamant about us staying at the

10  shop -- working the shop hours as they were designated.

11  Q.   What was Mr. Victor's just general demeanor in

12  life, what kind of person was he?

13  A.   He was a nice fellow.  He was just strict on the

14  hours, that's all.

15  Q.   Was he strict on the hours about working weekends?

16  A.   Yes, he was pretty adamant about that, also.

17  Q.   Do you remember what he would say about working on

18  weekends?

19  A.   He wanted us there at the shop.  If we wasn't on

20  the job, he wanted us there.

21  Q.   What hours did he want you there?

22  A.   Eight to five.

23  Q.   Were there circumstances where you had to work past

24  five p.m. when you were working in the shop?

25  A.   Yes, there was.

Michael Burchik - Direct

1   Q.   Can you describe for the ladies and gentlemen of

2   the jury what some of those circumstances might be?

3   A.   Well, if we had a package together to go out on a

4   job or if he was designated as the hotshot to take some

5   equipment to a job, after duty hours, then you would

6   have to do it.

7   Q.   When you would work past five p.m., did you ever

8   receive any overtime pay for those hours?

9   A.   No, sir, we did not.

10  Q.   Did you ever receive any job bonus in any form of

11  those hours?

12  A.   No, sir, we did not.

13  Q.   Earlier you described hotshots you performed.  Did

14  you ever receive a bonus for any hotshots you performed?

15  A.   No, sir.

16  Q.   When you worked at Oil States, did you clock in and

17  clock out during the day?

18  A.   No, we weren't required to clock in or out.

19  Q.   Would you keep track of the hours you worked in the

20  shop?

21  A.   No, not necessarily.

22  Q.   Do you know if Oil States kept any record of the

23  hours you worked in the shop?

24  A.   I don't believe they had records that indicated our

25  shop hours.

Michael Burchik - Direct

1  Q.   Have you ever seen any time records that showed the

2  hours that you were working at the shop?

3  A.   No, sir, I did not.

4  Q.   What about the hours you worked at the

5  wellsite -- let me first ask this.  Did you record days

6  you worked in the shop?

7  A.   I believe there was a time period we had to do a

8  man hours report but I think that particular block could

9  be left blank.  I don't recall.

10  Q.   We'll talk about those documents in just one

11  second.

12        Other than those man hours reports, do you

13  recall any other document that showed the days you

14  worked in the shop?

15  A.   No, sir.

16  Q.   What about the days that you worked at wellsites,

17  would you keep track of the days you worked at the

18  wellsite?

19  A.   Normally, the days we worked on a wellsite we kept

20  a tally of.

21  Q.   When you say you kept a tally of, where would you

22  record that information?

23  A.   A tally book, a little notebook that mostly all the

24  guys kept in order to keep track of their bonuses.

25  Q.   Why did you keep a tally book?

1   A.   Initially, when I first started, they would be

2   sending me out on a job with a boom truck but there was

3   no ticket to go along with a bonus packet, so I couldn't

4   file my bonus packet unless I had a ticket.

5        So, it was told to me if you wanted to get

6   paid, you should keep a running tally of the jobs you

7   worked on and the number of days.

8   Q.   Do you remember roughly when you started keeping

9   those tally books?

10  A.   The very first year, maybe within the first couple

11  months that I was working there.

12  Q.   If you could turn in your binder, please, to Tab

13  No. 12.

14  A.   I don't have a 12.  It jumps to 14.

15  Q.   We'll find Tab 12 for you but why don't you go to

16  14.  What is that document?

17  A.   It's a ticket for a wellsite and the name of the

18  pad is Chris well.

19  Q.   You said it's a ticket.  Can you describe for the

20  jurors what a ticket is.

21  A.   It's just an authorized document that was generated

22  to rent equipment to that particular company that was

23  working on the well.

24  Q.   And were those tickets, were they part of a group

25  of other documents?

Michael Burchik - Direct

1    A.   They were a part of our bonus packet when we filled

2    it out.

3    Q.   All right.  These documents that you're looking

4    through under Exhibit 14, are those your bonus packets?

5    A.   This particular one here (indicating), yes, it is.

6    Q.   It's a pretty thick stack.  I won't ask you to look

7    through every document, but if you can skim through and

8    see if this appears to be your bonus packets.

9             (Pause in the proceedings.)

10   A.   Well, I see some are mine and some are mine.  I see

11   quite a few of those with my name on it.

12             MR. WARREN:  Your Honor, may I publish?

13             THE COURT:  Yes.

14   Q.   Mike, could you please explain to the ladies and

15   gentlemen on the jury what is shown -- what information

16   is on the ticket.

17   A.   Basically, the ticket number right there is the

18   number that you want to concern yourself with.  If

19   you're going to get pay for, you need that number.  It

20   designates that particular job.

21             It shows the operators and myself and Wayne

22   Eddy, the type crane I'm using, and how much the crane

23   cost.

24   Q.   Who actually filled out these tickets?

25   A.   These are generated from our dispatch office I

Michael Burchik - Direct

1   believe.

2   Q.   Did you ever generate that ticket?

3   A.   No, sir.

4   Q.   And would someone give that ticket to you?

5   A.   Yes.  It was given to us prior to departure.

6   Q.   What would you do with it?

7   A.   We would carry it to the job site and the company

8   man would sign it once the job was finished.

9   Q.   Let's put that down and I'm going to hand you a

10  binder.  I think we tracked down Tabs 12 and 13.  See if

11  you can set that one to the side.

12          Could you identify what that document is?

13  A.   This particular document is a copy of my tally

14  book.

15  Q.   Is that your handwriting?

16  A.   That is my handwriting.

17  Q.   Is that a document you filled out?

18  A.   Yes.

19          MR. WARREN:  May I publish?

20          THE COURT:  Yes.

21  Q.   So, if you could just describe for the ladies and

22  gentlemen of the jury what type of information you would

23  write in your tally books?

24  A.   Basically the top information up here (indicating),

25  the ticket number, the location of the site, the

Michael Burchik - Direct

1  wireline unit we were working for right there

2  (indicating), the other shift people was Steve and Don,

3  this is the pad name with three wells on it, this is the

4  type of crane I used, and these are the tickets for the

5  three wells (indicating).

6  Q.   On the right side, what type of information are you

7  recording on the right side of that page?

8  A.   On the right side, basically since my job is so

9  repetitious, I normally record the date, a couple items

10 I do and the shift and the number of hours for the

11 shift.

12 Q.   So, could you just pick one of those entries and

13 read for the jurors what you are writing in your tally

14 books?

15 A.   This particular one says on location on a Sunday at

16 10:00, I picked up and set the lubricator, BOP and lube

17 well 3H.  At 11:20, I removed it and laid down at 2:00,

18 and I fueled the crane.

19 Q.   If you could just flip through the PDF, the paper

20 copy you have, and see what date range is covered by

21 this particular tally book?

22 A.   This is April 12th and it goes into May 6, May 7,

23 May 8th.

24 Q.   Of 2012?

25 A.   May 8th, 2012.

**Michael Burchik - Direct**

1  Q.   Let me have you please flip to Tab 13.  Could you

2  identify what that document is.

3  A.   It's the same document, just another company,

4  another day.  It's October the 9th of 2012.

5  Q.   Is this another one of your tally books?

6  A.   Yes, it is.

7         MR. WARREN:  Your Honor, may I publish?

8         THE COURT:  Yes.

9  Q.   If you could, could you flip through and tell the

10  ladies and gentlemen of the jury what date range is

11  covered by this particular tally book.

12  A.   Date range is October 9, 2012, October 19th, October

13  20th, October 22nd, October 23rd, 25th, 26th, October

14  29th -- October 29th was the last job.  So, October the

15  9th through the 29th.

16  Q.   I want to make sure the record is clear, October of

17  2012?

18  A.   2012, yes, sir.

19  Q.   What was the end date?

20  A.   The 29th, 2012.

21  Q.   Okay.  Could you go through -- if you look on the

22  first page of Exhibit 13, would you always record the

23  time that you arrived at the wellsite and the time that

24  you left the wellsite?

25  A.   No, sir, I did not.  We did 12-hour shifts and that

Michael Burchik - Direct

1    was like basic.

2    Q.   So, you felt you didn't need to write the time you

3    arrived?

4    A.   My concern was to have the company name, the

5    delivery ticket, and the dates I worked.

6    Q.   If you look on these entries on the first page,

7    let's look on the 11th and the 12th, are you able to

8    figure out what your general hours were at the wellsite

9    on those days?

10   A.   From October 11th, it was quarter to one in the

11   morning I removed the BOP and lubricator and at 3:00, I

12   set them again.  So, this was a night shift for myself.

13   Q.   On the 12th, how long was that shift on the 12th?

14   A.   I started the night shift and I departed at 7:00 in

15   the morning.

16   Q.   Are you able to go through these tally books that

17   you have and estimate the hours that you were working at

18   the wellsite for the time range covered by your tally

19   books?

20   A.   Estimate, yes, I was.

21   Q.   If you could turn, let's go to September 1st of

22   2013.

23   A.   September 13th.

24   Q.   We'll pull it up on the screen.  So you don't have

25   to flip through it.

1              This is a job.  I'm going to ask Milly to

2    scroll through.  Explain for the jurors what you are

3    doing on each day starting in August of 2013, describe

4    the general type of work you are doing on each of these

5    days.

6    A.   Just basically picking up and setting BOP and

7    lubricator on the well.

8    Q.   Is that typical of the work you were doing on the

9    wellsite?

10   A.   That's the typical everyday job.

11   Q.   Is that the type of work you were describing for

12   the ladies and gentlemen of the jury earlier?

13   A.   Yes, sir, it was.

14              MR. WARREN:  Milly, if you could go through.

15   Q.   Let's figure out the day when this particular job

16   started.  I ask you to go to August 23rd.  What happens

17   on the 23rd?

18   A.   I was at the shop and I went to Clarksburg, West

19   Virginia, hotel.

20   Q.   Then the 24th, 25th, 26th, 27th, are you working on

21   those days?

22   A.   Yes, sir.  We was on Phillip Base, 13 was the well.

23   Q.   The next, 28th, 29th, 30th, and 31st, were you working

24   those days?

25   A.   Yes.

1    Q.   What about the next few days?

2    A.   We had a holiday in there but 2, 3, 4, 5, and 6,

3    yes.

4    Q.   Did you work on the holiday?

5    A.   Yes, we was there.

6    Q.   Can we keep working to the 7th, 8th, 9th, 10th, 11th,

7    12th, were you working on those days?

8    A.   Yes.

9    Q.   13 through 17, were you working each of those days?

10   A.   Yes, sir.

11   Q.   What about the 18th and 19th?

12   A.   Yes.

13   Q.   Did you get a couple days off?

14   A.   20 and 21 was days off.

15   Q.   22, what are you doing there?

16   A.   We rigged up a crane and a grease package and we

17   was waiting for iron to come out.

18   Q.   Back on the wellsite?

19   A.   Yes.

20   Q.   Going through to the 24th through 29th, are you

21   working those days?

22   A.   Yes, we were.

23   Q.   Keep going all the way through, just quickly go

24   through the 30th through the 4th, are you working those

25   days?

Michael Burchik - Direct

1    A.    Yes, sir, I was.

2    Q.    What about the 5th through the 12th?

3    A.    6th, 7th, and 8th, we were on stand-by.

4    Q.    Describe for the ladies and gentlemen of the jury

5    what that means.

6    A.    Basically they had a problem with the well and they

7    called in a snubbing unit, so we had to basically rig

8    down and move to the side while they corrected the

9    problem and on the 9th of September we were back in

10   business.

11   Q.    Are you just waiting for them to fix the problem

12   while they are doing that?

13   A.    Yes.

14   Q.    Once you are back in business, are you working

15   through 9, 10, 11, 12?

16   A.    I started the night shift on the 9th.

17   Q.    The 13th through the 18th, working every single one

18   of those days?

19   A.    Yes.

20   Q.    What are your shifts on these days, how many hours

21   are you working?

22   A.    12-hour shifts.

23   Q.    Why are you confident of that?

24   A.    Because that's the typical shift for any jobs, 12

25   hours.

Michael Burchik - Direct

1    Q.   All right.

2             MR. WARREN:  Keep going, please, Milly.

3    Q.   The 19th through the 24th it looks like you are still

4    working, is that right?

5    A.   Yes, sir.  These are all in the same pad.  There

6    are three wells on the pad.  We are jumping well to

7    well.

8    Q.   What about on 25 to 29, are you working on the

9    wellsite each of those days?

10   A.   Yes, we were.

11   Q.   And let's finally go to the 30th through the 2nd, are

12   you working those days?

13   A.   Yes, sir, we are.

14   Q.   Do you remember this particular job where you

15   worked 70 out of 72 days?

16   A.   Yes.  We stayed in West Virginia quite a bit.

17   Q.   Do you remember where that was in West Virginia?

18   A.   Clarksburg hotel, Hampton Inn right off the

19   interstate.  It was about an hour to the wellsite,

20   through the mountains.  It was quite a distance.

21   Q.   What was your general work schedule at Oil States?

22   A.   30 days on and 10 days off.

23   Q.   Did you always get to take your 10 days off?

24   A.   No.  Normally, if we were in the middle of the job,

25   we stayed working.

Michael Burchik - Direct

1  Q.   Were there ever any situations where you were asked
2  to keep working but you wanted to take your days off?
3  A.   Could you repeat that.
4  Q.   Sure.  Were there ever any situations where someone
5  at Oil States asked you to keep working when your days
6  off came up but you wanted to take the days off?
7  A.   Yes, that happened quite a bit.
8  Q.   What would happen in those circumstances?
9  A.   Normally, they didn't have someone to replace you
10  if that was the question involved but we didn't mind the
11  work.  We would stay if there was no one there to
12  replace us.
13  Q.   In the time period of 2012, 2013 into 2014, do you
14  recall roughly how often you were working through your
15  days off?
16  A.   I just don't recollect.  It's too long ago.
17  Q.   That's fair.  Are you familiar with a daily report
18  or a job activity log?
19  A.   Yes, sir.
20  Q.   What is that document?
21  A.   It's basically a document we completed when we was
22  working on the well.
23  Q.   What information would you use to fill out your
24  daily reports?
25  A.   It was normally done with the tally book or same

1  timeframe we did for the tally book.

2  Q.   Could I ask you to look at Tab 15.  Can you

3  identify what those documents are?

4  A.   This is a job report but it is not one of mine.

5  Mine are normally handwritten.

6  Q.   Can you flip through it and see if you can find any

7  of yours in that document.

8  A.   There's mine, a real basic one.

9  Q.   What is the page number on the bottom?

10 A.   It says 007.

11          MR. WARREN:  Your Honor, may I publish?

12          THE COURT:  Yes.

13 Q.   Is this your handwriting up on the screen?

14 A.   Yes, sir.

15 Q.   Describe for the ladies and gentlemen of the jury

16 what type of information you recorded in these daily

17 reports?

18 A.   It got the time I arrived at the location, rigged

19 up, removed the risers.

20 Q.   Are you just generally describing the work you are

21 doing at the wellsite?

22 A.   Yeah.  It's a stinger job.  It was a different kind

23 of job.  It was a stinger operation where it had

24 different kind of equipment but I was operating a crane

25 for them.

Michael Burchik - Direct

1  Q.   You were doing a crane job for stinger?

2  A.   Yes.

3  Q.   Are you familiar with a job bonus spreadsheet?

4  A.   Yes, sir.

5  Q.   Is that a document you filled out at Oil States?

6  A.   Yes.

7  Q.   Could you turn to Tab 16.  What is that document?

8  A.   The job bonus spreadsheet is a document that went

9  along with the bonus packet when we turned in our bonus

10  packet.

11  Q.   Did you fill these out yourself?

12  A.   Yes, that's my writing.

13          MR. WARREN:  Your Honor, may I publish?

14          THE COURT:  Yes, please publish.

15  Q.   If we look here, does this reflect the location

16  where you were working?

17  A.   Yes, sir.

18  Q.   Column G, it says position on job?

19  A.   Yes, sir.

20  Q.   What did you write in that column?

21  A.   Crane operator.

22  Q.   Is that the work you were doing?

23  A.   Yes, sir, it was.

24  Q.   When would you fill out these job bonus

25  spreadsheets?

Michael Burchik - Direct

1    A.   Along with our bonus packet.

2    Q.   Let's pull that down.

3             Are you familiar with the monthly hours worked

4    report?

5    A.   Yes, sir, I am.

6    Q.   If you could go to Tab 17.

7    A.   Okay.

8    Q.   What is that document?

9    A.   That's the monthly hours report.

10   Q.   Did you also call that document by another name?

11   A.   I don't remember.  I don't think so.

12   Q.   No problem.  Is that your handwriting on that

13   document?

14   A.   That's my handwriting but we filled these out on a

15   monthly basis.

16            MR. WARREN:  Your Honor, may I publish?

17            THE COURT:  Yes.

18   Q.   Do you happen to recall what month this was for?

19   A.   January, I believe, 2015.

20   Q.   There is only one entry on that report.  Do you

21   know why?

22   A.   That's the only job I did for that particular

23   month.

24   Q.   Was business a lot slower in January 2015?

25   A.   Yes, sir, it was.

Michael Burchik - Direct

1   Q.   Would you fill out man hour reports in 2012, 2013,

2   and 2014?

3   A.   Yes, sir, we filled them out every month but when

4   we asked Oil States to give these documents to us, this

5   is the only document they furnished us with.

6   Q.   Do you have copies of your man hour reports from

7   2012 to 2014?

8   A.   No, sir, we weren't required to keep them.

9   Q.   So, when you filled these out, you would turn them

10  into Oil States?

11  A.   Yes.

12  Q.   Did you ever keep a copy for yourself?

13  A.   No, sir, we never had reason to keep them.

14  Q.   So, you haven't received copies of the 2012 to 2014

15  documents?

16  A.   That's correct.

17  Q.   So, earlier we talked about -- you can take that

18  down.   Earlier we talked about the amount of salary

19  compensation you earned at Oil States, do you remember

20  that?

21  A.   Yes.

22  Q.   Have you also gone through and tried to calculate

23  and estimate the amount of bonus compensation you earned

24  during the periods?

25  A.   Yes.

Michael Burchik - Direct

1  Q.   What documents or information did you use to

2  perform that estimate?

3  A.   I used my tally books.

4  Q.   Why were you able to use your tally books to figure

5  out the bonus you earned?

6  A.   Because basically that was the most accurate

7  information I had.

8  Q.   So, you used your tally books to figure out the

9  shifts you worked?

10  A.   Yes.

11  Q.   Were you able to determine the number or estimate

12  the number of bonuses that you earned?

13  A.   Yes.

14  Q.   Have you gone through and tried to add up or

15  estimate the number of bonuses you earned during

16  different time periods at Oil States?

17  A.   Yes.

18  Q.   Do you have an estimate of the dollar value of the

19  bonuses you earned between August 24 of 2012 and August

20  24, 2015?

21  A.   Yes, it's written down on my worksheet.

22  Q.   Are those notes that you took?

23  A.   Yes, they are my notes.

24  Q.   Would it help refresh your recollection if you look

25  at those notes?

Michael Burchik - Direct

1   A.   Yes, sir.

2   Q.   Let me know if that is the document you were

3   referring to?

4   A.   Yes, sir, it is.

5   Q.   Does this refresh your recollection of the

6   calculations you have done of the dollar value of job

7   bonuses you earned between August 25, 2012 and August 24

8   of 2013?

9   A.   Yes.

10   Q.   What is that number?

11        THE COURT:   Okay.   Answer the question, sir.

12   A.   The number of bonuses I received from August 25th,

13   2012 to August 24th, 2013 was 148 bonuses.

14   Q.   What was the dollar value of those bonuses?

15   A.   Dollar value was $66,600.

16   Q.   Have you performed a similar calculation of the

17   number and dollar value of the job bonuses you earned

18   from Oil States between August 25 of 2013 and when you

19   left the company in February of 2015?

20   A.   Yes, sir.   Number of bonuses was 229 at a dollar

21   value of $103,050.

22   Q.   Thank you very much.   Let me take those back from

23   you.

24        Mike, have you also gone through and tried to

25   estimate the hours that you worked at Oil States between

Michael Burchik - Direct

1   2012 and 2015?

2   A.   The hours, yes, sir, we did.

3   Q.   Can you please describe for the ladies and

4   gentlemen of the jury how you have gone through and

5   estimated your hours?

6   A.   Well, using our tally book by the documents you

7   showed, I had the job dates recorded and I also had the

8   hours that I worked on each job and the number of days.

9   Q.   And have you gone through and tried to figure that

10  out for each day between August 2012 and February of

11  2015?

12  A.   Yes, sir, I did.

13  Q.   Would you record your shop days in your tally book?

14  A.   Actually the shop days were not recorded.  If we

15  did not work on a job wellsite, we either worked in the

16  shop or had days off.

17  Q.   So, were you able to use the tally books to

18  estimate the hours that you worked at wellsites?

19  A.   Yes.

20  Q.   Did you have any documents that you were able to

21  use to estimate the hours you worked in the shop?

22  A.   No, not for the shop.

23  Q.   So, have you tried to come up with an estimate of

24  the hours that you worked in the shop?

25  A.   Yes.  Keeping my tally book in mind and the days

Michael Burchik - Direct

1  off schedule, we was able to get a fairly accurate

2  number of hours for the shop.

3  Q.   When you were coming up with those estimates, how

4  many hours did you use for each shop day?

5  A.   Regular shop day was eight hours.

6  Q.   Why did you use eight hours in your estimate?

7  A.   Because that was the designated number of hours for

8  a shop day.

9  Q.   What about weekends, did you include weekends in

10 your estimate?

11 A.   We included Saturdays and not Sundays.

12 Q.   Why would you do that?

13 A.   Well, normally, we worked Saturdays and Sundays we

14 normally had off.

15 Q.   When you were doing these estimates, did you try to

16 figure out your off days?

17 A.   That was taken from our days off report balanced

18 against our tally report.

19 Q.   The days off report, what document is that?

20 A.   That was our scheduled days off for each month was

21 30-day schedule.

22 Q.   Would you try to incorporate your scheduled days

23 off into these hour estimates you did?

24 A.   Exactly.

25 Q.   This may not be an obvious question and answer but

Michael Burchik - Direct

1  for the days that you took off, how many hours did you

2  include for those days in your estimate?

3  A.   Zero hours for days off.

4  Q.   So, have you actually gone through and tried to

5  look at these documents and compile this information and

6  come up with your best estimate of the total number of

7  hours you worked between August 2012 and August of 2013?

8  A.   Well, balancing those reports, that would give us a

9  fairly accurate number of hours that we worked within

10  that timeframe.

11  Q.   Have you actually gone through and tried to come up

12  with that estimate?

13  A.   Yes, I did, and it's written down on my notes.

14  Q.   If I handed you your notes, would that help refresh

15  your recollection of the estimates that you did for that

16  time period?

17  A.   Yes, it would.

18  Q.   I'm going to hand you this document and please let

19  me know whether those are your notes and whether that

20  document helps refresh your recollection of the

21  estimates that you've come up with for the total number

22  of hours you worked between August 25, 2012 and August

23  24, 2013.

24  A.   The total number of hours for the first dates was

25  3,012 total hours.

Michael Burchik - Direct

1  Q.   Have you also tried to estimate the number of

2  overtime hours you worked in that period?

3  A.   Yes, sir.  For the same period timeframe was 1,257

4  overtime hours.

5  Q.   Could you tell the ladies and gentlemen of the jury

6  how you calculated overtime hours based on the total

7  number of hours?

8  A.   The overtime hours are based on hours that are over

9  40 hours.  If it was over 40 hours, it was designated as

10 overtime hours.

11 Q.   Have you tried to go through and figure out how

12 many overtime hours you worked on each individual week?

13 A.   Yes, sir, I did.

14 Q.   The numbers you just provided the ladies and

15 gentlemen of the jury, is that how you came up with

16 those overtime hours?

17 A.   Yes.

18 Q.   Have you also gone through and tried to estimate

19 the total number of hours you worked between August 25th

20 of 2013 and then when you left the company in February

21 of 2015?

22 A.   Total hours?

23 Q.   Total number of hours, yes, sir.

24 A.   Total number for the first period was 3,012 and for

25 the second period was 4,029 hours.

1  Q.   The 4,029 just to be clear, what time period is

2  that covered by?

3  A.   August 25, 2013 through February 18, 2015.

4  Q.   Have you gone through and estimated the number of

5  overtime hours that you worked between that August 25,

6  2013 and February 2015?

7  A.   Yes.  Overtime hours was 1,731.

8  Q.   Mike, was there a period when you worked at Oil

9  States when you were out sick?

10 A.   Yes, sir, I was in the hospital.

11 Q.   When was that?

12 A.   December 18th, 2013 through I believe it was the

13 middle of March 2014.

14 Q.   That time period when you were in the hospital,

15 have you accounted for that in the hours estimate you

16 have done?

17 A.   I accounted for it, yes, sir.

18 Q.   How many work hours did you include for those days?

19 A.   Zero hours.

20 Q.   So, that time period that you were out, was that

21 included in the estimates you just provided to the

22 ladies and gentlemen of the jury?

23 A.   Yes, sir, it was.

24 Q.   Mike, based on those estimates you just provided,

25 have you calculated the average number of overtime hours

1   you worked in a typical week at Oil States?

2   A.   Average number of hours?  Yes, sir, by using the

3   documents, my tally book, plus days off report.

4   Q.   Do you recall what the average number of overtime

5   hours you worked in a typical week was?

6   A.   Between 24 and 25.

7   Q.   Somewhere between 25 overtime hours a week?

8   A.   Yes.

9   Q.   Do you believe that's an accurate estimate of the

10  overtime hours you worked at Oil States?

11  A.   Yes.

12  Q.   Do you believe these estimates you come up, do you

13  believe they are reasonable to the best of your ability?

14  A.   I believe so.

15  Q.   What are you asking the ladies and gentlemen of the

16  jury to award you in this case?

17  A.   Basically the hours that we compiled together that

18  we estimated that we worked that is due us.

19  Q.   Do you have any particular dollar amount in mind?

20  A.   No, I have no dollar amount.  It's just based on

21  the number of hours we worked during that timeframe.

22  Q.   What is your understanding of how the dollar amount

23  is determined based on the number of overtime hours you

24  worked?  Are you familiar with the formula that is used?

25  A.   I heard of it but I don't really understand how

**Michael Burchik - Cross**

 1   it's formulated.  I believe the judge figures that out.

 2   Q.   Okay.

 3        MR. WARREN:  Thank you, Mike.  I have no

 4   further questions.

 5        THE COURT:  Thank you very much.

 6        Counsel, do you wish to begin

 7   cross-examination?

 8        MR. DAVIS:  Yes, Your Honor.

 9        If I may approach to switch binders.

10        THE COURT:  Yes.

11                    CROSS-EXAMINATION

12   BY MR. DAVIS:

13   Q.   Good afternoon, Mr. Burchik.

14   A.   Good afternoon, sir.

15   Q.   I want to talk to you about the job you had before

16   coming to Oil States, I think it was Angelo's Landscape,

17   right?

18   A.   Yes, sir.

19   Q.   You talked about a couple different types of

20   machinery you operated there.  You had the forklift, I

21   think you said a front end loader?

22   A.   It was a loader, yes.

23   Q.   That's a lot different from the crane you operated

24   at Oil States, the 45-ton crane, correct?

25   A.   Basically, the levers are the same.

Michael Burchik - Cross

1   Q.   But let's just take a forklift, for example, at

2   Angelo's.  At Angelo's you were paid $13.20 an hour,

3   correct?

4   A.   Yes, sir.

5   Q.   If you worked 2,000 hours a week, that's about

6   $26,000.  Maybe with some overtime, maybe you get to

7   $30,000 a year, correct?

8   A.   Yes.

9   Q.   A forklift doesn't have a computer on it, does it?

10  A.   No, sir.

11  Q.   A forklift doesn't have outriggers that you have to

12  get placed in just the right place so this doesn't tip

13  over, does it?

14  A.   No, sir.

15  Q.   When you are operating a crane, you have to enter

16  information into that computer and it better be right or

17  that crane maybe will make an error in judgment and hurt

18  somebody, right?

19  A.   To a degree, that's correct.

20  Q.   You have to tell the computer how far out you have

21  the outriggers, right?

22  A.   Basically you only put them all the way out.

23  Q.   You have to tell the computer how many reeds you

24  have out, correct?

25  A.   Number of lines, yes, sir.

**Michael Burchik - Cross**

1    Q.    What is a reed?  Explain that.

2    A.    Number of lines on your block that each line that

3    you add, you get more weight to pick up.

4    Q.    If you put in the wrong information in that

5    computer, something could fall on something and somebody

6    could get hurt?

7    A.    That's incorrect.  The number of reeds, regardless

8    of what number you put in, if you try to pick something

9    up that is too heavy, the crane would shut down.

10   Q.    In a forklift, that doesn't have an anemometer,

11   does it?

12   A.    No, sir.

13   Q.    That measures wind speed?

14   A.    That's correct.

15   Q.    If you are operating a forklift in a warehouse, you

16   don't have to worry about lightning strikes off in the

17   distance that might cause you to shut down the crane,

18   you don't have to worry about wind that may make that

19   boom swing, you don't have to worry about those things,

20   do you?

21   A.    That's correct.

22          MR. DAVIS:  If we could put up Exhibit 59 up

23   on the screen.

24   Q.    So, when are you operating a forklift, you don't

25   have people standing under the forks, do you?

Michael Burchik - Cross

1    A.   That's correct.

2    Q.   When you are operating one of these cranes and

3    lifting -- this flow tube with the lubricator and the

4    grease head, about how much does that weigh?

5    A.   Maybe 10,000, 14,000 pounds all combined.

6    Q.   So, with this crane you are hanging something like

7    10,000 to 14,000 pounds up in an air and I'm seeing a

8    guy standing right under there, do you see that?

9    A.   Yes, I do.

10   Q.   You're in complete control of this crane using the

11   joy sticks, using the buttons, and that man's life is in

12   your hands hoping you don't drop it on him, right?

13   A.   I would say he is hoping, yes.

14   Q.   That's a little bit different than operating a

15   forklift, isn't it?

16   A.   Yes.

17   Q.   When you were hired by Oil States, one of the

18   reasons you wanted this job was because it was salary

19   and it had big job bonuses, correct?

20   A.   That's not necessarily true.

21   Q.   This pay plan paid you more than triple what you

22   were making at Angelo's, correct?

23   A.   Yes, it did.

24   Q.   And as a salary employee when you got those days

25   off, you still got your salary, right?

Michael Burchik - Cross

1   A.   Correct.

2   Q.   If you left early -- I think we saw some entrees in

3   your tally book where it said standby.  What that means

4   is you get to the wellsite and there's nothing to do,

5   right?

6   A.   Sometimes that might be true and sometimes it's

7   not.

8   Q.   Sometimes you wouldn't even have to go to the

9   wellsite, they would say you're on standby but we'll

10   call you if we need you, right?

11   A.   That might be true, yes.

12   Q.   On those days you got your salary even though you

13   didn't operate the crane at all, right?

14   A.   Correct.

15   Q.   You got your job bonus of $450 even though you

16   didn't operate that crane at all?

17   A.   That's correct.

18   Q.   I think we talked about this in your deposition.

19   When you were estimating your hours since Oil States

20   went ahead and treated that as a 12-hour shift and paid

21   you your bonus, you went ahead and put those hours in

22   and said, well, I worked 12 hours, right?

23   A.   That spreadsheet was scrubbed several times and on

24   several occasions.  There were oversights that were

25   brought to our attention and we corrected them but it

Michael Burchik - Cross

1    was scrubbed several times and if there was an error, it

2    was -- attempts were made to make it right.

3    Q.   Well, we'll talk about your hours estimate in a

4    minute.  I want to stay focused on the job.

5              This pay plan which paid you more than triple

6    what you had made at your last job, you never went to

7    management and complained about it and said I should be

8    getting overtime on top of this, did you?

9    A.   I did not know we were required to get overtime by

10   law.

11   Q.   And you didn't go to HR and say wait a minute, this

12   pay plan is illegal and Adam Fowler is willfully

13   violating the law like you're asking this jury to

14   decide, did you?

15   A.   Well, that pay plan came into effect well before

16   Adam was there and he probably wouldn't have said

17   nothing about it anyhow but that's the pay plan that was

18   offered by the company to employ people.

19   Q.   That you accepted and that you were paid exactly

20   according to that pay plan you agreed to until after you

21   left the company and then for the first time, you file a

22   lawsuit saying you were underpaid, right?

23   A.   That's because the hours that were due us was not

24   paid and it was brought to our attention.

25   Q.   Well, the hours that were due -- you were paid your

1  full salary whether you worked or you didn't, right?

2  A.   In certain instances, yes.

3  Q.   And you were paid the job bonus, whether you worked

4  or didn't, right?

5  A.   That's correct.

6  Q.   Talking about the crane for just another second,

7  this crane, there is some decision-making involved in

8  setting up, wouldn't you agree with me?

9  A.   Could you say that again, please.

10 Q.   When you go out to a wellsite, we have seen some

11 pictures about -- well, 59 shows all the different stuff

12 out there.  You have to figure out exactly where you can

13 place that crane so you can stick the boom out to cover

14 this well, this well, this well, this well, knowing the

15 capacities of the crane, the angle to put the boom, how

16 much it can hold, and all of the stuff you have to

17 avoid, right?

18 A.   That's part of the training that goes along with

19 the job.

20 Q.   Oil States gave you that training and helped you to

21 be able to make these decisions, how to set this thing

22 up, knowing how much weight you are going to have to

23 lift, where the boom should be positioned, you had to

24 make those decisions, right?

25 A.   According to my training, yes.

Michael Burchik - Cross

1   Q.   Then once you start operating the crane, you are

2   moving a joy stick, correct?

3   A.   Yes.

4   Q.   Is that one of these things that you consider

5   manual labor?

6   A.   Yes.

7   Q.   It doesn't take much effort, though, to move the

8   joy stick?

9   A.   It's still labor.

10   Q.   Looking at the computer and punching in those

11   coordinates or the things you have to punch in so it

12   knows how much weight you can lift, you view that as

13   manual labor as well?

14   A.   Yes.  You have to know how to operate it.

15   Q.   In looking at the manuals, I think there is one

16   pretty thick manual called the load charts, that has

17   chart after chart after chart.  When you are looking at

18   that before you set up, you view that as manual labor,

19   right?

20   A.   Yes.

21   Q.   And all of the paperwork, I think one of the

22   exhibits you had when Mr. Warren was asking you

23   questions was this job bonus packet.  I think it's about

24   600 pages of documents.  You did have to do paperwork in

25   your job, right?

1   A.    Other than a bonus report.

2   Q.    Well, the tally book, that's paperwork; job bonus

3   report, that's paperwork; job safety analysis, that's

4   where you go out to make sure it's safe to work, that is

5   all paperwork you do on your job?

6   A.    That was considered as part of the bonus package,

7   yes.

8   Q.    And you thought that was manual labor as well?

9   A.    Yes.

10  Q.    Then I believe you testified that after you are

11  finished with the lift, you get it in place, and the

12  wireline people start sending the tools down to do the

13  explosions, and then you can get out of the cab of the

14  crane, right?

15  A.    Yes.

16  Q.    And you said you would go help the person operating

17  the grease injection machine, right?

18  A.    Normally, yes.

19  Q.    Now, you'd agree with me, though, that the purpose

20  of you all being out there is to control pressure,

21  correct?

22  A.    Not my job.  I control the crane.

23  Q.    But you're going over when you are out of the crane

24  to help the pressure control operator, correct?

25  A.    I'm not helping him run his equipment, no.

Michael Burchik - Cross

1   Q.   But if you see a problem, you are not just going to

2   stand there while stuff starts shooting out of the well,

3   are you?

4   A.   Well, there's a lot of people around that well.

5   Anyone can stop the job.

6   Q.   Including you, you had stop work authority, right?

7   A.   That's correct.

8   Q.   Now, let's go to Exhibit 162, if we could.  I'm

9   sorry.  We don't need 162.

10          You indicated there is an alarm on the crane?

11  A.   Yes, sir.

12  Q.   So, if you are about to do something unsafe or get

13  something too heavy, it can fall and hurt somebody and

14  an alarm would go off?

15  A.   It won't let you pick it up.

16  Q.   You tried to operate in a safe zone where you never

17  got to the point of having the alarm go off, right?

18  A.   That's correct.

19  Q.   You had to make the judgment call where do I stop

20  before I hit the point where that alarm goes off, right?

21  A.   That's common sense.

22  Q.   It's sort of like the pilot flying along, they

23  don't want to wait until they get so close to the

24  mountain that the plane is telling them pull up, pull

25  up, pull up, that was your job to determine when do I

Michael Burchik - Cross

1    stop, where do I move this thing, how close do I get it

2    to that person who is standing on the man lift, that was

3    your job, right?

4    A.    That's an inaccurate statement.

5    Q.    You don't believe that operating this complicated

6    piece of machinery involved any decision-making at all?

7    A.    Well, we worked too close to the well even to pick

8    up something that heavy that would require us to stop.

9    Q.    But you had to make the judgment call on when to

10   stop, right?

11   A.    I don't see that coming into play, setting a

12   lubricator on the well.

13   Q.    One other aspect of operating the crane, you

14   punched those buttons and I think it was -- let's go to

15   Exhibit 163, if we could.

16          You got the joy stick there but you also have

17   some buttons beside it, right?  You may have covered it,

18   but what are those buttons used for?

19   A.    This is a joy stick that is similar to our crane.

20   Normally, we would have two joy sticks but basically the

21   buttons are for the speed of your secondary line.

22   Q.    You're in the crane.  You have to make the judgment

23   call on the speed of the secondary line, don't you?

24   A.    Normally, I don't even use the secondary line.

25   Q.    Are you claiming that pushing these buttons is

**Michael Burchik - Cross**

1  manual labor?

2  A.   Well, sure.

3  Q.   I'm not quite following you on the pickup truck

4  issue but you did drive some big trucks while you were

5  at Oil States, right?

6  A.   Yes.

7  Q.   You drove the International Durastar, which is a

8  big truck, right?

9  A.   I drove some of the trucks.  I'm not sure that was

10  one of them.

11  Q.   That is a DOT regulated truck?

12  A.   I'm not sure.

13  Q.   And you drove the 5500 flatbed, that's a DOT

14  regulated truck?

15  A.   Yes.

16  Q.   But the pickup truck, I think we saw the sticker

17  for it, this was about a $36,000 F-150 that the company

18  gave you that you drove back and forth from your home to

19  either the wellsite or the shop, right?

20  A.   Yes.

21  Q.   And on your days off, you would take it home,

22  right?

23  A.   Yes.

24  Q.   And if we look at the GPS reports, there were

25  occasions when you would go to restaurants or use the

Michael Burchik - Cross

1    truck to go places for personal business, right?

2    A.   To the restaurant, yes.

3    Q.   And the company bought all your gas for that,

4    right?

5    A.   Yes.

6    Q.   Mr. Warren showed you a fuel transaction report

7    which showed buying a lot of gas.  I think you said you

8    bought gas every day?

9    A.   Probably every other day.

10   Q.   One of the reasons you were buying so much gas for

11   that F-150 is that when you were at the wellsite, you

12   would leave it idling all day long for 12 hours, right?

13   A.   Normally, yes.

14   Q.   Why would you do that?

15   A.   Well, if it was wintertime, we would need the

16   heater and if it was in the summertime, for the air

17   conditioning.

18   Q.   But I thought you were either working in the crane

19   or working and helping out with the grease operator.

20   Why would you need to leave the truck running for 12

21   hours if you were doing those two things?

22   A.   That's just normally how we operated.

23   Q.   And nobody at Oil States ever said anything to you?

24   A.   No, sir.

25   Q.   So other people did that as well?

Michael Burchik - Cross

1   A.   I'm sure they did.

2   Q.   But it's your testimony that on a 12-hour shift,

3   you were either in the crane or helping out with the

4   grease but you still had your truck running for 12 full

5   hours?

6   A.   Not necessarily but could be.

7   Q.   That may be one of the reasons you were buying so

8   much gas just because you left the truck running rather

9   than you needing gas for work every day, right?

10  A.   That could be, yes.

11  Q.   I would like to talk to you about your hours

12  estimate just to make sure I understand those.

13          So, you used Exhibits 12 and 13 which are your

14  tally books, right, to estimate how many hours you were

15  working?

16  A.   12 and 13 exhibits?

17  Q.   Counsel showed them to you in his notebook but they

18  are also in front of you on my notebook.

19          Just so we're clear, I want you to look at

20  them and tell me if that is what you used to estimate

21  your hours worked during these timeframes.

22  A.   Yes, they are my tally books.

23  Q.   If you could, just so the record is clear, tell me

24  the timeframe of those tally books, when do they start

25  and when do they stop and if you would start with

1    Exhibit 12.

2              What is the first date on there and what is

3    the last date?

4    A.   April 27, 2012 and the last day of that job?

5    Q.   Last day of the tally book.

6    A.   That looks like November 18, 2014.

7    Q.   Exhibit 13, what's the timeframe on that?

8    A.   October 9th, 2012 to November 2014.

9    Q.   It looks like do those overlap?  Do you have one

10   that covers -- you said the first one Exhibit 12, April

11   27, 2012 to November 18, 2014 and the second one covers

12   the same timeframe?

13   A.   '12, '13, '14.

14   Q.   But if we're going to go and look at those and see

15   what you wrote down almost three years ago to determine

16   how many hours you were working and compare it to your

17   estimates, one thing you're doing is if it says standby,

18   whether you were at work or not, at home, at a hotel,

19   you are just including 12 hours for that, right?

20   A.   The normal shift was 12 hours and that is how it

21   was reported, yes.

22   Q.   And if you got to the wellsite, let's say, at

23   six a.m. and you determined that wireline was broken,

24   the other company wasn't ready and you only stayed a

25   couple of hours, you would still put down 12 hours in

Michael Burchik - Cross

1    your estimate for what you want the jury to award you,

2    right?

3    A.    Our normal shift was 12 hours, so I can't really

4    say when we left the site or not.

5    Q.    But for purposes of your hours estimate that you

6    testified about a minute ago, you went ahead and

7    included the full 12 hours, right?

8    A.    Only if it wasn't designated as a shorter day.

9    Q.    Right.  But if you got there, some other company

10   was having a problem and there was no crane work to be

11   done, you went ahead and put in 12 hours for this jury

12   to award you?

13   A.    That was the normal shift, 12 hours.  If it was

14   standby, I couldn't tell you what we was doing during

15   that period.

16   Q.    Then I think you testified that you used as part of

17   your estimates Exhibit 14, which is the big job bonus

18   packet which has invoices and all the stuff that Oil

19   States sold and things like that, right?

20   A.    Yes, sir.

21   Q.    But included in that 600 pages are documents

22   relating to other workers, not you, right?

23   A.    That particular part of the book, there were other

24   pages in there but it's not the pages I used to make my

25   spreadsheet.

Michael Burchik - Cross

1    Q.   Let's get one real specific.  If you could, go to

2    Exhibit 16.

3             MR. DAVIS:  If we could pop that one up,

4    Exhibit 16.  I'm sorry.  I have the wrong one.  It's 15

5    I need.

6    Q.   Exhibit 15 are the daily reports where you would

7    take information from your tally book and put it in the

8    formal company document which is the daily report,

9    right?

10   A.   That's correct.

11   Q.   And you used those for purposes of estimating the

12   hours you want the jury to award you?

13   A.   No, I did not use that.  I used my tally book.

14   These documents weren't given to me during the time that

15   I calculated that spreadsheet and I don't recollect the

16   time they were given to me, so I didn't use them at all.

17   Q.   Well, they were given to your lawyer two years ago.

18   When did you first see them?

19   A.   I don't recall.

20   Q.   I didn't hear you say anything about using the GPS

21   report in your estimates of hours worked.  Did you ever

22   look at that to see exactly where your truck was and for

23   how long?

24   A.   I had a GPS at the very end of my tenure when I

25   worked there and I wouldn't know how it worked to use

Michael Burchik - Cross

1   it.

2   Q.   Well, you had never seen the fuel transaction

3   report while you were working at Oil States?

4   A.   That's correct.

5   Q.   You are able to testify about that here in court

6   even though you never saw it while you were working at

7   Oil States?

8   A.   Well, that document is self-explanatory.

9   Q.   We'll offer it as an exhibit, this GPS report, but

10   I don't want you to testify about it if you have never

11   seen it.  You have never seen it?

12   A.   No, I have never seen it.

13   Q.   So, your lawyers didn't show you that document on

14   where your truck was and for how long for purposes of

15   estimating your hours?

16   A.   No, I never seen it.

17   Q.   Even though we gave that to them years ago, you

18   have never seen it?

19   A.   Well, I don't know about years ago.  I only had

20   that in my truck the latter part of the year I worked

21   there.

22   Q.   Well, if that report says that there are days you

23   were estimating that you were at the wellsite when you

24   were only there for a couple of hours, do you have any

25   reason to doubt that report?

1   A.   Well, I still stand by my tally book because I

2   filled it out on a day-to-day basis as I did the job.

3   Q.   But you would agree with me your tally

4   book -- there are days where there is no entry at all in

5   that tally book, right?

6   A.   Then I wasn't on a job site.

7   Q.   And then there are days it just shows what time you

8   arrived and a couple things you did during the day but

9   doesn't say what time you left?

10  A.   It showed me on the wellsite.  That's what I was

11  concerned about.

12  Q.   You didn't write down exactly what time you left,

13  right?

14  A.   No, I did not.

15  Q.   But the GPS report would say what time your truck

16  left that well and you never looked at that?

17          MR. WARREN:   Objection, Your Honor.

18  Foundation objection.

19          THE COURT:   No.  Overruled.  It may be

20  repetitive but overruled.

21  Q.   Is it possible this hours estimate you gave to the

22  jury is inaccurate?

23  A.   There might be some inconsistencies but we had

24  scrubbed that document on several occasions and it's a

25  document that -- it's an estimate to the best of our

1    ability.

2    Q.    Just so I'm clear, even though you were paid -- let

3    me clear up one thing.

4           There was a W2 for the year 2014 that said

5    $97,000, and you testified about that one.  That was a

6    year when you were off on FMLA for about three months,

7    right, from December of '13 to March of '14?

8    A.    Yes, sir.

9    Q.    So, there was a period of three months you weren't

10   working, but you would agree with me had you been

11   working, you would have made over a hundred thousand

12   dollars a year?

13   A.    Probably so.

14   Q.    So, I'm not asking you to testify about the law but

15   do you know anything about this highly compensated

16   exemptions for people that make over one hundred

17   thousand dollars a year?

18   A.    No, sir, I do not.

19   Q.    Your claim in this case is that even though Oil

20   States paid you over a hundred thousand dollars every

21   year, you're asking for more based on an hours estimate

22   that you acknowledge is probably not very accurate?

23   A.    That's incorrect.

24   Q.    We know there's errors in it, don't we?

25   A.    There were some errors, yes, but we corrected the

Michael Burchik - Cross

1  ones that were brought to our attention.

2  Q.   You are also asking this jury to find that there

3  was an intentional and willful violation of the law,

4  right?

5  A.   Of the monies being paid.

6  Q.   Well, you brought the claim under the Fair Labor

7  Standards Act.  Do you want the jury to find there was

8  an intentional, willful violation of the law?

9  A.   That's correct.  That's money due us and the

10  lawyers figure that out.

11  Q.   But as far as Adam and his willful or intentional

12  violation of the law, are you saying that's what he did

13  to you?

14  A.   I'm not saying he did anything to us.  That's a

15  company policy that was given to us.

16  Q.   He is the one approving your paychecks, signing off

17  on your bonuses, and getting you paid and you are still

18  saying he willfully and intentionally violated the

19  federal law?

20  A.   Well, if we was due that money according to

21  Pennsylvania law, that's correct.

22          MR. DAVIS:  Pass the witness.

23          THE COURT:  Thank you.

24          Counsel, redirect.

25          MR. WARREN:  Thank you, Your Honor.

Michael Burchik - Redirect

1                    REDIRECT EXAMINATION

2    BY MR. WARREN:

3    Q.   Mike, I just want to go through a couple things

4    Mr. Davis discussed with you.

5              One is the question of standby.  Can you just

6    explain for the ladies and gentlemen of the jury because

7    I'm not sure they understand what does standby mean?

8    A.   Basically a standby is if we're on a job and say

9    we're working and all of a sudden something breaks down,

10   the crane is no longer used and the company man will

11   have us set aside while they work the problem out.

12             So, basically I'm not operating a crane.

13   We're just standing by until operations continue to

14   function again.

15   Q.   And if the fracking contractor, if their equipment

16   goes down and the company man asks you to stand to the

17   side, in those circumstances were you permitted to leave

18   the wellsite?

19   A.   No, sir, we're not permitted to leave.  We're on

20   standby.  At any time he can call us back into position

21   and resume working.

22   Q.   And so would Oil States permit you to leave the

23   worksite if the company man told you that you needed to

24   stay there?

25   A.   No, they won't authorize us to leave either.

**Michael Burchik - Redirect**

1  Q.   Were there some circumstances when you were on

2  standby you were permitted to leave?

3  A.   Yes, sir, there was.

4  Q.   Describe for the ladies and gentlemen of the jury

5  what some of those circumstances might be?

6  A.   Basically if we had a big problem with the well,

7  they had someone to come out to make corrections and if

8  it is going to take several days to correct that, nine

9  times out of ten, the company man would release us but

10  to be on call.

11  Q.   If there was a situation where the company man

12  released you and sent you back to the hotel or sent you

13  somewhere to wait, did you include those hours in the

14  estimates of the work that you performed at Oil States?

15  A.   No, sir, they weren't included.

16  Q.   Mr. Davis also asked you questions.  I think he

17  asked you if there were circumstances where you worked

18  fewer than 12 hours and you wrote that in your tally

19  book and you just wrote 12 hours anyway.  Do you

20  remember questions on that topic?

21  A.   Yes, sir, I did.

22  Q.   When your tally books showed that you worked fewer

23  than 12 hours, that did happen?

24  A.   Yes, sir.

25  Q.   On those situations when your tally books showed

**Michael Burchik - Redirect**

1   you worked fewer than 12 hours, when you were preparing

2   the hour estimate, can you tell the ladies and gentlemen

3   of the jury how many hours you included in those days?

4   A.   It was the number of hours we started and the

5   number of hours we left.  So, if we worked nine and a

6   half hours, that is the numbers I recorded on the

7   spreadsheet, not a 12-hour shift.

8   Q.   Let's show the ladies and gentlemen of the jury an

9   example of that.

10          MR. WARREN:  Milly, can you please pull up

11  Exhibit 13.

12  Q.   So, let's just stick with the very entry in the

13  tally book.  Can you read for the jurors what the entry

14  for October 9, 2012 shows.

15  A.   Rigged up on Tuesday between 6 and 12 and that's

16  the last entry I put.  I can't really say what I did for

17  the rest of the day.

18  Q.   On that entry do you remember how many hours you

19  used in your hours estimate for that particular day?

20  A.   I got zero in the corner.

21  Q.   If I showed you the estimates that you performed,

22  would that help refresh your recollection?

23  A.   Yes, sir, it would.

24          MR. DAVIS:  May we approach on this one?

25          THE COURT:  Yes.  Very briefly.

Michael Burchik - Redirect

1          (Sidebar discussion held as follows:)

2          MR. DAVIS:  Now he is going to have him

3    testify from the spreadsheet which was a document

4    created by counsel.  It's like providing a script to a

5    witness.

6          THE COURT:  My question, we have already done

7    this.  You have already gone through this and you are

8    bringing the same sheet back.  Is he going to say the

9    same thing he said before?

10          MR. WARREN:  No, Your Honor.  What I'm asking

11   him is Mr. Davis suggested for every day he just wrote

12   12 hours for every day and I'm asking him whether

13   that's, in fact, true and asking him to refresh his

14   recollection for this particular day.

15          THE COURT:  But the document you are giving

16   him, if I understand it correctly, you are showing him a

17   spreadsheet he didn't offer.  It's your summary of his

18   notes, right?

19          You can use that sheet to refresh his numbers

20   but you are now asking for a particular day.  What is

21   the organic document for that?

22          MR. WARREN:  The document is what happened and

23   again, I would say Mr. Davis is free to cross-examine on

24   the subject, but the deposition of him shows the

25   documents and the tally book we were just looking at,

**Michael Burchik - Redirect**

1   Mr. Burchik reviewed them and figured out what the hours

2   were and someone else, his attorneys put that

3   information into a spreadsheet but he reviewed the

4   spreadsheet to confirm --

5           THE COURT:  The tally book is the real

6   evidence.  The tally book, if he challenges certain day,

7   go to that tally book and look at that day.

8           You are using a spreadsheet that he didn't

9   create to show him something about his tally book.  You

10  should use the tally book.

11          MR. DAVIS:  We've established the record with

12  the Court that the summary spreadsheet is not accurate.

13  Counsel took the liberty --

14          THE COURT:  Well, let's be careful here.  The

15  testimony is that it's inaccurate and he was pretty

16  careful with what he said.  He couldn't remember if it

17  was inaccurate.  To say it was wholly inaccurate is not

18  correct.  He just couldn't figure it out.

19          My problem is it's an evidentiary issue.  How

20  are you going to get -- you are challenging the

21  gentleman and trying to rehabilitate him on a document

22  he didn't create.  His memory is going to be

23  rehabilitated from the tally book if I understand you.

24          MR. WARREN:  Your Honor, I think to simplify

25  this, I'm happy to withdraw the question.

Michael Burchik - Redirect

1            THE COURT:  That's fine then.  Withdraw the
2   question.

3            Thank you.

4            (Sidebar discussion was concluded.)

5            THE COURT:  You may proceed.  Take that down.

6            MR. WARREN:  This is the tally book.  I didn't
7   pass up the exhibit.

8   BY MR. WARREN:

9   Q.  Mike, just to finish this point again, this is the
10  very first page of the tally book.  Can you just tell
11  the ladies and gentlemen of the jury how many hours you
12  are claiming you worked for October 9, 2012?

13  A.  It's in the corner.  I'm not sure.  It looks like
14  it's a zero or a ten.

15  Q.  Does that period, does that entry reflect the time
16  you arrived and left the wellsite on that day?

17  A.  No, sir, it does not.

18  Q.  Were there entries in your tally books that do
19  reflect when you arrived and left the wellsite?

20  A.  Yes, sir.

21  Q.  I'm going to show an example of that.  Let's go to
22  January 17 of 2013.

23            Mike, I think it's on the screen to make it
24  easier for you.  Can you look at January 17.  Can you
25  see whether that entry shows when you arrived and when

1  you left?

2  A.   I arrived at the location at 8:00 and left the shop

3  at 6:30.

4  Q.   What time did you depart location?

5  A.   5:00.

6  Q.   So, according to this tally book entry, you were

7  working at the wellsite from 8:00 to 5:00, is that

8  right?

9  A.   Yes.

10  Q.   How many hours are you asking the ladies and

11  gentlemen of the jury to award you or how many hours are

12  you claiming that you worked on that particular day?

13  A.   Between eight and five.

14  Q.   Do you call that nine hours?

15  A.   Yes.

16  Q.   So, are you asking the ladies and gentlemen of the

17  jury to determine that you worked nine hours on that

18  day, not 12?

19  A.   Correct.

20  Q.   Have you done the same thing for all of the other

21  days when your tally book showed you didn't work a full

22  12 hours, if your tally book showed you worked fewer

23  than 12 hours, are you asking them to award you the

24  actual number of hours you actually worked?

25  A.   No.  We would ask for less hours, whenever we were

**Michael Burchik - Redirect**

1    on the site.

2    Q.   You are asking the jurors to award you the actual

3    number of hours?

4    A.   The actual numbers, yes.

5    Q.   Mike, one of the questions you were asked is

6    whether you drove certain big trucks?

7    A.   Yes.

8    Q.   Was there a time at Oil States when you drove big

9    trucks more often?

10   A.   My first two years I did drive bigger trucks, more

11   hotshots.

12   Q.   Did you stop driving big trucks or drive trucks

13   less frequently at some point?

14   A.   Yes, when I was assigned my work truck.

15   Q.   Once you were assigned that work truck, what truck,

16   what vehicle were you using to do your work duties?

17   A.   My assigned truck.

18   Q.   Mr. Davis asked you a question, some questions

19   about whether you would leave your pickup truck idling.

20   Do you remember those questions?

21   A.   Yes, sir.

22   Q.   When you were not in the cab of the crane and you

23   were at the wellsite.  So when you are waiting on the

24   fracturing contractor, waiting on the wireline

25   contractor, were you permitted to leave the wellsite

**Michael Burchik - Redirect**

1  during those times?

2  A.   No, sir, we were not.

3  Q.   What were you required to do?

4  A.   Stand by until we was instructed to do something.

5  Q.   If you were waiting for the fracking contractor to

6  do their work, were you permitted to sit in your truck?

7  A.   Yes, we were.

8  Q.   Were there times when you would sit in your truck?

9  A.   Yes, sir.

10 Q.   So, would you want to keep your truck at a

11 comfortable temperature?

12 A.   Exactly.

13 Q.   And so you weren't always out sitting in the cab of

14 the crane when you were at the wellsite, is that fair?

15 A.   That's correct.

16 Q.   One other question on the use of the trucks.

17 Mr. Davis asked you whether you're using the -- you're

18 refilling the fuel tank so often because you left the

19 truck running, do you remember that question?

20 A.   Yes, sir.

21 Q.   Did you use any vehicle other than your assigned

22 work truck to do your work duties and to get around

23 while you worked for Oil States?

24 A.   No, sir, we had no other vehicle.

25 Q.   So, is it fair to say, would you say you were using

1   your assigned work truck every day for work purposes?

2   A.   Yes, sir, that's fair to say.

3   Q.   One last series of questions.  Mr. Davis asked you

4   about whether you thought you were performing manual

5   labor when you were performing certain activities.  I

6   believe you said those activities are manual labor, is

7   that accurate?

8   A.   Yes, sir.

9   Q.   When you are at the wellsite, what is your main

10   responsibility at the wellsite?

11   A.   Operate the crane.

12   Q.   And when during the day would you fill out

13   paperwork?

14   A.   Bonus paperwork?

15   Q.   Any paperwork.

16   A.   After my job was performed.

17   Q.   Was filling out the paperwork, was that something

18   you spent a lot of time thinking about during the day?

19   A.   No, not at all.

20   Q.   How did the paperwork kind of fit into the job you

21   were doing?

22   A.   It was part of Oil States' requirement in order for

23   us to get paid.

24   Q.   But when you are sitting in the cab, when you are

25   operating a crane, do you consider being a crane

1  operator to be a manual labor job?

2  A.   Yes, I do.

3  Q.   And so when you told Mr. Davis you believed certain

4  activities are manual labor, is that because you

5  associate those activities with operating a crane?

6  A.   Yes.

7            MR. WARREN:  Nothing further, Your Honor.

8            THE COURT:  Thank you.

9            Any recross on this witness?

10           MR. DAVIS:  Nothing, Your Honor.

11           THE COURT:  Ladies and gentlemen, I was going

12  to call up our next witness but it is ten of five and

13  you had a long day.  It has been a long day.

14           Sir, you may step down with the Court's

15  appreciation.

16           Ladies and gentlemen, we are going to adjourn

17  today.  I understand from my deputy you are willing and

18  I greatly appreciate to start at eight o'clock tomorrow

19  morning.  We will be ready to start at eight o'clock for

20  you.

21           This is a puzzle.  You are only seeing one

22  piece, in fact, one witness.  Please make no decisions,

23  please follow my admonition.  Please do not research

24  tonight.  Do not do any homework.  The test has nothing

25  to do with what you do outside this courtroom.

1           We will see you again tomorrow morning at

2    eight o'clock sharp for the calling of the next witness.

3           Thank you.

4           (Whereupon, court was recessed for the day at

5    4:50 p.m.)

6                        - - -

7

8           I hereby certify by my original signature

9    herein, that the foregoing is a correct transcript, to

10   the best of my ability, from the record of proceedings

11   in the above-entitled matter.

12

13

14              S/ Karen M. Earley

15                 Karen M. Earley

16                 Certified Realtime Reporter

17

18

19

20

21

22

23

24

25