IN THE UNITED STATES DISTRICT COURT

OF WESTERN PENNSYLVANIA

| | |
|---|---|
| MICHAEL BURCHIK, WAYNE EDDY, JASON LETT, ROBERT PICKEL, | CIVIL DIVISION |
| | No. 15-529 |
| Plaintiffs, | |
| vs. | |
| OIL STATES ENERGY SERVICES, LLC. f/k/a SPECIALTY TANK SUPPLY; OIL STATES INTERNATIONAL, INC., | |
| Defendants. | |

_____

Transcript of JURY TRIAL held on October 17, 2017
United States District Court, Pittsburgh, Pennsylvania
 BEFORE:  HONORABLE MARK A. KEARNEY, DISTRICT JUDGE

<u>APPEARANCES</u>:

| | |
|---|---|
| For the Plaintiffs: | Zachary K. Warren, Esq. Samuel Davidoff, Esq Michelle Hood, Esq. Williams & Connolly 725 Twelfth Street, N.W. Washington, DC 20005 |
| For the Defendants: | William R. Stukenberg, Esq. William L. Davis, Esq. Jackson Lewis Wedge international Tower 1415 Louisiana Street Houston, TX 77002 |
| Court Reporter: | Karen M. Earley, RDR-CRR 6260 U.S. Courthouse 700 Grant Street Pittsburgh, PA 15219 412-201-2660 |

Proceedings reported by mechanical stenography.
Transcript produced by computer-aided transcription.

```
                        I N D E X


                    DIRECT    CROSS   REDIRECT   RECROSS

PLAINTIFFS' WITNESSES:

Jason Lett               9       74      154       170

Excerpts of Deposition
 of Barry Blank        175

 Robert Pickel         190      228      249       252

Excerpts of Videotaped
 Deposition of
 Terry Woodall         255

Wayne Eddy             257      308      338        --
```

```
 1                    P R O C E E D I N G S
 2   (October 17, 2017, 7:45 a.m.  In open court, jury not
 3   present.)
 4               THE COURT:  Good morning.
 5               Please be seated.
 6               I understand before the jury comes in the
 7   attorneys have asked for guidance on a particular issue.
 8   I'll hear from whoever has a concern.
 9               MR. DAVIS:  In light of the Court's ruling on
10   the Jill Curry's deposition excluding certain testimony,
11   we had to revise our excerpts.
12               I sent those to counsel last night.  I have a
13   highlighted portion, very brief.  I was hoping the Court
14   could go ahead and make a ruling on that and then we can
15   get the video ready.
16               THE COURT:  Yes.  Give me the context again.
17   This is Jill Curry's deposition and what about the
18   experts?
19               MR. DAVIS:  I'm sorry.  The excerpts.  The
20   Court had ruled yesterday that certain portions were not
21   admissible, so we had to redo our designations.
22               THE COURT:  So these are new designations?
23               MR. DAVIS:  Yes.
24               THE COURT:  And you have seen them?
25               MS. HOOD:  Yes, Your Honor.  If I may?
```

```
 1                 THE COURT:  Yes.

 2                 MS. HOOD:  My name is Michelle Hood, counsel

 3   for the plaintiffs.

 4                 So, the designations that the defense has

 5   proposed are entirely new designations.  They have never

 6   been disclosed in any pretrial filing.  They were not

 7   disclosed four months ago.

 8                 THE COURT:  Stop.  It's too late for that.

 9   What is your problem with the substance?

10                 MS. HOOD:  The problem with the substance is

11   counsel mentioned that Your Honor yesterday ruled on

12   plaintiffs' motion for partial reconsideration and this

13   is why they are submitting their completely new

14   designations.

15                 These designations have nothing to do with

16   what Your Honor ruled on yesterday which was Jill

17   Curry's testimony about the alternative compensation.

18                 THE COURT:  Okay.  Let me take a look at it.

19                 (Pause in the proceedings.)

20                 THE COURT:  Okay.  So, Mr. Davis, let me ask

21   you this.  Do you have a copy of what you gave me?

22                 MR. DAVIS:  Yes.

23                 THE COURT:  At Page 91 I guess this is inquiry

24   from plaintiffs' counsel?

25                 MR. DAVIS:  Correct.
```

```
 1              THE COURT:  And what is the nature of your
 2   objection at Line 9, form, but as to what, foundation?
 3              MR. DAVIS:  Oh, we would pull that out, I'm
 4   sorry.  We would be offering that and removing the
 5   objection.
 6              THE COURT:  Okay.  So, it's a fair point the
 7   plaintiff makes that it's beyond what we talked about
 8   yesterday but it's also a fair point that we have
 9   to -- if this were a trial -- if you were here, this all
10   would be coming into evidence or arguably coming into
11   evidence.
12              So, I'm going to allow these designations to
13   come in, however, you make a fair point, and so if there
14   is something that you see in Jill Curry's testimony that
15   you would like to counter designate, you can do so.
16   When is Ms. Curry's video being shown?  Who is showing
17   it?
18              MS. HOOD:  We intended to show it today, Your
19   Honor.
20              THE COURT:  Is the technology person here to
21   do this?  Whoever adds this in, is that ready to go?
22              MR. DAVIDOFF:  Your Honor, I think we can
23   probably either have it ready to go today or we'll play
24   it tomorrow.
25              THE COURT:  Okay.  So, I don't want to mess up
```

1   your strategy but I want you to have an opportunity to

2   counter designate.

3          If you see something in here that you think

4   can be counter designated, you should do so but you have

5   to give it to Mr. Davis so everybody knows what we're

6   reading.

7          So, please add this in and if you have counter

8   designations, highlight them so Mr. Davis can see them.

9   If they are on the same wavelength, I'm telling you

10  ahead of time I'm going to let it in.  So, unless there

11  is an objection on the transcript but I don't know if

12  your technology person can do that while you're here.

13         MS. HOOD:  Yes, Your Honor, we can have our

14  technology person do that.

15         THE COURT:  Let me ask you this as you're

16  presenting the testimony.

17         Will you have for us an entirely highlighted

18  version of the deposition that is going to be shown?  In

19  other words, will I have when I'm on the bench and

20  frankly, Madam Court Reporter, have the highlighted

21  deposition?

22         MS. HOOD:  Yes, Your Honor.

23         We can print the entire deposition and

24  highlight it, if you wish.  We can also print the clips

25  that will be shown.

```
 1              THE COURT:  Whatever is easiest for you.  It's
 2   frankly for your records.  I'm going to listen to it.  I
 3   will be in the room but the people in the Third Circuit
 4   may not, so you really want to have a copy that the
 5   Madam Court Reporter can use and incorporate.
 6              MS. HOOD:  Yes, Your Honor.
 7              THE COURT:  Let's take a two-minute comfort
 8   break and we'll count the jurors.
 9              MR. DAVIDOFF:  Your Honor, may I raise one
10   issue related to this since we are on the subject of
11   deposition designations.
12              Ms. Curry's deposition and another deposition
13   Mr. Woodall will be played by video.  There is a
14   deposition designation that there is no video for, so we
15   would read it live.
16              Does Your Honor have a preference for how that
17   is done?
18              THE COURT:  That's a great question.  I don't
19   like people on the stand.  We are not theater.  I don't
20   want anybody on the stand playing Ms. Curry or somebody
21   else.  I would ask somebody to read it.
22              If you wish, you can have two of the lawyers
23   have a question and answer but I don't want to confuse
24   the jury as to anybody on the witness stand or swearing.
25              So, I would like you to read it to the jury.
```

```
1                MR. DAVIDOFF:  From counsel table?

2                THE COURT:  From counsel table.  If you wish

3   to have a question/answer, two people, you can do that

4   but that's entirely your style.  Whatever you think is

5   better for the jury.  I'm not going to interfere with

6   that.

7                I think this is impeachment information that

8   was received yesterday, detail payroll register with the

9   plaintiff yesterday.  I think it came from you.

10               MR. WARREN:  Yes.

11               THE COURT:  Okay.  Take two minutes and we'll

12  come back out.  We have six of the eight, so we'll be

13  ready to go.

14               (Whereupon, a break was taken.)

15               THE DEPUTY CLERK:  All rise.

16               (Whereupon, the jury entered the courtroom.)

17  (In open court, jury present.  8:08 a.m.)

18               THE COURT:  Please be seated.

19               Good morning, ladies and gentlemen.

20               Plaintiff, do you wish to introduce your next

21  piece of evidence.

22               MR. WARREN:  Yes, Your Honor.  We would like

23  to call Jason Lett.

24               THE DEPUTY CLERK:  Sir, please raise your

25  right hand.
```

1          <u>JASON LETT</u>, one of the plaintiffs herein,

2     having been first duly sworn, testified as follows:

3          THE DEPUTY CLERK:  Please be seated and please

4     state and spell your name for the record and speak right

5     into that microphone.

6          THE WITNESS:  Jason Lett, J-a-s-o-n, L-e-t-t.

7          THE DEPUTY CLERK:  Thank you.

8          THE COURT:  You may proceed.

9          MR. WARREN:  Thank you, Your Honor.

10                    <u>DIRECT EXAMINATION</u>

11    <u>BY MR. WARREN</u>:

12    Q.   Hey, Jason.

13    A.   How are you doing?

14    Q.   Can you tell the jurors where you live, please.

15    A.   I live in Avella, Pennsylvania.

16    Q.   Where are you originally from?

17    A.   I'm originally from Canonsburg, Pennsylvania.

18    Q.   Are you married, Jason?

19    A.   Yes, I am.

20    Q.   How long have you been married?

21    A.   Seven years.

22    Q.   Where do you currently work?

23    A.   I work for the Local 66 Operators Union as a crane

24    operator.

25    Q.   Are you working for any particular company at the

1    moment?

2    A.    Right now I'm working for a company called Welded.

3    We do pipelines, oil and gas pipelines.

4              I'm sure you have probably seen crossing on

5    different roads, I drive a boom truck and I deliver

6    heavy equipment for National Gas Pipelines.

7    Q.    How long have you been doing that work for Welded?

8    A.    Since June.

9    Q.    How long have you been in the union?

10   A.    Since 2014.

11   Q.    How do you get paid in your current job as a crane

12   operator?

13   A.    I get paid hourly.

14   Q.    What is your job title right now?

15   A.    My job title right now is crane operator.

16   Q.    Could you tell the ladies and gentlemen of the jury

17   what you were doing before you started working with

18   Welded?

19   A.    Before I was with Welded, I was with Allegheny

20   Crane working as a crane operator.

21   Q.    What type of work were you doing at Allegheny

22   Crane?

23   A.    I was doing oil and gas work, I was doing fracking,

24   different things like that.

25   Q.    Can you describe what type of cranes you were

Jason Lett - Direct

1  using?

2  A.   I was using boom trucks, large hydraulic cranes,

3  small boom trucks, things like that.

4  Q.   What were you using those cranes to do?

5  A.   I was using them to lift lubricators, BOPs, pretty

6  much everything that I was pretty much doing at my

7  previous job.

8  Q.   Were you in a union at Allegheny Crane?

9  A.   Yes, I was.

10  Q.   How long were you at Allegheny?

11  A.   I was at Allegheny Crane from 2013 to 2015.

12  Q.   What were you doing before you were in the union?

13  A.   Before I was in the union, I worked for Oil States

14  Energy.

15  Q.   Did you apply to work at Oil States Energy

16  Services?

17  A.   Yes, I did.

18  Q.   Do you remember roughly when you applied to work at

19  Oil States?

20  A.   I believe it was in March of 2010.

21  Q.   And when did you leave Oil States?

22  A.   I left Oil States in July of 2013.

23  Q.   What location were you working out of?

24  A.   I worked at the Canonsburg shop.

25  Q.   We're going to talk about your work at Oil States

Jason Lett - Direct

1    in just a moment but I would like you to finish

2    introducing yourself to the jurors.

3              What was your first job?

4    A.   My first job -- well, when I graduated high school,

5    I went to college for two years and then I went to the

6    U.S. Army.

7    Q.   What were you doing in the Army?

8    A.   I was a radar operator and field artillery.

9    Q.   Once you left the Army, what were you doing?

10   A.   I left in 2001 and got a job at Coca-Cola in 2002.

11   Q.   Just briefly can you tell the ladies and gentlemen

12   of the jury what you were doing at Coca-Cola?

13   A.   From 2002 to about 2007 or 2008, I was working in

14   the warehouse for Coca-Cola driving a forklift, loading

15   trucks, unloading trucks, I was shipping and receiving,

16   things like that.

17   Q.   After that, were you doing a different type of work

18   at Coca-Cola?

19   A.   In around 2009, the company come to the warehouse

20   and asked people to apply to be truck drivers because

21   they were short CDL drivers and so I applied to be a

22   truck driver for Coca-Cola.

23   Q.   When you were working at Coca-Cola, how were you

24   getting paid?

25   A.   I was getting paid hourly.

**Jason Lett - Direct**

1    Q.    Did you receive overtime there?

2    A.    Yes, I did.

3    Q.    How did you come to learn about Oil States?

4    A.    I met a gentleman named -- I believe his name was

5    Matt Pace and he said something like we need CDL drivers

6    because we don't have any CDL drivers to drive our

7    equipment around.

8    Q.    For the ladies and gentlemen of the jury who might

9    not know what a CDL is, can you explain that briefly?

10   A.    CDL is a commercial driver's license.

11   Q.    Did you end up applying to Oil States?

12   A.    Yes, I did.

13   Q.    What position did you apply for at Oil States?

14   A.    I believe at the time it was truck driver with an

15   intent to be trained as a crane operator.

16   Q.    Did you submit a written job application?

17   A.    Yes, I did.

18   Q.    I'm going to ask you to open up that big binder in

19   front of you and go to Tab 6, please.  What is that

20   document?

21   A.    This looks like my application for Oil States.

22   Q.    Did you fill that out and submit it to Oil States?

23   A.    Yes, I did.

24          MR. WARREN:  Your Honor, may I publish?

25          THE COURT:  Yes.

Jason Lett - Direct

1   Q.   Does this job application reflect the position that

2   you applied for at Oil States?

3   A.   Yes, it does.

4   Q.   What position was that?

5   A.   CDL driver.

6   Q.   When you submitted this job application to Oil

7   States, did you then have an interview with anyone?

8   A.   Yes, I did.

9   Q.   Who was that with?

10  A.   I believe his name was Wayne Yates.

11  Q.   Do you recall what Mr. Yates' role at the company

12  was?

13  A.   At the time he was the district manager.

14  Q.   Of the Canonsburg shop?

15  A.   Yes.

16  Q.   What did you and Mr. Yates discuss during your

17  interview?

18  A.   He discussed my job responsibilities before I guess

19  becoming a crane operator, being trained for a crane

20  operator, driving different things for people and

21  working in the shop.

22  Q.   How did the subject of cranes come up during that

23  interview?

24  A.   He mentioned that he would train me to be or have

25  me trained to become a crane operator.

1   Q.   Did he say while Oil States was looking for crane
2   operators?
3   A.   I'm not sure.  I believe they were just short crane
4   operators.
5   Q.   At the end of that interview, did Mr. Yates offer
6   you a position at Oil States?
7   A.   Yes, he did.
8   Q.   What position did he offer you?
9   A.   I believe it was truck driver with intentions of
10  becoming a crane operator.
11  Q.   Did he specifically say you would become a crane
12  operator?
13  A.   Yes, he did.
14  Q.   Did Mr. Yates mention anything about becoming a
15  pressure control operator?
16  A.   No, he did not.
17  Q.   How long after that interview or that job offer did
18  you begin to work for Oil States?
19  A.   I would say within the next month.
20  Q.   And could you just describe for the ladies and
21  gentlemen of the jury what type of work you were doing
22  at the beginning of your employment with the company?
23  A.   At the beginning the first couple months I was
24  working in the shop helping clean things, helping clean
25  things that came back from the field that were dirty

**Jason Lett - Direct**

1  from the field, get wiped down, get replaced and get

2  O-rings and things like that and sent back to the field.

3  Q.   The shop you are describing, is that the garage we

4  described yesterday?

5  A.   Yes.  At the time it was a different location, it

6  was a smaller shop so we only had one or two bays,

7  smaller shop.

8  Q.   How did the general layout of that shop compare to

9  the shop that Mr. Burchik described?

10 A.   Fairly same.

11 Q.   How long were you working in that particular shop?

12 A.   I believe we were at that shop for about almost a

13 year maybe.

14 Q.   And at the outset of your employment with Oil

15 States, how long were you doing the work you just

16 described for the jurors?

17 A.   I was in the shop working on different things

18 probably for about three or four months.

19 Q.   How did you spend a typical day?

20 A.   I would show up at eight a.m. and work with the

21 shop guys and get with them and either wash bolts or

22 buff bolts or clean different things, anything that

23 needed to be done around the shop.

24 Q.   Is this the kind of work you are doing with your

25 hands?

Jason Lett - Direct

1   A.   Yes.

2   Q.   Were you doing any office work at that time?

3   A.   No, I was not.

4   Q.   Did there come a time when you started doing

5   something else at Oil States?

6   A.   Yes.  Eventually, I was sent out to become a crane

7   operator.

8   Q.   How long were you working at Oil States when you

9   were sent out to be a crane operator?

10  A.   I believe it was four or five months.

11  Q.   What type of training did you receive?

12  A.   It was on-the-job training.

13  Q.   Describe for the ladies and gentlemen of the jury

14  what was involved in that training?

15  A.   Basically my first job -- my first job on a natural

16  gas site I was asked to drive a crane from Canonsburg to

17  Williamsport, Pennsylvania, which is about four hours.

18          Once I got there, I observed the crane

19  operator that was working for Oil States at the time for

20  about a week.

21  Q.   Who was the person who you were observing?

22  A.   Adam Fowler.

23  Q.   What was Mr. Fowler -- what was his job at the

24  time, if you recall?

25  A.   I believe his job title at the time was field

**Jason Lett - Direct**

1  service supervisor.

2  Q.   Do you recall what type of job duties he was

3  performing?

4  A.   At that particular site he was performing crane

5  operator duties.

6  Q.   And do you recall what general -- do you recall

7  whether Mr. Fowler was doing other types of work at the

8  time?

9  A.   He was running the grease unit.

10 Q.   What did Mr. Fowler show you on that crane?

11 A.   Basically just the procedures and steps that the

12 crane operators go through in conjunction with wireline

13 just to get things done and how everything is laid out

14 out there.

15 Q.   How long were you at the wellsite observing how to

16 operate a crane?

17 A.   I'm sorry.  Repeat the question.

18 Q.   How long were you at that job site watching and

19 doing this on-the-job training you just described?

20 A.   I want to say two or three weeks.

21 Q.   What happened once you had finished that on-the-job

22 training?

23 A.   After that on-the-job training, I believe I was on

24 my own as a crane operator.

25 Q.   What type of cranes were you operating at that

1    point?

2    A.   At that point I believe we only had a 40-ton

3    National and maybe a 35-ton, 30-ton National Crane.

4    Q.   Once you finished that training and you started

5    operating cranes, what was your understanding of your

6    job title at Oil States?

7    A.   My understanding was that I was a crane operator.

8    Q.   Did any managers at Oil States tell you what your

9    job title was?

10   A.   I'm not really sure.

11   Q.   Okay.  Did anyone at Oil States -- are you familiar

12   with the job title field service supervisor?

13   A.   Yes, I am.

14   Q.   What is your understanding of the job duties

15   associated with a field service supervisor?

16   A.   Field service supervisor, my understanding is a

17   grease operator who maintains the grease package that is

18   brought up by the CDL driver and as far as I know, I

19   don't think -- that's their primary job is to operate

20   the grease trailer.

21   Q.   Were there some field service supervisors who would

22   sometimes operate cranes?

23   A.   Yes.

24   Q.   Were there any crane operators who would operate

25   the pressure control equipment while you worked at Oil

**Jason Lett - Direct**

1  States?

2  A.   Sometimes, yes.

3  Q.   In what circumstances would you have to do that?

4  A.   Sometimes like we would get all the equipment onto

5  the well and maybe the grease operator had to go to the

6  restroom or maybe meet with the company man, the crane

7  operator would get down and kind of watch the unit and

8  make sure nothing went wrong.

9  Q.   Were you actually operating the unit or just kind

10  of looking over and pressing the alarm button?

11  A.   More of just monitoring it to make sure nothing

12  actually was going haywire.

13  Q.   In your experience at Oil States, did you ever hear

14  of a crane operator who was actually sent out to a

15  wellsite to operate the pressure control equipment?

16  A.   There were some people who were crane operators and

17  actually field service supervisors.

18  Q.   Those people were trained on the pressure control

19  equipment?

20  A.   Yes.

21  Q.   Were you familiar with anyone whose job title was

22  crane operator who was sent out -- someone who was only

23  a crane operator who would operate the pressure control

24  equipment at a wellsite?

25  A.   No.

Jason Lett - Direct

1    Q.   When you worked at Oil States, were you ever sent

2    out just to operate pressure control equipment?

3    A.   No, I was not.

4    Q.   Have you ever done anything with the pressure

5    control equipment other than what you described of

6    watching it while someone went to the restroom?

7    A.   No, I did not.

8    Q.   Let me take a step back and I would like to give

9    the jurors a brief overview of the type of work that is

10   going on at these wellsites.

11           We've tossed around the word "fracking"

12   yesterday and today.  What is fracking generally

13   speaking?

14   A.   Fracking is the process of putting fractures into

15   the Marcellus Shale and having fluid pumped down to the

16   well, to the actual fissures and making them bigger.

17   That's the basic process of fracking.

18   Q.   Are there a couple of steps involved in fracking?

19   A.   Yes.  There is the wireline company that provides

20   the explosives that are sent down the well, and there's

21   the fracking company that provides the 12 to 15 jet

22   power tractor-trailers that pump all the water and sand

23   and mixtures down into the well to break up in those

24   fractures.

25   Q.   When you were working at wellsites, was anyone from

**Jason Lett - Direct**

1   Oil States doing that type of work?

2   A.   No, we were not involved in wireline or fracking.

3   Q.   When a well is fracked, is the entire thing fracked

4   at one time?

5   A.   No.  There's stages.  Wireline would come in and

6   they would send down a gun, one stage, and they'll set a

7   plug; and then the fracking company will start their

8   work.  They'll fire up the jet engines and pump down

9   water, sand and some kind of solvent and lubricant and

10  they will frack that for about two hours to get those

11  fractures bigger.

12          Once fracking is down, wireline comes in and

13  does the same thing, sends down a gun, explodes their

14  explosives, sets a plug.  They pull out a hole and frack

15  comes in and does the same thing.  It's a step-by-step

16  process.

17  Q.   In each stage are you just repeating the same

18  process over and over?

19  A.   Every day pretty much the same.

20  Q.   How many stages when you were at Oil States, how

21  many stages were involved in fracking a typical well?

22  A.   Depending on the oil company's specifications,

23  anywhere from 11 to 15 stages per well.

24  Q.   Could you turn in your binder to Exhibit 63,

25  please.

**Jason Lett - Direct**

1          Crane operator just very broadly before we

2    show the picture to the jurors, can you describe what is

3    shown in that photograph.

4    A.   This looks like a fracking site.

5    Q.   Is that a fair and accurate representation of the

6    fracking sites you were working at?

7    A.   Yes, it is.

8               THE COURT:  You may publish.

9    Q.   So, Jason, I would just like to go through now that

10   the ladies and gentlemen on the jury are able to see

11   what these fracking sites look like, if you could just

12   go through and identify the different equipment that is

13   shown in this photograph?

14   A.   Okay.  This equipment right here (indicating) this

15   is the crane that I would be using to set up the

16   wireline equipment.

17          This trailer right here (indicating) looks

18   like the trailer for the grease unit, I believe so.

19          This is the wireline truck right here

20   (indicating) which has like, I would say, about

21   twenty-five to thirty thousand foot stool on the back of

22   it.

23          This right here (indicating) is the command

24   center for the frack company where they do all the

25   controls, all the controls for the fracking companies.

**Jason Lett - Direct**

1          These are the, as I said before, the jet
2    engines (indicating) that are 12 to 15 trucks backed up,
3    and to the right here is called a manifold, and they
4    pump the water into the manifold down these lines and
5    goes up the well right here (indicating) and goes down
6    into the well and that's how it gets down the well.
7          These back here (indicating) are the water
8    tanks that supply water with or the fracking company
9    uses, and that's about it.
10   Q.   Okay.  Thank you.  I'm going to go through and talk
11   about a couple of these things.  What is this trailer up
12   here (indicating)?
13   A.   That looks like the company man trailer.
14   Q.   Who is the company man?
15   A.   The company man is a representative of the oil
16   company that owns the well.
17   Q.   What is his role at the wellsite?
18   A.   He oversees all operations.
19   Q.   Was he responsible for telling you as the crane
20   operator what to do?
21   A.   As far as what?
22   Q.   When you are working at a wellsite, what is his
23   role relative to what you are doing?
24   A.   He controls pretty much all the operations, so,
25   yes, they set the standard on what to do, when to do it.

1  Q.   And let me ask, all these pickup trucks, who do all

2  these pickup trucks belong to?

3  A.   It looks like a lot of them belong to the fracking

4  company because they are red and the fracking company is

5  red.

6  Q.   Did you have an assigned pickup truck at Oil

7  States?

8  A.   Yes.

9  Q.   Where did you park your pickup?

10  A.   If I was on this location, I would probably park

11  somewhere in this general area (indicating), maybe out

12  of the way over here (indicating) near my crane.

13  Q.   Did all of the people who were working at the

14  wellsite have these work trucks with them?

15  A.   Yes, they did.

16  Q.   Can you just point out again where you were working

17  in this photograph?

18  A.   I would be in the cab of this yellow crane right

19  here (indicating).

20  Q.   Are you responsible for operating any of the other

21  equipment at this wellsite?

22  A.   No, I'm not.

23  Q.   Let's go through and discuss the equipment that Oil

24  States is operating.  Can you just explain what pressure

25  control is broadly?

**Jason Lett - Direct**

1   A.   Pressure control is basically the water that frack

2   pumps down the well, it wants to come back out.

3   Pressure control, we rig up all this equipment to put on

4   the well so the water and stuff does not come out of the

5   top of our equipment.  That's basically what it is.

6   Q.   And could you just describe some of the pressure

7   control equipment that the field service supervisors

8   were using when you were working with them at the

9   wellsite?

10          THE COURT:  Counsel, I just want to guide you.

11   Let's not be repetitive of yesterday.  I think the jury

12   understands now how the system works, so I don't want

13   each plaintiff to come up and tell us, unless the

14   defense thinks they need to hear from each.

15          I think we understands how it works.  Let's

16   try to streamline to his claims.

17          MR. WARREN:  Absolutely.

18          THE COURT:  Thank you.

19   Q.   I just want to show a couple photographs of the

20   equipment you are working with.  If you could flip in

21   your binder to Tab 53.

22   A.   Okay.

23   Q.   What is shown in this photograph?

24   A.   This is a grease injected unit.

25   Q.   Is this similar to the equipment that was being

Jason Lett - Direct

 1   used at these wellsites?

 2   A.   It's exactly.

 3            MR. WARREN:  May I publish that?

 4            THE COURT:  To the extent it has been

 5   published, you don't need to ask it.

 6            MR. WARREN:  This has not.

 7            THE COURT:  Okay.

 8   Q.   Could you explain what this piece of equipment is

 9   used for?

10   A.   This piece of equipment is used to inject grease

11   into the top of the piece that we're putting on top of

12   the well.

13            We use these hoses right here and maybe this

14   hose or this hose (indicating) to inject grease.  It's

15   also used to -- it's used like in case water wants to

16   come back out of there, it would come back through a

17   hose.  It's used to inject grease and for flow back of

18   water.

19   Q.   When you are at the wellsites, who is responsible

20   for operating this piece of equipment?

21   A.   That would be the field service supervisor.

22   Q.   Were you responsible for operating this piece of

23   equipment?

24   A.   No, I was not.

25   Q.   I don't want to go into too much detail here

Jason Lett - Direct

1  because you heard Mr. Burchik testify yesterday.  Can

2  you just broadly describe what your role was at the

3  wellsite?

4  A.   My role was to basically operate the crane, lift

5  all the heavy pieces of equipment around the site and

6  basically just lift all the equipment to be put together

7  so we can put everything on the well.

8  Q.   How did the job duties that you performed at Oil

9  States compare to the job duties you heard Mr. Burchik

10  describe yesterday?

11  A.   They were pretty much the same.

12  Q.   Were the two of you performing the same job?

13  A.   Yes.

14  Q.   Were you operating the same equipment?

15  A.   Yes.

16  Q.   Did your role at the wellsite differ from the role

17  that Mr. Burchik described yesterday?

18  A.   No.

19  Q.   Would you ever work with the three other plaintiffs

20  in this case?

21  A.   No.

22  Q.   Would you talk to them while you were both -- while

23  all four of you were employed by Oil States?

24  A.   We would talk from time to time.

25  Q.   Were you aware of the general work they were

1   performing at the time?

2   A.   Yes.

3   Q.   What was your understanding of the work they were

4   performing while they worked at Oil States?

5   A.   My understanding was they were performing the same

6   duties that I was performing.

7   Q.   Which was what?

8   A.   Crane operations.

9   Q.   I want to go back and touch on one thing we

10  discussed yesterday which is the computer that is -- the

11  little computer that is in the crane.

12          Could you go to Tab 161 in your binder,

13  please.  What is shown in that photograph?

14  A.   This is what is called an LMI.

15  Q.   Could you describe how that piece of equipment

16  works?

17  A.   Basically, the LMI stands for Load Moment

18  Indicator.  It lets you know all your limits and all

19  your swing radius, how much stick you have out, how many

20  degrees your boom is down, what is your radius from your

21  turntable to your block, things like that.

22  Q.   And what was this LMI doing, what was its function?

23  A.   It was a guide to let you know you were within your

24  limitations to running the crane.

25  Q.   If you approached the end of your limitations of

**Jason Lett - Direct**

1   the crane, what would happen?

2   A.   During operations if you are safe, there is a green

3   bar.   As you start picking up heavier equipment and it

4   starts getting into the yellow bar, it lets you know you

5   are in the cautionary mode.   If you are picking up

6   things that are too heavy, you are in the red and the

7   crane will shut down.

8   Q.   Are you able to operate the crane when you are in

9   the red?

10  A.   No.   It will shut down.

11  Q.   What are you supposed to do if you get into the

12  red?

13  A.   You are supposed to either put the object down and

14  move the crane closer to get more leverage or make other

15  adjustments.

16  Q.   Did you program any of that information into the

17  computer so it knew when it was approaching the crane's

18  limits?

19  A.   No.

20  Q.   Is it possible when you are in the red to keep

21  working?

22  A.   Yes, it was.

23  Q.   Can you describe what would happen, how you would

24  do that?

25  A.   Well, most cranes have a key or button to push if

1   you are in the red in an emergency situation where you

2   can still operate the crane in the red for emergency

3   purposes only.

4          So, if you want to pick something up, you just

5   turn the key and it will still work but if you turned

6   the key back, it wouldn't work.

7   Q.   While you worked at Oil States, were you permitted

8   to turn the override key?

9   A.   No.

10  Q.   Was management strict about that?

11  A.   Yes.

12  Q.   What were you -- were you supposed to do anything

13  before you could turn that key?

14  A.   I believe you were supposed to call management or

15  whoever to get authorization.

16  Q.   And while you worked at Oil States, was there ever

17  a time when you did turn that override key?

18  A.   Yes, I did.

19  Q.   Did you do that without management's permission?

20  A.   Yes.

21  Q.   Can you describe what happened when you turned the

22  override key, describe just the general events for the

23  ladies and gentlemen of the jury.

24  A.   Well, basically, we were doing wireline.  Wireline

25  had some issues.  I think frack had issues.  Wireline

**Jason Lett - Direct**

1    was pulled out of the way and another company was

2    brought in.  They are called bullet tubing.  It's

3    basically just like wireline, bigger truck and bigger

4    tool.  They wanted to go down the well and fix the

5    problem.

6             Bullet tubing is much heavier.  They generally

7    weigh about 25,000 pounds.  I was rigged up for wireline

8    initially so when they brought in bullet tubing, I did

9    not have enough leverage to pick up the 25,000 pounds

10   and so I had -- and I had a malfunction on the crane and

11   I could not make my boom shorter to get more leverage.

12   So I hit the override key to do the job.

13   Q.   What happened when you did that?

14   A.   It was let go.

15   Q.   And can you describe how the company learned that

16   you had turned the override key?

17   A.   My relief informed them that I had turned the

18   override key and he proceeded to let management know and

19   because I didn't let management know, I was relieved.

20   Q.   Did you have a conversation with someone from

21   management about what you had done?

22   A.   Yes.

23   Q.   What was discussed during that conversation?

24   A.   Basically that I was in the wrong for turning the

25   key without proper authorization.

1  Q.   Who was the manager who you were having that

2  conversation with?

3  A.   I believe his name was Brian Victor.

4  Q.   What was his role at the time?

5  A.   He was the district manager for Canonsburg.

6  Q.   Did Mr. Victor tell you that you were not permitted

7  to turn the override key without contacting management?

8  A.   I'm not sure that is what he said at the time but

9  that was the general understanding.

10 Q.   And if you could turn in your binder, please, to

11 Tab 7.

12 A.   Okay.

13 Q.   Have you seen this document before?

14 A.   Yes, I have.

15 Q.   Just can you identify what the document is?

16 A.   I believe it is my release papers.

17         MR. WARREN:  Your Honor, may I publish?

18         THE COURT:  Yes.

19 Q.   Mr. Lett, I'm going to ask you a couple questions.

20 First off, does this document reflect what your job

21 title was when you were let go from Oil States?

22 A.   Yes.

23 Q.   What does it say?

24 A.   Crane operator two.

25 Q.   Was that your understanding of your job title?

1   A.   Yes.

2   Q.   Can you point out on the screen where that is

3   shown?

4   A.   Right here (indicating).

5        MR. WARREN:  Milly, if you could please scroll

6   down a little bit.

7   Q.   Does this document reflect the reason you were let

8   go from Oil States?

9   A.   Yes.

10  Q.   Could you point that out and describe for -- just

11  read what it says.

12  A.   It's right here.  It says, Second write-up for

13  violation of crane operations' safety policies.

14  Q.   What is your understanding of the company's

15  policies that you had violated?

16  A.   My understanding is that when I turned the override

17  key, it violated policy.

18       MR. WARREN:  Milly, if you could go to the

19  second page, please.

20  Q.   This document in the middle of the page, this is a

21  personnel requisition form, do you see that?

22  A.   Yes.

23  Q.   In the middle of the page it says replacement for

24  and could you read what is shown in that box?

25  A.   It says, Due to the termination of Jason Lett, who

**Jason Lett - Direct**

1   was a crane operator two, we will need a replacement.

2   Q.   Again, crane operator two, was that your

3   understanding of your job title at Oil States?

4   A.   Yes.

5          MR. WARREN:   Milly, if you could go to the

6   third page, please.

7   Q.   Once, again, Jason, I'm just going to ask you to

8   read at the top here.  It says nature of current

9   incident.  Could you read what is written in that box?

10  A.   Okay.  It says, Failure to notify management as to

11  the malfunction of the Grove GMK 4100, 100-ton crane and

12  continuing to operate the crane in a questionable

13  status.

14  Q.   Go ahead.  Read the next line.

15  A.   Failure to follow Oil States' safety policies and

16  procedures.

17  Q.   Once, again, is the information on this form

18  consistent with your understanding of why you were let

19  go from Oil States?

20  A.   Yes.

21          MR. WARREN:   Thanks, Milly.  You can take that

22  down.

23  Q.   Could you just go through and explain and, again, I

24  don't want you to get into too much detail here, I don't

25  want you to repeat anything that Mr. Burchik said

1   yesterday, but just describe briefly what happens start

2   to finish on a job.

3             What happens when you show up through to when

4   you leave, what are the general job duties you are

5   performing on a wellsite?

6   A.   We usually show up at the shop early so we can get

7   a head start on the drive.  We would usually drive to

8   the location.

9             First thing we would do is get with the

10  wireline engineers and the company man and to decide

11  where we're going to be setting up.

12            Once the company man and engineer decided

13  where they wanted to set up, we would set up within

14  their area that they wanted to set up.

15            Once they picked that area, I would spot the

16  crane, set up the outriggers, get the pads out for the

17  outriggers.  The outriggers have feet on them so you're

18  pressing down on the ground, not pressing down on the

19  cylinder, there is an actual pad under them, and you put

20  another pad under that pad so you can have stability for

21  the ground.

22            Once you get everything level with your

23  outriggers, you unhook the block from the crane and

24  raise it up and make sure your crane is level again.

25            Once you get everything level with the crane,

**Jason Lett - Direct**

1   you pretty much get with your grease operator and

2   whatever he wants to do at that time is what you do.

3   Q.   Once you got the crane set up, can you just kind of

4   in the same detail go through how you set up the

5   pressure control equipment?

6   A.   The pressure control equipment, the first thing

7   they usually do is get pieces of the lubricator off the

8   trailer, ten feet long silver and they have collars on

9   the end of them and they basically thread the other.

10       Depending how long the tool for the wireline

11  company is would determine how long our lubricator would

12  be.  So, if their tool was 35 feet long, we would

13  generally make 40 feet long lubricator.

14       You would lay the lubricator down on the

15  ground, assemble 40 feet long.  You would reach over and

16  grab the BOP, which is the blow-up preventer, and put

17  that on the well.

18       Then once you got everything on the well, you

19  would stand the lubricator up, put wheels on the end of

20  it so when I lift the lubricator up, the wheels would go

21  like this (indicating), and I would lift it up and stand

22  it up.

23       Once I stood it up, they would unscrew the

24  wheels and the wireline would -- at that time if we were

25  ready to go in the well, the wireline would stick their

1    gun up into our tube and they would swing everything

2    over to the well and stab onto the well.

3    Q.   Can you describe the next step of what you are

4    doing during the wireline and fracking operation?

5              Before we get to that, let me just ask.

6    During the process of setting up this equipment, where

7    are you seated and what are you doing?

8    A.   I'm in the crane and operating the crane.

9    Q.   Is that what you are doing on every single job?

10   A.   Yes, every job site.

11   Q.   Let's fast forward to the wireline and fracking

12   operation.  Can you describe generally what is going on

13   and what your specific role was.

14   A.   During the wireline operations, after we got on the

15   well I would generally --

16   Q.   I'm sorry.  Describe how you get on the well.

17   A.   Okay.  So, what happens is the wireline tools are

18   about 35 feet long, so our lubricator is about 40 feet

19   long plus other pieces of equipment.

20             What you want to do is raise it high enough so

21   that a 35-foot long tool can get up in there, our tool.

22   Once it's up in there, I bring everything down.  So if

23   you can imagine a paper towel with a pencil inside it.

24   I bring everything over to the well.  Once I get it over

25   to the well, they screw the paper towel onto the well

Jason Lett - Direct

1  and the pencil drops down into the hole attached to a

2  wire.

3  Q.   Again, during that process of getting the equipment

4  on the well, where are you and what are you doing?

5  A.   I'm in the crane cab.

6  Q.   What are you doing?

7  A.   Operating the crane, swinging the crane left,

8  taking signals from the grease operator.

9  Q.   Is that what you're doing at every single job you

10  worked at Oil States?

11  A.   At every single job, yes.

12  Q.   I would like to discuss the work schedule that you

13  worked.  What was your typical shift at Oil States, how

14  long?

15  A.   On a wellsite, it was 12 hours.

16  Q.   Were some of your shifts fewer than 12 hours?

17  A.   Yes.  Sometimes we were working less than 12 hours,

18  yes.

19  Q.   In what circumstances might that happen?

20  A.   Sometimes if we left the shop and we got on

21  location and we rigged up or we spotted the crane and

22  the package, we didn't have to do nothing that day, we

23  would spot and then leave the location.

24  Q.   In what circumstances might your shift be longer

25  than 12 hours?

1  A.   There's lots of time when if it's daylight only

2  operations, so if you don't have relief and the oil

3  company wants to work daylight operations, a lot of

4  times they want to get a lot of stuff done during the

5  day, you run six in the morning to eight, nine o'clock

6  at night.  Once your job is done, then everybody can go

7  home.

8  Q.   How many Oil States' employees are typically at the

9  wellsite when you are working there?

10  A.   On a 24-hour operation, there's usually four.

11  Q.   What are their shifts?

12  A.   Usually, 12-hour shifts.

13  Q.   How many people are on each shift?

14  A.   Two people per shift.

15  Q.   Who are they?

16  A.   The crane operator and the grease operator.

17  Q.   Are they usually the only two Oil States'

18  employees?

19  A.   They are usually the only two people there.

20  Q.   When you were working at these wellsites as a crane

21  operator, were you ever supervising anybody?

22  A.   I don't believe so.

23  Q.   Were you ever telling anyone else at the wellsite

24  what work they should be doing?

25  A.   No.  No.

**Jason Lett - Direct**

1  Q.   Did you have any sort of management

2  responsibilities when you were working at a wellsite?

3  A.   No, I did not.

4  Q.   Where are these wellsites located, what type

5  of -- what region?

6  A.   Usually, they're not near any kind of city, so they

7  are usually in the rural area mostly in some states.

8  Q.   Where would you typically stay at night?

9  A.   Usually, we would stay in hotels.  If the wellsite

10  was close enough to your house, you could stay at your

11  house.

12  Q.   Generally speaking, how often -- how much time were

13  you spending in a hotel versus at your house?

14  A.   Very often we were in hotels.

15  Q.   How long did it typically take you to get from the

16  hotel to the wellsite?

17  A.   Some hotels were an hour away, some were an hour

18  and a half, some were half-hour.  So, around an average,

19  around 45 minutes.

20  Q.   Is that both ways or one way?

21  A.   That's one way.

22  Q.   How would you travel back and forth to these

23  hotels?

24  A.   Using my company pickup truck.

25  Q.   Did Oil States assign a company pickup truck to

**Jason Lett - Direct**

1  you?

2  A.   Yes, they did.

3  Q.   Describe for the ladies and gentlemen of the jury,

4  if you would, just what that truck looked like?

5  A.   2011 Ford F-150.

6  Q.   Did it have any markings on it?

7  A.   No, it did not.

8  Q.   What was in the back of that truck?

9  A.   I had a toolbox and an L-shaped fuel tank.

10  Q.   What type of tools did you carry around in that

11  toolbox?

12  A.   I carried extra grease tubes for my crane, a grease

13  gun to put the grease tube into.

14  Q.   The grease tubes, what do you use this grease for?

15  A.   Sometimes you have to lubricate the different parts

16  that move in the crane, the block, so there is less

17  friction so it doesn't get as hot.  The boom, you have

18  to lubricate different parts on the crane.

19  Q.   In addition to the grease, what other type of stuff

20  are you carrying around in that toolbox?

21  A.   Straps, slings, chain lube, stuff like that.

22  Q.   Can you please describe what that equipment is used

23  for at the wellsite?

24  A.   Mostly used for crane operations.  Chain lube is

25  obviously used to lube the rope on the crane so it

Jason Lett - Direct

1    doesn't crust out.

2    Q.    What about the straps and slings, what are they

3    used for?

4    A.    They are used for picking up different objects

5    around the wellsite.

6    Q.    Do they hook up to the crane itself?

7    A.    They hook up to the block on the end of the crane

8    and the strap hooks up to a different object and you

9    just pick it up.

10   Q.    Did you need to have that equipment with you at the

11   wellsite?

12   A.    Yes.

13   Q.    Were you required to take it to the wellsite?

14   A.    Yes.

15   Q.    Were you permitted to take your personal vehicle to

16   the wellsites?

17   A.    No, I was not.

18   Q.    Do you know if Oil States had a policy about that?

19   A.    I'm not sure but nobody ever brought their personal

20   vehicles to a wellsite.

21   Q.    You said there was an L-tank in the back?

22   A.    Yes.

23   Q.    Do you know the fuel capacity, how many gallons

24   that held?

25   A.    I believe it was 99 gallons.

**Jason Lett - Direct**

1   Q.   What did you use that fuel tank for?

2   A.   I filled it up to fill up the crane on the wellsite

3   because the crane did not move for weeks at a time.

4   Q.   These toolboxes and the L-tank, are they attached

5   to the truck in any way?

6   A.   They are usually bolted to the bed of the truck.

7   Q.   So, when you get to a wellsite, how do you get the

8   diesel from the tank to the crane?

9   A.   Well, usually we would park the pickup truck close

10  enough to the fuel tank for the crane, and we would run

11  our hose from the fuel tank to the fuel tank for the

12  crane.

13  Q.   You would siphon it out of the work truck to the

14  crane?

15  A.   Yes.

16  Q.   What type of truck did you say you were driving,

17  your assigned truck?

18  A.   2011 Ford F-150.

19  Q.   I am going to ask you to turn to Tab 75, Jason.

20          Could you just identify what that document is,

21  please?

22  A.   This looks like the window sticker from my 2011

23  Ford F-150.

24  Q.   Why do you think that's for your particular truck?

25  A.   I recognize the number through filling out vehicle

Jason Lett - Direct

1    reports every month.

2              MR. WARREN:  Your Honor, may I publish?

3              THE COURT:  You may publish.

4              MR. WARREN:  Milly, let's go to Page 2 to

5    start, please, and if you could zoom in on the top

6    there.

7    Q.   Can you describe what type of truck is shown on

8    that document, Jason?

9    A.   It's a 2011 Ford F-150, 4x4 super cab.

10   Q.   Is that the type of truck that was assigned to you

11   at Oil States?

12   A.   Yes, it was.

13   Q.   Were there any Department of Transportation

14   markings on that truck?

15   A.   No.

16   Q.   Was it a DOT registered vehicle?

17   A.   No, it was not.

18             MR. WARREN:  Milly, if you could please go

19   back to the first page of that document.

20   Q.   Jason, if you look at the top here, does this

21   document reflect the gross vehicle weight rating of your

22   assigned truck?

23   A.   Yes.  It says 8,200 pounds.

24   Q.   Is that consistent with your recollection of the

25   GVWR that was of your truck?

Jason Lett - Direct

1   A.   Yes, it is.

2   Q.   Just briefly could you describe what different

3   types of trips, what you are using that work truck to

4   do?

5   A.   I would use it to get to and from locations.   I

6   would use it to go to the shop, I would use it for

7   hotshots, different things like that.

8   Q.   How often are you using your assigned work truck?

9   A.   Pretty much every day.

10  Q.   When you would go to a location, where would you

11  typically leave from?

12  A.   Typically, it was at the beginning of the job, we

13  would leave from the shop.

14  Q.   And you would drive from the shop to the wellsite?

15  A.   From the shop to the wellsite, yes.

16  Q.   At the end of the job, where would you leave from

17  and go to?

18  A.   At the end of the job, we would leave from the

19  wellsite and depending if we had to go to another

20  wellsite, I would leave that wellsite to go to another

21  one.

22         If there was another job to go to, we would

23  leave from the wellsite and go back to the shop.

24  Q.   Mr. Burchik explained what a hotshot was yesterday.

25  You said you were doing hotshots?

Jason Lett - Direct

1  A.   That's correct.

2  Q.   What type of equipment or tool supplies were you

3  hotshoting in your assigned pickup truck?

4  A.   Ranging anything from torque wrenches, flow tubes,

5  any kind of object that was small enough to put in the

6  back of the truck or in the cab of the truck to take it

7  to anybody on location or another business or another

8  facility.

9  Q.   How often were you being sent out on hotshots?

10 A.   Not really sure.  If I was working in the shop, I

11 would say two to three times a week.

12 Q.   Two to three times every week?

13 A.   If I was in the shop.

14 Q.   Who would ask you to go do those hotshots?

15 A.   Typically management would.

16 Q.   Were you required to do them as part of your job?

17 A.   Yes.

18 Q.   Why were you hotshoting this equipment out to

19 wellsites?

20 A.   If there is a grease operator or a crane operator

21 out there doing some wireline operation and they either

22 forgot a piece of equipment or something broke or they

23 needed something for whatever reason, somebody from the

24 shop would take it to them because they couldn't leave

25 the location.  So, we would have to take it to them.

**Jason Lett - Direct**

1   Q.   When you would do a hotshot, would you keep any

2   record of the hotshots you did?

3   A.   No, I did not.

4   Q.   Do you know if Oil States kept any record of those

5   hotshots?

6   A.   Not sure.

7   Q.   Have you ever seen any record of those hotshots?

8   A.   No.

9   Q.   Again, briefly, without kind of retreading over any

10  ground that Mr. Burchik covered yesterday, when you are

11  working in the shop, what type of work are you doing?

12  A.   Shop work is mainly consisting of maintenance for

13  equipment that came from the wellsites that is dirty and

14  greasy and you have to get it ready to go back out, so

15  it's usually like all hands on deck kind of thing

16  breaking down tools, unscrewing the different parts of

17  the greasehead and taking out 0-rings and replacing them

18  and stuff like that.

19  Q.   Is this work you are doing with your hands?

20  A.   Yes, it is.

21  Q.   Do you believe you would characterize that as

22  manual labor?

23  A.   Yes, I would.

24  Q.   When you were working in the shop, did you have an

25  office, a desk, a computer or anything like that?

Jason Lett - Direct

1    A.    No, I did not.

2    Q.    Were you ever doing any sort of back office type

3    work?

4    A.    No.

5    Q.    Were you involved in any way in interviewing or

6    hiring or firing or any sort of that type of activity?

7    A.    No, I was not.

8    Q.    Were you involved in running the company in any

9    way, and I characterize that as budgeting or taxes or

10   any sort of that type of work when you are in the shop?

11   A.    No, I was not.

12   Q.    So, what was your job duty when you are working in

13   the shop, what are you doing?

14   A.    My job duties being in the shop was basically

15   maintenance for different things that came back to the

16   shop that needed to be sent back out or just prepared to

17   be sent back out for a future date.

18   Q.    Was there anyone in the shop who reported to you or

19   who you supervised on a daily basis?

20   A.    No.

21   Q.    When you were working in the shop, what were the

22   typical shop hours?

23   A.    Eight a.m. to five p.m.

24   Q.    Were they the same hours for all of the crane

25   operators?

Jason Lett - Direct

1    A.    All of the crane operators, yes.

2    Q.    Did you receive a lunch break when you worked in

3    the shop?

4    A.    Usually, from around twelve to one.

5    Q.    Who was the district manager, let's say, between

6    the middle of 2012 and when you left in July of 2013?

7    A.    Brian Victor.

8    Q.    Did Mr. Victor have a certain position on whether

9    you needed to come in on time or leave early or what

10   hours you should work in the shop?

11   A.    Yes.  He was actually kind of strict.  He was a

12   former military man.  He was pretty adamant on having

13   people there at certain times.

14   Q.    What was the company's policy or Mr. Victor's

15   policy on working on weekends?

16   A.    Usually, we worked on Saturdays, very rarely worked

17   on a Sunday.

18   Q.    Were there any circumstances where you would work

19   past five p.m. when you were working in the shop?

20   A.    Yes.

21   Q.    Describe, please, for the ladies and gentlemen of

22   the jury what those circumstances would be?

23   A.    Well, say a crane operator or a grease operator

24   came back at 4:30 and they needed to be somewhere in the

25   morning to do another job.  They would come back to the

Jason Lett - Direct

1    shop and we would have to stay and help them get their

2    equipment scrubbed down, everything replaced, everything

3    repainted, everything strapped back down to go back out

4    for the next job the next morning.  So, we couldn't

5    leave until that was done.

6    Q.   And did circumstances like that arise pretty often?

7    A.   Pretty often.

8    Q.   Let's go through -- let me change again and let's

9    quickly go through the compensation you received at Oil

10   States.

11           Did you receive a salary when you worked at

12   Oil States?

13   A.   I did.

14   Q.   Was that structured similarly to how Mr. Burchik

15   described his salary?

16   A.   Yes.

17   Q.   Did the amount of your salary change in any way

18   depending on the number of hours you worked in a week?

19   A.   No, it didn't.

20   Q.   Jason, I'm going to ask you to please go to Tab 8

21   in your binder.  Can you identify what that document is,

22   please?

23   A.   It's Oil States' payroll register.

24   Q.   Do you see a pay code on there that says r-e-g?

25   A.   Yes, I do.

Jason Lett - Direct

1          MR. WARREN:  Your Honor, may I publish this?

2          THE COURT:  Yes.

3  Q.   What is your understanding of what the reg pay code

4  stands for?

5  A.   Regular pay, that would be my salary.

6  Q.   Have you actually gone through these payroll

7  reports yourself and added up the salary that you

8  received between May 22nd of 2012 and May 21st of 2013?

9  A.   Yes, I have.

10  Q.   Could you please identify for the jurors the amount

11  that you calculated when you went through and did that?

12  A.   Not off the top of my head.

13  Q.   Is there something you might look at that would

14  refresh your recollection?

15  A.   Yes.  My notes.

16  Q.   The notes you took?

17  A.   Yes.

18          MR. WARREN:  Your Honor, would you like a

19  copy?

20          THE COURT:  Yes, please.

21  Q.   Are those the notes you were referring to, Jason?

22  A.   Yes, they are.

23  Q.   Could you look through and see if that document

24  refreshes your recollection of the amount of salary that

25  you received from Oil States between May 22nd of 2012 and

**Jason Lett - Direct**

1    May 21st of 2013?

2    A.   Yes, it does.

3    Q.   What is that number?

4    A.   $40,249.

5    Q.   All right.  Have you also gone through and

6    calculated the amount of salary you earned between May

7    22nd, 2013 and when you left the company two months later

8    in July?

9    A.   Yes.  That would be $7,495.

10   Q.   Okay.  I'll take that back from you.  Thank you.

11            I believe you testified that your

12   compensation -- maybe you didn't testify to this.  Did

13   you also receive a job bonus?

14   A.   Yes, I did.

15   Q.   Can you explain to the jurors quickly how that job

16   bonus worked.  What would you have to do to earn a job

17   bonus?

18   A.   We usually got a job bonus if Oil States charged

19   the oil company a fee for that day.

20   Q.   So, if Oil States got paid for a job, you received

21   a job bonus?

22   A.   Yes, I did.

23   Q.   What was the amount of the job bonus that you

24   received for each day, each shift that you worked?

25   A.   $450.

**Jason Lett - Direct**

```
 1   Q.   Again, did the amount of that job bonus, did it
 2   change in any way depending on the number of hours you
 3   worked in a week?
 4   A.   No, it did not.
 5   Q.   While you worked at Oil States, did you ever earn
 6   any sort of overtime compensation?
 7   A.   No, I did not.
 8   Q.   Did the amount of your compensation ever depend on
 9   whether you worked more than 40 hours in a particular
10   workweek?
11   A.   No, it didn't.
12   Q.   Jason, could you please turn to Tab 200 in that
13   binder.
14   A.   Okay.
15   Q.   Is this document your IRS W2 Form for the year
16   2012?
17   A.   Yes, it is.
18            MR. WARREN:  Your Honor --
19            THE COURT:  You may publish it.
20            MR. WARREN:  Milly, can you please --
21   Q.   Jason, look at Box 1.  There is a box that
22   identifies compensation you received from Oil States.
23            Do you believe that box accurately describes
24   the amount of compensation you received from Oil States?
25   A.   Yes, it does.
```

**Jason Lett - Direct**

1   Q.   Turn to the next page of the binder, please.   Is

2   this your IRS W2 Form for 2013?

3             MR. WARREN:   Your Honor --

4             THE COURT:   Yes, you may publish.

5   Q.   Jason, I'll ask again does that Box 1 at the top of

6   the form, does it accurately state the compensation you

7   received from Oil States in 2013?

8   A.   Yes, it does.

9   Q.   Okay.   Thank you very much.

10             Let's talk about how you kept track or what

11   information you have of the hours that you worked when

12   you were at Oil States.

13             When you were working at a wellsite, would you

14   keep any record of the activities you were performing?

15   A.   Yes.   I usually kept a daily log.

16   Q.   Could you please describe for the ladies and

17   gentlemen of the jury what a daily log is.

18   A.   A daily log, it's a piece of paper that I just jot

19   down the time I got on location, the time I was doing

20   any particular movement with the crane and the time I

21   left.

22   Q.   Was that daily log, was that part of a broader

23   packet of documents?

24   A.   Yes.   It was required to put in the bonus packet in

25   order to receive a bonus.

Jason Lett - Direct

1    Q.    When during the day would you fill out that daily

2    log?

3    A.    I would fill it out as the day was going on.

4    Q.    As you were performing those activities?

5    A.    Yes.

6    Q.    When you filled out these daily logs, did you

7    typically track the time you arrived at a wellsite?

8    A.    Yes.

9    Q.    Would you typically track the time you left a

10   wellsite?

11   A.    Yes, I did.

12   Q.    Let's show the jurors an example of what these

13   documents look like.

14          If you could turn to Tab 23 in your binder,

15   Jason.

16   A.    Okay.

17   Q.    Are these examples of the documents you were just

18   describing?

19   A.    Yes.

20          MR. WARREN:  Your Honor, may I publish?

21          THE COURT:  Yes.

22          MR. WARREN:  So, Milly, if you could pick one

23   of those in the middle of the page and zoom in.

24   Q.    If you could just go through and let's pick this

25   one in the middle, if you could describe the information

1   that you would record in these daily reports or job

2   logs.

3   A.   Okay.  4-21-2012, we arrived on location looks like

4   at 4:30 in the evening -- I can't read my own

5   handwriting.  Arrived on location and pump down is in

6   progress.  They are already pumping down the hole which

7   is the explosives for the wireline.  At 5:30, out of the

8   hole.

9   Q.   That's coming out of the well?

10  A.   Discharge the gun and outside the hole and pumping

11  it down.

12          5:50, secure the lubricator, which means I

13  would bring the lubricator down to ground level, strap

14  it to something sturdy so it wouldn't blow in the wind

15  and stand by for frack.

16          Then at 12:45 p.m., I would raise the lube,

17  prepare to go back into the well, wireline would lift

18  their gun back out of the lubricator and stab onto the

19  well.

20          1:30 p.m., go into the hole 1H.

21  Q.   That's the number of the well?

22  A.   Yes.  Usually wells are 1H, 2H, depending how many

23  wells are on a pad.

24          2:30 p.m., set the plug.  The guns wouldn't

25  fire.  There was a malfunction.  It's called a

1    misfunction.  When they have a malfunction, you have to

2    pull -- it's already on the gun so you have to pull it

3    all the way out and be very careful.

4              Out the hole at three p.m., lay the guns down

5    and they had wireline had to change their gun out.  They

6    changed the gun out at 3:15 p.m.

7              Once they got the gun replaced, we went back

8    in the hole at four p.m.

9              Stand by for frack to get charge and I guess

10   we went on the well.  I was probably leaving the

11   location at 4:30.

12   Q.   So, how long was that shift?  How long were you on

13   that well that day?

14   A.   Looks like 12 hours.

15   Q.   Is that typical of your shift?

16   A.   Yes.

17   Q.   For all of this work going on for this particular

18   day, what are you doing during the day?

19   A.   Operating the crane.

20   Q.   That's the process you described before, picking up

21   the equipment and putting it on the well?

22   A.   That's correct.

23   Q.   Is this typical of a typical day you would work at

24   a wellsite?

25   A.   It's a typical day at a wellsite, yes.

1    Q.   While you worked at Oil States, were there periods

2    when you would work continuously for several weeks in a

3    row?

4    A.   Yes.

5    Q.   I would like to show the ladies and gentlemen on

6    the jury just one example of such an instance.

7            MR. WARREN:  Milly, could you please go to

8    Bates No. 013003.

9    Q.   Jason, what's the date at the top of this report?

10   A.   8-17-2012.

11   Q.   What happens on the very first day?

12   A.   Looks like we arrived on location at 11 a.m.  We

13   spotted the equipment and leave location at 12 p.m.

14   Q.   How long were you there on that day?

15   A.   Looks like about an hour.

16   Q.   What happens over the next couple of days at the

17   wellsite?

18   A.   8-18-2012, we arrive at location and frack was

19   setting up, so we probably just left again.

20            8-19, same thing.

21            8-20, arrive at location, spot crane up,

22   inspect the crane.

23            Do you want me to keep reading?

24   Q.   You don't need to read every entry.  Once the

25   equipment is rigged up, what are you doing at the

**Jason Lett - Direct**

1  wellsite on these days?

2  A.   Once the crane is rigged up, I'm operating the

3  crane for wireline operations or standing by for frack.

4  Q.   Let's go through you arrive at this particular job

5  on August 17.

6         MR. WARREN:   Milly, please just scroll

7  through.

8  Q.   Are you continuing to work through each of these

9  days here?

10  A.   Yes, I am.

11  Q.   So, we're through the 31st and into September.  Are

12  you continuing to work each of these days here?

13  A.   Yes, I am.

14  Q.   What is the length of most of these shifts?

15  A.   Looks like 12-hour shifts.

16         MR. WARREN:   Milly, if you could please just

17  scroll through quickly.

18  Q.   Are you continuing to work on these days?

19  A.   Yes, I am.

20  Q.   That's every day?

21  A.   That's every day, yes.

22  Q.   So, is this an example of a situation where you are

23  working for I think what appeared to be from about 30

24  days?

25  A.   Yes, it is.

Jason Lett - Direct

1   Q.   Was that a fairly frequent occurrence when you
2   worked at Oil States?
3   A.   Yes, it was.
4   Q.   Did you hear Mr. Burchik yesterday describe a
5   document called a tally book?
6   A.   Yes, I did.
7   Q.   Did you keep a tally book while you worked at Oil
8   States?
9   A.   No, I did not.
10  Q.   Can you remind the jurors please what a tally book
11  is?
12  A.   A tally book is a small book where you take notes,
13  jot down things what you did that day.
14  Q.   A little notebook?
15  A.   Yes, about that big (indicating).
16  Q.   Why did you not use a tally book?
17  A.   I used my daily logs as my tally book.
18  Q.   Did you record the same information on these sheets
19  that other people recorded on their tally books?
20  A.   Right.  I wrote them on the daily logs because we
21  had to turn it in.  I didn't want to write it twice, so
22  I wrote it once.
23  Q.   When you filled out these documents, what did you
24  do with them?
25  A.   Put everything together with the bonus packet and

1    turn it into management.

2    Q.   Did you keep copies of those documents for

3    yourself?

4    A.   No, I did not.

5    Q.   If you could go to the next tab in your binder,

6    which is 24, I believe.

7            What type of document is that?

8    A.   Looks like a job bonus spreadsheet.

9    Q.   Is that your handwriting?

10   A.   Yes, it is.

11           MR. WARREN:  Your Honor, may I publish?

12           THE COURT:  Yes.

13           MR. WARREN:  Milly, maybe you can go to the

14   next page so we have a little more information.

15   Q.   What type of information were you recording on this

16   document?

17   A.   This is the job date, this is the ticket number,

18   the PLO code, district I was working out of, which is

19   Canonsburg, and this is the Cabot Delucia Pad 3H, the

20   type of job is pump down, the position I was in was

21   crane operator, the amount of bonus was $480 since I was

22   probably running a 100-ton.

23   Q.   The job bonus for 100-ton was $480?

24   A.   Yes.

25   Q.   When you filled out these job bonus spreadsheets,

Jason Lett - Direct

1   did you ever list anything other than crane operator in

2   the position of job column?

3   A.   No.

4   Q.   Was that the position you were always working?

5   A.   Yes, it was.

6   Q.   Let's go -- I want to identify one other type of

7   document.  If you could turn to the next tab, which is

8   25, please.

9        Could you please identify what type of

10  document this is.

11  A.   This is a man hours report.

12  Q.   And is that your handwriting?

13  A.   Yes, it is.

14       MR. WARREN:  Your Honor, may I publish?

15       THE COURT:  Yes.

16  Q.   What type of information would you record in these

17  man hour reports?

18  A.   On this particular one I recorded the days off, my

19  days off, the days I was in the shop, my office duty

20  days, and the days I was on location.

21  Q.   Is this typical of the information you would record

22  in these man hour reports?

23  A.   Yes, it is.

24  Q.   When would you fill out these particular documents?

25  A.   Usually at the end of the month.

1  Q.   What would you do with them when you filled them

2  out?

3  A.   Turn them into management.

4  Q.   Did you keep copies of them?

5  A.   No, I did not.

6  Q.   How did you obtain this particular document?

7  A.   We requested that Oil States send them to us.

8  Q.   You asked Oil States for that?

9  A.   Yes.

10 Q.   Have you received all of the man hour reports that

11 you requested from Oil States?

12 A.   I don't believe so.

13 Q.   Are you able to obtain those missing man hour

14 reports from any other way?

15 A.   No, I'm not.

16 Q.   Have you -- before we get to that, have you

17 calculated the amount of bonus compensation that you

18 earned from Oil States between 2012 and 2013?

19 A.   Yes, I did.

20 Q.   Could you just describe, please, for the ladies and

21 gentlemen of the jury how you tried to estimate the job

22 bonuses you earned at Oil States?

23 A.   Well, basically, we just tried to figure out the

24 days I was on location and if there was a day I was on

25 location, we pretty much counted that as a job bonus for

**Jason Lett - Direct**

1  that day.

2  Q.   How did you figure out the days you were on

3  location?

4  A.   By either using my daily log sheets or my man hours

5  reports to determine what day, if I was on a wellsite or

6  not in conjunction with my days off schedule.

7  Q.   So, you used the documents that we were just

8  showing to the jurors?

9  A.   Yes.

10  Q.   And have you actually gone through and estimated

11  the total number of job bonuses that you earned between

12  May 22nd of 2012 and May 21st of 2013?

13  A.   Yes.

14  Q.   Do you recall what that number is?

15  A.   No, not off the top of my head.

16  Q.   Is there something you might look at to refresh

17  your recollection of that number?

18  A.   Yes, my notes.

19  Q.   Your notes?

20  A.   Yes.

21  Q.   Jason, I'm handing you a document.  Is that the

22  notes you were talking about?

23  A.   Yes, it is.

24  Q.   Look through that document and see if that

25  refreshes your recollection of the amount of job bonuses

Jason Lett - Direct

1    you estimated you earned between May 22nd, 2012 and May

2    21st of 2013.

3    A.    Yes, it is.

4    Q.    And what was that number?

5    A.    The number of bonuses was 133.

6    Q.    What was the dollar value of those bonus?

7    A.    $59,850.

8    Q.    Have you also gone through and tried to estimate

9    using the documents you were just discussing the number

10   of job bonuses you earned between May 22nd, 2003 and when

11   you left the company a few months later in July of 2013?

12   A.    Yes.  It was 21.

13   Q.    21 is the number of bonuses?

14   A.    Yes.

15   Q.    What was the dollar value of those bonuses?

16   A.    That was $9,450.

17   Q.    These figures that you just provided the jury,

18   these estimates that you did, do you believe those are

19   reasonable and accurate estimates of the dollar value of

20   the bonuses you received between those time periods?

21   A.    Yes, I believe so.

22   Q.    Have you also gone through and tried to estimate

23   the hours you worked at Oil States?

24   A.    Yes, I did.

25   Q.    Could you please describe for the ladies and

Jason Lett - Direct

1  gentlemen of the jury the process you went through in

2  order to estimate the hours you worked at Oil States and

3  let's start with the hours you worked at the wellsite.

4  A.   At the wellsite, I would usually try to use my

5  daily logs to figure out how many hours I worked at a

6  wellsite.  Typically, the wellsite hours are 12 hours.

7  Sometimes, like I said, daylight operations were

8  sometimes shorter, sometimes longer.

9          I would use my daily logs and/or my man hours

10  report to determine if I was on a wellsite.

11  Q.   Have you gone through those documents and tried to

12  and actually done an estimate of the hours you worked at

13  the wellsite?

14  A.   Yes.

15  Q.   And did you use a 12-hour shift for every day or

16  did you actually use the specific number of hours that

17  were shown in the reports?

18  A.   I used the specific number of hours that were shown

19  in the report.

20  Q.   What about your shop days, have you gone through

21  and tried to figure out what shop days you worked?

22  A.   Yes.

23  Q.   Did you use any documents to do that estimate?

24  A.   I used the man hour reports to try to determine if

25  I was at the job at that time.

Jason Lett - Direct

1   Q.   Did those man hour reports generally reflect the
2   days you were working in the shop?
3   A.   Yes.
4   Q.   Did those man hour reports, would you write the
5   number of hours you worked in the shop?
6   A.   Sometimes I did and sometimes I didn't.
7   Q.   On a day you didn't record your shop hours when you
8   were doing these estimates, how did you estimate your
9   shop hours for those days?
10  A.   Typically, shop days were eight-hour days,
11  eight a.m. to five p.m. minus lunch.  The days I did not
12  put hours down, I estimated eight hours.
13  Q.   What about the days you worked 12 hours in the
14  shop, what did you estimate for those days?
15  A.   If I worked 12 hours in the shop and I did not
16  report it, I would estimate eight hours for that day.
17  Q.   Why did you use eight hours for those days if you
18  think you might have worked 12?
19  A.   Because that's pretty much the average we worked.
20  If I did not write down 12 hours for the day, then the
21  average for a shop day is eight hours, so that's what I
22  used.
23  Q.   Do you believe your estimate of the shop hours you
24  worked, do you believe they are conservative estimates?
25  A.   I believe they are really conservative estimates.

**Jason Lett - Direct**

1  Q.    When you were doing these estimates of your hours

2  you were describing, did you also account for the off

3  days when you weren't working?

4  A.    Yes.

5  Q.    How did you figure out what your off days were?

6  A.    Using the man hour reports and my 30 and 10

7  schedule, I could figure out I was on off days or not.

8  Q.    You would include off days generally in accordance

9  with the 30 and 10 schedule?

10  A.    Yes.

11  Q.    Can you just describe, I don't think we discussed

12  the 30 and 10 schedule this morning, describe what you

13  mean by that?

14  A.    30 and 10 schedule is on call 30 days straight,

15  Sundays doesn't matter.  If you were on a location for

16  30 days, that's okay.  If you are in the shop 30 days,

17  they can call you back to the shop on a Sunday and work

18  Sunday.

19         If you are on ten days off, they would

20  typically not call you so you are not on call for 10

21  days.

22  Q.    Were there ever circumstances you worked through

23  your off days at Oil States?

24  A.    Yes.

25  Q.    When you were doing these estimates, did you rely

**Jason Lett - Direct**

1  on the 30 and 10 schedule?

2  A.   I tried to.

3  Q.   Have you gone through and tried to come up with an

4  accurate estimate of the number of hours, the total

5  number of hours you worked between May 22nd of 2012 and

6  May 21st of 2013?

7  A.   Yes, I did.

8  Q.   Do you recall what that number was that you

9  estimated?

10  A.   I can't recall at this time.

11  Q.   Is there something I can show you that might

12  refresh your recollection?

13  A.   My notes.

14  Q.   Okay.  I'm going to hand you the same notes that I

15  handed you a moment ago.

16        Could you look through that document and see

17  if that document refreshes your recollection of the

18  amount -- the total number of hours that you estimate

19  you worked between May 22nd of 2012 and May 21st of 2013.

20  A.   Yes, it does.

21  Q.   What is the total number of hours you worked in

22  that period?

23  A.   Total number of hours is 2,747.

24  Q.   And have you gone through and tried to figure out

25  the number of overtime hours you worked in that period?

Jason Lett - Direct

1    A.    Yes, I have.

2    Q.    Can you describe for the jurors, please, how you

3    determined overtime hours as opposed to total hours?

4    A.    So, what we did -- what I did was I calculated the

5    number of hours for each given week and take 40 hours

6    out of it and that's how you get your overtime hours.

7    Q.    You did that calculation for every week during that

8    time period?

9    A.    For every week, yes.

10   Q.    Can you please tell the ladies and gentlemen of the

11   jury how many overtime hours you estimate you worked

12   between May 22nd of 2012 and May 21st of 2013?

13   A.    The overtime hours was 964.

14   Q.    Have you done a similar calculation of the total

15   number of hours you worked again between May 22nd of 2013

16   and when you left the company in July of 2013?

17   A.    Yes, I did.

18   Q.    What was the total number of hours that you

19   estimate you worked in that period?

20   A.    464 hours.

21   Q.    Have you tried to figure out the number of overtime

22   hours?

23   A.    Yes, I did.

24   Q.    What was the number of overtime hours?

25   A.    126 hours.

**Jason Lett - Direct**

1   Q.   Let me take that document back from you.

2            These estimates that you just provided to the

3   jurors, do you believe these are reasonable and accurate

4   estimates of the overtime hours that you worked in those

5   time periods?

6   A.   I believe so and I would also believe they are

7   underestimated.

8   Q.   Why do you think they are underestimated?

9   A.   We worked a lot of hours at Oil States.  We

10  worked -- sometimes we would have to sleep on location,

11  sometimes we would work 24 hours straight getting a

12  couple here and a couple hours there.

13           A lot of times we had to show up at the shop

14  at four a.m. to get everything ready and ride six hours

15  to Scranton, Pennsylvania, to get everything ready for

16  the next day.  A lot of hours we did work we didn't

17  record.

18  Q.   Why did you not record those hours in your estimate

19  if you think you worked them?

20  A.   We felt like we wanted to be conservative and just

21  use the average hours we worked in a shop and on any

22  given particular wellsite.

23  Q.   When you were doing these estimates, did you go

24  through and try to figure out the average number of

25  overtime hours you worked in a week between May of 2012

1    through July of 2013 time period?

2    A.   Yes.

3    Q.   What was the average you came up with?

4    A.   I believe it was 19 or 20 hours a week.

5    Q.   19 or 20 hours of overtime a week, does that seem

6    kind of consistent with your recollection of the hours

7    you worked at Oil States?

8    A.   Yes, because there was times when we worked 50

9    hours of overtime in a week or we had 12 hours of

10   overtime for a given week, so I felt that 20 hours or 19

11   hours was an average.

12   Q.   You believe that's a fair and accurate estimate?

13   A.   I believe so.  If anything, it's conservative.

14   Q.   What are you asking the ladies and gentlemen of the

15   jury to award you in this case?

16   A.   I'm asking for any kind of overtime that I am

17   entitled to and anything that I did not earn, I'm not

18   asking for.

19   Q.   So, you're asking the jurors to come up with a fair

20   estimate of the overtime hours you worked?

21   A.   Yes, I am.

22   Q.   Do you have any particular dollar amount you

23   believe you are owed?

24   A.   No, I don't.

25   Q.   Why don't you have a dollar amount?

**Jason Lett - Direct**

1   A.   I'm not involved in the calculations of the dollar

2   amount.   I just know the information that I provided and

3   based on that information, however it's calculated, is

4   up to somebody else.

5   Q.   Is it your understanding that the dollar amount is

6   based on a formula that's in the law?

7   A.   Yes.

8   Q.   But you've gone through and figured out how much

9   you earned and how many overtime hours you worked?

10   A.   Yes, I have.

11   Q.   You believe those are good estimates?

12   A.   I do believe so they are good estimates and fairly

13   conservative.

14              MR. WARREN:   Thank you.

15              Nothing further, Your Honor.

16              THE COURT:   Counsel, do you wish to examine?

17              MR. STUKENBERG:   Yes, Your Honor.

18              THE COURT:   Please.

19                     CROSS-EXAMINATION

20   BY MR. STUKENBERG:

21   Q.   Good morning, Mr. Lett.

22              If we could, I would like to turn to Tab 6.   I

23   believe your lawyer was just asking you about that

24   document.

25   A.   I don't have a Tab 6.

**Jason Lett - Cross**

1    Q.   It's on the screen.  This was your application, is

2    that right?

3    A.   Yes.

4    Q.   At the time you applied, you asked for salary.  If

5    you look at the left-hand side corner there, sixty to

6    eighty thousand dollars a year, is that accurate?

7    A.   Yes.

8    Q.   You were actually paid in 2012 about $110,000, is

9    that accurate?

10   A.   That's right.

11   Q.   So, you were actually paid thirty or forty, fifty

12   thousand dollars more than your requested salary, is

13   that right?

14   A.   That is correct.

15   Q.   In 2013 you made about $71,000 in about six and a

16   half, seven months of work, is that right?

17   A.   That's correct.

18   Q.   So, if you would have worked the full year, you

19   would have earned over a hundred thousand dollars?

20   A.   Well, I'm not sure about that.

21   Q.   Well, about every month you were making about

22   eleven, twelve thousand, is that right?

23   A.   On average, I guess so.

24   Q.   So, if that had continued, you would have earned

25   over a hundred?

**Jason Lett - Cross**

1   A.   If it had.  I'm not sure it would have.

2   Q.   You mentioned after you left, you started work at

3   Allegheny Crane, is that right?

4   A.   Yes.

5   Q.   You were paid an hourly rate?

6   A.   That's correct.

7   Q.   You were a crane operator?

8   A.   That's correct.

9   Q.   What was your hourly rate?

10  A.   My hourly rate?

11  Q.   At Allegheny Crane.

12  A.   At Allegheny Crane, at the time I was non union, so

13  it would probably be about $25 an hour.

14  Q.   About $25 an hour.  Were you paid when you didn't

15  work at Allegheny Crane?

16  A.   No.

17  Q.   You didn't get any job bonuses at Allegheny Crane?

18  A.   No, I did not.

19  Q.   At Allegheny Crane at $25, you made about what,

20  $50,000, $55,000 a year?

21  A.   I'm not sure.

22  Q.   At $25 an hour, if you worked 2,000 hours, that

23  would be about $45,000, is that right?

24  A.   I'm not sure but if you say so.

25  Q.   If you worked a little overtime, maybe you could

**Jason Lett - Cross**

1   make 50, 55, something like that?

2   A.   Sounds about right.

3   Q.   Before you started with Oil States, you were at

4   Coke, correct, making $23 an hour?

5   A.   That is incorrect.

6   Q.   I'm sorry.  Where were you working?

7   A.   I was working at Coca-Cola.

8   Q.   I said Coca-Cola.  What was your hourly rate?

9   A.   As a driver?

10  Q.   Correct.

11  A.   I think I was making $18 an hour, $17.

12  Q.   What was your annual compensation?

13  A.   I think my highest compensation was maybe $50,000,

14  $45,000 a year.

15  Q.   So, when you worked at Oil States, you got more

16  than double what you had been making, is that accurate?

17  A.   That's correct.

18  Q.   At the time that you applied to work at Oil States,

19  you mentioned you met with a Mr. Yates, is that correct?

20  A.   Correct.

21  Q.   You discussed your compensation at that interview,

22  correct?

23  A.   I believe it may have come up.  I'm not really

24  sure, it's been so long ago.

25  Q.   Do you recall testifying at your deposition he told

**Jason Lett - Cross**

1   you, you would receive a salary plus a job bonus?

2   A.   I think so.

3   Q.   During the time you were employed at Oil States,

4   you never complained to anybody about not receiving

5   overtime, is that right?

6   A.   Yes, I did.

7   Q.   In your deposition we asked you that question and

8   you said you never complained about receiving overtime.

9   A.   About not receiving overtime?

10  Q.   That's correct.

11  A.   If I did, I was mistaken.

12  Q.   You were mistaken at the time we took your

13  deposition?

14  A.   Well, I recall an instance where I complained about

15  working beyond the hours that we were not being paid

16  for.

17  Q.   Can you explain that to me.

18  A.   Well, if you were in the shop, you were getting

19  paid salary, so if you had to work over your eight hours

20  or over 12 or 13 hours, you weren't getting paid for,

21  you were just getting salary and I voiced my opinion on

22  that one time.

23  Q.   You voiced your opinion to Mr. Fowler?

24  A.   Correct.

25  Q.   And you said Mr. Fowler, I don't want to make this

1    hotshot run, is that right?

2    A.   No, that was not me, sir.

3    Q.   What did you say to Mr. Fowler?

4    A.   I believe it was along the lines of we're not

5    getting paid for staying late or something along those

6    lines.

7    Q.   What did Mr. Fowler say?

8    A.   He said if you don't like it, you could always go

9    back to Coca-Cola.

10   Q.   Did you use the word "overtime" at any point?

11   A.   No, I did not.

12   Q.   You testified earlier that there were people who

13   did crane and pressure control, right?

14   A.   Correct.

15   Q.   I believe the quote was the people who did both

16   were trained on pressure control, right?

17   A.   If they were running pressure control, they were

18   usually trained on it.

19   Q.   I wrote down exactly what you said.  People who did

20   both were trained on pressure control, is that accurate?

21   A.   Yes.

22   Q.   You were trained on pressure control, weren't you?

23   A.   Yes.

24   Q.   You went to pressure control school in Louisiana?

25   A.   Yes.

**Jason Lett - Cross**

1  Q.   And Oil States paid for you to go to pressure

2  control school to learn the pressure control?

3  A.   Correct.

4  Q.   You attended that class, it was in Lafayette,

5  right?

6  A.   Lafayette, Louisiana.

7  Q.   And they paid for you to stay in a hotel to attend

8  that course?

9  A.   Yes.

10 Q.   We talked about going to hotels at the wellsite.

11 Oil States paid for those, didn't they?

12 A.   That's correct.

13 Q.   Would you agree that pressure control is

14 complicated?

15 A.   I would believe so, yes.

16 Q.   It requires that you think?

17 A.   Yes.

18 Q.   Yes?

19 A.   Yes.

20 Q.   And if you would turn to Tab 31 in the binder in

21 front of you.

22        Do you recognize that document?

23 A.   I believe this is a pressure control certification.

24 Q.   These are the course materials that you would have

25 learned when you attended pressure control school, when

**Jason Lett - Cross**

1  Oil States sent you to pressure control school?

2  A.   I believe so.

3  Q.   I want to take a look -- you actually produced this

4  document to us, correct?  You saved these materials?

5  A.   I believe so.  I'm not sure.

6  Q.   If we look at Page 402 at the top there, it says,

7  The most important object of the training is to provide

8  you with an understanding of how the equipment works and

9  the safe way to operate it.  Effectiveness of this

10 training course is measured by assessing your

11 comprehension and by verifying you can operate the

12 equipment in a safe and efficient manner, is that right?

13 A.   Yes.

14 Q.   Is that what pressure control entailed?

15 A.   I believe so, yes.

16 Q.   You attended pressure control school so you could

17 run pressure control equipment, right?

18 A.   No.  They sent pretty much a group of people to

19 pressure control school in case they needed some other

20 pressure control operators.

21 Q.   Well, they wouldn't pay for you to go to Louisiana

22 and travel on the company's expense to attend a course

23 that they didn't expect you to use, correct?

24 A.   Well, I was never a pressure control operator.

25 Q.   If you could, turn to Page 406.  It says,

1   Operational safety, and the third item says, Pressure

2   can kill you.  That's correct, right?

3   A.   That's correct.

4   Q.   If you don't operate pressure correctly, you can

5   have a blowout, right?

6   A.   That's correct.

7   Q.   You can hurt people and you can kill people,

8   correct?

9   A.   That's correct.

10  Q.   And if we look at what you were learning here at

11  pressure control school, some of these subheadings are

12  discuss maximum wellhead pressure expected.  What is

13  maximum wellhead pressure?

14  A.   I believe the maximum wellhead pressure is what the

15  pressure of the wellhead gets at any certain point.

16  Q.   When running pressure control, your job was to make

17  sure that pressure didn't come out?

18  A.   I was a crane operator.  I didn't run pressure

19  control.

20  Q.   Let's talk about what you learned at pressure

21  control school and then we'll talk about what you

22  supposedly did at the wellsite but that was the point of

23  pressure control?

24  A.   Yes.

25  Q.   You discussed minimum ID tolerance of the well.  Is

**Jason Lett - Cross**

1   that the internal diameter?

2   A.   Yes, I believe so.

3   Q.   You discussed the types of fluid expected, is that

4   right?

5   A.   Yes.

6   Q.   When you are going out on a well, there could be

7   lots of different types of gases down there, correct?

8   A.   I'm not sure about the different types of gases.

9   Q.   Well, you can run into natural gas?

10  A.   Yes.

11  Q.   You could run into CO2?

12  A.   Yes.

13  Q.   You could run into H2S?

14  A.   I'm not sure about what H2S is.  I was never

15  anywhere near that.

16  Q.   Have you ever heard of H2S?

17  A.   Yes.

18  Q.   Are you aware H2S can escape if pressure control is

19  not done correctly?

20  A.   I believe so.

21  Q.   If you inhale H2S, you die within 30 seconds or so,

22  is that right?

23  A.   I believe it's fatal, right.

24  Q.   You discussed pressure test events.  What is a

25  pressure test event?

Jason Lett - Cross

1   A.   A pressure test event, from my understanding, maybe

2   it was people who are pressure testing equipment.

3   Q.   To prepare to go down the well?

4   A.   Correct.

5   Q.   Let's turn to 411.  That's a picture of a blowout.

6   A blowout is defined here as an uncontrolled flow of

7   reservoir fluid into the wellbore and sometimes

8   catastrophic to the surface.  A blowout may consist of

9   salt, water, oil, gas, or a mixture of these.

10       Do you agree with that definition of blowout?

11  A.   Yes.

12  Q.   That's what happens if you don't do pressure

13  controlling correctly?

14  A.   As far as Oil States is concerned?

15  Q.   This is what you learned could happen if you didn't

16  do pressure control?

17  A.   I think this might be an oil rig or something.

18  This is not natural gas.

19  Q.   Okay.  So, it's your position this couldn't happen?

20  A.   I'm not saying this couldn't happen but this

21  particular picture looks like an oil rig or oil

22  refinery.  It's a little different than a natural gas

23  wellsite.

24  Q.   A natural gas wellsite can have a blowout?

25  A.   Yes.

Jason Lett - Cross

1   Q.   Just like a gas wellsite?

2   A.   Yes.

3   Q.   But this one you think is gas?

4   A.   I think this is probably an oil rig.

5   Q.   Okay.  But it's the same principle?

6   A.   In some aspects, yes.

7   Q.   Let's look at 413.  This is where you are doing

8   some math as part of determining pressure and it's got

9   an abnormal hydrostatic pressure grading estimated at

10  .52 psi, pounds per square inch?

11  A.   Yes.

12  Q.   Then it gives you an example of how you would

13  calculate the expected well pressure?

14  A.   I see it.

15  Q.   You see you multiply that .52 hydrostatic pressure

16  by the depth of the anticipated well, in this instance,

17  4,000 feet, correct?

18  A.   Yes.

19  Q.   And you multiply that by the fluid density and

20  there's a formula for fluid density?

21  A.   I see it.

22  Q.   And then that gives you the actual psi, correct?

23  A.   I don't understand that equation.  If that's what

24  it says, that's what it means.

25  Q.   Well, you went to school to learn this equation,

1   they taught you this equation, correct?

2   A.   At the time I may have remembered the equation but

3   today it's been so long.

4   Q.   Sitting here now you don't remember what they sent

5   you to school to learn?

6   A.   I don't remember that exact equation is what I'm

7   saying.

8   Q.   Let's look at some other equations you may have

9   learned.

10          Turn to 416.  Force equals pressure times

11  area.  Is that the formula to determine force?

12  A.   I'm not really sure but if it's in the

13  certification class, I'm sure it is.

14  Q.   This is what you were learning at pressure control

15  school as to how to calculate force?

16  A.   Yes.

17  Q.   If we look at 420, this is a pressure theory,

18  correct?

19  A.   Looks like it.

20  Q.   They give you some -- this is a sample problem that

21  you would have solved at pressure control school and

22  they give you the outside diameter of the line, that's

23  the wireline?

24  A.   Yes.

25  Q.   And then they give you the inside diameter of the

**Jason Lett - Cross**

1  flow tube.  That's how big the flow tube is that the

2  wireline is running through, correct?

3  A.   Yes.

4  Q.   And it gives you a proposed well pressure of 5,000,

5  correct?

6  A.   Okay.

7  Q.   Is that accurate?

8  A.   That's what it says, 5,000.

9  Q.   So, it gives you these sample metrics and then you

10  calculate how much grease should be used by plugging in

11  force equals pressure times area to come up with how

12  much pressure is necessary to prevent that gas from

13  blowing out, right?

14  A.   Sounds like it, yes.

15  Q.   Okay.  Turning to 422, how do you pronounce that,

16  Couette's equation?  This is another pressure equation

17  you would calculate in order to maintain well pressure

18  to prevent a blowout?

19  A.   It looks like it.

20  Q.   It would be P2 minus P1 equals 6LUQ divided by

21  RCH3, and we can walk through what all of those -- what

22  P2 equals grease injections pressure, flow tube, P1

23  equals grease outlet pressure, but rather than walk

24  through what each of those means, would you agree with

25  me that applying pressure control, you got to think,

1  yes?

2  A.   Correct.

3  Q.   And it's a thinking job, right?

4  A.   That's correct.

5  Q.   And doing this math, that's not manual labor, is

6  it?

7  A.   Well, I don't believe the pressure control

8  operators did much math out there.

9  Q.   Well, the pressure control school you went to used

10 a lot of equations to calculate how to properly prevent

11 this well from blowing back and exploding, correct?

12 A.   That's correct.

13 Q.   That's how you would determine how to prevent that

14 from happening, right?

15 A.   All I'm saying is I don't recall any operators

16 doing any kind of equations with their pencils and pens.

17 Q.   Why do you think they teach you this if that's not

18 how you control pressure?

19 A.   Maybe it's just a guide or something that they use

20 or maybe for classroom purposes.

21 Q.   Okay.  If we could, let's turn to 492.  Pressure

22 control, this is another sample problem where it gives

23 you normal operations and it gives you wellhead pressure

24 of 7,850 psi, right?

25 A.   Yes.

1    Q.    And it gives you an outside diameter and a cable

2    type?

3    A.    Yes.

4    Q.    Then what does TVD stand for?

5    A.    I don't know.

6    Q.    It gives you type of gas, sweet gas in the well?

7    A.    Yes.

8    Q.    It gives you the cable height?

9    A.    Cable head.

10   Q.    I apologize.  The weight?

11   A.    Yes.

12   Q.    And this is what you would use to determine how

13   long the lubricator should be, is that right?

14   A.    I'm not really sure.

15   Q.    If we look at the last question, how much

16   lubricator is required surface type and wellsite TP,

17   that was the purpose of this problem, right?

18   A.    Okay.

19   Q.    So, again, you would have to take all of that data

20   into account in determining how fast to assemble your

21   lubricator to prevent a blow-back, right?

22   A.    On a natural gas site?

23   Q.    On a wellsite.

24   A.    Generally, what the grease operator did in our

25   field or our company was get with the wireline company

1   and determine how long his gun was and that would

2   determine how long our lubricator would be.  I don't

3   remember anybody doing any equations.

4   Q.   Right.  He would have to know the cable type.  He

5   would have to know how long the gun was going to be so

6   he could perform this work, correct?

7   A.   Correct.

8   Q.   If we flip to 493, this is another normal operation

9   where it's giving you an equation and includes pi, and

10  I'm going back to high school and college math, but pi

11  equals 3.14, is that right?

12  A.   I believe so.

13  Q.   And it gives you an equation here to determine what

14  the ideal pressure control is to maintain well pressure

15  safety, right?

16  A.   Correct, I guess.

17  Q.   And you perform that equation and it gives you

18  wellhead pressure and then it gives you a suggested

19  wellhead pressure beyond that to prevent the

20  hydrocarbons from blowing out, correct?

21  A.   I'm not really sure.  I'm not familiar with those

22  equations.

23  Q.   Let's go to 536.  This is another wireline problem

24  cable pull out.

25              Now, wireline problem cable pull out means the

1  tool has gone down the hole and it's stuck basically,

2  right?

3  A.   Correct.

4  Q.   And that can occur for a variety of reasons,

5  including not applying proper pressure, correct?

6  A.   I'm not sure.

7  Q.   And when a tool gets caught down there, that's a

8  really bad day, right?

9  A.   Usually, yes.

10  Q.   That means there's I think you said 20 to 80 people

11  potentially on the wellsite that are completely

12  shutdown?

13  A.   I didn't say that.

14  Q.   How many people on the wellsite?

15  A.   I'm not really sure.  Wireline usually has about

16  four or five, Oil States usually had about two, frack

17  company maybe 20, 30.  I'm not really sure.

18  Q.   Okay.  I may have written it down wrong yesterday.

19  I thought Mr. Burchik testified it could be anywhere

20  from 20 to 80 people?

21  A.   I thought you said I said that.

22  Q.   No.  Mr. Burchik said that.  What would be your

23  estimate of how many people would be at the wellsite?

24  A.   I don't know.  40, 50.

25  Q.   If a wireline gets stuck, the whole job shuts down,

**Jason Lett - Cross**

1   you can't work on the well?

2   A.   Well, that's not entirely accurate.   Wireline can't

3   work on the well.

4   Q.   Can anybody else go down the well?

5   A.   Yes.

6   Q.   Who else can go down the well while the wireline is

7   stuck in the well?

8   A.   A company called coiled tubing.

9   Q.   And the coiled tubing actually pulls the tool out?

10  A.   Yes.

11  Q.   Coiled tubing is not there operating on the well?

12  A.   Well, if the tool gets stuck in the hole, what

13  wireline will do is actually ask us or the grease

14  operator to cut the wire with the rams and then once

15  they cut the wire, they'll somehow cap the well.

16          Wireline will get out of the way, coiled

17  tubing will come in and set up on the well and extract

18  the tool.

19  Q.   I guess my question is coiled tubing is a specialty

20  service that comes out to fish the broken tool out of

21  the well because there's been a problem, correct?

22  A.   Correct.

23  Q.   It's not a productive activity on the well, it's to

24  fix what got messed up?

25  A.   No.   That's one of the aspects they do.

**Jason Lett - Cross**

1   Q.   Well, when they break the tool, that's what they

2   are doing?

3   A.   Yes.  They provide services to retrieve tools, too.

4   Q.   So, other than retrieving a tool, there is nothing

5   productive that can be done for these other 30, 40, 50

6   people on the wellsite?

7   A.   You mean coiled tubing?

8   Q.   Correct, while the coiled tubing is done?

9   A.   Yes.  I don't believe anybody else is doing any

10  operations.

11  Q.   And they call that a fishing operation for coiled

12  tubing to come in and fish the tool out?

13  A.   I believe so, yes.

14  Q.   Fishing --

15  A.   A fishing company or another company would come in.

16  Q.   And a fishing operation they call it, that can take

17  12 hours, maybe longer?

18  A.   Yes, 12 hours, two days.

19  Q.   Two, three days?

20  A.   Correct.

21  Q.   So, you have a whole wellsite shut down 40, 50

22  operators with nothing to do for several days if this

23  happens?

24  A.   Well, that's not correct for a crane operator

25  because a crane operator has to be there for the coiled

**Jason Lett - Cross**

1    tubing operations.

2    Q.   Okay.  So, you assist in fishing the tool out?

3    A.   I would hold the coiled tubing equipment onto the

4    well much like I would hold the wireline equipment on

5    the well.

6    Q.   And when doing a fishing operation, you still have

7    to have pressure control, right?

8    A.   I believe so, right.

9    Q.   You never worked pressure control, is that your

10   testimony?

11   A.   Correct.

12   Q.   And you never worked pressure control anywhere else

13   in any other company?

14   A.   Correct.

15   Q.   If you would, turn to Exhibit 198.  Can you just

16   look in your binder for 198.

17   A.   Okay.

18   Q.   Do you recognize that document?

19   A.   I believe so.

20   Q.   Can you describe it for me, please.

21   A.   It looks like my resumé.

22           THE COURT:  You may publish.

23           MR. DAVIS:  Pull up 198, if we could.

24   Q.   This is your resumé.  If we look in the middle here

25   under core qualifications, you have pressure control

1    certified?

2    A.   Correct.

3    Q.   So, on your resumé, you are representing you do

4    pressure control, right?

5    A.   I was representing I was pressure control

6    certified.

7    Q.   That means you are qualified and have performed

8    pressure control?

9    A.   Correct.

10   Q.   But it's still your testimony you really don't know

11   anything about pressure control?

12   A.   No.  It was my testimony that I never operated

13   pressure control equipment.

14   Q.   When you were at the wellsite, you did help out

15   with pressure control, didn't you?

16   A.   From time to time.

17   Q.   Yes?

18   A.   From time to time.

19   Q.   Now, we just went through all the math that you do

20   when you are running the pressure control and we'll get

21   to some of the math when you do the crane but I wanted

22   to come back to something that your lawyer said

23   yesterday that you were the low man on the totem pole.

24   Do you agree with that?

25   A.   In some aspects, yes.

**Jason Lett - Cross**

1  Q.   In some aspects, yes.  The company had hourly

2  people that worked in the shop, right?  They had shop

3  hands?

4  A.   Yes.

5  Q.   And the shop hands were paid hourly?

6  A.   I'm not sure.

7  Q.   Did they receive overtime?

8  A.   I'm not sure.

9  Q.   Are you aware that the typical shop hand made about

10  $35,000, $40,000 a year?

11  A.   No, I'm not.

12  Q.   You made three or four times that amount of money,

13  correct?

14  A.   I made --

15  Q.   Well over a hundred thousand dollars?

16  A.   Sometimes, yes.

17  Q.   Well, every year you worked there, right?

18  A.   Not in 2013.

19  Q.   You only worked there seven months and made

20  $70,000?

21  A.   2010 I don't believe I made 100,000 either.

22  Q.   That was before you went into the field?

23  A.   Correct.

24  Q.   Once you went into the field to do the job we are

25  talking about here, you always made over?

1   A.   I thought you said every year.

2   Q.   I apologize.  I should clarify.  Every year at

3   issue in this case when you were in the field.

4   A.   I would say so, yes.

5   Q.   Do you still stand by the representation that you

6   were low man on the totem pole and you made three or

7   four times what the shop hands did?

8   A.   As far as making decisions around the shop, yes.

9   Q.   Making decisions around the shop you were low man

10  on the totem pole.

11         You never asked to be a shop hand, did you?

12  A.   No.

13  Q.   Let's talk about some of the training other than

14  pressure control.

15         You also were certified in NCCCO.  Is it three

16  Cs, NCCCO?

17  A.   Correct.  National Commission Certified Crane

18  Operators.

19  Q.   That's a requirement that you be certified to

20  operate that piece of computerized machinery?

21  A.   Correct.

22  Q.   There was another crane Mr. Burchik talked about at

23  the shop that anybody could operate, correct?

24  A.   As far as the overhead cranes you are referring to?

25  Q.   Yes.  Is that accurate?

**Jason Lett - Cross**

1   A.   I believe so.

2   Q.   That's a lot different than the 100-ton crane you

3   were operating?

4   A.   Yes.  It's a crane that runs along a ceiling of the

5   building.

6   Q.   The 110-ton crane you were operating is a

7   telescopic crane?

8   A.   Yes.  Large hydraulic telescopic crane.

9   Q.   And that had a telescopic boom that is basically

10  like a pocket telescope that had four parts that you

11  could extend to different lengths?

12  A.   Four or five different sections that you could

13  extend.

14  Q.   You were trained at Oil States to be NCCCO

15  certified?

16  A.   That's correct.

17  Q.   You also were state certified from the State of

18  Pennsylvania, correct?

19  A.   Yes.  Once you get your NCCC0 certification, you

20  just send away for your Pennsylvania and you receive it

21  in the mail.

22  Q.   Okay.  If you are certified by the federal

23  government, then you can be certified automatically by

24  the state?

25  A.   That's correct.

**Jason Lett - Cross**

1   Q.   And let's talk about spotting the crane.  You said

2   you go out there and the company man says you are going

3   to be about here, and you said you just rig out.

4            Well, there's a lot more that goes into that,

5   isn't there?

6   A.   Yes, there is.

7   Q.   When you are spotting the crane, you have to

8   understand the condition on the ground?

9   A.   That's correct.

10  Q.   You have to understand on a well pad, you may have

11  four or five, even more wells you have to work on,

12  correct?

13  A.   That's correct.

14  Q.   And some of those wells may be 20 feet away, some

15  may be 120 feet away, right?

16  A.   Not entirely accurate.

17  Q.   How big is a well pad?

18  A.   How big is the pad?

19  Q.   Sure.

20  A.   Anywhere from three to four football lengths wide.

21  Q.   So, the pad is three or four football lengths, the

22  wells are beyond five, six wells.  How far apart are

23  those?

24  A.   Any given pad usually five or ten feet apart, maybe

25  ten feet.

1   Q.   So, you could be 30 feet from up and 10 feet from

2   another?

3   A.   Correct.

4   Q.   And you didn't want to move the crane in the middle

5   of an operation, right?

6   A.   Me personally?

7   Q.   Well, anybody because it shuts the job down while

8   you go to move the crane to rig up.

9   A.   Generally, you want to stay in one spot but

10  sometimes things won't allow you to stay in one spot so

11  you have to move a couple times.

12  Q.   But part of spotting the crane was to do whatever

13  you could to figure out if you could work on each well

14  without moving the crane, that was the objective,

15  correct?

16  A.   Yes, that was the objective to leave the crane in

17  one spot.

18  Q.   So, you needed to figure out if you could reach

19  each well from one location as part of the spotting

20  exercise, correct?

21  A.   That's correct, however sometimes it couldn't be

22  controlled and you had to move the crane.

23  Q.   Sometimes you just couldn't do it because the crane

24  didn't have the capacity and you would have to figure

25  that out as well?

**Jason Lett - Cross**

1    A.   Or there were certain pieces of equipment that was

2    in your way and you couldn't put the crane where you

3    wanted to, to hit all the wells, so you maybe had to do

4    this side of the wells first and maybe have somebody

5    move to get to the other side.

6             It depended on -- it varied from each pad.

7    Q.   When you are determining whether you can reach the

8    well safely, you got to know the weight of what you're

9    going to be lifting?

10   A.   Correct.

11   Q.   And you have to know the distance to the well?

12   A.   That's correct.

13   Q.   You have to know your counterweights, correct?

14   A.   That's correct.

15   Q.   And your counterweight is basically how much weight

16   you are going to put on the back of the crane to keep it

17   from falling forward?

18   A.   The counterweights usually on the cranes that I ran

19   were usually affixed to the crane, so yes.

20   Q.   But you have to know the weight of the

21   counterweights to know which prevented it from falling

22   forward, right?

23   A.   Not necessarily you don't have to know the weight

24   of it.  It was just on there.

25   Q.   You didn't have to know the weight of the

1   counterweights is your testimony?

2   A.   Not a particular weight, no.

3   Q.   Let me ask you this.  Do you put the weight of the

4   counterweights in the computer?

5   A.   No, not in the National 50-ton, no.

6   Q.   Not on what?

7   A.   A National 50-ton crane.

8   Q.   What about the 100-ton?

9   A.   I believe you did.

10  Q.   So, you needed to know the weight of the

11  counterweights?

12  A.   It depended on what crane you run.

13  Q.   You mainly ran the hundred ton?

14  A.   No.  I ran the 50-ton.

15  Q.   How often did you run the hundred ton?

16  A.   Maybe a handful of times.

17  Q.   You got $480 for running the hundred ton?

18  A.   I believe that's right.

19  Q.   We talked about the counterweights, the distance,

20  the weight of the load, and you have to know the boom

21  radius?

22  A.   Yes.  All of this is in your load chart in the

23  crane cab.

24  Q.   We'll get to the load chart, but you have to

25  recognize all of these factors to then go find the

**Jason Lett - Cross**

1  correct load chart to use, right?

2  A.   Yes.

3  Q.   So, you have to know the radius that you

4  anticipated using to get to a well?

5  A.   No.  You have to -- first of all, you want to

6  consult your load chart first to figure out where you

7  can set up as far as what the weight is in regards to

8  the wireline equipment.

9  Q.   When we are talking about the radius, we're talking

10 about how high up the boom is?

11 A.   No.

12 Q.   How far you extend it?

13 A.   No.

14 Q.   What are we talking about?

15 A.   The radius is the turntable of the crane to the

16 actual well itself, the distance from the crane to the

17 well.

18 Q.   The radius is how far you can turn the crane from

19 left to right?

20 A.   No.  The radius is from the distance from the

21 actual crane itself to any particular spot you're

22 putting the crane.

23         If you're the well and I'm the crane, the

24 radius is the distance between us.

25 Q.   Understood.  So, the radius is the distance between

1   the crane and the well.  You have to know the angle that

2   you anticipate suspending the lubricator at?

3   A.   No.  As long as you get your radius, you are within

4   your limits of the radius, you don't really need to know

5   the angle.

6   Q.   Well, the higher the angle, the more weight you can

7   support, is that right?

8   A.   That's correct.

9   Q.   So, if you are trying to reach a well that is

10  further away, you are going to be at a lower angle and

11  you can't support as much weight, correct?

12  A.   That's why you consult your flow chart first so you

13  can make sure that you hit all the wells before you

14  start operations.

15  Q.   So, when you are evaluating can I safely spot here

16  to reach this well, you really have to do that for five

17  or six wells that you are going to be working on,

18  correct?

19  A.   If there were five or six wells, yes.

20  Q.   So, in reaching each of those wells, you are going

21  to have a different radius?

22  A.   That's correct.

23  Q.   You are going to have a different angle?

24  A.   That's correct.

25  Q.   And all of that data you have to process in order

**Jason Lett - Cross**

1   to determine whether you can safely do the load?

2   A.   That's correct.

3   Q.   Safely do the job, I guess, correct?

4   A.   That's correct.

5   Q.   And if you did that wrong, then you could

6   potentially drop a load?

7   A.   That's incorrect.

8   Q.   Why is that?

9   A.   Cranes don't usually drop loads.  If you are not

10  within your limits, the crane will shut down and it will

11  not allow you to pick up the object.

12  Q.   Okay.  We'll get to that more in relating to your

13  termination because you actually overrode the crane?

14  A.   That's correct.

15  Q.   And were terminated because you engaged in an

16  unsafe act that violated what the load chart said you

17  could lift, right?

18  A.   That's correct.

19  Q.   It wasn't because you overrode it, it was because

20  you overrode and then violated the procedures of how

21  much you could lift, right?

22  A.   I violated the procedures of overriding the crane.

23  Q.   But it wasn't the fact you overrode, it was the

24  fact you overrode and exceeded your load capacity in an

25  unsafe manner?

**Jason Lett - Cross**

1   A.   I'm not sure what you're saying.

2   Q.   And you had previously flipped a crane, right?

3   A.   That's incorrect.

4   Q.   You never got into an accident in a crane?

5   A.   No.

6   Q.   And had a prior warning for violating the loading

7   capacity of the crane, right?

8   A.   No, that's not correct.

9   Q.   Let's flip to your termination paperwork that your

10  lawyer asked you about, which is Exhibit 7.  Go to the

11  first page, that's 33270.

12          Go to the middle of the page, reason for

13  recommendation.  Second write-up for violation of crane

14  operation safety policy.

15          So, you had a prior violation with the crane?

16  A.   That's correct.

17  Q.   If we go to 33272, it says, Failure to notify

18  management as to the malfunction of the grove crane,

19  100-ton crane and continued to operate the crane in a

20  questionable status.

21          So, the nature of the incident wasn't that you

22  overrode the crane, it's that you overrode it and

23  continued to operate the crane in a questionable status

24  without notifying management, right?

25  A.   That's what it says.

1  Q.   And the operator that came in after you called

2  management and said this crane has been operating in an

3  unsafe manner, right?

4  A.   I'm not sure what his exact words were.

5  Q.   You're not sure if he actually dropped a load as a

6  result of your overriding the crane in this instance,

7  right?

8  A.   I'm not sure because I wasn't there but he did not

9  drop the load.

10 Q.   He did not?

11 A.   No, I don't think he dropped the load.

12 Q.   You don't think but you don't know either way?

13 A.   But I would have heard about it.

14 Q.   You are just assuming?

15 A.   Correct.

16 Q.   We were talking about when you are spotting the

17 crane, you got to know the distance, the weight, the

18 angle, the radius for all five or six of those wells to

19 figure out where can I put this crane to safely operate

20 in each of those places?

21 A.   Somewhat, yes.

22 Q.   Would you agree with me that takes some thought?

23 A.   Yes.

24 Q.   Would you agree with me that there are thinking

25 aspects to this job?

**Jason Lett - Cross**

1   A.   Of course.

2   Q.   Let's talk about rig out.  There is really two

3   parts to a rig out.  There is rigging the crane up and

4   then there's rigging the equipment up.

5          Your role in the rig up process was to rig the

6   crane up, which is pushing a series of buttons for the

7   crane, for the outriggers to go out, correct?

8   A.   That's not entirely the whole of just rigging up a

9   crane.

10  Q.   Okay.  What are they?

11  A.   Well, first of all, when you pull up on location

12  after driving it, you have to get out.

13  Q.   There are drivers?

14  A.   Sometimes there were drivers and sometimes there

15  are not.

16  Q.   Go on.  I'm sorry.

17  A.   On the deck of the crane, these 50-ton cranes, they

18  have a small deck so they carry your outrigger pads on

19  the outriggers feet that are pinned to the outriggers.

20          So, once you pull up and run the outriggers

21  with your fingers, your hands, you have to get out of

22  the cab, put your feet onto the outrigger itself, take

23  the pads off of the deck of the crane and position them

24  under the feet once you get your outriggers fully

25  extended.  You are cribbing, as they call it, cribbing.

1    Q.    Then you push a button and the outriggers come out?

2    A.    Once you get all your feet on the outriggers

3    cribbing set, you get into the crane cabin and press the

4    button to extend the outriggers.

5    Q.    Then are you pretty much rigged up on the crane?

6    A.    No.

7    Q.    What else do you do?

8    A.    Once you do that, once you get the crane level,

9    depending on if there was somebody there to help you,

10   you would have to raise the boom up with the block still

11   attached to the front bumper.  Once you get it to a

12   certain level, you can look through the windshield.

13           You have to get back out, go to the front of

14   the crane, unhook the block from the actual -- there is

15   a cable up front that hooks to the bumper.

16           Once it's unhooked, you get back in the crane

17   and raise it up and continue leveling, getting ready for

18   operations.

19   Q.    That's pretty much the crane rig up process?

20   A.    Then in some instances, you would rope off your

21   crane, you would use danger tape so nobody would walk

22   within your swing radius.

23   Q.    To let people know you are going to be operating

24   here?

25   A.    Yes.

**Jason Lett - Cross**

1  Q.   And the crane rig up process takes 10 or 20

2  minutes?

3  A.   Something like that.

4  Q.   So, it's a small part of the job?

5  A.   Yes.

6  Q.   Vis-a-vis figuring out how you are going to safely

7  reach all these wells, it's a matter of minutes to do

8  the rigging?

9  A.   I'm sorry.  What was the question?

10 Q.   The rig up is 10 to 20 minutes?

11 A.   Yes.

12 Q.   Then there's the second stage of rigging up which

13 is assembling the lubricator and the valves that we have

14 been talking about?

15 A.   That's correct.

16 Q.   And your job in that rig up process was to use the

17 crane to take the materials off the truck and place them

18 where they are to be assembled?

19 A.   That's correct.

20 Q.   Then the other operator assembled those pieces?

21 A.   That's correct.

22 Q.   So, you are moving the crane back and forth?

23 A.   That's correct.

24 Q.   And would you consider moving the crane back and

25 forth manual labor?

**Jason Lett - Cross**

1   A.   I considered it labor.

2   Q.   Would you consider it manual labor?  Is it

3   physically taxing?

4   A.   Some aspects of it.

5   Q.   And the joy stick, was that the physically taxing

6   piece of it?

7   A.   No.  The previous part of rigging it up.

8   Q.   So, the 10 to 20 minutes of putting the pads down,

9   pushing the button for the outriggers, and making sure

10   the hook was ready to go?

11   A.   Yes.

12   Q.   But in the process of rigging up the actual

13   lubricator where you're moving the joy stick back and

14   forth, that's not physically taxing?

15   A.   I wouldn't say physically taxing but I would say

16   it's labor related.

17   Q.   But you would agree with me there were some

18   nonmanual parts of this job?

19   A.   In what aspects?

20   Q.   Well, for instance, when you are reading the load

21   charts, which we'll get to, that's nonmanual in nature,

22   you're reading, right?

23   A.   That's true.

24   Q.   You complete a lot of reports, correct?

25   A.   That's true.

**Jason Lett - Cross**

1   Q.   For instance, you may complete four or five reports

2   a day?

3   A.   I'm not sure.

4   Q.   Well, you did a crane inspection safety report

5   before you started every day, right?

6   A.   That's correct.

7   Q.   You did a job safety analysis, correct?

8   A.   That's correct.

9   Q.   You would complete your daily log report?

10  A.   Well, just write down different things that went on

11  throughout the day.  I wouldn't complete it.

12  Q.   I'm sorry?

13  A.   I would write down as I was doing the work but I

14  wouldn't complete the whole thing until the job was

15  done.  It was contemporaneous as I was doing it.

16  Q.   You would also complete the job bonus packet?

17  A.   Usually the job bonus packet was at the end of the

18  job.

19  Q.   That's another report you would complete?

20  A.   That's correct.

21  Q.   So, you would agree with me there was a lot of

22  paperwork that went into this?

23  A.   Paperwork was one aspect of the crane operator's

24  job.

25  Q.   And completing that paperwork, that's not manual

**Jason Lett - Cross**

1   labor, that's not manually taxing, is it?

2   A.   I don't believe so.

3   Q.   We got your crane spotted, you have done these

4   calculations to figure out the radius, the distance, the

5   weight, the angle, all these different things for the

6   five different wells and then you mentioned there are

7   load charts.

8           If you would, turn to Tab 92.

9           THE COURT:  If you recognize it and -- if the

10   gentleman recognizes it, let's take our morning break if

11   the gentleman recognizes it.

12           MR. STUKENBERG:  That's great, Your Honor.

13           THE COURT:  Thank you.

14   A.   Is this what you're referring to (indicating)?

15   Q.   It should be 92.

16           THE COURT:  You may approach.

17           MR. STUKENBERG:  Your Honor, maybe we should

18   take the break now and we'll get 92 and the binder put

19   back together for Mr. Lett.

20           THE COURT:  Ladies and gentlemen, we'll take a

21   mid morning break for about ten minutes or so.

22           Again, keep an open mind.  Do not discuss the

23   matter but get a chance to stretch your legs and take a

24   break.

25           (Whereupon, the jury exited the courtroom.)

**Jason Lett - Cross**

```
 1  (In open court, jury not present.)
 2            THE COURT:  Sir, you are under oath.  Please
 3  do not talk to anybody about your testimony.  Walk
 4  around, do whatever you wish and be back in around ten
 5  minutes or so.
 6            THE WITNESS:  Yes, sir.
 7            (Whereupon, a break was taken.)
 8            THE DEPUTY CLERK:  All rise.
 9            (Whereupon, the jury entered the courtroom.)
10            THE COURT:  Please be seated.
11  (In open court, jury present.)
12  BY MR. STUKENBERG:
13  Q.   If you could turn to Tab 92, Mr. Lett.
14  A.   Okay.
15  Q.   Do you recognize that document?
16  A.   Yes.
17  Q.   Can you identify it for us, please?
18  A.   Load charts for the grove.
19  Q.   That's for the hundred ton crane?
20  A.   I'm not sure.  It could be for any ton crane.
21  Q.   And you mentioned you refer to the load charts when
22  determining whether you could support the weight that
23  you were looking into, correct?
24  A.   Yes.
25  Q.   And so you would determine -- we talked about
```

**Jason Lett - Cross**

1  weight, distance, radius, angle, all of those things,

2  and then you would refer to the load chart to see if

3  your calculation was -- if using the numbers you

4  proposed that the crane could hold that weight, right?

5  A.   We would use the load chart to determine where or

6  where not we could set up.

7  Q.   And whether the crane could support what you

8  proposed to do?

9  A.   Correct.

10 Q.   If you would, let's look at 2187 and I think your

11 lawyer put one of these up the other day.

12         THE COURT:   You may publish.  I've seen it.

13 Q.   Can you describe for the jury what this is?

14 A.   This is a range diagram.

15 Q.   What does it tell you?

16 A.   It tells you your height.  This particular one has

17 a jib attached.  So, if you had a jib attached to your

18 particular crane, you could go off the range diagram.

19 Q.   You could use this diagram to figure out if what

20 you were proposing to do was supported by the crane?

21 A.   No.

22 Q.   Okay.  Would this diagram explain to you what the

23 weight capacity was for the crane at different angles?

24 A.   No.

25 Q.   What would it tell you?

**Jason Lett - Cross**

1  A.   It would just tell you the distance or angle you

2  would be at for any particular -- it would tell you the

3  radius you were at, at any particular angle.

4  Q.   So, it would tell you, depending on what your angle

5  was, how far you were from where you wanted to put the

6  load?

7  A.   No.  It would just basically tell you basically

8  what radius you are at and what angle you would be at.

9  It has nothing to do with the load of anything.

10  Q.   What is on the bottom, what are the numbers on the

11  bottom of the graph?

12  A.   Those are the feet and radius, radius and feet.

13  Q.   The distance?

14  A.   Correct.

15  Q.   And then on the left side of the chart it got

16  height from the ground and feet?

17  A.   Yes.  That's the height from the boom tip.

18  Q.   This graph would represent how far out your boom

19  would be at any given angle, is that accurate?

20  A.   The height of the boom at any given angle.

21  Q.   If we could, it looks like there is a number of

22  these diagrams.  Did you use these diagrams in your

23  work?

24  A.   No, sir, I did not.

25  Q.   If we flip to 2191, this is a sample load chart

1  (indicating)?

2  A.   Correct.

3  Q.   And this is a rigging chart (indicating).  What's a

4  rigging chart?

5  A.   I'm not really sure.  I'm not really sure what a

6  rigging chart is.

7  Q.   It reads, On outrigger fully extended, 360 degrees

8  for all CWTs configuration, and CWT, is that

9  counterweight?

10  A.   Yes.

11  Q.   On outriggers 50 percent extended, 360 degrees for

12  all except no removable counterweight, right?

13  A.   Yes.

14  Q.   What does that mean?

15  A.   What does what mean?

16  Q.   What does that document mean?

17  A.   It means if your crane is on outriggers fully

18  extended and you can rotate fully 360 degrees for all

19  counterweight, and it says on outriggers 50 percent

20  extended, halfway extended, not fully extended, for all

21  except no removable counterweights.

22  Q.   Then it gives in the chart here a telescope

23  section.  What are the different telescope sections?

24  A.   One says IM, one says CM, one says OM, and one says

25  fly.

1   Q.   Are those the names of the different segments on
2   the boom for the telescopic crane?
3   A.   It depends on the type of crane, yes.
4   Q.   And that would tell you the main boom length in
5   feet, that would tell you the range the piece of boom
6   might be or could extend to?
7   A.   Correct.
8   Q.   Then depending if we look below that, we have
9   radius and feet, so that's the distance we talked about?
10  A.   That's correct.
11  Q.   And then it would give you lifting capacities in
12  pounds to the right of that?
13  A.   Okay.
14  Q.   Is that accurate?
15  A.   That's accurate.
16  Q.   So, it looks like it would give you lifting
17  capacities for different distances depending on how far
18  your boom was extended?
19  A.   That's what it looks like, yes.
20  Q.   And different pieces of the boom could extend
21  different ways?
22  A.   It depends on what you are operating.
23  Q.   Let's talk about the hundred ton.
24  A.   Okay.
25  Q.   That's accurate because that's what this guide is

1    for?

2    A.    I'm not sure but yeah, that's accurate.

3    Q.    So, are different segments of the boom stronger

4    than others?

5    A.    I'm not really sure about that.

6    Q.    When you decided distance, angle, weight, all of

7    those things and you go to these load charts, you have

8    to figure out which load chart to use, right?

9    A.    That's correct.

10   Q.    And in this book, and you might hold it up for the

11   jury, there's hundreds of load charts and it's a packet

12   of paper that big (indicating), right?

13   A.    Some of them are bigger than others.  I believe so,

14   yes.

15   Q.    That's the hundred ton load chart you said you used

16   and it's a stack of paper a couple inches thick?

17   A.    Myself, I rarely used the hundred ton crane.  I

18   used the 50-ton crane.

19   Q.    We can go to the 50-ton after this.  The 50-ton

20   load chart is three inches thick of paper as well?

21   A.    Yes.

22   Q.    And that had hundreds, if not more, load charts

23   that you have to select from, correct?

24   A.    Usually you selected from the same load chart every

25   time.

**Jason Lett - Cross**

1    Q.   So, there were hundreds and hundreds of load charts

2    in this guidebook but you just used the same one over

3    and over again?

4    A.   Correct.

5    Q.   But at each job you were dealing with different

6    lengths, right?

7    A.   Correct.

8    Q.   Different distances?

9    A.   Correct.

10    Q.   Different angles?

11    A.   Correct.

12    Q.   Different radiuses?

13    A.   That's correct.

14    Q.   And each of these load charts accounts for

15    different setup configurations, correct?

16    A.   That's correct.

17    Q.   But it's your testimony that your configurations

18    were always the same?

19    A.   As far as the setup of the crane is concerned and

20    the crane components, yes, they are pretty much all the

21    same.

22    Q.   And it's your testimony that you used the same load

23    charts -- I want to be clear on this -- you used the

24    same load charts for each job?

25    A.   That's correct.

**Jason Lett - Cross**

1    Q.   So, once you have done the math that we talked

2    about, about the angle distance and radius, you refer to

3    this guidebook, the load charts, and that confirms

4    whether your proposed lifts are safe, can be tolerated

5    by the crane?

6    A.   Not really.  Once you get on location, you use the

7    load charts first to determine where you can set up.

8    Q.   Okay.

9    A.   Once you determine the distance that you're within

10   a certain distance, you are allowed to pick up 7,000

11   pounds or 8,000 pounds at any particular radius, then

12   that's your parameters to set up.  Once you figure that

13   out, then you can set up.

14   Q.   You are doing that math and checking the load

15   charts as part of the spotting process?

16   A.   That's correct.

17   Q.   Rather than once you start operating?

18   A.   Once you start operating, you cannot move the

19   crane.

20   Q.   Got it.  Let's talk about operating the crane and

21   we heard some discussion about a computer.  You enter

22   the data in the computer, is that right?

23   A.   Some data, yes.

24   Q.   What data do you enter into the computer?

25   A.   Some data -- like, say, for instance, if you have a

1  jib on your crane but you're not using it and it's

2  attached to the boom, you have to enter -- there's a

3  picture that will say this configuration or if there is

4  a configuration that don't have a jib on the side of

5  your crane, you select that one.

6  Q.   Do you enter distance?

7  A.   No.

8  Q.   Do you enter proposed angle?

9  A.   No.

10  Q.   What other data do you enter?

11  A.   You enter outrigger length if you are fully

12  extended.

13        You enter how many reeding lines you have and

14  depending on what kind of crane you are running, you

15  enter the boom length.

16  Q.   The boom length?

17  A.   Yes.

18  Q.   If you enter that data incorrectly in the computer,

19  I assume it's bad data in, bad data out, it gives you an

20  inaccurate reading if you don't enter the correct data,

21  right?

22  A.   Not really.  You can't really enter bad data.

23  Q.   Well, if you enter the wrong boom length, then the

24  computer doesn't know the boom length because you

25  provided that information, right?

**Jason Lett - Cross**

1    A.   If you enter a boom length, then the crane will go

2    out to that particular boom length.

3    Q.   It won't go beyond that unless you override it?

4    A.   No.  You can change the configuration of the boom

5    length depending on how long you wanted it.

6    Q.   So, you could change the configuration of the boom

7    length depending on how long you wanted it?

8    A.   Correct.

9    Q.   And you would enter that into the computer?

10   A.   That's correct.  That's for a hundred ton crane.

11   For the 50-ton cranes, you don't need to enter the boom

12   length.

13   Q.   You don't enter boom length on the 50s?

14   A.   Correct.

15   Q.   But it's your testimony that it didn't really

16   matter what data you put into that crane?

17   A.   Well, as far as making the error in the crane, no.

18   If you wanted to put a hundred feet of boom length on a

19   hundred ton crane, you would enter the configurations to

20   make a hundred feet or whatever length it was.

21   Q.   And it's your position that it didn't matter what

22   you put in because it couldn't make an error?

23   A.   I would say so.

24   Q.   Have you ever heard of a crane tipping over?

25   A.   I believe so, yes.

1   Q.   That happens, right?

2   A.   Sure.

3   Q.   I guess in that instance, the computer didn't work?

4   A.   What instance are you referring to?

5   Q.   When a crane tips over.

6   A.   I don't know the circumstances, sir.

7   Q.   Let's look at -- I think your lawyer asked you

8   about Exhibit 22.  That's been published.

9        Exhibit 22 are your job bonus packages.  You

10  said you completed those at the end of the job.

11  A.   That's correct.

12  Q.   This is Exhibit 22.  This is the job bonus packet

13  you completed when you were employed?

14  A.   I'm not sure.

15       THE COURT:  You may approach.

16  Q.   It's been published and your lawyer asked you

17  questions about it.

18       MR. WARREN:  The document was not published by

19  us but we have no objection to it being introduced.

20       MR. STUKENBERG:  I apologize.

21       THE COURT:  Thank you.

22  Q.   Exhibit 22, you said these are the forms you

23  completed at the end of the job?

24  A.   We completed job bonus forms at the end of the job.

25  Q.   This paperwork is all the paperwork you completed?

**Jason Lett - Cross**

1    A.    Throughout my three years there, yes.

2    Q.    This only stretches from 2012 to 2013, so that's

3    what you did for a year and a half?

4    A.    Okay.

5    Q.    Would you agree with me that paperwork was a big

6    part of your job?

7    A.    I would say that paperwork was a part of the job.

8    I wouldn't say it was the big part of the job.

9    Q.    Completing that paperwork was required of the

10   position?

11   A.    That's correct.

12   Q.    Completing that paperwork, that wasn't manual work,

13   was it?

14   A.    No, it was not.

15   Q.    Let's look at a couple of documents.  I got 12990.

16   What is this document?

17   A.    I believe this is a JSA or job safety analysis.

18   Q.    So, we haven't talked much about job safety

19   analysis.  Before each job, you were required to

20   undertake an analysis as to whether the proposed

21   activity for the job was safe to do?

22   A.    I would not say that, no.

23   Q.    What is the job safety analysis then?

24   A.    At Oil States we would perform a job safety

25   analysis at the beginning of a job, however, we would

1  not fill it out throughout the job.

2  Q.   I didn't mean to cut you off.

3  A.   There would be one job safety analysis in the

4  packet.

5  Q.   So, you didn't complete a job safety analysis

6  daily?

7  A.   I don't believe so.

8  Q.   Did you participate in a safety meeting daily?

9  A.   Yes.

10  Q.   And was the job safety analysis discussed at the

11  safety meeting?

12  A.   All different types of hazards and things like

13  that, mitigating responses were discussed during the

14  safety meeting with the whole entire well pad.

15  Q.   Okay, and that was daily?

16  A.   That was every shift, yes.

17  Q.   You participated in those meetings as well?

18  A.   That's correct.

19  Q.   Would you agree with me participating in those

20  meetings wasn't manual work?

21  A.   Well, we had laborers participating in those

22  meetings as well.

23  Q.   I'm just asking if your participation in the

24  meeting was manual work?  Were you performing manual

25  work when you participated in the safety meeting?

**Jason Lett - Cross**

1   A.   I wouldn't call it manual labor.

2   Q.   If we look at this job safety analysis, in the

3   middle there it says supervisor and identifies you,

4   correct?

5   A.   Yes.

6   Q.   You then filled out what the potential hazards were

7   for the day?

8   A.   That's correct.

9   Q.   And then at the bottom it says, Job safety analysis

10  performed to protect the undersigned employees and it

11  lists four employees that you undertook this job safety

12  analysis for?

13  A.   Okay.

14  Q.   Is that accurate?

15  A.   I believe so.

16  Q.   If we turn to 12868, this is another job safety

17  analysis worksheet that you completed, correct?

18  A.   That's correct.

19  Q.   It identifies you as the supervisor?

20  A.   That's correct.

21  Q.   Then it says that you performed this task for two

22  other employees.  I can't read the first one and it's

23  Kari Gordon?

24  A.   That's correct and the first person is myself.

25  Q.   So, it's your name and Kari Gordon?

**Jason Lett - Cross**

1   A.   That's correct.

2   Q.   And you completed that analysis on May 9th, 2012?

3   A.   Yes.

4   Q.   And completing this paperwork was a routine part of

5   your job and something you did regularly?

6   A.   In order to turn in our bonuses, we had to have all

7   the proper paperwork.

8   Q.   Let's look at 12994, which should be a preliminary

9   operational checklist.  When we get to the document, can

10  you walk us through what your preoperational

11  walk-through was.

12  A.   The preoperational checklist of what we --

13  Q.   Right.

14  A.   You mean the document we filled out before the job?

15  Q.   Correct.

16  A.   I'm not really sure what your question is.

17  Q.   Why don't we look at the document, if you would.

18  Do you recognize this preoperational inspection

19  checklist for fixed and swing cab boom trucks.

20          THE COURT:   Can you turn it right side up.

21  Q.   So, this preoperational checklist, is that

22  something you undertook?

23  A.   Yes.

24  Q.   Is this another form you completed, correct?

25  A.   Correct.

**Jason Lett - Cross**

1  Q.   And this was specifically for the crane?

2  A.   Yes.  It says fixed and swing cab boom trucks.

3  Q.   So, yes?

4  A.   Yes.

5  Q.   Is this something you did daily?

6  A.   No.

7  Q.   How often would you do the preoperational

8  inspection?

9  A.   I believe this was before -- one time before any

10 job.

11 Q.   Before you went out to the job, you would do this

12 checklist?

13 A.   Yes.

14 Q.   Did you do any preinspection on the day of the job?

15 A.   On the crane itself?

16 Q.   Yes.

17 A.   I believe so.

18 Q.   But this particular checklist you just did before

19 the job, correct?

20 A.   I believe so.

21 Q.   And then you would do a daily inspection as well?

22 A.   I believe so.

23 Q.   I assume completing this preoperational checklist,

24 doing that paperwork you didn't consider manual labor?

25 A.   I wouldn't think so.

1   Q.   There was no supervisor at the wellsite, right?

2   A.   As far as who is concerned?  As far as Oil States

3   is concerned?

4   Q.   As far as Adam wasn't at the wellsite telling you

5   what to do, right?

6   A.   There was a grease operator at the wellsite.

7   Q.   There was a grease operator.  You actually got paid

8   a higher bonus than the grease operator?

9   A.   That's not true.

10  Q.   The grease operator got $450, you got $480 when you

11  ran the hundred ton and $450 when you ran the smaller

12  one?

13  A.   Yes.

14  Q.   Sometimes you got paid more than the grease

15  operator and sometimes you got paid the same?

16  A.   That would be correct.

17  Q.   You are not saying the grease operator told you

18  what to do out there?

19  A.   No.

20  Q.   Grease operators may or may not be NCCCO certified,

21  right?

22  A.   That's correct.

23  Q.   So, it's your testimony that a grease operator

24  without any certification is telling you how to run the

25  crane?

1    A.   Well, sir, in operating the crane, the crane

2    operator does not just operate the crane.  Any

3    particular person on the ground has to tell him where --

4    any operation -- the crane operator does not just

5    operate the crane without guidance.

6    Q.   You are doing it together?

7    A.   At his guidance, correct.

8    Q.   You guys are out there providing this pressure

9    control service as a team, right?

10   A.   That's correct.

11   Q.   He is not your boss?

12   A.   That's correct, however he is rigging up his

13   equipment.  However he wants to do it is on the grease

14   operator.  The crane operator's job is to assist in

15   whatever the grease operator wants to do.

16   Q.   So, your job is to run the crane and understand how

17   to do that, right?

18   A.   Yes.

19   Q.   And then work with the grease operator to provide

20   the pressure control, correct?

21   A.   To assist, yes.

22   Q.   And you went to school and were certified to run

23   pressure control, right?

24   A.   Correct.

25   Q.   When I was saying there was no supervisor, what I

**Jason Lett - Cross**

1  really meant is there was not an Oil States manager out

2  there looking over your shoulder?

3  A.   Sometimes there was.  A lot of times there was not.

4  Q.   A lot of times there was not?

5  A.   Correct.

6  Q.   I mean who was your manager at that time?

7  A.   I believe his name was Brian Victor.

8  Q.   And how many times were you on the wellsite with

9  Mr. Victor?

10 A.   I can't recall, sir.

11 Q.   Would he come out once a month?

12 A.   I'm not really sure.

13 Q.   Could be less than that?

14 A.   Could be more.

15 Q.   When he comes out, he is typically visiting the

16 customer?

17 A.   If Brian Victor would come out, he would be

18 generally visiting the employees, which would be myself

19 and the grease operator.

20 Q.   But he is not telling you how to do your job day in

21 and day out?

22 A.   Not day in and day out, no.

23 Q.   You are not calling him every shift and saying I

24 hit this issue, tell me what to do, nothing like that?

25 A.   As a crane operator, no.  I'm not sure about the

 1  grease operator.

 2  Q.   You don't know one way or another about the grease

 3  operator?

 4  A.   I'm not sure if he called the manager and talked

 5  about problems that were arising.  I'm not sure.

 6  Q.   What is equalization of pressure?

 7  A.   Are you referring to equalizing pressure?

 8  Q.   Yes.

 9  A.   From what I understand, it's getting the equal

10  amount of pressure in the wellhead itself relative to

11  the above word "closed" or below where it's closed, I

12  believe so.

13  Q.   So, once the lubricator is attached, there is no

14  downward pressure, so you have to equalize the pressure

15  before opening the well to prevent the guns from

16  shooting out the top, is that basically it?

17  A.   That sounds about right.

18  Q.   And you equalize the pressure before you open the

19  wellhead to begin operations, is that right?

20  A.   That's correct.

21  Q.   And did you ever equalize pressure?

22  A.   I don't believe so.

23  Q.   And isn't it true that 99 percent of the time the

24  person operating the crane performed the initial

25  pressure equalization?

1    A.    I don't believe so.

2    Q.    At the time equalization pressure happens, the

3    grease operator is actually on the lubricator, right?

4    He is in the basket away from the pressure control unit?

5    A.    Repeat the question.

6    Q.    Sure.  At the time equalization occurs, the grease

7    operator is typically with the lubricator and not with

8    the pressure injection unit, correct?

9    A.    I don't believe so.

10   Q.    You don't think that's accurate?

11   A.    No.

12   Q.    Nobody at the wellsite other than you, this team of

13   operators, provided pressure control, right?

14   A.    That's correct.  We were out there to provide

15   pressure control.

16   Q.    That was your expertise to provide this pressure

17   control service?

18   A.    Oil States provided pressure control.

19   Q.    We talked about there are all kinds of service

20   providers doing all kinds of different tasks, correct?

21   A.    That's correct.

22   Q.    But Oil States' subject matter expertise was the

23   pressure control, correct?

24   A.    That's correct.

25   Q.    So, you and the other operator were out there to

**Jason Lett - Cross**

1   provide that expert service to the customer, right?

2   A.   That's correct.

3   Q.   And you were paid anywhere from $450 to $480 a day

4   every day you went out there to provide that service?

5   A.   Generally, yes.

6   Q.   And that was in addition to the salary that you got

7   all the time, right?

8   A.   That's correct.

9   Q.   And you said "generally?"

10   A.   Yes.  A lot of times if we would show up to a

11   location and there was nothing to do or there was

12   standby, the company didn't charge the other -- Oil

13   States did not charge for that day, then we did not get

14   a bonus.

15   Q.   It's your testimony that while on standby, you

16   weren't paid a bonus?

17   A.   Certain particular instances, yes.

18   Q.   How many instances did that happen?

19   A.   I'm not sure.

20   Q.   Can you name one?  Can you identify the job?

21   A.   Not off the top of my head.

22   Q.   Can you identify one time when that happened?

23   A.   Not off the top of my head.

24   Q.   But you know it did?

25   A.   Of course.

**Jason Lett - Cross**

1  Q.   Can you give us approximately how many times that

2  happened?

3  A.   Not sure.  I think there was a policy where they

4  might have stopped paying bonuses for standby time.

5  Q.   No.  I'm asking you how many times did you show up

6  at a wellsite to do work and you are saying you didn't

7  get a bonus?

8  A.   I'm not sure, sir.

9  Q.   You're not sure?

10  A.   No.

11  Q.   Let's talk a little bit about the bonuses.  So, if

12  you were out there for six hours or 12 hours, you

13  received a bonus, correct?

14  A.   Correct.

15  Q.   It wasn't tied to the amount of time you spent on

16  the well, right?

17  A.   That's correct.

18  Q.   So, you wouldn't say this was a time-based bonus,

19  it was showing up for the wellsite to do the work and

20  you got paid, right?

21  A.   That's correct.

22  Q.   Let's talk about what you do once you stabbed on

23  and pressure control operations are underway.

24          Typically, they do a rundown of anywhere from

25  one to three hours?

Jason Lett - Cross

```
 1   A.    I would say two to four, two to three.
 2   Q.    Two to three, two to four, and the crane is not in
 3   use during that entire period of time?
 4   A.    That's not accurate.  The crane is actually holding
 5   tension on the lubricator itself.
 6   Q.    That's right but you're not sitting in the crane
 7   operating it.  It's suspending.
 8   A.    Not sitting in there, however, at times I would
 9   have to get into it and put tension on the cables so it
10   would not fall to either side.
11   Q.    What else were you doing?
12   A.    After we stabbed on the well?
13   Q.    Right.
14   A.    I would assist the grease operator in anything that
15   he needed.
16   Q.    You heard Mr. Burchik say that he typically left
17   his truck running for the full shift however long he was
18   out there.  Did you do the same?
19   A.    I'm sure I did.
20   Q.    Let's talk a little bit about rig down.  You only
21   rig up and down typically once per job, correct?
22   A.    It depended on the type of job, but yes.
23   Q.    So, it could be you rig up once every couple of
24   weeks and rig down once every couple of weeks?
25   A.    That's correct.
```

**Jason Lett - Cross**

1    Q.   So, the rig up we were talking about earlier you

2    said was manual labor for 10 or 15 minutes, that may

3    happen every couple of weeks?

4    A.   That's correct.

5    Q.   Let's talk about the rig down.  In the rig down,

6    there is again really two stages to this.  The first is

7    moving the lubricator and the equipment that goes on the

8    wellhead, right?

9    A.   That's correct.

10   Q.   That's done -- you use the crane to move that

11   equipment, right?

12   A.   That's correct.

13   Q.   And you're not disassembling that, your job is to

14   use the crane to move it off the wellhead?

15   A.   That's correct.

16   Q.   The second stage of rig down is you're putting the

17   crane back to be transported, correct?

18   A.   That's correct.

19   Q.   That's pushing the button, and then the outriggers

20   come back?

21   A.   Getting out, taking off the feet of the outrigger,

22   picking up the pads, putting them on the deck,

23   ratcheting them down, stuff like that.

24   Q.   That's about it, right?  You said stuff like that.

25   Is there anything else?

1    A.    Washing the windows in case you have grease on

2    them, getting them cleaned.

3    Q.    That's really it, right?

4    A.    That's about it.

5    Q.    That's what, another 10 or 15 minutes?

6    A.    Something around there.

7    Q.    That rigging down again would happen for 10 or 15

8    minutes every couple of weeks?

9    A.    Depending on the job, yes.

10   Q.    At the time you were hired, you never received a

11   job description, did you?

12   A.    I was told that I would be driving trucks and be

13   trained on the crane.

14   Q.    No.  I'm asking did you ever get a piece of paper

15   with a job description?

16   A.    I don't recall.

17   Q.    You never at any point in your employment recall

18   receiving a document that said this is your job, there

19   is your job description?

20   A.    As far as being a crane operator?

21   Q.    Any position.

22   A.    I don't recall.

23   Q.    Do you recall at your deposition being given a

24   document entitled "Crane Operator Job Description?"

25   A.    I believe so.

**Jason Lett - Cross**

1   Q.   Do you recall testifying that that job description

2   was inaccurate as to what your job duties were?

3   A.   I'm not sure.

4   Q.   Let me see if I can refresh your recollection.

5            The question is:

6            Mr. Lett, I want to show you what has been

7   previously marked as Exhibit No. 17.  This is a job

8   description for a crane operator.  Can you take a look

9   at that and tell me if you agree with the statements in

10   that job description.

11            Then there are several objections.

12            THE COURT:  You, sir, you can't refresh that

13   way.  You can't read to him to refresh his recollection,

14   unless you are impeaching him.  Just read it to

15   yourself.

16   A.   Where do you want me to start?

17   Q.   Where it's highlighted, Line 24 where it's outlined

18   onto 35.

19   A.   Okay.  Mr. Lett, I'm going to show you --

20            THE COURT:  Sir, just read it to yourself.

21   The question is -- you couldn't recall something.  Does

22   that help you recall.

23            MR. WARREN:  I ask the witness be given an

24   opportunity to read through the end of that.

25            THE COURT:  No.  You can ask him on redirect.

**Jason Lett - Cross**

1  Read as much as you need to refresh your recollection.

2  You said you couldn't remember something.

3            (Pause in the proceedings.)

4            THE COURT:  Does this help you remember?

5            THE WITNESS:  Somewhat, yes.

6  BY MR. STUKENBERG:

7  Q.   If I could have that back, please.

8            Do you recall being asked did you receive a

9  crane operator job description in your deposition?

10 A.   I believe so.

11 Q.   Do you recall testifying that job description was

12 inaccurate?

13 A.   I'm not sure.

14           THE COURT:  The question is did you just read

15 that?  Do you recall just reading that question in a

16 deposition?

17           THE WITNESS:  I do.

18 Q.   Do you recall previously testifying that the job

19 description, the crane operator job description was

20 inaccurate?

21 A.   What description are we referring to?

22 Q.   The one in your deposition.

23 A.   Okay.  I didn't read any kind of job description.

24 I just read what I said.

25 Q.   Do you recall testifying previously that the job

Jason Lett - Cross

1  description you reviewed in your deposition was

2  inaccurate?

3  A.   I believe so.

4  Q.   Let's talk a little bit about the pickup trucks and

5  I want to focus on the period of time in 2012 and 2013

6  that's at issue in this case.

7            Now, Oil States had dedicated drivers.  There

8  was a position called driver, correct.

9  A.   That's correct.

10 Q.   And the drivers were responsible for driving

11 equipment to the wellsite, correct?

12 A.   For the most part, yes.

13 Q.   Including hotshot runs, correct?

14 A.   Sometimes yes, sometimes no.

15 Q.   They were drivers and part of their job was to do

16 hotshot runs?

17 A.   That was part of their description, yes.

18 Q.   You were not in this '12 and '13 time period

19 employed as a driver, correct?

20 A.   Not specifically as a driver.

21 Q.   Your job wasn't to drive equipment to the wellsite,

22 your job was to perform pressure control services at the

23 wellsite?

24 A.   My job description was a crane operator.

25 Q.   Crane operator but what you were paid for and what

1    your job was, was for performing those tasks at the

2    wellsite, correct?

3    A.    That's correct.

4    Q.    Your job wasn't to drive stuff out to the wellsite,

5    your job was to do work at the wellsite, right?

6    A.    I did perform -- I did drive equipment out to

7    wellsites, though.

8    Q.    I know you mentioned hotshots.  Is that what you

9    are referring to?

10   A.    Yes.

11   Q.    Let's set aside the hotshots.  Let's talk about

12   what you were hired to do and your job.  Your job task

13   was what you did at the wellsite?

14   A.    That's correct.

15   Q.    Your job was not to drive equipment to the

16   wellsite, it was to do the work at the wellsite,

17   correct?

18   A.    In the job description, yes.

19   Q.    And in actuality?

20   A.    In actuality, no.  I also did other things besides

21   wellsite operations.

22   Q.    I know you did that, you worked in the shop?

23   A.    And I drove equipment.

24   Q.    I'm not talking about the hotshots.

25   A.    Okay.

Jason Lett - Cross

1    Q.   We can talk about the hotshots separate.  I'm just

2    talking about what you were hired for and what you were

3    paid a salary and a job bonus for was for the work you

4    did at the wellsite, correct?

5    A.   Correct.

6    Q.   You weren't paid those bonuses and salary to drive

7    equipment to the wellsite, correct?

8    A.   Correct.

9    Q.   And I know you mentioned that you had an L-tank

10   that you used to fuel up the crane, correct?

11   A.   Correct.

12   Q.   You said you had to stop to refill that L-tank so

13   you could operate the crane?

14   A.   On our way to and from location, we would stop and

15   fill up our trucks and our L-tanks.

16   Q.   How often do you think you filled up the L-tank?

17   A.   I'm not sure.  I don't recall.

18   Q.   There are fuel transaction reports, are you

19   familiar with that, right?

20   A.   Correct.

21   Q.   You had a card, a fuel card that you used every

22   time you bought fuel, correct?

23   A.   That's correct.

24   Q.   And the crane ran on diesel, correct?

25   A.   That's correct.

Jason Lett - Cross

1   Q.   And your truck ran on gasoline, which is regular

2   gas, right?

3   A.   That's right.

4   Q.   And in the fuel transaction report, it actually

5   distinguishes between diesel and gas, right?

6   A.   That's correct.

7   Q.   Would it surprise you that you only filled up with

8   diesel twice in 2013?

9   A.   I'm not sure.

10  Q.   You're not sure?

11  A.   Would it surprise me?

12  Q.   Yes.

13  A.   Possibly.

14  Q.   Because you worked for seven months in 2013,

15  correct?

16  A.   Okay.

17  Q.   And your testimony is you stopped and filled up

18  with diesel?

19  A.   Well, I stopped and filled up my truck and if I

20  topped my diesel tank off.

21  Q.   Okay.  So, when we see a fuel transaction report

22  with a lot of transactions, that's all gasoline unless

23  you needed to fill up the diesel tank?

24  A.   That's correct.

25  Q.   Just to clarify, in 2013, did you fill up the

1    diesel tank more than twice?

2    A.   I'm not sure.

3    Q.   So, do you want to reconsider your testimony that

4    you did it a couple times a week?

5    A.   I didn't know you were referring to 2013, sir.  If

6    I filled it up twice in 2013, I guess I filled it up

7    twice.

8    Q.   I want to be sure because earlier you characterized

9    that you were filling up your diesel tank --

10   A.   I thought you were referring to the entire time at

11   Oil States.

12   Q.   No.  The period of time in this lawsuit is mid 2012

13   to 2013.

14   A.   Correct.

15   Q.   So in 2013, you were employed from January 1st to

16   mid July?

17   A.   Yes.

18   Q.   And you filled up your diesel tank twice during

19   that period of time?

20   A.   If you say so.

21   Q.   So, the notion that you were always filling up your

22   diesel tank as part of your job at the wellsite, that's

23   not really accurate, is it?

24   A.   If I was required to fill up my diesel tank, yes,

25   if I needed to.

**Jason Lett - Cross**

1  Q.   I guess you needed to twice in 2013?

2  A.   Well, sir, sometimes we are with -- all times we

3  are with grease operators as well, so they also have an

4  L-tank.

5           So, sometimes we would use both tanks.  So, if

6  the grease operator used his tank, then --

7  Q.   Then you didn't need your tank?

8  A.   Correct.

9  Q.   You and the grease operator, you each had your own

10  pickup trucks?

11  A.   That's correct.

12  Q.   So, would you guys go fill up together or

13  separately?

14  A.   Depends.

15  Q.   Let's talk a little bit about your damages or your

16  hours worked, I apologize.

17           Your attorney asked you if a document

18  refreshed your recollection, is that right?

19  A.   I believe so.

20  Q.   You said -- I think you used the word "we" did

21  those numbers.  What did you mean by "we?"

22  A.   In what aspect?

23  Q.   When he asked you how you tallied these numbers,

24  you said we.  I want to understand who the "we" is.

25  A.   I sat down with my lawyers and I provided the

**Jason Lett - Cross**

1    information to calculate the hours.

2    Q.    Okay.  So, you sat down with your lawyers and did

3    that?

4    A.    Correct.

5    Q.    I'm not asking what you and your lawyers talked

6    about.  The data that you added, who entered that data?

7    A.    The data that we received from Oil States?

8    Q.    What I'm asking you is whatever you used to tally

9    up your hours.

10   A.    I tallied them up.

11   Q.    No, but the data that you used, the information

12   from the tally books or from the job reports or from the

13   man hours reports.

14   A.    I'm sorry.  What is the question?

15   Q.    The document that you referenced where you said

16   that you tallied up hours, who entered the information

17   in that document?

18   A.    Into the --

19   Q.    Whatever document you used to come up with that

20   number.

21   A.    I didn't actually do the information in the

22   spreadsheet, however, I did tally up all the hours

23   myself.

24   Q.    Not from the tally books?

25   A.    I didn't have a tally book.

**Jason Lett - Cross**

1    Q.    Not from the man hour reports?

2    A.    From the man hour reports and from the daily logs.

3    Q.    So, you went through all your daily logs and

4    transposed that number?

5    A.    With the help of my lawyers.

6    Q.    During your deposition we talked about your hour

7    estimate.  Do you recall testifying it was inaccurate?

8    A.    I believe I testified there were some inaccuracies.

9    Q.    There were a number of inaccuracies?

10   A.    Okay.

11   Q.    Is that correct?

12   A.    Correct.

13   Q.    For standby, there are times on standby where you

14   sit at the hotel all day, correct?

15   A.    Possibly.

16   Q.    And you can go to the movies, you can go out to

17   eat, do whatever you want to do, you just have to be

18   ready to go out to the wellsite if they need you,

19   correct?

20   A.    That's correct.

21   Q.    You were paid a job bonus for those standby days,

22   right?

23   A.    Not necessarily.

24   Q.    I asked you earlier and you couldn't remember an

25   occasion where that didn't happen?

**Jason Lett - Cross**

1    A.    I don't remember a specific instance but I do know

2    we were not paid job bonuses for every day on standby.

3    Q.    Not every day?

4    A.    No, sir.

5    Q.    How many standby days did you not get a job bonus

6    for?

7    A.    I can't remember.

8    Q.    Can you remember a job where you didn't get a job

9    bonus for standby days?

10   A.    Not off the top of my head.

11   Q.    I'm just asking for one.

12   A.    I can't recall.

13   Q.    Sometimes you would be on standby for 24 hours a

14   day and you would get two bonuses, right?

15   A.    I don't think so, sir.

16   Q.    That's not accurate?

17   A.    I don't think so.

18   Q.    When you were working with your lawyers to tally up

19   these hours, what did you do with the standby time?

20   A.    I believe in certain instances we counted it and in

21   certain instances, we did not.

22   Q.    What was your rationale for counting it and

23   sometimes not counting it for others?

24   A.    I believe if we were on location, I believe we

25   counted it.

**Jason Lett - Cross**

1          I believe if we showed up for a couple hours

2     or something like that, we didn't count it.

3     Q.   A lot of times you wrote standby and it doesn't

4     delineate whether you are on location or not?

5     A.   That's correct, however my daily logs usually

6     indicate how long I was on location.

7     Q.   There's huge gaps in your daily logs of time,

8     right?

9     A.   Yes.  We did not receive all the daily logs.

10    Q.   Those are documents that you created?

11    A.   Those are documents that I created on the wellsite

12    that we turned in for a bonus.

13    Q.   Let me pull up Exhibit 23, which I think was

14    published.

15          MR. STUKENBERG:  Correct?

16          MR. WARREN:  Yes.

17    Q.   I'm going to Page 12927 on Exhibit 23.  This caught

18    my eye.

19          Let me ask you this.  Was it common for

20    operators to white out somebody else's name on a sheet

21    and put their name down and submit it with a bonus

22    packet?

23    A.   I'm not sure.

24    Q.   Did you ever do that?

25    A.   I don't think so.

**Jason Lett - Cross**

1    Q.   Let's look at 12927.

2          If we look at the STS technician, did you

3    white that out and put your name?

4    A.   Possibly.

5    Q.   And it looks like the line underneath "Jason Lett"

6    is whited out, right?

7    A.   Correct.

8    Q.   So, you took somebody else's job bonus sheet,

9    whited their name out, put your name down and then used

10   this document to tally up the number of hours you claim

11   you worked that you submitted to this jury?

12   A.   No, sir.

13   Q.   Well, you said it looks like you whited it out?

14   A.   I may have wrote my name that wasn't clear enough,

15   so I whited it out to write it correctly.

16   Q.   It's your testimony that you wrote your name, your

17   own name incorrectly on this document and so you whited

18   it out to correct it?

19   A.   I'm not sure why I whited it out, however that is

20   my handwriting.

21   Q.   I'm just asking you why you would have whited it

22   out to write your name?

23   A.   Maybe there was a name printed on the sheet that I

24   picked up from somewhere that was previously printed and

25   I just used the sheet and I just whited it out and put

**Jason Lett - Cross**

1   my name.

2   Q.   All these sheets are blank, they don't say Joe

3   Smith or anything like that, do they?

4   A.   I'm not sure.

5   Q.   So, I'm just trying to understand why on 12927, on

6   document 12927 -- let's get to 12927.  At the top there

7   right here (indicating) certainly looks like it was

8   whited out, right?

9   A.   Certainly looks like it.

10  Q.   You don't know sitting here why it would have been

11  whited out?

12  A.   Like I said, I may have dropped my "L" or dropped

13  my "J" a little too low to go into the company's rep's

14  name, so I whited it out.  I don't know.  All I know is

15  this is in my handwriting.

16  Q.   How often did you white out documents?

17  A.   I'm not sure.

18  Q.   You used this document in tallying the hours you

19  testified about earlier?

20  A.   Yes.

21          MR. STUKENBERG:  Pass the witness.

22          THE COURT:  Counsel, do you wish to redirect?

23          MR. WARREN:  Yes, I do, Your Honor.

24          Could you put that document back up that we

25  were just looking at, Milly, Exhibit 23, 092127.

**Jason Lett - Redirect**

1                    REDIRECT EXAMINATION

2    BY MR. WARREN:

3    Q.   Jason, I'm going to go through a bunch of things

4    that Mr. Stukenberg asked you about.  Let's start where

5    he finished and work our way backwards.

6                You testified this handwriting is your

7    handwriting?

8    A.   That is my handwriting.

9    Q.   Do you know this document?

10               MR. WARREN:  Milly, if you could zoom out a

11   little bit.

12   Q.   Do you see the stamp at the bottom of that

13   document?

14   A.   I do.

15   Q.   Is it your understanding that this document

16   is -- when you requested this document from Oil States,

17   is this the format it was in when you received it from

18   Oil States?

19   A.   Yes, it was.

20   Q.   To the extent it was whited out, was that the way

21   the document was in the files of Oil States when you

22   received it?

23   A.   That is correct.

24   Q.   You have not taken any documents you received from

25   Oil States and whited them out and scanned them in and

Jason Lett - Redirect

1   used them in this case?

2   A.   No.

3   Q.   So, this was done back when you worked for Oil

4   States?

5   A.   Correct.

6   Q.   When Mr. Stukenberg suggested that you had printed

7   this out and whited this out and then used it to

8   calculate your hours in this case, do you believe that

9   was accurate or inaccurate?

10  A.   It was inaccurate.

11  Q.   I want to ask you about the hours estimate that you

12  prepared in this case.

13         Do you remember that Mr. Stukenberg asked you

14  during your deposition that you discussed inaccuracies

15  of those estimates, do you remember that?

16  A.   That's correct.

17  Q.   Do you remember discussing or finding some

18  inaccuracies in those estimates during your deposition?

19  A.   I do.

20  Q.   After your deposition, what did you do about those

21  inaccuracies?

22  A.   I corrected those inaccuracies and we eliminated

23  them from the total sum.

24  Q.   Once you corrected those inaccuracies that were

25  discussed during your deposition, did you send new

1   estimates to Oil States?

2   A.   Yes, I did.

3   Q.   The estimates that you provided the ladies and

4   gentlemen of the jury this morning, were those estimates

5   based on the new estimates after you corrected the

6   inaccuracies or were they based on the old estimates

7   with the inaccuracies?

8   A.   They were based on new estimates.

9   Q.   So, do you believe the estimates you gave the

10  ladies and gentlemen of the jury this morning are

11  accurate and you have found and removed the inaccuracies

12  that you saw in those documents?

13  A.   Yes.   These are as accurate as we could come up

14  with and if there are any other inaccuracies, we are

15  willing to look at those, too.

16  Q.   Let's keep working our way backwards.

17          Mr. Stukenberg asked you some questions about

18  the crane operator job description.   Do you remember

19  those questions?

20  A.   Yes, I do.

21          MR. WARREN:   Milly, could you put up

22  Exhibit 47.

23          Your Honor, may I publish that?

24          THE COURT:   Yes.

25  Q.   Let's look through this job description, Jason, if

1  we could.  If you could start at the top.  What is the

2  job title for this position?

3  A.    The job title is crane operator.

4  Q.    Do you believe this was your job title?

5  A.    I believe so, yes.

6  Q.    And could you go through and look through that job

7  description and see whether it generally describes the

8  job duties that you performed at Oil States?

9  A.    Yes, it does.

10 Q.    Mr. Stukenberg asked you whether you were asked

11 about this job description during your deposition.  Do

12 you remember those questions?

13 A.    Yes.

14 Q.    I believe he suggested that you had said the job

15 description was not accurate or do you remember him

16 asking you questions about that?

17 A.    I do.

18 Q.    Do you remember what you said in response to

19 Mr. Stukenberg's questions?

20 A.    I wasn't sure.

21 Q.    If you read the deposition testimony you gave

22 again, would that refresh your recollection of how you

23 answered the question in the deposition?

24 A.    Correct.

25 Q.    Okay.  I'm going to ask you to look from the bottom

1   of Page 34 to the bottom of 36 and just read that again

2   to yourself and see if that refreshes your recollection

3   as to how you answered that in your deposition.

4            (Pause in the proceedings.)

5   A.   Okay.

6   Q.   Does that refresh your recollection of how you

7   answered the question when you were asked whether this

8   job description described the job you performed at Oil

9   States?

10  A.   Yes.

11  Q.   And what did you generally say, without reading it,

12  but just now that you refreshed your recollection, what

13  do you generally say in response to the question that

14  you received?

15  A.   Basically that the job description of the crane

16  operator was fairly accurate, I guess.

17  Q.   Did you say anything about whether you thought

18  maybe certain job duties were missing from the

19  description?

20  A.   Yes.

21  Q.   But did you believe that the job duties that were

22  included, the basic job duties about describing a crane,

23  did you believe that those were accurate?

24  A.   Yes.

25  Q.   Did you, in fact, perform these job duties

Jason Lett - Redirect

1  operating a crane at Oil States?

2  A.   Yes, I did.

3  Q.   I'll take that back from you.

4        Jason, I would also like to talk just very

5  quickly about the bonuses and what you had to do in

6  order to receive a bonus.

7        Did the amount of your job bonus, was it

8  affected by the quality of the performance of how you

9  did your job when you were at Oil States?

10  A.   No, sir.

11  Q.   If you did a really good job one day, nailed every

12  lift right on, you were ready to go, you were full of

13  energy, did you get a better job bonus?

14  A.   No, I did not.

15  Q.   Did anyone ever come to you and say Jason, you did

16  a really bad job, you hit the crane into another piece

17  of equipment and so we're taking your bonus for the day?

18  A.   I don't believe so.

19  Q.   Did the quality of your performance, did it affect

20  your job in any way at all?

21  A.   If you got -- sometimes people got ran off the

22  jobs.

23  Q.   Describe for the ladies and gentlemen of the jury

24  what it means to get run off the job.

25  A.   The company man would decide whether he liked your

1  performance or whatever and if he did not, he would ask

2  you to leave and they would bring in another crane

3  operator.

4  Q.   You would actually get kicked off the job?

5  A.   That's correct.

6  Q.   And if you didn't complete that job, you wouldn't

7  receive a job bonus?

8  A.   That's correct.

9  Q.   But if you worked a job, is there any circumstance

10  where the quality of the work you did on that day would

11  somehow affect the amount of the job bonus?

12  A.   No, it didn't.

13  Q.   So, what did you have to do in order to earn a job

14  bonus?

15  A.   Basically, we earned job bonuses any time the

16  company charged the oil company for that day.

17  Q.   Would you have to go to the wellsite, would you

18  have to be working the job in order to receive the

19  bonus?

20  A.   Yes.

21  Q.   So, is it fair to say, do you believe the amount of

22  your bonus, was it tied -- did you have to work some

23  hours or do work in order to receive that bonus?

24  A.   I don't believe so.

25  Q.   Okay.   Were there circumstances other

Jason Lett - Redirect

1   than -- describe some of the circumstances where you

2   wouldn't have to do anything in order to get the bonus?

3   A.   Let's say if we were on standby and maybe there was

4   a problem with the well, so the next day if they didn't

5   fix the problem and we arrived on location, they would

6   say, well, we don't need you for that day, you are on

7   standby.  You can stay at the location or if they

8   permitted you to leave, you can leave to go to the

9   hotel.  As long as our company charged that oil company

10  a charge, we would get a bonus.

11  Q.   When you were on standby, were you able to go work

12  on another job?  Let's say you are on a Range job and

13  that job goes on standby, can you go next door to an

14  Anadarko job and work on that job the day you were on

15  standby?

16  A.   No.

17  Q.   So, was your time tied up for the day when you were

18  on standby?

19  A.   Yes, you were on call.

20  Q.   Did you ever receive a job bonus where your time

21  for the day wasn't tied up on that job?

22  A.   No.

23  Q.   Next I want to go through and talk about the load

24  charts.  Do you remember Mr. Stukenberg asking you

25  questions about the hundred ton crane load charts?

1   A.   Yes, I do.

2   Q.   He showed you a document that was an inch or an

3   inch and a half thick and he asked you to describe those

4   load charts?

5   A.   Yes.

6   Q.   How often did you operate the hundred ton crane at

7   Oil States?

8   A.   I would probably say a handful of times, handful of

9   jobs.

10  Q.   Would you say that you operated the 45-ton crane

11  more often?

12  A.   I would say that, yes.

13  Q.   Okay.  Do you remember Mr. Stukenberg asking you --

14  well, we can look at the 45-ton crane load charts, they

15  would be three inches thick.  Do you remember something

16  to that effect?

17  A.   Yes.

18  Q.   Can we look at the load charts for the 45-ton

19  crane.

20        This is Exhibit 94 I'm handing you.  Can you

21  describe what that document is.

22  A.   It's a load chart for National Crane.

23  Q.   How thick would you say that document is?

24  A.   A centimeter.

25  Q.   Is it anywhere close to three inches?

Jason Lett - Redirect

1    A.    No.

2    Q.    Could you flip through that document and tell me

3    actually how many load charts are in there?

4    A.    It looks like five.

5    Q.    I think you testified when you used the load

6    charts, you almost always used the same one.  Is that an

7    accurate statement of your testimony?

8    A.    Yes.

9    Q.    Why did you always use the same load chart?

10   A.    Well, if I was driving the same exact crane for

11   weeks on end and nothing on the crane can change, the

12   components stay the same, and we always use 360 degrees

13   for our load chart, then that's the one we used.  We

14   would never use over the rear load charts.

15   Q.    So, when Mr. Stukenberg suggested that on your jobs

16   you are digging through three inches of load charts to

17   figure this out, would you say that's an accurate or an

18   inaccurate characterization?

19   A.    Inaccurate.

20   Q.    I have a similar question about the bonus packets

21   you filled out.  You remember Mr. Stukenberg held up, I

22   don't know, six inches of bonus packets?

23   A.    I believe so.

24   Q.    He suggested that it was a whole lot of paperwork

25   you were filling out, is that right?

1   A.    That's correct.

2   Q.    What are some of the documents that are in the

3   bonus packets?

4   A.    JSAs, there is job safety, the load out of what you

5   bring to the wellsite, your daily logs, the bonus packet

6   cover sheet itself, different things like that.

7   Q.    Most of these documents in the bonus packet,

8   invoices, JSA, a lot of these documents, are you

9   actually typing these documents up?

10  A.    No, I'm not.

11  Q.    Did you ever type up any documents while you worked

12  at Oil States?

13  A.    No.

14  Q.    So, the documents in the bonus packet, are those

15  documents you prepared or documents you were given to

16  carry around and have as part of your job?

17  A.    Those were documents given to us by the management

18  to fill out in order to receive a bonus.

19  Q.    So, when Mr. Stukenberg held up the six inches of

20  bonus packets and asked -- he said there's a whole lot

21  of paperwork you are doing as part of your job, do you

22  believe that was an accurate or inaccurate

23  characterization of the paperwork you did in your job as

24  a crane operator?

25  A.    I believe it was inaccurate.

**Jason Lett - Redirect**

1   Q.   Jason, Mr. Stukenberg also asked you I think about

2   ten minutes of questions about pressure control school

3   and pressure control theory.  Do you remember that?

4   A.   Yes.

5   Q.   Let me first ask when did you attend pressure

6   control school?

7   A.   I'm not really sure on the date.

8   Q.   How long had you been working as a crane operator

9   before you went to pressure control school?

10   A.   I would say maybe a year or two.

11   Q.   Do you remember roughly how long you kept working

12   as a crane operator after you went to pressure control

13   school?

14   A.   I would say maybe a year.

15   Q.   Could you tell the ladies and gentlemen of the jury

16   what happened, what was discussed at pressure control

17   school?

18   A.   It was basically discussing different procedures

19   you take in order to properly conduct pressure control

20   and different equipment, different things like that.

21   Q.   How long did that school, that class last?

22   A.   I believe it was a week.

23   Q.   After you finished pressure control school, how, if

24   at all, did the job duties you performed at Oil States

25   change?

Jason Lett - Redirect

1    A.    They did not change.

2    Q.    Once you went to pressure control school, did you

3    ever operate pressure control equipment?  Was that ever

4    part of your responsibility?

5    A.    No, it was not.

6    Q.    Did you ever -- were you ever asked to apply

7    anything that you learned in pressure control school?

8    A.    No, I was not.

9    Q.    Did your job title change after you went to

10   pressure control school?

11   A.    No, it did not.

12   Q.    And earlier we looked through the daily reports

13   that you filled out that described the work that you

14   performed as a crane operator, do you remember that?

15   A.    Yes.

16   Q.    Those are documents you obtained from Oil States?

17   A.    That's correct.

18   Q.    And has anyone from Oil States ever shown you any

19   report you filled out where you described operating the

20   pressure control equipment?

21   A.    No, sir.

22   Q.    Did you ever fill out any daily report where you

23   described operating the pressure control equipment?

24   A.    No, sir.

25   Q.    So, when Mr. Stukenberg suggested that you had gone

 1    to pressure control school to become a pressure control

 2    operator, do you believe that was an accurate or

 3    inaccurate characterization of what happened to your job

 4    duties when you went to pressure control school?

 5    A.   I believe it was inaccurate.

 6            MR. WARREN:  Milly, could you put up Exhibit

 7    198.

 8    Q.   That's your resumé, Jason.  All right.  Let's look

 9    at what you wrote on your resumé.  First off, is Oil

10    States listed on here?

11    A.   Yes, it is.

12    Q.   What did you list as your -- let me first ask what

13    is the description in your resumé -- how did you

14    describe the work you performed at Oil States?

15    A.   For Oil States?

16    Q.   Yes.  If you could just look at your resumé and

17    read to the ladies and gentlemen of the jury how you

18    described what your job duties were at Oil States.

19    A.   Operated and maintained a crane on various natural

20    gas sites, inspected cranes and rigging equipment,

21    maintained operator's logs, forms, and records in

22    accordance with company's policies and DOT regulations,

23    executed daily pretrip and post-trip inspections, and

24    documentation and compliance with the DOT guidelines and

25    company policies.

1   Q.   In your resumé, did you prepare this after you left
2   the company?
3   A.   Yes, I did.
4   Q.   Did you send this to other companies that you were
5   applying to work at?
6   A.   Yes, I did.
7   Q.   In this description of how you described your work
8   to other companies, did you mention pressure control
9   equipment or operation of pressure control equipment
10  anywhere?
11  A.   No.
12  Q.   Do you think that the job title field service
13  supervisor is a fancier title of crane operator?
14  A.   I believe so, yes.
15  Q.   If your job title had been field service
16  supervisor, would you have put that on your resumé that
17  you sent to other employers?
18  A.   Yes.
19  Q.   What actually did you put on your resumé?
20  A.   I put certified crane operator.
21  Q.   And was it your understanding, was that the job
22  title you held when you worked at Oil States?
23  A.   Yes, it was.
24  Q.   The last series of questions for you, Jason.
25          Mr. Stukenberg suggested to you that normal

1  crane operators don't have to think, so you must have

2  been a field service supervisor, you must have been

3  doing pressure control equipment.

4           Have you ever held a job where you didn't need

5  to think?

6  A.   I don't believe so.

7  Q.   Do you need to think at your current job?

8  A.   Yes.

9  Q.   Do you need to think in your current job -- can you

10  say where that is?

11  A.   Right now, I'm working for a company called Welded.

12  Q.   And you are doing crane work there?

13  A.   I'm driving a boom truck.

14  Q.   When you were working at Allegheny Crane before

15  that, did you need to think?

16  A.   Yes.

17  Q.   When you were working at Coca-Cola before you went

18  to Oil States, did you need to think at that job?

19  A.   Yes, I did.

20  Q.   Have you ever held any job in your entire career

21  where you didn't have to think.

22  A.   No, sir.

23  Q.   At all of those other jobs with the exception of

24  Oil States, were you paid an hourly wage and did you

25  receive overtime compensation?

Jason Lett - Recross

1    A.   Yes, I did.

2             MR. WARREN:  Nothing further.

3             THE COURT:  Thank you.  Recross on this

4    witness?

5             MR. STUKENBERG:  Very briefly, Your Honor.

6             THE COURT:  Please.

7                    RECROSS-EXAMINATION

8    BY MR. STUKENBERG:

9    Q.   You said that if you did a bad job and the company

10   man kicked you off the job, you didn't get your bonus,

11   right?

12   A.   Generally, yes.

13   Q.   So, would you say that's performance based, you got

14   kicked off the job because you didn't do a good job, you

15   didn't get paid because of your performance?

16   A.   That's correct, sometimes you got ran off.

17   Q.   You mentioned standby.  Do you remember on your

18   first job being in Montrose, Pennsylvania, with

19   Mr. Fowler?

20   A.   It was not Montrose, Pennsylvania.

21   Q.   Where was it?

22   A.   I believe it was near Williamsport, Pennsylvania.

23   Q.   Was it with Mr. Fowler?

24   A.   It was with Mr. Fowler.

25   Q.   Do you remember being on standby for ten days?

**Jason Lett - Recross**

1   A.   That was the second job we were on together.

2   Q.   Was that Montrose?

3   A.   Montrose, yes.

4   Q.   Okay.  I apologize.  The second job with

5   Mr. Fowler, do you remember being on standby for ten

6   days?

7   A.   Yes, I do.

8   Q.   Do you remember you and Mr. Fowler got paid your

9   job bonus for each of those ten days you were on

10  standby?

11  A.   I believe I got the standby, the job bonuses for

12  the Montrose job but not for the previous job.

13  Q.   Let's focus on Montrose.  You got all ten of those

14  job bonuses?

15  A.   That's correct.

16  Q.   Do you remember going to the mall with Mr. Fowler?

17  A.   Correct.

18  Q.   Do you remember taking a joy trip up to New York,

19  you guys drove over to New York?

20  A.   Possibly.

21  Q.   You guys went out to eat?

22  A.   That's correct.

23  Q.   And you were paid those days, correct?

24  A.   The company charged the oil companies, and we

25  received our bonuses.

**Jason Lett - Recross**

1   Q.   And in your calculation to the jury about your

2   hours worked, did you include those ten days when you

3   were out to eat and going to the mall and driving up to

4   New York?

5   A.   I'm not sure we received those daily logs, so I

6   would have to say no.

7   Q.   You don't know?

8   A.   If I did not receive those daily logs that I filled

9   out, then we did not include them into the --

10  Q.   Do you know if you received them or not?

11  A.   I don't believe so.

12  Q.   Do you know?

13  A.   We did not receive them.

14  Q.   You did not receive those logs?

15  A.   I don't believe so.

16  Q.   Isn't it true you mentioned that you never typed

17  anything, right?

18  A.   That's correct.

19  Q.   Didn't you type up your P-card transactions?

20  A.   We had to go into the computer and fill out I think

21  our P-card transactions.

22  Q.   Like typing?

23  A.   I believe so.

24  Q.   Okay.  So, you did type reports?

25  A.   If we used our P-card for that month, yes.  If we

Jason Lett - Recross

1  did not, no.

2  Q.   On your P-card transactions, you mentioned -- I

3  think there's been testimony you periodically stopped to

4  buy equipment, is that right?

5  A.   I believe so.

6  Q.   You felt it was part of your job to stop and buy

7  equipment?

8  A.   Correct.

9        MR. WARREN:  Objection.  This is outside the

10  scope of cross-examination.

11        THE COURT:  Yes, it is.  Sustained.

12        MR. STUKENBERG:  Thank you, Your Honor.

13  Q.   On Exhibit 47, which is the job description that

14  seems to be vacilating, that job description, there's

15  nothing on that job description that mentions assisting

16  the grease operator, correct?

17  A.   That's correct.

18  Q.   It never mentions anything about working in the

19  shop?

20  A.   That's correct.

21  Q.   It never mentions being NCCCO certified, correct?

22  A.   I believe so.

23  Q.   And you did all those things, correct?

24  A.   That's correct.

25        MR. STUKENBERG:  Nothing further.

```
1               THE COURT:  Thank you.

2               Sir, thank you for your testimony.  You may

3    step down with the Court's appreciation.  You are

4    welcome to stay, of course, the remainder of the trial.

5               Plaintiff, your next piece of evidence.

6               MR. WARREN:  Your Honor, we would like to read

7    the testimony of Barry Blank from his deposition.

8               THE COURT:  All right.  Ladies and gentlemen,

9    a federal court can only bring in witnesses from a

10   certain distance.  In other words, if you are not a

11   party to a lawsuit, I can't bring you here under the

12   Federal Rules unless you are within a certain number of

13   miles, et cetera.

14              Mr. Blank is not available to testify before

15   you but his deposition was taken and the counsel are now

16   going to tell us, counsel agreed as to what to read to

17   us some limited portions of his testimony.

18              So, you are to take this testimony just like

19   you would take it if the gentleman were in front of you.

20   Of course, you are not seeing him.  You don't have the

21   ability to fully evaluate his facial demeanor,

22   et cetera, but you are at least hearing information.

23   This is evidence you are receiving from Mr. Blank.

24              Now, I would like counsel to tell us first

25   when the deposition was taken and the witness' name and
```

1    then we can proceed.

2              MR. DAVIDOFF:  I'm happy to hand out copies.

3              THE COURT:  Yes, please.  Make sure everyone

4    has a copy, yes.

5              MR. DAVIDOFF:  Your Honor, we are going to

6    read from the deposition of Barry Blank that was taken

7    under oath on Thursday, December 17, 2015, in

8    Pittsburgh, Pennsylvania.

9              Ms. Hood will read the questions and I will

10   read the answers that Mr. Blank gave.

11             THE COURT:  Okay.  Please proceed.

12             (Whereupon, excerpts of Barry Blank's

13   deposition were read into the record as follows:)

14   BY MS. HOOD:

15   Q.   Good morning, Mr. Blank.

16   A.   Good morning.

17   Q.   My name is Jeffrey Chivers.  I represent the

18   plaintiffs in this lawsuit against Oil States Energy

19   Services for which you are being deposed today.

20   A.   All right.

21   Q.   Do you understand that you are under oath?

22   A.   Yes.

23   Q.   Do you understand that even though you are in a law

24   office right now, the testimony you give here under oath

25   is subject to the same penalty of perjury that would

```
 1   apply if you were testifying in a court of law?
 2   A.   Yes.
 3   Q.   Was Robert Pickel, P-i-c-k-e-l, a grease operator
 4   at Watsontown Yard?
 5   A.   No, he wasn't.
 6   Q.   What did Robert Pickel do?
 7   A.   He was a crane operator for the Canonsburg shop.
 8   Q.   Did he ever work for the Watsontown Yard?
 9   A.   Possibly.
10   Q.   What is your title?
11   A.   My title is assistant manager.
12   Q.   Who is the district manager?
13   A.   The district manager/regional manager is Cori
14   Courts.
15   Q.   So, Cori Courts, is it fair to say, he has two
16   hats.  He is a regional manager and he is the district
17   manager of the Watsontown wireline issue?
18   A.   Being that he is the regional manager of the
19   northeast, he covers everything in the northeast.
20           My position -- I answer to Jerry Benson, who
21   is my manager in corporate.
22   Q.   Where does Jerry Benson work?
23   A.   For Oil States in Texas.
24   Q.   Are you the highest level manager over the
25   day-to-day operations of the wireline division at
```

1    Watsontown?

2    A.    At Watsontown, yes.

3    Q.    When did you start working in that position that

4    you are in now?

5    A.    Two years ago.

6    Q.    Do you remember the month and year?  It's December

7    2015 right now.

8    A.    I want to say August 2012, '13.  It would be on my

9    OSA chart.

10   Q.    You think it was either August 2012 or August 2013?

11   A.    '13 probably.

12   Q.    Before then, what was your position?

13   A.    I was field service manager.

14   Q.    Also at Watsontown?

15   A.    Yes.

16   Q.    Were you a field service manager over the wireline

17   division?

18   A.    Yes.

19   Q.    Were you the only field service manager?

20   A.    Yes.

21   Q.    In this deposition I'm going to ask you questions

22   about the wireline and fracking operations from the

23   Watsontown Yard, okay?

24   A.    Yes.

25   Q.    I'm going to be asking you most of those questions

1    about the time period between when you became a field

2    service manager at the Watsontown Yard and the April

3    2015 layoffs.

4    A.    Okay.

5    Q.    Do you understand?

6    A.    Yes.

7    Q.    In that same time period who was in charge of

8    dealing with clients to bring in business for the

9    fracking division at Watsontown?

10   A.    That would be the sales department, one of three.

11   Q.    Same sales department you had identified earlier?

12   A.    Yes.  More than likely, it was Gary Bartelt.  That

13   was his forte.

14   Q.    Who was employed as a dispatcher at the Watsontown

15   Yard?

16   A.    There were three.  Mark -- what was his name?

17   Daniel Hakes, Robert Folmer at one point for about a

18   year, and Mark, I can't remember his name.

19   Q.    What were the dispatcher's job duties?

20   A.    The dispatcher's job duties are to take phone calls

21   and relay them to me, to where I line up equipment, and

22   then we collaborate on the people we are going to send,

23   depending on days off and availability.  Skill level has

24   something to do with it, also.

25   Q.    From whom did the dispatcher get phone calls?

1  A.   From customers, oil companies, service companies.

2  Q.   All right.  So, customer calls the dispatcher and

3  the dispatcher then notifies you that your services are

4  needed somewhere, is that right?

5  A.   Yes.  And then between me and the dispatcher and

6  the shop hand, if we have one, we round up the

7  equipment, make sure we have it all, notify the customer

8  we can supply him, and we go forward from there.

9       They confirm that they want us on location, we

10  send the equipment and the people.

11  Q.   The only two people at the Watsontwon Yard involved

12  in determining whether equipment is ready and which

13  operators are to send to the job are you and the

14  dispatcher, is that right?

15  A.   Yes.

16  Q.   What were the job duties of the shop hands?

17  A.   Rebuilding tools, keeping the shop clean, operating

18  forklifts and loading and unloading equipment, coming

19  back from a job or going to one and pressure test.

20  Q.   So, the job duties of the shop hands were to

21  rebuild tools, clean the shop, operate forklifts, load

22  and unload equipment and do pressure testing on

23  equipment, is that right?

24  A.   Yes.

25  Q.   Anything else you can think of that they were

1    responsible for doing?

2    A.    Short runs, pickup truck runs.

3    Q.    What do you mean by that?

4    A.    If we had to drop off a piece of equipment or pick

5    one up and they had availability, they got to do it.

6    Q.    As long as you had been working at Watsontown, has

7    Oil States always paid the shop hands on an hourly rate?

8    A.    Yes.

9    Q.    Have they always got paid overtime?

10    A.    Absolutely.

11    Q.    How did you use the cranes in the wireline

12    operations?

13    A.    I would like a job description of it, what do we

14    actually use them for?

15    Q.    As someone who spent zero days on location in the

16    field site, I'm somewhat uninformed about how the crane

17    is used.  So, why did you have cranes in the wireline

18    division at Watsontown?

19    A.    It's part of the job we do.  We have to raise the

20    lubricator, which is a pipe, up into the air, put it on

21    top of the well and the crane is used for that.  Holding

22    it up while the well is running, taking it down after

23    the well is done, rigging up the equipment and rigging

24    down the equipment to load it back on the trailer.

25              If there is a lift that can be made on

1  location that the company man requires and we are
2  capable of making the lift, we also help out rigging up
3  on location.
4  Q.   The crane is used to do work on a job location,
5  right?
6  A.   Yes.
7  Q.   It's not used for transporting stuff, is it?
8  A.   No, we don't haul anything with a crane.  The crane
9  is by itself.
10 Q.   It's a piece -- is it fair to say it's like a piece
11 of equipment with wheels on it?
12 A.   Absolutely.
13 Q.   So, do you find out from the company man who is
14 hiring you what the well pressure is?
15 A.   We find out through the salesman.  The salesman
16 gathers the information for the job, relays it over to
17 the dispatch and the manager and we make our decision on
18 equipment and personnel at that point.
19 Q.   So, you know outside of the job what the pressure
20 is?
21 A.   Yes.
22 Q.   And if it's a 10K job or lower, you would send one
23 grease operator and one crane operator per shift?
24 A.   Yes.
25 Q.   And each shift normally would be how long?

1    A.    Depends on the company calling us out and setting

2    the schedule.  Normally, it's a 12-hour schedule from

3    six a.m. to six p.m. and then from six p.m. to six a.m.

4    Q.    And each of those 12-hour shifts would have one

5    grease operator and one crane operator?

6    A.    One crane operator.

7    Q.    Is it fair to say the vast majority of jobs --

8    A.    Vast majority is one operator and one operator.

9    Q.    One grease operator and one crane operator?

10   A.    Yes.

11   Q.    The vast majority of jobs are 24 hours around the

12   clock jobs?

13   A.    Normally, yes.

14   Q.    The crane operators that worked for you are not

15   permitted to do a manual override of their cranes?

16   A.    Not suppose to make a manual override to make a

17   lift.  That is going outside the crane's capacity.  The

18   machine tells you don't do this, you shouldn't be doing

19   it.

20          It does happen where something is screwed up

21   with a sensor where you have to manually override.  That

22   involves a phone call.  I have to use the override.

23   They give me the situation, I consult -- the field

24   service manager I had at the time was a crane

25   professional.  I would consult him.  He would be like,

1  it's good to go, just make the lift.  Just get whatever

2  is wrong fixed.  If it's positioning, change the

3  position.

4  Q.  Was it true that a crane operator needed to call

5  into the office to do a manual override throughout the

6  entire time you were assistant manager?

7  A.  Yes.  At that point he is deviating from policy and

8  procedure and he is making a dangerous decision on his

9  own, but there is a certain amount of trust with a crane

10  operator and a grease operator.  You trust them to make

11  decisions but you also expect them to notify you when

12  they have to make that kind of decision so you can

13  overlook their procedure.

14  Q.  You said that the crane operators aren't doing

15  algorithms in their head as part of their job, right?

16  A.  Yes.

17  Q.  Does the work of a crane operator require any

18  particular academic background?

19  A.  The job description that we put out is not like you

20  don't have to have a degree in math.  You don't have to

21  be specifically good at math.  Everything goes off the

22  charts.  You have to be able to decipher this chart and

23  read charts.  Take the information you have and apply it

24  to the chart and turn that chart into a real situation.

25  Q.  Have the equipment operators, as far as you know,

1    have the crane operators who have worked for you had any

2    involvement in the creation of those charts?

3    A.    No.   That is a factory created item.

4    Q.    Does that come from corporate?

5    A.    That comes from the crane manufacturer.   We have

6    nothing to do with load charts.   Every crane has its own

7    set of load charts from the manufacturer.

8    Q.    In your view what skills and qualifications does a

9    crane operator need to have to do his job effectively?

10   A.    Basically, the ability to climb in and out of a

11   crane, to have the brains to set up his own rigging.   If

12   he has to go to a single port block, he has to make a

13   decision is that feasible for my lift, is that within

14   the load specifications of this crane.

15           He has to be able to read a block, set up a

16   screen, take it down after the job, drive to and from

17   location.

18   Q.    Anything else?

19   A.    Using good judgment during a lift.   Is the wind --

20   OSHA requires 30 mile an hour, shut down a job or 32

21   mile an hour wind to shut down the job.

22           Does your anemometer say you can make this

23   with the wind conditions?   There is a lightning storm

24   brewing, you have to make the case I will shut this job

25   down because I don't want to get struck by lightning,

1  circumstances as such.

2  Q.   Other than the training on pressure control

3  equipment and training on other equipment, what other

4  work did grease operators and crane operators do in the

5  shop?

6  A.   There is cleanup.  If the floor needs swept while

7  we were there, everyone gets together and sweeps the

8  floor.  It's a shop-wide effort.  Wash bay needs

9  cleaning.  Housekeeping, if you want to narrow it down.

10 Testing in the test bay.  A grease operator should be

11 able to test his equipment and other peoples' equipment

12 that he works with.

13 Q.   What does testing consist of?

14 A.   After it's torn apart and rebuilt, we have to put

15 hydrostatic pressure on the equipment to make sure it

16 will hold the pressure it's rated to hold in a

17 controlled environment.

18 Q.   Is testing pressure testing?

19 A.   Yes.  Testing with water up to a rated amount of

20 pressure, holding it for a certain amount of time on a

21 chart, and adding that chart in the equipment paperwork

22 is proof it passed the test.

23 Q.   Anything else?

24 A.   There were safety training constantly.

25 Q.   What were the topics of safety training?

1    A.    Safety training could be H2S certification, it

2    could be first aid, it could be a driving course that

3    the company wants us to take.

4              It's all corporate required.  HSE has a list

5    and we are expected to meet criteria.

6    Q.    You said there's a list from corporate of the

7    safety training that needs to be done?

8    A.    The HSE coordinators have their own list of what we

9    are expected to have and the days it expires and when we

10   are supposed to make it up.

11   Q.    So, you get your safety training schedules from the

12   HSE coordinators?

13   A.    Yes.

14   Q.    Anything else that the equipment operators were

15   required to do when they were working in the shop?

16   A.    If there was a delivery that needed made and they

17   were available, they could get in the pickup truck and

18   deliver it.  That could go anywhere from Watsontown to

19   Texas.

20   Q.    When you say pickup trucks, do you mean the non DOT

21   pickup trucks?

22   A.    Non DOT.  If I didn't have a driver for a DOT

23   vehicle, it would be a while before a DOT operator was

24   going to go to work and he needed something to do.  He

25   could jump in a truck and make the run, if he so

1  pleased.

2  Q.   Would the tally books be the most reliable record

3  of the number of hours somebody worked, in your opinion?

4  A.   Yes.  Because a tally book is going to --

5  Q.   Did you instruct your equipment operators to take

6  notes in their tally books?

7  A.   I instructed my operators to fill out their bonus

8  sheets.  In the process of instructing them to fill out

9  this particular sheet --

10  Q.   The job activity log?

11  A.   014938.  You takes notes as you are working when

12  you get a minute in your tally book.  At the end of your

13  shift, you take your tally book and translate it to your

14  bonus sheet.

15         That's why in my opinion the tally book would

16  be the most accurate form to tell how many hours and

17  what they did in a day because you can take from your

18  tally book and sum it up here, but whatever you wrote in

19  your tally book is what you were using to fill this

20  paper.

21  Q.   Since you have been the assistant manager, has it

22  ever come to your attention that an equipment operator

23  wrote down false information in his tally book?

24  A.   Not to my knowledge.

25  Q.   I just mean do you know any instance in which you

1    determined that a grease operator or crane operator had

2    written in a daily activity log an entry that did not

3    accurately describe what the grease or crane operator

4    had done at that time?

5    A.   Nothing I can prove.  Nothing I considered false

6    because it's a daily operation.  You can -- I can tell

7    you how this job is going to progress day by day unless

8    they run into a problem for whatever reason.  It's going

9    to be pretty much the same thing every day.

10   Q.   You mean the entries are going to be pretty much

11   the same thing every day?

12   A.   Yes.  We are going to be rigging up.  We are going

13   to be stabbing on a well.  We are going to be running in

14   hole.  We are going to be pulling out of hole.  We are

15   going to rig down, pull off well, move to next well.

16   Running in hole, running out hole, move to next well, up

17   until the end of the job.

18          Unless they run into a situation where the

19   wire gets stranded and we have to perform duties to fix

20   the strand, the job is not going to deviate.  It's

21   fairly boring.

22   Q.   It's pretty repetitive?

23   A.   It's a repetitive situation.

24   Q.   And so those repetitive entries in the job activity

25   logs reflect the repetitive nature of the work on site?

```
 1   A.   Yes.
 2   Q.   Now, can you remember any instance in which you
 3   found out that a grease or crane operator's entry in a
 4   job activity log did not accurately describe what the
 5   grease or crane operator had done at that time?
 6   A.   No, I can't.
 7   Q.   Do you have any reason to believe that any specific
 8   grease or crane operator who worked for you falsified
 9   any daily activity log?
10   A.   No, I don't.
11             MR. DAVIDOFF:  Your Honor, pass the witness.
12             THE COURT:  You read everything?
13             MR. DAVIDOFF:  I believe so.
14             MS. HOOD:  Yes, Your Honor.
15             THE COURT:  Thank you very much.
16             So, you have no additions to be read, and
17   everything, to your understanding, has been read,
18   correct?
19             MR. DAVIS:  Yes.
20             THE COURT:  As a result, ladies and gentlemen,
21   we have reached a four-hour period this morning.  I
22   think now is a good time to take a break.
23             We'll take a break until 12:45.  Let's plan to
24   come back at 12:45.
25             (Whereupon, a luncheon break was taken.)
```

```
 1                    (Afternoon Session.)
 2                    THE DEPUTY CLERK:  All rise.
 3                    (Whereupon, the jury entered the courtroom.)
 4                    THE COURT:  Please be seated.
 5      (In open court, jury present.)
 6                    THE COURT:  Plaintiff, are you ready to call
 7      your next piece of evidence?
 8                    MR. WARREN:  Yes, Your Honor.
 9                    Plaintiffs call Robert Pickel, please.
10                    THE DEPUTY CLERK:  Sir, please raise your
11      right hand.
12                    ROBERT PICKEL, one of the Plaintiffs herein,
13      having been duly sworn, testified as follows:
14                    THE DEPUTY CLERK:  You may be seated.
15                    Please state and spell your name for the
16      record and speak right into that microphone.
17                    THE WITNESS:  Robert Pickel, R-o-b-e-r-t,
18      P-i-c-k-e-l.
19                    THE DEPUTY CLERK:  Thank you.
20                    THE COURT:  You may proceed.
21                         DIRECT EXAMINATION
22      BY MR. WARREN:
23      Q.   Mr. Pickel, where do you live?
24      A.   In Houston, Pennsylvania.
25      Q.   What have you spent the last 20 or 25 years of your
```

**Robert Pickel - Direct**

1   life doing?

2   A.   As a crane operator.

3   Q.   Can you describe for the ladies and gentlemen of

4   the jury what type of stuff you have been doing with

5   cranes for the last 20 years?

6   A.   I built buildings, bridges, recently for the past

7   year or two I have been putting up big wind turbines.

8   Q.   What are some of the companies you have worked for

9   over the last five years?

10  A.   Maxim Crane here in Pittsburgh, Pennsylvania, TNT

11  Crane & Rigging, Peter Kiewit Crane & Rigging.

12  Q.   When you were working at these different places,

13  what was your job title in each of these positions?

14  A.   Crane operator.

15  Q.   How did you first learn how to operate a crane?

16  A.   My grandfather and dad both are crane operators.

17  I'm third generation crane operator.

18  Q.   How old were you when you first started operating

19  cranes?

20  A.   18 years old.

21  Q.   How did you learn how to operate a crane?

22  A.   I worked on-the-job training with crane operators.

23  I was hired as an oiler and basically went out and

24  greased the crane, washed the windows for the crane

25  operator, helped to put the cranes together, et cetera.

**Robert Pickel - Direct**

1   Q.   How did you learn how to operate a crane over the

2   course of this on-the-job training?

3   A.   The operators would take a break and they would put

4   me in the cab and I would make lifts, smaller lifts.

5   Q.   Over the last 15 or 20 years, have you done any

6   work other than operating cranes?

7   A.   No, sir.

8   Q.   These other jobs where you worked as a crane

9   operator, what type of compensation have you received?

10  A.   An hourly pay.

11  Q.   Have you received overtime at all at these other

12  jobs where you have been a crane operator?

13  A.   Yes, sir.

14  Q.   We're going to come to the time you worked at Oil

15  States in just two seconds and try to keep this quick so

16  we don't waste anyone's time.

17         After you left Oil States, what did you do?

18  A.   I went to work for Great White Pressure Control.

19  Q.   What is Great White Pressure Control?

20  A.   They offer pressure control services like Oil

21  States did.

22  Q.   How does the work that Great White does compare to

23  the work that Oil States does?

24  A.   It's the same.

25  Q.   When did you start working for Great White?

**Robert Pickel - Direct**

1    A.   I'm not sure.

2    Q.   How long after you left Oil States were you at

3    Great White?

4    A.   Two weeks.

5    Q.   When you worked at Great White, what type of work

6    were you doing?

7    A.   Crane operator.

8    Q.   What was your job title at Great White Pressure

9    Control?

10   A.   Crane operator.

11   Q.   Do you remember how you were getting paid when you

12   worked at Great White?

13   A.   By the hour.

14   Q.   Did you receive overtime at Great White?

15   A.   Yes, sir, I did.

16   Q.   Okay.  Let's talk about your work at Oil States.

17   How did you first hear about Oil States?

18   A.   I got a phone call from an employee Larry White

19   that told me that they were -- they had bought a couple

20   hundred ton cranes and he knew I had big crane

21   experience.

22        So, he called for a manager to see if I would

23   come up and help them out with the bigger cranes.

24   Q.   Do you remember what Mr. White's role was at Oil

25   States at the time?

1   A.   A pressure control operator.

2   Q.   Did Mr. White put you in touch with anyone at Oil

3   States?

4   A.   He handed the phone to John Ward.

5   Q.   What was Mr. Ward's role at the time?

6   A.   District manager.

7   Q.   What particular shop or office?

8   A.   Canonsburg shop.

9   Q.   Did you have a conversation with Mr. Ward at that

10   time?

11   A.   Yes, I did.

12   Q.   What did Mr. Ward tell you?

13   A.   He asked me my experience on larger cranes.   We

14   talked about that.   He asked me would I like to come to

15   work for them in Pennsylvania, and I told him yes.

16   Q.   Did he tell you what type of work he wanted you to

17   do at Oil States?

18   A.   No, sir.

19   Q.   Did he tell you what your job position would be at

20   Oil States?

21   A.   He told me I would be a crane operator.

22   Q.   Did he ever mention during that conversation

23   anything about you operating pressure control equipment?

24   A.   No, sir.

25   Q.   How long after that conversation with Mr. Ward did

1   you come up to Oil States, come up to start working for

2   Oil States?

3   A.   I made the trip that weekend.  I was filling out

4   applications the following Monday.  I spoke to him on a

5   Thursday.

6   Q.   You were in the shop on Monday?

7   A.   Yes, sir.

8   Q.   When you started working for Oil States,

9   immediately after you started working there, what type

10  of work were you doing?

11  A.   I went straight in the field running a crane.

12  Q.   What type of cranes were you running at the

13  beginning there?

14  A.   In the very beginning, I was running a 45-ton and a

15  50-ton.

16  Q.   How did those 45-ton, 50-ton, is that similar to

17  the 45-ton we were looking at yesterday?

18  A.   Yes.

19  Q.   National Crane?

20  A.   Yes.

21  Q.   What type of work were you doing with that 45-,

22  50-ton crane?

23  A.   Building frack stacks and picking up lubricator.

24  We'd get there to the job location and the company man

25  wants you to hang down joints for fracks and we would do

**Robert Pickel - Direct**

1    that.

2    Q.   When you started working at Oil States doing this

3    work you just described, had you ever worked in the oil

4    and gas industry before?

5    A.   No, sir.

6    Q.   How did you know how to do -- when you started

7    working at Oil States, did you receive any training on

8    how to operate the crane?

9    A.   Before I went to Oil States?

10   Q.   When you arrived at Oil States, did anyone show you

11   how to use a crane?

12   A.   No, sir.

13   Q.   Did you already know how to use a crane?

14   A.   Yes, sir.

15   Q.   When you arrived at Oil States, did anyone give you

16   any training on oil field equipment, pressure control

17   equipment?

18   A.   No, sir.

19   Q.   Did you need to know how to use that equipment in

20   the course of your job?

21   A.   No, sir.

22   Q.   When you were going out to the wellsite and

23   operating a crane and, again, I don't need you to go

24   over anything in detail that Mike and Jason already

25   covered, but describe, if you would, for the ladies and

1  gentlemen of the jury generally what type of work you

2  were doing at the wellsite and how it compared to the

3  work you heard Jason and Mike describe this morning and

4  yesterday afternoon?

5  A.    We would get to the wellsite and it would typically

6  be the same thing day in and day out.  You would pick up

7  a lubricator, stab on a well, let them make their run,

8  come off the well, you would wait for frack and then you

9  would do it again.

10  Q.    When you were working at Oil States, did the work

11  that Jason and Mike described, is that the same work you

12  were doing?

13  A.    Yes, sir.

14  Q.    So, let's go through and again speed through this

15  but when you arrive at the wellsite, what's the first

16  thing you do?

17  A.    You make relief with whoever is there.

18  Q.    What do you mean by that?

19  A.    I would make relief -- whoever was there running

20  the crane opposite shift from me, I would make relief

21  with them, see what was going on, and depending on where

22  they were at, if they were in the middle of wireline or

23  in the middle of fracking, then we would wait.

24  Q.    You are just a shift relief for the other person?

25  A.    Yes, sir.

**Robert Pickel - Direct**

1   Q.   What about at the beginning of the job when you

2   show up for a new job, what do you do at the beginning?

3   A.   We show up and rig up with pressure control.

4   Q.   Let's talk about how you rig up the crane.  Let me

5   ask you this first.  When you worked at Oil States, how

6   did the cranes get to the job sites?

7   A.   They were driven by a CDL driver.

8   Q.   Who did that CDL driver work for?

9   A.   Oil States.

10  Q.   While you worked at Oil States, did you ever drive

11  a crane to or from a wellsite?

12  A.   No, sir.

13  Q.   Did you ever drive a crane anywhere?

14  A.   No, sir.

15  Q.   Why not?

16  A.   I did not have a CDL license.

17  Q.   What is CDL?

18  A.   Commercial driver's license.

19  Q.   Were you permitted to drive a crane when you worked

20  at Oil States?

21  A.   No.

22  Q.   How would you get to Oil States?

23  A.   I would get there in a company truck that was

24  issued by Oil States.

25  Q.   We'll talk about that truck in a little bit.

 1              Now, when you would get to the wellsite at the

 2    beginning of the job, was the crane already there?

 3    A.   Yes, sir.

 4    Q.   So, what do you do when you get there?

 5    A.   We would get there on location, we would have a

 6    morning safety meeting, then the company man would meet

 7    with the pressure control operator, me, or the crane

 8    operator and the wireline engineer.

 9    Q.   What goes on in that conversation?

10    A.   Basically where he wanted and suggested to have us

11    three in a work area.

12    Q.   So, you would tell -- you, the crane operator,

13    would tell --

14    A.   Like you here, pressure control here, wireline over

15    here.

16    Q.   And once you get the crane set up in that spot,

17    what do you do?

18    A.   You get the crane set up in that spot, then we

19    would help pressure control rig their stuff up.

20    Q.   What's involved in getting the crane set up?  Once

21    you parked it, what do you have to do?

22    A.   You have to get out, you get your outriggers and

23    stuff out, you have to pull your outrigger pads off the

24    deck of the crane and there's four of them.

25              You pull them off, drag them underneath your

1    outriggers and go ahead and jack the crane up and level

2    it up.

3    Q.   Once you have done that process, do you have to do

4    anything else to get the crane ready to run?

5    A.   Yes, sir.  You have to get in and plug your

6    information into your computer.

7    Q.   And what type of information are you plugging into

8    the computer?

9    A.   Depending on what crane, the 45, 50 tons, you would

10   plug in your outriggers length, whether it was mid or

11   full extension.  It already had the counterweight on

12   there, so it was basically just okay.

13   Q.   So you plug in outrigger length?

14   A.   And your parts, however parts aligned you made, if

15   you needed to change them, then you would have to add

16   parts or take parts out of the block.

17   Q.   And how did you know what you should be plugging

18   into the crane computer?

19   A.   It's based on what something weighs.  Normally,

20   your typical crane -- I don't know about -- I am going

21   to say each part of the line is good for a certain

22   amount of weight.

23         If something weighs 80,000, your parts aligned

24   are good for ten, then you need eight parts aligned.

25   Q.   How do you know that?

1   A.   Because it tells you in the -- every crane has a

2   load chart.

3   Q.   Was there a crane -- did you use a crane manual?

4   A.   The manual is normally with -- it's all one book.

5   The crane manual, it's got your load charts, crane

6   diagram and stuff like that.

7   Q.   Once you have been doing the job for a while like

8   you have, do you get to know these charts?

9   A.   Yes, sir.

10  Q.   Did you reach a point where you kind of didn't need

11  to refer to them at some point?

12  A.   Yes, sir.

13  Q.   Earlier you heard some questions about how many

14  different load charts in a book of charts you might have

15  to use.  How many different load charts did you rely on

16  when you were working at Oil States?

17  A.   In the 45 and 50 tons, normally one book, one page

18  and even in the hundred and a hundred ten ton, it was

19  basically one page.  We always ran the same amount of

20  counterweight.  The outriggers were always fully

21  extended.

22  Q.   That's true on every job you worked at?

23  A.   I would say 95 percent, yes, sir.

24  Q.   Okay.  When you worked at Oil States, what types of

25  cranes did you operate?

Robert Pickel - Direct

1    A.   When I first hired in, they hadn't yet took

2    delivery on the hundred ton or hundred ten ton, so I ran

3    the 45 and 50 tons.

4    Q.   How long after you started working there did they

5    get into the hundred or hundred ten tons?

6    A.   I would say three, four, maybe five months.

7    Q.   Were you generally running those cranes once they

8    got them?

9    A.   Yes.  Once they arrived, I was on them all the

10   time.

11   Q.   I'm not going to go through this whole story again,

12   I imagine the jury understands the kind of work, but

13   when you are working on the wellsite, are you doing the

14   work you described before, lifting up these lubricator

15   pressure control equipment, putting it on and taking it

16   off?

17   A.   Yes, sir.

18   Q.   I'm not sure we have shown how the equipment looks

19   once it's been spotted in.  Can you turn to Exhibit 64

20   in the binder that's before you.

21   A.   Yes, sir, I got it.

22   Q.   Before we put this up and show the jurors, could

23   you please just identify what is shown in that

24   photograph?

25   A.   Typical wellsite.

**Robert Pickel - Direct**

1   Q.   That's a fair and accurate representation of a

2   wellsite where you worked?

3               THE COURT:   You may publish.

4               MR. WARREN:   Thank you.

5   Q.   Robert, if you would, if you could go through and

6   identify for the ladies and gentlemen of the jury what

7   the different things shown in this photograph are?

8   A.   You have your crane right here (indicating), these

9   are your outriggers, two of them on each side

10  (indicating), this is your crane boom (indicating),

11  these are your counterweights (indicating), they go on

12  the back.  Here is your well, aerial lift, that's frack

13  stuff there (indicating).

14  Q.   What is the -- it looks like there is a trailer

15  sitting next to the crane, at the top right of the

16  picture?

17  A.   Yes, that's pressure control stuff.

18  Q.   This is the grease trailer?

19  A.   Yes, sir.

20  Q.   Is this typical of where you would set up the crane

21  when you get to the wellsite?

22  A.   Yes, sir.  When there is one well, yes.

23  Q.   What about when there's multiple wells?

24  A.   When there's multiple wells, normally, there is

25  five, six wells, you want to set up on your middle well

**Robert Pickel - Direct**

1   where you will catch each end and you don't have to move

2   any more than once if you don't have to.

3   Q.   When you get there, who tells you what area to put

4   the crane in?

5   A.   The company man, the representative for the whole

6   company that we were working for.

7   Q.   All right.  In this picture, did you ever operate

8   when you worked at Oil States any of the equipment in

9   this picture other than the crane that's on the right

10  side?

11  A.   No, sir, I did not.

12  Q.   Are you able to tell what type of crane that is?

13  A.   That is a TMS 9008.  If it's not, it's pretty close

14  to it.

15  Q.   Who makes that type of crane?

16  A.   Grove does.

17  Q.   Did you operate a crane similar to that at Oil

18  States?

19  A.   We had one just like it.

20  Q.   Was that one of the cranes you usually operated?

21  A.   Yes, sir.

22  Q.   When you were working in a wellsite, what was your

23  typical schedule at the wellsite?

24  A.   We worked in 12-hour shifts, typically 12-hours, 12

25  hours nights, 12 hours on days.

**Robert Pickel - Direct**

1   Q.   Did your schedule, were there times when you worked

2   more than 12 hours?

3   A.   Yes, sir.

4   Q.   In what circumstances would you have to work more

5   than 12 hours?

6   A.   If you had done a daylight hour only, the oil

7   company would only want to run daylight hours, if you

8   were close to a town or school buses in the morning and

9   stuff like that, but we would typically work sometimes

10  18, 19 hours and sometimes five or six.

11  Q.   Were there times when you worked straight through,

12  two shifts in a row?

13  A.   Yes, sir, I've done that when we were at Oil

14  States.  When we were real busy and didn't have relief,

15  we would pull 24s until they could get somebody out

16  there to relieve us.

17  Q.   How often did that happen when you were working

18  multiple 24-hour shifts in a row?

19  A.   I remember doing a stretch of five 24 hours a day.

20  I did 21 straight 24 hours a day.

21  Q.   Where do you sleep when you are doing that?

22  A.   In between wireline runs you would sleep basically

23  in your pickup truck, get you an hour or two of sleep

24  here and there.

25  Q.   Were you ever able to get more than a couple hours

**Robert Pickel - Direct**

1   of sleep at a time?

2   A.   No, sir.

3   Q.   Could you ever sleep anywhere else other than in

4   your pickup truck?

5   A.   No, sir.

6   Q.   Was there a time period when you were working those

7   types of hours more often than other time periods?   In

8   other words, was business busier than other times?

9   A.   When I first hired in there, they were really busy.

10  Q.   All the way through when you left, did they remain

11  busy through when you left?

12  A.   I think the last -- they had slowed down the last

13  three or four months I was there.

14  Q.   What about in 2012?

15  A.   They were busy.

16  Q.   When you were working at the wellsite, were you the

17  only crane operator most times?

18  A.   On the site?

19  Q.   Yes.

20  A.   Yes, sir.

21  Q.   Would you work at jobs where Oil States would have

22  two cranes and two crane operators?

23  A.   No, sir.

24  Q.   What about the grease operators, how many grease

25  operators were at the wellsite?

**Robert Pickel - Direct**

1   A.   One.

2   Q.   Did you ever work jobs where there was more than

3   one grease operator?

4   A.   No, sir -- well, if it was a 15K job, I would say

5   there were two grease operators.  It's been a while.

6   Q.   When you say 15K job, can you explain for the

7   jurors what you mean by 15K job?

8   A.   Not really but it's a bigger package, more to do

9   for the pressure control operator.

10  Q.   When you say package, what do you mean by the term

11  "package?"

12  A.   The grease package that's got their unit on it and

13  their lubricator.  All that stuff is bigger, heavier.

14  Q.   So, the 15K pressure control equipment is designed

15  for a higher pressure than the other stuff?

16  A.   Yes, sir, I believe so.

17  Q.   And there were times when Oil States would use that

18  equipment and they would have to send out two people to

19  operate that heavier equipment?

20  A.   Yes, sir.

21  Q.   Do you remember how often that happened when you

22  were there?

23  A.   I couldn't speculate on that.

24  Q.   When Oil States had the 15K equipment at the job,

25  were they using two cranes for that equipment or just

1  one?

2  A.    Just one.

3  Q.    So, even with the 15K equipment, were you still the

4  only crane operator at the wellsite?

5  A.    Yes, sir, I was.

6  Q.    Earlier you mentioned a company assigned pickup

7  truck.  What type of trucks were assigned to you at Oil

8  States?

9  A.    I think I had three different trucks when I was

10  there.  I had an F-150, and then I got an F-250.

11  Q.    The F-250, can you describe what it looked like for

12  the ladies and gentlemen of the jury.

13  A.    It was four wheel drive, four door, had a diesel

14  tank in the back, toolbox for all my tools and stuff.

15  Q.    What did you carry around in that toolbox?

16  A.    Hammers, some wrenches, slings, shackles, tag

17  lines.

18  Q.    Would you mind just explaining for the ladies and

19  gentlemen of the jury what some of that stuff is so they

20  understand how you are using that at the wellsite?

21  A.    The slings and shackles we would use to -- they

22  would come off the hook of the crane down to the

23  lubricator.  The pressure control operator would rap it

24  around and choke it.

25              We could pick it up and it would be steady.

1    The tag line, we'd put it on the end.  When you are

2    swinging the crane, they can control the load if it's

3    above peoples' heads.

4    Q.    Where did you carry this stuff when you

5    were -- where in the truck would you carry it around?

6    A.    In the toolbox in the bed.

7    Q.    Did you need to have that equipment with you at the

8    wellsite?

9    A.    Yes.

10   Q.    Could you have performed your job without the

11   equipment that you carried around in your pickup truck?

12   A.    No, sir.

13   Q.    Did you also have a diesel tank in the truck?

14   A.    I did.

15   Q.    What did you use that diesel tank for?

16   A.    I would use the diesel tank in the truck to fill

17   the crane up if it was low on fuel or sometimes we

18   would -- the grease unit would be low, we would fill

19   that one up, too.

20   Q.    What time of day, when would you fill up the diesel

21   tanks in the truck?

22   A.    I would normally stop later after shift on the way

23   home because I didn't like getting up early.

24   Q.    All right.  How did you pay for the fuel when you

25   would pay for it?

**Robert Pickel - Direct**

1  A.   With a fuel card that was issued to me by Oil

2  States.

3  Q.   Can I ask you to turn to Exhibit 71, please.

4  A.   Yes, sir.

5  Q.   That's a big spreadsheet.  Can you identify

6  generally what this spreadsheet shows?

7  A.   It shows the store that it was pumped at.  It shows

8  the gallons, city.

9  Q.   It's a spreadsheet of your fuel transactions from

10  what you can see?

11  A.   Yes.  I have never seen these before.  I don't know

12  if these are mine or not.

13  Q.   Could you turn in the binder to Exhibit 76.  I'm

14  going to hand you a document marked Exhibit 76.  Would

15  you identify what that is?

16  A.   It looks like a sticker out of the door of a pickup

17  truck.

18  Q.   All right.  Is that your pickup truck, your

19  assigned pickup truck?

20  A.   Yes, it is.

21         MR. WARREN:  May I publish?

22         THE COURT:  Yes.

23         MR. WARREN:  Milly, if you can scroll to the

24  second page to begin.  Zoom in on the top there.

25  Q.   What type of truck is shown on that document?

1    A.   2011 super duty F-250 4x4 crew cab with a 6.7 V8

2    diesel in it.

3    Q.   Is that the type of pickup truck that was assigned

4    to you at Oil States?

5    A.   Yes.

6            MR. WARREN:  Milly, could you please go back

7    to the first page on that.  I'm going to ask you to zoom

8    in.

9    Q.   Are you familiar with the term "gross vehicle

10   weight rating?"

11   A.   Yes, sir, I am.

12   Q.   Do you see the GVWR of your truck?

13   A.   Yes.

14   Q.   What was the GVWR of that truck?

15   A.   10,000 pounds.

16   Q.   I'm going to hand you a photograph marked as

17   Exhibit 153.  Is that basically the type of truck that

18   was assigned to you at Oil States?

19   A.   Yes, sir.

20           MR. WARREN:  Your Honor, may I publish?

21           THE COURT:  Yes, please.

22   Q.   Can you just describe what the things are in the

23   back of that particular pickup truck?

24   A.   This is a rigging box here (indicating), looks like

25   a set of torque wrenches there and toolbox and diesel

**Robert Pickel - Direct**

1  tank is behind it (indicating).

2  Q.   The diesel tank is behind the white toolbox?

3  A.   Yes.

4  Q.   Did you carry equipment similar to this when you

5  worked at Oil States?

6  A.   Yes, sir.

7  Q.   Did you usually carry around that blue toolbox?

8  A.   I did towards the end when we got the bigger cranes

9  because it had a little bit rigging that just wouldn't

10  roll up that you could put in a regular toolbox.

11  Q.   What type of rigging is that?

12  A.   They are blue endless chokers and they are 30-foot

13  long.

14  Q.   You are going to have to help me out and explain

15  what that means.

16  A.   They're like a rubber band and they're made of

17  cloth and strands of fiber in the middle that makes them

18  strong and they are about 30-foot long and continuous

19  like a rubber band is.

20  Q.   What do you use a choker for?

21  A.   Pick up different things, wellheads, lubricator.

22  Q.   That choker, do you hook that up to the crane?

23  A.   Yes, sir.

24  Q.   And then it wraps around something?

25  A.   Yes, sir.

**Robert Pickel - Direct**

1   Q.   Is that different than a sling?

2   A.   The round endless chokers and then you have slings

3   which can be from two inches to three inches or four

4   inches wide.  It's a flat sling.

5          It's basically the same purpose but one picks

6   up more and is more durable than the other one depending

7   on the weight of what you are picking up.

8   Q.   How often when you are using the crane are you

9   using chokers and slings and chains?

10  A.   It always has something hooked to it on the

11  wellsite.

12  Q.   And all of those things, would you carry them

13  around in the work truck?

14  A.   Yes, sir.

15  Q.   And they were in one of those two boxes in the

16  back?

17  A.   Yes, sir.

18  Q.   What other types of tools did you carry in those

19  boxes?

20  A.   Grease gun, tubes of grease.

21  Q.   The same grease gun that was described to grease up

22  the crane?

23  A.   Yes.

24  Q.   Okay.

25  A.   Carry wrenches, if there's something loose on the

1   crane, you tightened it up.  You always want to keep

2   pliers with you and a crescent wrench so when you took

3   the block apart, you would be able to put it back

4   together, rope for tag lines, shackles.

5   Q.   All of that stuff you carried around in your work

6   truck?

7   A.   Yes, sir.

8   Q.   Did you work in the shop when you worked at Oil

9   States?

10  A.   Yes, sir, I did.

11  Q.   What type of work did you do in the shop?

12  A.   I did anything from pressure washing the floor,

13  sweep the floor, I painted steps, I helped pressure

14  control break down their equipment, cut O-rings, clean

15  out lubricator, change out OB parts, clean everything

16  and help them strap it down.

17  Q.   Where are you in the shop when you are doing this

18  work?

19  A.   In the shop on the floor.

20  Q.   This is like a big open garage?

21  A.   Yes, sir.

22  Q.   Did you ever work in an office or at a desk?

23  A.   No, sir.

24  Q.   Did you ever do any of the things I was asking

25  about before, budgeting and taxes and that type of

**Robert Pickel - Direct**

1    office work?

2    A.   No, sir.

3    Q.   Mr. Pickel, what type of compensation did you

4    receive from Oil States?

5    A.   I got a salary and a daily job bonus.

6    Q.   That salary, was it the same fixed salary that was

7    described before?

8    A.   Yes.

9    Q.   And what was the amount of job bonus you received?

10   A.   $480 a day for every day I was running a crane on a

11   job site.

12   Q.   All right.  Again, did the amount of job bonus

13   depend on the number of hours you worked.  In other

14   words, if you worked more than 40 hours, did the job

15   bonus become a bigger bonus?

16   A.   No, sir, it did not.

17   Q.   Could you look at Exhibit No. 11, please.

18   A.   Yes, sir.

19   Q.   What is this document?

20   A.   It looks like a payroll registry.

21   Q.   Does this appear to be your payroll records?

22   A.   Yes, it does.

23           MR. WARREN:  Your Honor --

24           THE COURT:  Yes, you may publish.

25   Q.   Robert, have you gone through these payroll records

1   and added up the amount of salary that you earned

2   between May 22nd of 2012 and May 21st of 2013?

3   A.   Yes, sir, I have.

4   Q.   Do you recall what that number is?

5   A.   I do not recall but I've added it up and I put it

6   in some notes.

7   Q.   If I gave you those notes, would it help refresh

8   your recollection?

9   A.   Yes, sir, it would.

10   Q.   Robert, I'm handing you a document.  Let me know if

11   that's the notes you were referring to.

12   A.   Yes, sir, it is.

13   Q.   You can flip through there, does that refresh your

14   recollection of the calculations you did of the amount

15   of salary that you earned from Oil States between May

16   22nd, 2012 and May 21st of 2013?

17   A.   Yes, it does.

18   Q.   What is that number?

19   A.   $41,809.

20   Q.   Have you also done the same calculation for the

21   time period from May 22nd, 2013 until you left Oil States

22   in September of 2013?

23   A.   Yes, sir.

24   Q.   What is that number?

25   A.   $11,741.

1    Q.   I will take that back.

2            When you worked at Oil States, did you clock

3    in and clock out when you worked in the shop?

4    A.   No, sir.

5    Q.   Did you keep any track of the hours that you worked

6    in the shop?

7    A.   We did a monthly man hours report.

8    Q.   And that monthly man hours report, what type of

9    information did you record in those reports?

10   A.   It was days worked -- it was basically hours worked

11   on location, hours worked in the shop and off days.

12   Q.   Why don't you turn in your binder to Tab 29.  What

13   is that document at Tab 29?

14   A.   It is an October 2012 monthly man hour report.

15   Q.   Is that your handwriting?

16   A.   Yes, sir.

17            MR. WARREN:  Your Honor, may I publish?

18            THE COURT:  Yes, please.

19            MR. WARREN:  Thank you.

20   Q.   So, could you just describe for us what type of

21   information so the ladies and gentlemen of the jury

22   could see this, what you would put in these man hour

23   reports?

24   A.   We would put the customer's name over here

25   (indicating), which was H&G Energy and hours worked over

1    here (indicating) that was spent on that job site for

2    that day.  It looks like there are some off days in

3    there, too.

4    Q.   Would you generally record your off days in the man

5    hour reports?

6    A.   Yes, sir.

7              MR. WARREN:  Can you go to the next one.

8    Q.   What is shown here on this page of the document?

9    A.   Same thing, off days and wellsite days, I mean what

10   wellsite I was on and the hours that I worked and the

11   off days.

12   Q.   When you completed these documents, what would you

13   do with them?

14   A.   Turn them in at the end of the month or whenever

15   they were due.  I don't remember when they were due.

16   Q.   When you were working at wellsites, I believe you

17   heard Mike and Jason describe tally book job logs they

18   would fill out at wellsites.  Did you fill out something

19   similar to that?

20   A.   No, sir, I didn't.

21   Q.   When you were working at a wellsite, did you keep

22   some record of the activities you were performing?

23   A.   Yes.  I would use in my phone there's an app I

24   would use notes and when I would get home when I did my

25   bonus package, I would print it out so I didn't have to

1   write it all down two or three times.

2   Q.   What type of information would you type in your

3   phone?

4   A.   What time I arrived at location, what time we went

5   on the well, what time we got off the well, that

6   happened two or three times and what time we left

7   location.

8   Q.   Could you turn to Tab 27, please.

9   A.   Okay.

10  Q.   What is that document?

11  A.   Daily job log.

12  Q.   Is this something that you prepared?

13  A.   Yes, it is.

14          MR. WARREN:  Your Honor, may I publish?

15          THE COURT:  Yes.

16          MR. WARREN:  Thank you.

17          Can you just zoom in a little bit.

18  Q.   So, generally, it looks like you would record the

19  time.  Why don't you explain what you recorded in here?

20  A.   On 3-16-2012, I recorded on location stabbed on

21  well, 6:30 p.m., left location at 7 p.m.

22  Q.   What about the next day?

23  A.   3-17-2012, on location at 7 a.m., came off Well E

24  at 8:30 a.m. and off at 11 a.m., back on Well A at 11

25  a.m. and off at 3 p.m. and left location at 7 p.m.

1   Q.   All right.  Is this typical of the information you

2   would record in your daily reports?

3   A.   Yes, sir.

4   Q.   Are you also familiar with a document called a job

5   bonus spreadsheet?

6   A.   Yes, sir.

7   Q.   Why don't you turn to Tab 28.  It should be the

8   next tab in the binder.

9   A.   Yes, sir.

10  Q.   Does that document look familiar?

11  A.   Yes.

12  Q.   Is that your handwriting in there?

13  A.   Yes, sir.

14          MR. WARREN:  Your Honor, may I publish?

15          THE COURT:  Yes.

16  Q.   So, generally speaking, what type of information

17  did you record in these documents?

18  A.   Customer's name, job type would be crane, position

19  on job, the operator, the daily bonus, what hours was

20  worked to get that bonus.

21  Q.   All right.  When you filled out these documents,

22  did you always write you were the crane operator in

23  these documents?

24  A.   Yes, sir.

25  Q.   Did you ever write that you were operating some

1   other type of equipment?

2   A.   No, sir.

3   Q.   And this bonus, the $480 bonus, what equipment were

4   you operating to receive the $480 bonus?

5   A.   I was running either a hundred ton or a hundred and

6   ten ton.

7         MR. WARREN:   Thanks, Milly.   You can pull that

8   down.

9   Q.   Earlier we have been discussing this job bonus.

10  Have you gone through and tried to estimate the number

11  of job bonuses you received at Oil States?

12  A.   Yes, sir.

13  Q.   Did you do that using this paperwork we just

14  described?

15  A.   Yes, our man hour reports and my daily job logs.

16  Q.   Can you just describe how you used this paperwork

17  to try to figure out how many job bonuses you earned at

18  Oil States?

19  A.   I went through and whatever day you said I was on

20  the job, on a location, then that's how I added up the

21  job bonus.

22  Q.   What if you were on location for 24 straight hours,

23  would you receive any -- did the amount of your job

24  bonus change?

25  A.   Yes, sir.

**Robert Pickel - Direct**

1   Q.   How did that change?

2   A.   If you are on a wellsite for 24 hours, you would

3   get two job bonuses.

4   Q.   Okay.  And did you try to figure that out when you

5   were going through the documents and adding this up,

6   trying to figure out how many jobs you were working 24

7   straight hours?

8   A.   Yes.

9   Q.   Have you gone through and actually done that

10  calculation and tried to figure out the number of job

11  bonuses you earned between May of 2012 and May of 2013?

12  A.   Yes, sir, I have.

13  Q.   Do you remember the number off the top of your

14  head?

15  A.   No, I don't.  It's in my notes.

16  Q.   If I gave you the notes, would that help refresh

17  your recollection?

18  A.   Yes, sir, it would.

19  Q.   Sir, if you could please thumb through that and see

20  if that refreshes your recollection of the estimates you

21  have done of the number of job bonuses received between

22  May 22nd of 2012 and May 21st of 2013.

23  A.   Yes, sir, it does.

24  Q.   What was the number of job bonuses you received in

25  that period according to the estimates you have done?

**Robert Pickel - Direct**

1  A.   From 5-22 --

2  Q.   5-22-12 to 5-20-13.

3  A.   226.

4  Q.   What was the dollar amount of the bonus?

5  A.   $108,480.

6  Q.   Okay.  Have you done a similar estimate of the

7  number of bonuses you received between 5-22-13 and when

8  you left the company in September of 2013?

9  A.   Yes, sir.  It was 61.

10  Q.   What was the dollar value of those bonuses?

11  A.   $29,280.

12  Q.   I'll take that back from you, please.

13        Mr. Pickel, have you also gone through and

14  tried to estimate the number of hours that you worked at

15  Oil States between 2012 and 2013?

16  A.   Yes, sir.

17  Q.   Can you please just describe for the ladies and

18  gentlemen of the jury how you went through and tried to

19  add up your work hours?

20  A.   I went through my man hour reports and daily job

21  logs and came up with the best estimate I could that

22  seemed fair.

23  Q.   What about your travel time, when you prepared the

24  estimates of the hours you worked, did you include any

25  travel time in those estimates?

**Robert Pickel - Direct**

1    A.    Yes, sir.

2    Q.    What type of travel time did you include in your

3    estimates?

4    A.    Included 45 minutes in the travel time.

5    Q.    And when you say 45 minutes, what type of travel

6    are you referring to?

7    A.    That's to and from location.

8    Q.    Why did you use 45 minutes as part of your

9    estimates?

10   A.    Because it seemed to be a fair and adequate number

11   versus an hour and a half.  I mean we drove anywhere

12   from 30 minutes to an hour and 30 minutes to an hour and

13   45 minutes one way.

14             So, instead of trying to go through and figure

15   all that out, we just figured 45 minutes to and from.

16   Q.    Okay.  And when you were doing those trips back to

17   and from the hotel, what type of vehicle were you

18   operating?

19   A.    2011 F-250 that was provided to me.

20   Q.    That was your company assigned truck?

21   A.    Yes, sir.

22   Q.    When you went through and did these estimates, did

23   you come up with an estimate of the total number of

24   hours you worked between May 22 of 2012 and May 21 of

25   2013?

**Robert Pickel - Direct**

1   A.   Yes, sir.

2   Q.   Do you remember that number off the top of your

3   head?

4   A.   No, sir, I don't.

5   Q.   Would it refresh your recollection to look at your

6   notes?

7   A.   Yes, sir.

8   Q.   Please provide the ladies and gentlemen of the jury

9   with an estimate of the total number of hours you worked

10  between May 22nd of 2012 and May 21st of 2013.

11  A.   3,632.

12  Q.   Have you gone through and tried to figure out how

13  many overtime hours you worked in that time period?

14  A.   Yes, sir.

15  Q.   Explain for the jury, please, how you did that

16  process?

17  A.   Basically whatever was worked in a workweek,

18  whatever was over 40 hours, that's how I come up with my

19  overtime hours.

20  Q.   Have you actually done that on a week-by-week basis

21  for the entire period May 2012 and when you left in

22  2013?

23  A.   Yes, sir.

24  Q.   Can you please tell the ladies and gentlemen of the

25  jury how many overtime hours you estimate you worked

**Robert Pickel - Direct**

1   between May 22nd of 2012 and May 21st of 2013?

2   A.    1,783.

3   Q.    Have you done a similar calculation of the total

4   hours you work between May of 2013 and when you left the

5   company?

6   A.    Yes, sir, a thousand forty-five.

7   Q.    And what about overtime hours in that period?

8   A.    498.

9   Q.    Let me take that document back from you, please.

10              Once you went through and did these

11  calculations of the total number of hours that you

12  worked in these periods, did you try to figure out the

13  number of overtime hours you worked in a typical week?

14  A.    Yes, sir.

15  Q.    Do you remember that number of the overtime hours

16  you worked in a typical week?

17  A.    30, 34.

18  Q.    Does that seem like an accurate estimate of the

19  number of overtime hours you were working in 2012, 2013

20  at Oil States?

21  A.    Actually, it is way less than what we actually

22  worked.

23  Q.    Why do you say that?

24  A.    Well, because we was turning in 85, 90, 100 hours a

25  week.

**Robert Pickel - Direct**

1   Q.   And if you were working weeks with so many hours,

2   why have you provided the ladies and gentlemen of the

3   jury with a calculation of 34 hours of overtime per

4   week?

5   A.   Because that's what seems fair to me.

6   Q.   Why did that seem fair to you?

7   A.   It seemed fair because on our 30 -- we worked 30

8   days on and 10 days off.  So, you can't go in there and

9   calculate 40 days worth of overtime.

10          So, instead of charging the 50, 60, 70, 80

11  hours overtime, we just calculated 34.

12  Q.   Is that estimate of 34 a week, is that based on a

13  day-by-day calculation of how many hours you estimate

14  you worked every day between May 2012 and September of

15  2013?

16  A.   Yes, it was.

17  Q.   Do you believe these estimates you just provided to

18  the jurors, do you believe these are reasonable and

19  accurate estimates?

20  A.   With the information that was provided to me, I

21  believe it was a conservative figure and fair.

22  Q.   What are you asking the ladies and gentlemen of the

23  jury to award you in this case?

24  A.   I'm not.  I don't have a figure on that.  I never

25  added that up.

Robert Pickel - Cross

1    Q.    Why are you not familiar with the dollar amount?

2    A.    Because I'm not sure how they add that, where that

3    comes from, who it comes from or anything else.

4    Q.    Okay.  So, putting the dollar amount aside, are you

5    confident that the hours estimates that you provided

6    these calculations you have done, are you satisfied and

7    confident that those don't overstate the hours you

8    worked at Oil States?

9    A.    Yes, sir, I am.

10             MR. WARREN:  No further questions, Your Honor.

11             THE COURT:  Thank you.

12             Do you wish to cross-examine?

13             MR. STUKENBERG:  I do.

14             THE COURT:  Ladies and gentlemen, if you wish

15   to stand and stretch your legs, you may do so.

16             (Pause in the proceedings.)

17                     CROSS-EXAMINATION

18   BY MR. STUKENBERG:

19   Q.    Good afternoon, Mr. Pickel.

20   A.    How are you?

21   Q.    How are you?

22   A.    Pretty good.

23   Q.    You left Oil States in July of 2013, is that right?

24   A.    I don't remember the date, but yeah, that sounds

25   right.

Robert Pickel - Cross

1  Q.   And you were terminated for submitting a fraudulent

2  expense reports?

3  A.   Yes, sir, I was.

4  Q.   And you used your company credit card to go

5  purchase personal items for your truck?

6  A.   When I first hired on with Oil States, we were

7  allowed to go buy drinks, I mean, no matter what kind of

8  drink it was, Dr. Pepper, water, whatever.  That got a

9  little tighter as manager and manager went on, yes.

10  Q.   But you weren't terminated for buying a drink, you

11  were terminated for buying equipment for your personal

12  vehicle --

13  A.   No, sir.  I had the oil changed in my truck.

14  Q.   If I could finish my question.

15  A.   I'm sorry.

16  Q.   You were terminated for submitting fraudulent

17  expense report for something you purchased for your

18  personal truck, is that correct or not?

19  A.   No, sir.

20  Q.   Did you submit an expense report for a personal

21  item that you purchased for your truck?

22  A.   No, sir, I don't believe I did.

23  Q.   Okay.  What is your understanding for why you were

24  terminated?

25  A.   I used my company credit card to pay for an oil

Robert Pickel - Cross

1  change that I had on my personal truck.

2  Q.   An oil change?

3  A.   Yes.

4  Q.   Did you purchase any other items beyond an oil

5  change for your personal vehicle?

6  A.   No, sir, not other than -- my termination was due

7  to the oil change and the drinks that I had been

8  purchasing other than water.

9  Q.   And the charge for the oil change is several

10  hundred dollars, wasn't it?

11  A.   I don't remember.  A couple hundred bucks, maybe

12  two or three, I'm not sure.

13  Q.   That seems like a lot for an oil change, doesn't

14  it?

15  A.   No.

16  Q.   Is an oil change typically several hundred dollars?

17  A.   In a diesel powered vehicle, yes.

18  Q.   I also wanted to ask you and I quoted this, your

19  attorney asked you could you have done the job if you

20  didn't have the truck with your equipment and you

21  answered no, correct?

22  A.   Yeah.

23  Q.   Do you remember testifying differently at your

24  deposition?

25  A.   I don't remember what I --

1    Q.    In your deposition on Page 143, Line 10.

2            In other words, could you actually get the job

3    done if you didn't have a truck?

4            Yes.

5            Question:  How so?

6            Answer:  You just have to sit with the crane.

7            That's how you testified in your deposition,

8    right?

9    A.    If it says that, yes, sir.

10   Q.    Why is your story changing now?

11   A.    It's not changing.  I mean once you get the

12   location in and everything is actually set up, then all

13   you have to do is run the crane.  You still have to get

14   back and forth to location.

15   Q.    But your testimony in the deposition was you didn't

16   have to have the truck, right?

17   A.    I guess I didn't explain it in detail then.

18   Q.    And you said you have to get back and forth, so the

19   truck allowed you to commute back and forth to the

20   wellsite?

21   A.    Yes.

22   Q.    Your lawyer also asked you about shop days,

23   correct?

24   A.    Yes.

25   Q.    And I wrote down you cleaned lubricators, swept the

**Robert Pickel - Cross**

1  floor.  What else did you say you did in the shop?

2  A.   Painted stairs, pressure washed the floor, helped

3  grease operators clean their packages, clean the crane.

4  Q.   Does that mean you would load and unload packages?

5  A.   Yes, sir.

6  Q.   Do you remember testifying differently in your

7  deposition?

8  A.   No, I don't.

9  Q.   On Page 38, Line 21.

10        Question:  Okay.  Besides cleaning the crane,

11  would you perform any other duties in the shop?

12        Answer:  No, ma'am.

13        Question:  Were you ever asked to load or

14  unload packages?

15        Answer:  No.

16        Question:  Never?

17        Answer:  No, I wasn't.

18        Now, from that deposition testimony it sounds

19  like the only thing you did at the shop was clean the

20  crane, right?

21  A.   Sure.

22  Q.   So, why is your story changing now?

23  A.   I was pretty nervous at that deposition.  I never

24  went through anything like this before.

25  Q.   You were nervous at the deposition but you are

Robert Pickel - Cross

1   telling the truth now, is that what you want the jury to

2   believe?

3   A.   I don't understand the question.

4   Q.   Well, were you telling the truth at your deposition

5   or are you telling the truth now?

6   A.   We unloaded trucks and trailers and cleaned and

7   everything I just said, yes, sir.

8   Q.   So, why in your deposition did you say you didn't

9   do that?

10  A.   I'm not sure.

11  Q.   In your deposition you were under oath, right?

12  A.   Yes, sir.

13  Q.   You swore to tell the truth, correct?

14  A.   Yes, sir.

15  Q.   And you didn't work in the shop much, did you?

16  A.   In between jobs.

17  Q.   How often would you --

18  A.   I stayed in the field mostly.

19  Q.   How often were you in the shop?

20  A.   I'm not sure.

21  Q.   Do you remember testifying in your deposition that

22  you almost never went to the shop?

23  A.   No.  I don't remember what I testified.  What I'm

24  saying is I don't know how many days that I was in the

25  shop.

Robert Pickel - Cross

1   Q.   Is it fair to say you were very rarely in the shop?

2   A.   In the beginning, yes, sir, that's fair to say

3   that.

4   Q.   Did that change at some point?

5   A.   When Oil States slowed down, then we were in the

6   shop.

7   Q.   In your deposition you were asked a question on

8   Page 39, Line 4.

9        Okay.  How often did you work in the shop?

10       And the answer was:  Not very often.

11       Do you stand by that answer?

12  A.   Yes, sir.

13  Q.   You testified that you brought a lot of equipment

14  out to the wellsite and you mentioned a spread bar and a

15  wire rope slings for picking up the pressure control, is

16  that correct?

17  A.   Yes, sir.

18  Q.   Isn't that set with the grease unit?

19  A.   Sometimes it is, sometimes it ain't.

20  Q.   Isn't it always part of the grease package?

21  A.   No, sir, it is not.  There are times that it is

22  not.

23  Q.   Isn't the grease package the same equipment each

24  time?  I thought we heard testimony from the other

25  plaintiffs that's true, the grease package is always the

**Robert Pickel - Cross**

1    same package?

2    A.    Yeah, I'm not saying it's not.  What I'm saying is

3    the rigging is not always with it.  Sometimes it can be

4    in your truck, depending on how you took it off in the

5    beginning.

6    Q.    But it's packed with the grease unit, right?

7    A.    Most of the time, yes, but not all.

8    Q.    Not every time?

9    A.    No.

10   Q.    You did a lot of work with H&G, correct?

11   A.    Yes.

12   Q.    And they only worked Monday through Friday,

13   correct?

14   A.    If I remember right, yes.

15   Q.    They didn't work any weekends, correct?  Is that

16   right?  I need you to answer verbally.

17   A.    I'm not sure.  It's been three or four years ago.

18   Q.    I understand.

19   A.    But I do remember it not being the normal working

20   frack site.  We worked daylight hours only.  It was like

21   five, six hours a day, maybe eight, sometimes 12 and 18.

22   Q.    It was only Monday through Friday?

23   A.    Yes, sir, I guess.

24   Q.    It was daylight hours?

25   A.    Yes, sir.

**Robert Pickel - Cross**

1  Q.   You worked extensively with H&G, correct?

2  A.   I want to say probably three, four, maybe five

3  months.

4  Q.   Just for H&G?

5  A.   Yes.

6  Q.   You actually scheduled your own jobs with H&G, they

7  hired you directly, correct?

8  A.   No, sir.

9  Q.   You didn't facilitate working with H&G by talking

10  to the company man about what the next project would be?

11  A.   No.

12  Q.   Let's turn to and if you would open the binder to

13  Tab 202.

14  A.   Yes, sir.

15  Q.   Have you seen that document before?

16  A.   I'm guessing it's a payroll stub, pay stub.

17  Q.   It's got your name on it?

18  A.   Yes, sir, it does.

19            MR. STUKENBERG:   Your Honor, could we publish

20  it?

21            THE COURT:   Yes.

22  Q.   This is your pay stub for the pay period ending

23  December 21st, 2012, is that right?

24  A.   Yes, sir.

25  Q.   And it shows what you made for that pay period,

Robert Pickel - Cross

1  which was $1,692 in salary, correct?

2  A.   Yes, sir.

3  Q.   And then it shows you made $3,200 in bonus pay for

4  that pay period?

5  A.   Yes, sir.

6  Q.   And how long was a pay period?

7  A.   Every two weeks.

8  Q.   So, then you got a housing DW and a per diem around

9  another $650, is that right?

10 A.   Yes, sir.

11 Q.   So, for this two-week pay period, you made a little

12 over $5,000, is that right?

13 A.   Yes, sir.

14 Q.   If we look at the bottom, we get a gross

15 year-to-date number?

16 A.   Yes, sir.

17 Q.   It looks like you made $167,000 after September 21,

18 2012, that year?

19 A.   Yes.

20 Q.   How much more do you think Oil States should have

21 paid you?

22        MR. WARREN:   Objection, Your Honor.

23        THE COURT:   Sustained.

24 Q.   You mentioned since you left, you have worked as a

25 crane operator at Maxim, TNT, and Peter, is that

1   correct?

2   A.   Yes, sir.

3   Q.   You got an hourly rate I believe you said?

4   A.   Yes, sir.

5   Q.   What was your hourly rate at Maxim?

6   A.   It was $39.63 I think an hour.

7   Q.   What about at TNT?

8   A.   At TNT, it was $37.50.

9   Q.   You mentioned a Peter Kiewit?

10  A.   Yes, sir.

11  Q.   What was your hourly rate there?

12  A.   $41.63.  That was a union scale.

13  Q.   Your total compensation at Maxim, TNT, and Peter

14  Kiewit was much less than Oil States, right?

15  A.   I don't know.  I haven't -- I make just about the

16  same money now that I did then.

17  Q.   You make $167,000 a year?

18  A.   Yes, sir, I think I did.

19  Q.   If we could, let's flip to your Tab 303.

20  A.   You said 303?

21  Q.   I'm sorry.  203.

22  A.   Yes, sir.

23  Q.   Do you recognize this document?

24  A.   Yes, sir, I do.

25  Q.   Can you identify that for me, please?

**Robert Pickel - Cross**

1    A.    It is also a pay stub.

2    Q.    And this is dated September 27, 2013?

3    A.    Yes, sir.

4    Q.    You mentioned you left in September of '13, is that

5    correct?

6    A.    I don't know what the date is.

7    Q.    Sometime in that range?

8    A.    Yes, sir.

9    Q.    So, if we look at the year-to-date total on Exhibit

10   203, it looks like as of September, you had made

11   $130,627.99, is that right?

12   A.    Yes, sir.

13   Q.    So, you would have earned well over a hundred

14   thousand dollars in '13 had you stayed with Oil States?

15   A.    Yes, sir.

16   Q.    Had you not been separated for the transaction

17   involving your company credit card?

18   A.    Yes, sir.

19   Q.    You trained a lot of other employees, didn't you?

20   A.    Yes, sir, I helped train a couple of the guys.

21   Q.    What were your responsibilities on training?

22   A.    I would bring them out, let them run the crane, get

23   a few hours on the crane with supervising so they would

24   feel more comfortable in the field when they went out by

25   themselves.

Robert Pickel - Cross

1   Q.   That was part of your job duties to train less

2   seasoned crane operators?

3   A.   It was something that was asked of me during my

4   time there but it wasn't part of my regular, when I was

5   hired in.  I was just hired as a crane operator.  It

6   just so happened I had 27 years experience.

7   Q.   One of your job duties was not to perform general

8   maintenance, correct?

9   A.   No, sir.  I'm saying we did do general maintenance.

10  Q.   Oh, you did do general maintenance out on the

11  wellsite?

12  A.   We would make sure the crane was greased, make sure

13  the cable was good.  We didn't change the oil.  They

14  sourced that out through the company they rented the

15  cranes from.

16  Q.   What about cleaning equipment, is that something

17  you did?

18  A.   Yes, sir.  If it was asked of me, I did.

19  Q.   Do you remember testifying differently at your

20  deposition?

21  A.   I don't.

22  Q.   On Page 29, Line 4 of your deposition the question

23  is:

24          Question:  So, you could have performed other

25  duties out on the worksite, like I heard some general

1    maintenance, I heard cleaning equipment, things of that

2    nature?

3              Answer:  No.

4              So, is that something you did or didn't do?

5    A.   We didn't change the oil or anything like that.  We

6    kept up with the windows being cleaned, making sure the

7    cable was greased properly for daily use.  I never

8    changed the oil in a crane.

9    Q.   And you mentioned in your deposition greasing the

10   crane.  I think you said that takes less than ten

11   minutes, is that right?

12   A.   It actually takes longer than that.  If I said ten

13   minutes --

14   Q.   How long do you think it takes?

15   A.   To do it all the way to the bottom of the drum, an

16   hour, two hours.

17   Q.   In your deposition on Page 86, Line 19, the

18   question was:

19              How long would it take you to grease the block

20   and the cable?

21              Answer:  Maybe ten minutes.

22   A.   The block itself takes ten minutes.  You have three

23   or maybe four grease certs on there.  You put five pumps

24   of grease in each one and it might take ten minutes.

25   Q.   It takes about ten minutes to do that?

1    A.    Yes, sir.

2    Q.    Do you recall in your deposition we asked -- you

3    were asked questions about a crane operator job

4    description?

5    A.    I don't recall talking about it then, no.

6    Q.    Did you ever receive a crane operator job

7    description while you were employed at Oil States?

8    A.    Yes, sir.

9    Q.    When did you receive that?

10   A.    When I first hired in.

11   Q.    Who gave it to you?

12   A.    John Ward.

13   Q.    Do you have a copy of that?

14   A.    Oh, no, sir.

15   Q.    When did you hire in?

16   A.    I want to say it was October or November of '10,

17   maybe.

18   Q.    So --

19   A.    I know it was October or November.  I don't know

20   the year.

21   Q.    You do or don't know the year?

22   A.    I don't know the year.

23   Q.    Do you think it was 2010?

24   A.    I don't know.

25   Q.    You were certainly employed before January 1st,

**Robert Pickel - Cross**

1  2012?

2  A.   Yes.

3  Q.   We heard some testimony earlier about the

4  crane -- the hundred ton crane, if I'm accurate, would

5  always use the same counterweights.  Do you have that

6  same opinion?

7  A.   Every job that I've ever taken, yes, sir.

8  Q.   Isn't it true that if you entered the wrong

9  counterweight in the computer on the crane, that you

10  could actually lift up a load that exceeded the crane's

11  weight?

12  A.   If you entered in more than what, than a lesser

13  amount, then, yes, but the way these new manufacturers

14  have the crane, it will not -- it recognizes by sensors

15  what is hanging on the back of the crane as far as

16  weight.

17          So, if you put in 6,900 or there is not a

18  number on there, it will know.

19  Q.   And is it your testimony that was true of the

20  110-ton crane at Oil States?

21  A.   Yes, sir.

22  Q.   Let's pull up Exhibit 29, which I believe your

23  lawyer asked you some questions about.

24          THE COURT:  You may publish.

25  Q.   I want to go to a page your lawyer asked you about,

1   it's 21990.  This is your man hour report, right?

2   A.   Yes, sir, it is.

3   Q.   You indicated that you used these documents to come

4   up with an hours worked estimate, right?

5   A.   Yes, sir.

6   Q.   I see this is for November and it says on November

7   31st you worked 12 hours?

8   A.   Yes, sir.

9   Q.   Is that correct?

10  A.   Yes, sir.

11  Q.   And you represent today that you worked 12 hours on

12  November 31st?

13  A.   Yes, sir, that's what it says there.

14  Q.   You mentioned in a question by your lawyer that you

15  took these numbers and tallied them up.

16          You didn't transpose these numbers from your

17  tally book and man hour report to add them up, did you?

18  A.   I don't understand.

19  Q.   You didn't take these numbers and transpose them?

20  A.   Transpose meaning?

21  Q.   Write them down and add them up.

22  A.   I went through here and added hours.

23  Q.   So, you went through these and added them up

24  yourself from the tally book?

25  A.   I never had a tally book.  I had a man hour report

Robert Pickel - Cross

1    and I used my phone.

2    Q.   Okay.  So, you used your phone to go through your

3    man hour reports to add up all the hours worked?

4    A.   No, sir.  You just asked me did I use a tally book

5    and I said no, sir.  I kept up with all my information

6    in my phone to transfer over to a bonus -- in our bonus

7    package paperwork that was what we needed to do which

8    was our daily job log we had to keep up with.

9              I kept up with what I had done daily, hour to

10   hour on my phone and then I put it into the job log.

11   Q.   I apologize.  I didn't ask a good question.  What

12   I'm asking about is how you got to the total number of

13   hours you worked and the total overtime hours that you

14   testified about?

15   A.   I went through my daily job logs that I got from

16   Oil States in my man hour reports, the ones that were

17   given to me.

18   Q.   And you went through those documents and added them

19   up?

20   A.   Yes, sir, I did.

21   Q.   And you actually went through each tally book to do

22   so?

23   A.   You mean each man hour report and each job log?

24   Q.   You went through all of those and tallied them

25   yourself?

Robert Pickel - Cross

1   A.   The ones that were provided to me, yes, I did.

2   Q.   The man hour reports that were produced to you?

3   A.   Yes.

4   Q.   That's where you got your estimate?

5   A.   Yes, sir.

6   Q.   That included November 31st?

7   A.   Yes, sir.

8   Q.   You were paid your salary even when you didn't

9   work?

10  A.   Yes, sir.

11  Q.   You were paid your job bonus when you were on

12  standby?

13  A.   Yes, sir.

14  Q.   And you were paid your job bonus whether you worked

15  six hours or 12 hours, you got the job bonus?

16  A.   Yes, sir.  As long as Oil States was able to get

17  paid, then they would pay us, yes.

18  Q.   It wasn't an hours-based pay?

19  A.   No.

20  Q.   Let's turn to Exhibit 27.  We see here you are on

21  standby 6-16 and 6-17 -- Page 5.  So, on this document

22  you'll see here, for instance, on 8-20, it says you

23  arrived at 7 a.m., 2 p.m., left location, and then

24  underneath it's got 7 p.m.

25          Would you record that as a 12-hour day?

Robert Pickel - Cross

1   A.   On location start rigging up at two p.m. left

2   location.  If we was on location at two p.m., we were at

3   the shop before then getting ready for it.  I would have

4   to say yes.

5   Q.   So, you counted that as a 12-hour day?

6   A.   Yes, sir.

7   Q.   And the next entry says six a.m., on location, came

8   off and back at two p.m., left location.

9        Is that a 12-hour day?

10  A.   Yes, sir.

11  Q.   And do you know if you left at two or six?

12  A.   I would have to say I left at two.

13  Q.   Do you know how you counted it in your hours worked

14  estimate?

15  A.   As eight hours.

16  Q.   Do you know that?

17  A.   I'm pretty sure of it, yes, sir.

18  Q.   On 8-22, 8-23, 8-24, you were on standby call.

19  Standby on call, correct?

20  A.   Yes, sir.

21  Q.   Do you count that as 12 hours?

22  A.   No, sir.  Eight.

23  Q.   You count standby time as eight?

24  A.   Yes.

25  Q.   You received your salary for that day, right?

Robert Pickel - Cross

1   A.   Yes.

2   Q.   And you received your job bonus that day, right?

3   A.   I'm sure I did, yes.

4   Q.   And you didn't work that day, right?

5   A.   I was still on call.  It's not like it was a

6   free-for-all day, and I could just run and take care of

7   what I needed to take care of.  I still had to be ready

8   to go as soon as they called.

9   Q.   Right.  If they called you, you had to head out,

10  but you could go out to dinner and watch TV?

11  A.   Yes.

12  Q.   You are claiming you should have been paid overtime

13  for that day, too, right?

14  A.   What was the question?  Did you ask me a question

15  about that?

16  Q.   Yes.  I'm sorry.  Are you claiming you should be

17  paid overtime for the time that day, correct?

18  A.   I'm claiming to be paid overtime for whatever hours

19  I worked, yes.

20  Q.   You are counting that time where you were paid a

21  job bonus and a salary but you didn't work?

22  A.   Yes, sir.  If it fell anything after 40 hours,

23  then, yes, sir, I would have counted it as overtime

24  hours.

25  Q.   Understood.  In your hours worked estimate, you

1    said between May 22nd of 2012 and May 21st, 2013, you

2    worked 3,632 hours?

3    A.   Yes, sir.

4    Q.   How much of that was travel time?

5    A.   I don't remember.  I didn't separate it all.

6    Q.   Do you remember how much was standby time where you

7    were paid a salary and a bonus but didn't actually go to

8    the wellsite?

9    A.   No, sir, I don't.

10            MR. STUKENBERG:  Pass the witness.

11            THE COURT:  Counsel, do you wish to redirect?

12            MR. WARREN:  Yes, Your Honor.  Just briefly.

13                    REDIRECT EXAMINATION

14   BY MR. WARREN:

15   Q.   Mr. Pickel, do you remember some questions about

16   the man hour report and November 31st on the man hour

17   report?

18   A.   Yes, sir.

19   Q.   Do you remember what time of month would you

20   typically fill out those man hour reports?

21   A.   At the end of the month.

22   Q.   Do you remember if it was right at the end of the

23   month or if it was a little bit before the end of the

24   month?

25   A.   It was probably a little bit before, a week or so.

**Robert Pickel - Redirect**

1    You try to get it all together for when it was due.

2    Q.   Do you recall whether Oil States had some policy of

3    requiring you to fill out the prior month's hours on a

4    particular man hour report?

5    A.   I don't remember how all that --

6    Q.   You don't remember?

7    A.   No, sir.

8    Q.   Okay.  No problem.

9         One other question.  I wanted to ask you about

10   the training you performed.  When you were training

11   someone at a wellsite, were you performing your regular

12   crane operator duties on those days?

13   A.   Yes, sir.

14   Q.   Could you just describe for the ladies and

15   gentlemen of the jury what happened when someone was

16   sent to the wellsite with you, what was going on?

17   A.   What would happen is they would -- normally

18   stand -- like, say this is your operator's cab

19   (indicating).  You have a deck right here (indicating).

20   They would stand there (indicating) and watch what you

21   were doing.

22        You would explain to them you have to be

23   gentle or you have to watch this, make sure you watch

24   for that.

25        They would observe you for a few days, and

1    then I would stand out there and let them run it while I

2    was standing there to observe them if they were smooth

3    with it and stuff like that.

4    Q.   When you had someone with you at a wellsite, were

5    you still responsible for operating the crane on that

6    job?

7    A.   Yes, sir.  I was responsible for the safe

8    operation, making sure that everything made it to the

9    well smoothly, without tearing anything up, making sure

10    the trainee didn't hit anything.

11         I was still ultimately responsible for the

12    crane and the operations of it.

13    Q.   On those times when someone was with you at the

14    wellsite, were pressure control operations going on as

15    normal on those days?

16    A.   Yes, sir, there was.

17    Q.   Did Oil States at some point ask you if they could

18    send out someone to do what you described, to watch you

19    operate the crane?

20    A.   To watch me?

21    Q.   Yes.  The situation you described, did Oil States

22    say we'd like to send this person out to watch you?

23    A.   Yes, sir.

24    Q.   How did it first come up when someone was sent out

25    with you to a wellsite, do you remember?

1   A.   It would just -- they would call.  It was either

2   established before we left the shop, hey, such and such,

3   we don't have anything for him to do or he needs some

4   training on the crane, can you take him with you and

5   show him the safe operations work or either they would

6   send him out in the middle of the job.

7   Q.   Were you happy to have those people come out and

8   watch you?

9   A.   Yes, sir.  I have always been willing to teach and

10  whatever I could do.  It was taught to me and passed

11  along to me, so I would do the same for others.

12  Q.   Did Oil States pay you any extra compensation when

13  they sent anyone out there with you?

14  A.   No, sir.

15  Q.   Did Oil States ever send more than one person out

16  to watch you on any given day?

17  A.   No, sir.

18          MR. WARREN:  I don't have anything further.

19          THE COURT:  Thank you.

20          Any recross briefly on that scope?

21          MR. STUKENBERG:  Yes, Your Honor.

22                RECROSS-EXAMINATION

23  BY MR. STUKENBERG:

24  Q.   You mentioned and this came up during a 12-hour

25  shift on November 31st?

**Robert Pickel - Recross**

1   A.   Yes, sir.

2   Q.   There aren't 31 days in November, are there?

3   A.   I'm not sure.

4   Q.   But you in your calculation to the jury submitted

5   that you worked 12 hours on a day that doesn't exist?

6   A.   If that's what I wrote down, then, yes, sir, I

7   guess I did.

8   Q.   You testified in your deposition that your estimate

9   had some inaccuracies?

10  A.   Yes, sir.

11  Q.   Does that continue to be the case?

12  A.   With what information that I had to go through that

13  was given to me, I did the best that I could to come up

14  with an estimate.

15          If there are still discrepancies in there, I'm

16  sure there is one or two.  I'm sure you could find one

17  here and there.

18  Q.   I didn't find that one.  Your lawyer just randomly

19  pulled that document up.

20  A.   I'm just saying I'm pretty sure there are still

21  discrepancies.  You look over anything enough, you'll

22  find them.

23          MR. STUKENBERG:  Pass the witness, Your Honor.

24          THE COURT:  Thank you, sir.

25          Your testimony is complete.  You may step down

```
 1    from the stand with the Court's appreciation.

 2              You are welcome to stay during the trial.

 3              Plaintiff, do you wish to call forth your next

 4    piece of evidence?

 5              MR. WARREN:  We would like to play the

 6    deposition testimony of Terry Woodall.

 7              THE COURT:  Can you give me for scheduling

 8    purposes the time on that?

 9              MR. WARREN:  Your Honor, I don't think it's

10    going to take more than 20 minutes.

11              THE COURT:  Okay.  Thank you.

12              MR. WARREN:  What we are planning to do is

13    both sides have designated some portions.  We are going

14    to play our portions on direct and play their portions

15    on cross.

16              THE COURT:  It's not sequential?

17              MR. WARREN:  It is split up in the way the

18    parties designated.

19              THE COURT:  It's already set that way, right?

20              MR. WARREN:  That's the way the video is done.

21              THE COURT:  So, again, what is the date and

22    time of this deposition?

23              MR. WARREN:  The deposition was taken on June

24    17, 2016.

25              THE COURT:  Of whom?
```

1              MR. WARREN:  It was taken of Terry D. Woodall.

2              THE COURT:  Where does Mr. Woodall work or

3     what is his title?

4              MR. WARREN:  Mr. Woodall, at the time of the

5     deposition, he was the vice president of Human Resources

6     for Oil States and he works at their corporate

7     headquarters.

8              THE COURT:  Thank you.  You may proceed.

9              This time you get to see the witness on a

10    videotape.  This is Mr. Woodall and you're going to

11    hear -- this is going to be more like evidence, what the

12    plaintiff wants from that evidence and then you are

13    going to hear what the defense wants from that evidence.

14             You may proceed.

15             (Whereupon, excerpts of the videotaped

16    deposition of Terry Woodall was played for the jury.)

17             THE COURT:  Does that close the testimony?

18             MR. WARREN:  It does, Your Honor.

19             THE COURT:  Thank you very much.

20             All right, ladies and gentlemen, we are going

21    to take a ten-minute break, so you can stretch your legs

22    and move around.

23             So, we'll stand and rise for you and be ready

24    when you are.

25             I promise I won't be on the phone and I will

 1  be ready when you are ready to come back.

 2            Thank you.

 3            (Whereupon, the jury exited the courtroom.)

 4            (Whereupon, a break was taken.)

 5            THE DEPUTY CLERK:  All rise.

 6            (Whereupon, the jury entered the courtroom.)

 7   (In open court, jury present.)

 8            THE COURT:  Please be seated.

 9            Plaintiff, you may call your next piece of

10  evidence.

11            MR. WARREN:  Thank you, Your Honor.

12            Plaintiff would call Mr. Wayne Eddy to the

13  stand.

14            THE DEPUTY CLERK:  Sir, please raise your

15  right hand.

16            WAYNE EDDY, a plaintiff herein,

17  having been duly sworn, testified as follows:

18            THE DEPUTY CLERK:  Please be seated and please

19  state and spell your name for the record and speak into

20  that microphone.

21            THE WITNESS:  Good afternoon.  My name is

22  Wayne Eddy, W-a-y-n-e, E-d-d-y.

23            THE COURT:  Good afternoon.

24            You may proceed, Counsel.

25            MR. WARREN:  Thank you, Your Honor.

1                    DIRECT EXAMINATION

2     BY MR. WARREN:

3     Q.    Wayne, could you please tell the jurors where you

4     currently live.

5     A.    Guys Mills, Pennsylvania.

6     Q.    Where is Guys Mills located?

7     A.    About 100 miles north from here.

8     Q.    Where are you originally from?

9     A.    Guys Mills, Pennsylvania.

10    Q.    Let's cut straight to the chase.  Was there some

11    point where you worked for Oil States Energy Services?

12    A.    Yes, there was.

13    Q.    What was the time period you worked for Oil States?

14    A.    Right around 2011 to 2015.

15    Q.    Which location of Oil States were you working at?

16    A.    The Canonsburg shop out of Washington,

17    Pennsylvania.

18    Q.    How did you learn about Oil States before you

19    worked there, when you applied there?

20    A.    Actually, my son worked there as a hand.

21    Q.    Can you describe what type of work he was doing as

22    a hand?

23    A.    He was just in the shop doing anything from

24    painting, lubricating, pressure testing, sweeping

25    floors, whatever they needed him to do.

**Wayne Eddy - Direct**

```
 1            He would clean the packages, he
 2   would help prepare the packages to go out that needed to
 3   go out on the job at that time.  The shop hands did
 4   that.
 5   Q.   What is your son's name?
 6   A.   Andy.
 7   Q.   What time period was Andy working in Oil States?
 8   A.   I can't remember when he did start at Oil States,
 9   sir.
10   Q.   How long did he overlap with you?
11   A.   He overlapped with me I would say about a year.
12   Q.   Do you recall whether Andy was getting paid
13   overtime while he was working there?
14   A.   Yes.
15   Q.   What did Andy tell you about Oil States?
16   A.   How good a place it was to work and he enjoyed the
17   people that worked there and they also had cranes and
18   so, I was interested in maybe going into employment with
19   them.
20   Q.   So, did you apply to work at Oil States?
21   A.   Yes, I did.
22   Q.   Did you fill out a written job application?
23   A.   Yes, I did.
24   Q.   Could you please turn in the binder that's in front
25   of you.  If you can go to Tab 4.  Can you identify that
```

**Wayne Eddy - Direct**

1  document?

2  A.   My application for employment.

3  Q.   Is that something you filled out?

4  A.   Yes, sir.

5          THE COURT:  You may publish.

6          MR. WARREN:  Thank you, Your Honor.

7          Milly, if you would please go to the second

8  page of that document.  Zoom in on the top.

9  BY MR. WARREN:

10  Q.   Wayne, does this document reflect the job position

11  you applied for at Oil States?

12  A.   Yes, sir.

13  Q.   What does it say?

14  A.   Crane operator.

15  Q.   Can you point that out for the ladies and gentlemen

16  of the jury.

17  A.   (Witness indicates.)

18  Q.   Once you submitted this job application to Oil

19  States, did you have an interview with anyone?

20  A.   Yes, I did.

21  Q.   Who did you interview with?

22  A.   I interviewed with Brian Victor.

23  Q.   What was Mr. Victor's role at the company at that

24  time?

25  A.   At that time, Mr. Victor was assistant manager.

**Wayne Eddy - Direct**

1    Q.    He was the second in charge of the shop?

2    A.    Yes, he was.

3    Q.    What did you and Mr. Victor discuss during your

4    interview?

5    A.    Well, there wasn't a whole lot to discuss because

6    they knew Andy and Andy had told them prior that I had

7    previous experience and was working for another company

8    at that time.

9         So, when he interviewed me, he just said,

10   well, your position will be a crane operator, and I said

11   absolutely, and I said crane only because I didn't feel

12   I could do the duties of a grease operator.  He said it

13   will be crane only.

14   Q.    Why did you feel you could not do the duties of

15   grease operator?

16   A.    Well, they are very strenuous.  For an older

17   fellow, it's very strenuous, a lot of heavy work and

18   lifting.

19   Q.    So, when you interviewed with Mr. Victor, you

20   discussed only doing crane work for the company?

21   A.    Yes.

22   Q.    What did he say when you told him you just wanted

23   to do crane work?

24   A.    Absolutely because Mr. Victor and his boss, which

25   was John Ward at the time, was also good friends with my

**Wayne Eddy - Direct**

1  son Andy and he knew I was operating cranes and he said

2  that's all I would be doing.

3          He asked me to come to work for him.  He said

4  you would only be operating cranes.  You wouldn't be

5  hurting yourself.

6  Q.   Did he tell you what your job title would be?

7  A.   Yes.  A crane operator.

8  Q.   During that conversation, did he say anything about

9  the job position field service supervisor?

10  A.   No, sir.

11  Q.   Are you familiar with that job position?

12  A.   Yes.

13  Q.   What do you understand that job position to be?

14  A.   I understand that job to be the grease operator of

15  the job.

16  Q.   At the end of that interview with Mr. Victor,

17  during the interview, did he offer you a job at Oil

18  States?

19  A.   Certainly.

20  Q.   How long after that interview did you begin to work

21  for Oil States?

22  A.   Well, I had a little problem with my driver's

23  license.  I had more points on it and the oil field is

24  very strict about your driving record.

25          I had three points against me in three

**Wayne Eddy - Direct**

1  previous years for driving and you are only allowed to

2  have two.  Three strikes and you're out in Oil States or

3  most oil industries.  I had three within three years.

4         So, I had to let one go away, and as soon

5  as -- that was like three months.  So, I worked for

6  another company for three months as a crane operator and

7  as soon as it was gone, they had an opening position for

8  me.

9  Q.   So, once you started working at Oil States, what

10  type of work were you doing at the beginning of your

11  employment with the company?

12  A.   I started right out into the field.

13  Q.   What were you doing in the field?

14  A.   I was setting these large frack stacks they are

15  called.

16  Q.   What type of equipment were you using to set the

17  frack stacks?

18  A.   It was a 30-ton National Crane, yes.

19  Q.   How did that crane -- what did it look like

20  compared to some of the cranes we have seen pictures of?

21  A.   The crane that you folks have seen several times

22  already, it's the same crane that I would operate.  They

23  all operate with levers, they all have foot pedals, one

24  for gas, one for a brake and one for making what

25  everybody calls a boom.  That's the thing that extends.

**Wayne Eddy - Direct**

1    There are three of them pedals down here.

2           You are sitting here like this (indicating),

3    and you have these things called joy sticks and each one

4    does a specific job.

5           As you get more experience, you run them like

6    they are your hands or like the stenographer running her

7    fingers, you just do it automatically.  It's experience.

8    Q.   And you said you were setting frack stacks with

9    these cranes?

10   A.   Yes, sir.

11   Q.   And could you just -- I think this was discussed in

12   the very beginning of the testimony, can you just remind

13   the ladies and gentlemen of the jury what a frack stack

14   is?

15   A.   When they showed you a typical wellsite, the thing

16   in the center, the wire that was going in and out,

17   that's actually valves stacked on top of each other.

18   That's where they come up with a frack stack.

19           There may be three, four valves but eventually

20   that stack is about ten foot high, eleven foot high, and

21   that's what you would have to keep taking a valve off

22   here and stacking it on here and eventually you come up

23   with a frack stack which would be the wellhead that we

24   do our work at.

25   Q.   So, when you're using cranes to set these frack

**Wayne Eddy - Direct**

1   stacks, are you picking them up with the crane and

2   setting them on the well?

3   A.   Certainly.

4   Q.   Is anyone giving you any direction of what to be

5   doing with the crane?

6   A.   Well, at that moment there is off the valve, hands

7   that are -- they're there specifically to tighten the

8   bolts on.  Every valve I set up there, they jump up

9   there with their wrenches, they wrench it all together

10   and they put torque wrenches on and they're operated by

11   hydraulics, da-da-da, until everything is tight.

12           Then the next one goes on.  They are directing

13   me.

14   Q.   Okay.  How much time did you spend setting frack

15   stacks at the beginning of your employment with Oil

16   States?

17   A.   That wasn't a steady job.  If a company called and

18   they said they needed a frack stack set, we would go out

19   there and also assist wireline while we were doing that.

20   Often there was pressure control involved.

21   Q.   How long into your job at Oil States until you

22   started doing assisting pressure control operations with

23   the crane?

24   A.   I led right into it.  I can't remember exactly.

25   That was my very first job is frack stacks and then I

**Wayne Eddy - Direct**

1  can't remember my second job but I went right into the

2  field.

3  Q.   Okay.  And once you started doing pressure control

4  work, and you obviously heard the testimony so far in

5  this case, so I don't need you to go through it in any

6  detail, so can you quickly go through and describe what

7  type of work you were doing when you were a crane

8  operator assisting with pressure control?

9  A.   When I was assisting with pressure control, when we

10  first came on the site and we brought all of our

11  equipment on the site, the crane was needed to lift all

12  this equipment off of a trailer.  Everything came in on

13  a trailer, big and heavy stuff.

14          So, I would be lifting it up, putting down the

15  lubricator, which is that long tube they described

16  before, that would be laid out.

17          When I laid that out with the crane, the

18  grease operator would be tightening, collars on and

19  tighten it together.

20          When they were all done, you had about 40 feet

21  of this laying on the ground.

22          Now, after we had all that assembled, then

23  there was other duties that had to be performed that

24  didn't involve the crane.  There would be big hoses,

25  reels.  In order to control the pressure on the well,

**Wayne Eddy - Direct**

1   they had grease that goes up to the top.

2           Well, if you have 40 feet of that lubricator

3   and then your frack stack is ten feet high, there's 50

4   feet, and then you have to lift that up twice as high as

5   all that is in order for these people to get these big

6   long pipes in there called guns.

7           So, you're talking about you're having a

8   hundred feet at least of hose.  So, all these hoses have

9   to be pulled off this trailer and stretched out for a

10  long ways and then come back so you would have enough

11  hose that when I lifted up like a crane, that it had to

12  have enough hose to go up there in order to put the

13  pressure, the grease in there.

14          There was four hoses, that was air hose or a

15  grease hose, hydraulic hose, there was a hose for when a

16  well got, if it did get out of hand, there was a hose to

17  let the water come back out and go down into a tank so

18  it didn't have have water all over the place.

19  Q.   So once you -- was this part of getting the

20  pressure control equipment set up?

21  A.   Yes.

22  Q.   Would you do that type of work on every single job

23  you worked at?

24  A.   Yes, I did myself on every job.  There was only the

25  grease operator and I as a team, and it took somebody to

1  run the levers on the grease operator's machine and he

2  always took the lever, let's just put it that way.

3         And here you go, help me out here.  I'm a

4  crane operator.  Grab that hose and pull it on out

5  there.  He says okay.

6  Q.   All right.  He took the easy job and you got to

7  haul the hoses?

8  A.   Yeah, exactly, and there's a lot of it.  There's a

9  lot of it.

10  Q.   All right.  So, once you got the hoses stretched

11  out and the equipment is rigged up, what type of work

12  were you doing with your crane?

13  A.   Well, then I would be just helping him put the --

14  we would have to put the hoses on there, have to tape

15  them all together.  We have to then lay on the side of

16  the lubricator.  Now, this is all summer, and everybody

17  is thinking of the summer.

18         Now, in the wintertime we worked and it was

19  definitely cold out there, and in order for all this

20  stuff not to freeze up, we had another thing called --

21  it was a water heater.  That's the best way I can

22  explain it to you.

23         It had hundreds of feet of hose on a reel and

24  we would pull all that hose out and the hose made a big

25  circle so the water could circulate, and we had to lay

1  that up the side of this lubricator inside all those

2  hoses I described and then tape them together to that

3  big pipe.

4  So, when it was hanging up there and it was

5  ten below zero, it wasn't freezing up.  Otherwise, it

6  would be freezing up.

7  After you did that, you took bubble wrap and

8  you wrapped that whole silver tube with that and you

9  taped it up with black tape.  If there was ever any

10  problem, you had to rip it back off and put it back on.

11  Q.   How big were these water heaters you were

12  describing?

13  A.   Them water heaters were as big as the place I'm

14  sitting here (indicating).  Most of it consists of a big

15  reel, and it had a diesel engine on it which ran some

16  type of a heating source inside there, like a generator

17  actually.

18  Well, we actually had to plug them in.  That

19  is just what it was, one big water heater.

20  Q.   So, once you got -- is there anything else that is

21  involved in getting all this equipment set up?

22  A.   Well, that's a lot right there.

23  Q.   I'm not saying it's not.  So, once you got all the

24  equipment set up, what type of work are you doing with

25  the crane while operations are going on?

**Wayne Eddy - Direct**

1    A.    You mean by -- I got to pick the lubricator up.

2    I'm assisting the wireline, which they explained to you

3    earlier, and I lift that lubricator up and set there and

4    wait for my turn to go on the well.

5              When it wasn't my turn, I'd assist him.  I'd

6    pick that up, put it on the well.  The wireline is

7    laying on the ground.  There is always somebody on the

8    ground to control you.

9              You are running the levers but you have to

10   depend on someone on the ground for everybody's safety

11   sake to tell you go up, come on down, there's another

12   engineer out there who is telling me what to do.  He

13   tells someone which relays it to me.  Go on up.  Stop up

14   there.

15             Then they pull this big gun up and they tell

16   me when to come down to a certain spot, and they can

17   tell me when to move.

18             There are other aspects of it that I don't

19   want to bore you with.  Eventually, I go over here, set

20   it on that well and the grease operator, he gets in his

21   little man lift and he gets up on there and he tightens

22   everything down there.

23             Then I pull the crane up tight and that's what

24   holds this stack up and puts tension on it.

25   Q.    All of this work that you just described, is that

**Wayne Eddy - Direct**

1   what you're doing at all of the jobs that you were

2   working at, at Oil States?

3   A.   Every job.

4   Q.   That's a typical day for you, the work you just

5   described?

6   A.   Yes.  Every day if you came in and there was

7   something wrong, you may come in and they say, oh, we

8   have a bad tube and we have to take the whole top off.

9   So, then you might have to cut all that tape down, rip

10  it open, if you have a leak.  You are not allowed to

11  have any leak, no leaks on location.

12            So, if you have a leak, you have to pull it

13  out, fix the O-rings and whatever is leaking, tape it

14  all back up and get ready to do your next job.

15  Q.   When you were working at the wellsites, we heard

16  different folks were operating different types of

17  cranes.  What types of cranes were you operating?

18  A.   I operated the 30-ton for a while -- we only had it

19  for a short period -- and 45- and 50-ton cranes.

20  Q.   Would you ever operate the hundred ton crane?

21  A.   I operated the hundred ton crane for a period of

22  two weeks.

23  Q.   Other than those two weeks, would you operate the

24  hundred ton?

25  A.   No.

**Wayne Eddy - Direct**

1   Q.   When you were working at the wellsite, were you

2   ever responsible for operating the pressure control

3   equipment?

4   A.   No.

5   Q.   Did you ever look over the pressure control

6   equipment?

7   A.   Of course I looked it over.  It's our job to be as

8   safe as we can.  With everything that's going on around

9   us, you want to be as knowledgeable as you can and I had

10  a certain amount of time in the oil field, so I

11  definitely knew how to push the emergency stop button.

12          If the fellow had to go to the bathroom, he'd

13  say, hey, Wayne, watch this for me, will you.  Okay.  I

14  know where the stop button is.

15          Also, we had radios, walkie-talkies that went

16  to the main station like the frack crew in other words.

17  They all had monitors and they all had headsets and

18  radios.  If something were to happen dangerous on the

19  well and he was in the john, I would get on the radio

20  and I would say stop operations because everybody has

21  stop work authority out there no matter who you are.

22  So, I could get on there and stop it at that time.

23          So, certainly, I couldn't set there and start

24  adjusting things.  I knew how everything worked but to

25  get up on there and start it and to set the controls,

**Wayne Eddy - Direct**

1   no, no.

2   Q.   So, you were never responsible for actually

3   adjusting the grease pressure?

4   A.   No.

5   Q.   Did you ever actually get into the machine and

6   start adjusting things?

7   A.   No.  No.  That was not my job.  That was his job.

8   Q.   You described a stop work authority.  Was that

9   something -- if you saw something unsafe going on, were

10  you required to bring that to people's attention?

11  A.   Yes.

12  Q.   Was that a decision you made or was that you

13  following company policy?

14  A.   That's a decision that everybody was responsible

15  for making.  If you saw a leak in the pipe when you were

16  walking by, you would grab somebody and say, hey,

17  there's a water leak there.  That's not allowed.

18  Q.   When you are trying to figure out if something is

19  unsafe, what are you using to figure that out?

20  A.   Oh, your common sense.

21  Q.   Is that all stop work authority?

22  A.   That shouldn't be leaking and it's starting to

23  squirt, you know, common sense.  It doesn't take a real

24  experienced person to do, to stop operations is what I'm

25  trying to say.

**Wayne Eddy - Direct**

1          If you see something leaking or something that

2    didn't look right, you have to bring it to somebody's

3    attention and have -- it doesn't have to be the company

4    man, it could be the fracking engineer, wireline

5    engineer, a person walking by if you didn't know anybody

6    else and they would know somebody to stop it.

7    Q.   When you brought this to someone's attention, who

8    ultimately was responsible for making a decision about

9    what to do about that unsafe condition?

10   A.   That would be brought to the attention of the

11   company man, first of all, and then he would -- if it

12   involved a frack company, it would be up to them, the

13   frack engineer.

14   Q.   If someone at the wellsite, someone else saw an

15   unsafe condition, were you ever responsible for saying,

16   hey, this is what is going on and here is what you are

17   going to do and you are going to do that and you are

18   going to do that, was that your responsibility?

19   A.   No, sir.

20   Q.   Who was responsible for kind of coordinating the

21   response?

22   A.   Well, each person.  Like, for instance, the grease

23   engineer or the grease operator, he was responsible for

24   his stuff.

25          If he was looking up there and seen something

**Wayne Eddy - Direct**

1  happening, he is responsible for it.  If I was watching

2  my stuff or if I had a crane that may be a buzzer or a

3  warning signal, something was going off, it would be my

4  responsibility to bring it to their attention, hey, my

5  crane is malfunctioning.  I need time to fix this or we

6  need to stop.  Everybody has that authority.

7  Q.   Wayne, you heard Robert and Jason and Mike testify

8  about the job duties they performed.  Did you perform

9  the same type of job duties at wellsites?

10  A.   Yes.

11  Q.   Did you ever work with any of the three plaintiffs?

12  A.   Oh, Yes.  Mr. Burchik and I were kind of the oldest

13  guys out there and we kind of traveled as a pair.  We

14  took care of each other.  He had a slight problem with

15  seeing at night, so I would do the night shift and he

16  would do the day shift.

17       We worked -- it was like nobody else wanted us

18  but we were out there because they were busy but we

19  worked together.

20  Q.   When you were working with the other plaintiffs in

21  this case, were they performing the same job duties that

22  you were performing?

23  A.   Yes.

24  Q.   What were their job titles when you worked at Oil

25  States?

**Wayne Eddy - Direct**

1  A.   It was all crane operators.

2  Q.   Were any of them field service supervisors?

3  A.   Oh, absolutely not.

4  Q.   Wayne, if you could describe for the jurors how you

5  were paid at Oil States?

6  A.   I was paid by a regular salary and job bonuses.

7  Q.   How did that -- did that salary change at all?

8  A.   No.

9  Q.   Did you receive a higher salary if you worked more

10  than 40 hours in a week?

11  A.   No, I didn't.

12  Q.   Did your salary change at all based on the hours

13  you worked?

14  A.   No.

15  Q.   Could you please describe for the jurors how your

16  job bonus worked and whether it worked the same way as

17  the others described.

18  A.   My job did.  My job bonus worked exactly the way

19  every other person that has been up here told you.

20        We worked 12-hour shifts regularly.

21  Generally, they were 12-hour shifts.  Some days you had

22  to be there a little longer, some days you weren't.  You

23  may be there a little shorter but generally speaking,

24  everything was a 12-hour day.

25  Q.   What was the amount of the job bonus that you

**Wayne Eddy - Direct**

1   received or were eligible to receive at Oil States?

2   A.   $450 per shift.

3   Q.   Earlier Mr. Stukenberg had asked whether crane

4   operators received a higher bonus than field service

5   supervisors.

6          Do you know what a job bonus is for a field

7   service supervisor?

8   A.   I believe it was the same for a crane operator.

9   Q.   What was your understanding of what a field service

10  supervisor is?

11  A.   I believe it's a grease operator.

12  Q.   Did you ever hear the term "field service

13  supervisor" used to describe someone performing duties

14  other than a grease operator?

15  A.   Did I ever --

16  Q.   While you worked at Oil States, did you ever hear

17  anyone use the title "field service supervisor" to refer

18  to someone who is doing something other than operating

19  the grease unit?

20  A.   No, other than the field service manager in the

21  same sense, put it that way.

22  Q.   Who is the field service manager?

23  A.   The field service manager was a fellow named Chip.

24  Actually, at one time Frank Fowler was our field service

25  supervisor.

**Wayne Eddy - Direct**

1  Q.   What was his role, the field service manager?

2  A.   Overlooking, periodically come on your wellsite and

3  look to see how well you were maintaining your site, if

4  it was clean, if it was safe, and if there were any

5  problems.

6  Q.   If you had a problem at the wellsite, was there

7  anyone who you would call to ask what should I do?

8  A.   Certainly, you could either call him or the

9  assistant manager.

10 Q.   And in what circumstances were you supposed to call

11 the management and ask them what to do?

12 A.   Well, certain things might arise.  For instance, if

13 I had a problem on my crane.  Now, sometimes we're

14 operating and 75 percentile of what you're allowed to

15 lift up is always in close circumference.

16        If I'm allowed to lift 6,000 pounds with the

17 boom length and a whole lot of technical stuff, then I

18 might have 5,000 pounds; but when I come to come off the

19 well, once the gentleman unscrews the thing, there's a

20 vacuum oftentimes that will suck it down or the crane --

21 the wellhead might not be straight.  So, it will be kind

22 of wedged in there.

23        So, if you get to pulling on that and say it

24 takes it up to 6,000 pounds and the crane says,

25 da-da-da, you know, well, now you are in the danger zone

**Wayne Eddy - Direct**

1    and the crane is not going to allow to do that.  In an

2    instant like that there, I would have to stop operations

3    and then call my service manager or the assistant and

4    say, hey I have a problem here.  I'm stuck on the well

5    and I can't get it off with the amount of hoist that I

6    have, meaning I couldn't pull it off without going into

7    override.

8           At that point they would say, well, have you

9    done everything that you could do, wiggle it, jiggle it.

10          Yes, I have.

11          Well, do you feel you could get it off if you

12   pull a little more.

13          Yes, I do feel but at this point I'm in the

14   red.

15          Okay.  Try that and see if it works.

16          So, if he gave me permission, then I would try

17   something like that there.

18   Q.   So, were you supposed to call the field service

19   manager and talk through these issues before you did

20   anything that went outside company policy?

21   A.   Yes.

22   Q.   All right.  Let's go back.  You were talking about

23   the compensation you received.  Let me show you a

24   document and if you can turn to Exhibit 5.

25          What is that report?

**Wayne Eddy - Direct**

1    A.   That is one of my payroll stubs.

2              THE COURT:  You may publish it.

3              MR. WARREN:  Thank you.

4    Q.   Wayne, have you gone through these payroll

5    documents and you heard me ask the question a bunch of

6    times now, did you go through and add up the amount of

7    salary you received from Oil States during various time

8    periods?

9    A.   Yes.

10   Q.   Do you happen to remember those calculations off

11   the top of your head?

12   A.   Absolutely not.

13   Q.   Would it help you to remember if I gave you your

14   notes?

15   A.   If I could have my notes, it would help me to

16   remember.

17   Q.   All right.  Wayne, see if those are the notes you

18   took?

19   A.   Yes.

20   Q.   Looking over that document, does that refresh your

21   recollection of the calculation you did of the amount of

22   salary you earned from Oil States between August 25th of

23   2012 and August 24th of 2013?

24   A.   Yes, it does.

25   Q.   What was the amount of salary you earned during

1  that time period?

2  A.   $41,210.

3  Q.   All right.  Did you do a similar calculation for

4  the amount of salary that you earned between August 25th

5  of 2013 and February of 2015 when you left the company?

6  A.   Yes, I did.

7  Q.   What was the amount that you calculated for that

8  time period?

9  A.   60,684.

10  Q.   All right.  Let me take that back from you.

11        Now, Wayne, there was some question before

12  about whether the amount of the -- whether the -- let me

13  start again.

14        There was some question before about whether

15  you needed to do a good job or whether your performance

16  affected the job bonus that you received, do you

17  remember that?

18  A.   Yes.

19  Q.   And would your performance at a wellsite, did that

20  have any affect on the amount of your job bonus?

21  A.   No.

22  Q.   Were there any circumstances at all where the

23  amount of the job bonus changed other than based on the

24  size of the crane you're operating?

25  A.   No.

**Wayne Eddy - Direct**

1   Q.   No one ever said, you're doing a great job, here is

2   a bigger bonus; you're doing a poor job, here is a

3   smaller bonus?

4   A.   No, sir.

5   Q.   What did you have to do in order to earn a job

6   bonus?

7   A.   You had to pull a shift, a 12-hour shift on a well

8   location or -- well, that's what you had to do.  You had

9   to come to work six to six.

10  Q.   But would you still receive a job bonus if you were

11  released early for a day?

12  A.   Only if the company got paid for a job bonus and

13  there's a little gray area there.  When I first started,

14  there was two different ways that they kind of got paid.

15          Some days they got paid for not being there

16  and then not doing any work and at the end of my job

17  period there, we could be on job location and not get a

18  job bonus if the operations didn't do anything for the

19  day.

20  Q.   Was that based on whether Oil States got paid for

21  the job from the company that hired it?

22  A.   Yes.

23  Q.   So, if Oil States got paid for the job, you would

24  receive a job bonus?

25  A.   Yes, sir.

**Wayne Eddy - Direct**

1  Q.   So, on the days when you only had to be there for

2  eight hours and got paid a job bonus, on those days was

3  Oil States also getting its full fee only when its

4  equipment was used for eight hours?

5  A.   Yes, sir.

6  Q.   Were you ever on a job where you were run off the

7  job?  Did that ever happen to you while you worked at

8  Oil States?

9  A.   Doesn't stand out to me.

10  Q.   I'm not saying it did.  I'm just asking.  Did you

11  hear about that happening with other people?

12  A.   Well, it certainly has.

13  Q.   In what circumstances would someone get run off a

14  job?

15  A.   In most circumstances it wasn't the person's fault.

16  There are certain things that do happen in the frack

17  industry and they may have problems, cannot hold a seal

18  and sometimes the people just collapse.  They didn't

19  like interacting with each other.

20  Q.   Personalities?

21  A.   Sometimes personalities clash and for some reason

22  that like there they would say I want him off the job.

23  Q.   Who was it -- who made the decision to kick someone

24  off the job?

25  A.   That would be the company man.

**Wayne Eddy - Direct**

1   Q.   Let me ask you when you worked at wellsites, did

2   you ever have the authority to kick someone else off the

3   job?

4   A.   Heavens no.

5   Q.   Wayne, if you could turn in your binder, please, to

6   Tab 192.  Is that your IRS W2 Form for the year 2012?

7   A.   Yes, sir, I believe it is.

8              THE COURT:  You may publish.

9   Q.   Wayne, in the year 2012, did you work at Oil States

10  for the full year?

11  A.   Yes, 2012, certainly.

12  Q.   You didn't take any time off, any extended break or

13  anything?

14  A.   No.

15  Q.   This Box 1 at the top of the page that says wages,

16  tips, and other compensation.  Can you read the number

17  in that box.

18  A.   Yes.  $87,555.90.

19  Q.   Is that an accurate statement of the amount of

20  money you received from Oil States in 2012?

21  A.   Yes, sir.

22  Q.   That's what you got paid in 2012 for a full year's

23  work?

24  A.   Yes.

25  Q.   In 2012, what type of work were you doing at Oil

**Wayne Eddy - Direct**

1   States?

2   A.   I was a crane operator.

3   Q.   Were you doing the same duties you were doing in

4   2013 and 2014?

5   A.   Yes, sir.

6   Q.   That was for the full year?

7   A.   Yes.

8   Q.   All right.  If you wouldn't mind, Wayne, could you

9   flip to the next tab of your binder.  Does that look

10  like your IRS W2 Form for 2013?

11  A.   Yes, it does.

12          THE COURT:  You may publish.

13  Q.   I'll ask again, does the amount that is shown in

14  Box 1, does that look like an accurate reflection of the

15  amount of compensation you earned from Oil States in

16  2013?

17  A.   Yes, sir.

18  Q.   How was business in 2013?

19  A.   Booming.

20  Q.   How much time were you spending at wellsites?

21  A.   All of it.  I was being worked pretty good that

22  year.

23  Q.   Let's go to the next year, the next tab of your

24  binder.  Is that your W2 Form for 2014?

25  A.   Yes.

**Wayne Eddy - Direct**

1          THE COURT:  You may publish.

2    Q.   Wayne, in Box 1 there at the top, $101,164, does

3    that accurately reflect the amount of compensation you

4    earned from Oil States in 2014?

5    A.   Yes, I believe it does.

6    Q.   All right.  One last time.  Go to the next tab,

7    please.  Is that your W2 Form for 2015?

8    A.   Yes, sir.

9          THE COURT:  You may publish.

10         MR. WARREN:  Thank you.

11   Q.   And that box at the top of the page, $15,000

12   roughly, is that the amount of compensation you earned

13   from Oil States in 2015?

14   A.   Yes.

15   Q.   When did you leave the company, do you remember

16   when in 2015?

17   A.   I believe it was in February.

18   Q.   And the money that you received in February, was

19   all of that money earned in -- I'm sorry.  The money you

20   received in 2015, was all that money earned in 2015?  In

21   other words, the work that got you the money?

22   A.   No.  I believe some of that money was earned in

23   2014 but carried over to 2015.

24   Q.   Why would that be?

25   A.   Well, when a job finishes, I may not be on it but I

1   have to get the ticket number and whoever is running the

2   job, meaning the grease operator, the field service

3   supervisors, and I may have been taken off of that job

4   and only worked four days and somebody else replaced me

5   and then the job kept on going.

6            When that job finishes, only then are you

7   entitled to put in for what hours you worked on that

8   job.

9   Q.   Could it sometimes take a month or two months for

10  you to get paid the job bonuses that you had worked for

11  at a job?

12  A.   A month is within reason I believe.

13  Q.   So, you think some of this compensation you earned

14  in 2015 was from jobs you had done in 2014?

15  A.   Yes, I believe so.

16           MR. WARREN:  You can take that down, Milly.

17  Thank you.

18  Q.   When you were working at wellsites, how many people

19  were on the crews that you were on?

20  A.   Well, there was a grease operator and myself but in

21  whole you mean?

22  Q.   No.  I think you answered my question.  It was you,

23  the crane operator, and the grease operator?

24  A.   Yes, sir.

25  Q.   Were you ever working at wellsites when there was

**Wayne Eddy - Direct**

1   more than two people there?  While you are thinking, let
2   me clarify, more than two Oil States employees.
3   A.   I can't recall any.
4   Q.   What was your typical shift at these wellsites?
5   A.   My typical shift would be 12 hours.
6   Q.   Were these 24-hour jobs as well like the other
7   plaintiffs described?
8   A.   Yes, sir, 24/7.
9   Q.   When you were working at the wellsites, were you
10  ever responsible for overseeing the work that anyone
11  else was doing at the wellsite?
12  A.   No, sir.
13  Q.   Were you ever responsible for managing anyone or
14  telling them what to do?
15  A.   No, sir.
16  Q.   Was anyone at the wellsite telling you what to do?
17  A.   Everyone.
18  Q.   Was there anyone at the wellsite who was under you,
19  you know, who had a lower kind of authority, who had
20  less authority to direct other people's work than you
21  did?
22  A.   Meaning with my crew?  I'm not understanding.
23  Q.   Was there anyone under you who was taking any sort
24  of direction from you at all?
25  A.   Oh, no.

**Wayne Eddy - Direct**

1    Q.    What about when you are working in the shop, when

2    you are working in the shop, was there anyone in the

3    shop who you were responsible for telling them what work

4    to do?

5    A.    No, sir.

6    Q.    When you worked there -- there was some questions

7    earlier about shop hand and your son Eddy was a shop

8    hand, right?

9    A.    Andy.

10   Q.    I'm sorry.  Eddy Eddy would be an interesting name.

11         When Andy was a shop hand, were you ever

12   responsible for directing his work or the work of any

13   other shop hands?

14   A.    No, sir.

15   Q.    Who told the shop hands what they should be doing

16   around the shop?

17   A.    The manager was in charge of what the shop people's

18   responsibilities were.

19   Q.    Did you ever tell a shop hand, hey, go clean that

20   bolt, go sweep that floor, hey, I want you to do this?

21   A.    No, sir.

22   Q.    When you were working in the shop, how did the work

23   that you were doing compare to the work that the shop

24   hands were doing?

25   A.    Well, at first I would be responsible -- if I were

**Wayne Eddy - Direct**

1    to come back with a grease package in my crane, first of

2    all, I would be responsible for my crane, inspect it, I

3    would grease it throughout the day, wash all the grease

4    off of it.  They are terribly greasy when they come in.

5    You have to spray them down and pressure wash.  You have

6    to clean your equipment very well.

7            After that, you would have to help the grease

8    operator, help him dismantle his trailer again and take

9    all the grease out of the pipes and O-rings out.

10   Anything they would need that you can help, you were

11   still a team.

12            Then if the shop hand needed you to do

13   anything, you did what he asked you to do.  It was just

14   work.

15   Q.   When you were working in the shop, if you can

16   roughly estimate, kind of ballpark, how much time you

17   spent doing this work pulling apart the pressure control

18   equipment, putting it back together, replacing seals,

19   the stuff you just described?

20   A.   How much time in a day?

21   Q.   What percentage of time in the shop were you doing

22   that kind of work?

23   A.   Constantly.  If you were in the shop, you were

24   supposed to be doing something productive.

25   Q.   All right.  Let's switch topics and keep this

**Wayne Eddy - Direct**

1    going.  Did you have an assigned company truck at Oil

2    States?

3    A.    Yes, I did.

4    Q.    What type of truck was that?

5    A.    2011 Ford half ton.

6    Q.    Wayne, could I get you to flip to Tab 74 in your

7    binder, please.

8    A.    Yes, sir.

9    Q.    Maybe let's go to Page 2.  Do these documents page

10   1 and 2 relate to the truck assigned to you from Oil

11   States?

12   A.    Yes.

13   Q.    Why are you confident of that?

14   A.    Well, the last four numbers of the --

15   Q.    VIN?

16   A.    The VIN number is 8862.  I'm familiar with that

17   because every time we had an oil change, we had to keep

18   very good tabs on this.  You had to use that number to

19   get your oil changed.  So, that was my truck right there

20   (indicating).

21              THE COURT:  You may publish.

22              MR. WARREN:  Thank you.

23              Milly, go to Page 2 of that document.

24   Q.    What type of truck is described on this document?

25   A.    2011 F-150 4x4 super cab.

**Wayne Eddy - Direct**

1  Q.   Was that the type of truck assigned to you at Oil

2  States?

3  A.   Yes.

4  Q.   Go to Page 1, please.

5           Wayne, I'm going to ask you, are you familiar

6  with the concept of gross vehicle weight rating?

7  A.   Yes.

8  Q.   Do you see the GVWR of your truck on this document?

9  A.   GVWR is 8,200.

10 Q.   Is that consistent with your recollection of what

11 the GVWR of that truck was?

12 A.   Yes.

13 Q.   What is gross vehicle weight rating?  We used that

14 term a few times during the trial.  I'm not sure we

15 explained it.  What is your understanding?

16 A.   That's how much that vehicle weighs.

17 Q.   Do you know if that's the fully loaded weight or

18 empty weight?

19 A.   Empty weight.

20 Q.   Wayne, did you also have a toolbox in the back of

21 your truck?

22 A.   Yes, I did.

23 Q.   Did you carry the same types of tools and supplies

24 and equipment that the other three gentlemen have

25 identified?

**Wayne Eddy - Direct**

1   A.   I did.  I carried a fuel tank with my toolbox and

2   often a couple toolboxes.

3   Q.   And just very briefly, what type of tools and what

4   type of supplies did you carry around in your toolboxes?

5   A.   Well, one of the tools I carried around I hadn't

6   heard anyone else mention is if you would, if you

7   remember the big pipe we talked about standing up which

8   is the lubricator.

9        Well, when we go on sites, you can't just set

10  that lubricator down on the ground because the grease

11  comes out of that pipe and will go all over the place.

12       So, the Oil States mechanics over there, they

13  made these little pyramids with real heavy rods that

14  come to a point like that (indicating), and the

15  lubricator is about eight inches around and you would

16  set that lubricator on there.  They were about that tall

17  (indicating).

18       Well, anyways, you had to carry that from job

19  to job with you and that was part of your equipment.

20  That was one of the things you put these pads down to

21  prevent grease from going on the ground and you set your

22  lubricator down on there and so the grease, so it

23  couldn't fall over.  The grease went in one spot where

24  you could contain it.  So, that was part of my tools.

25       The other part of my tools were the straps

**Wayne Eddy - Direct**

1  that he identified earlier.  Some of them were round

2  straps, some of them were flat straps but you always had

3  to have different sizes.  You may have ten foot, you may

4  have six foot, five foot for different types of jobs.

5        Some small stuff required smaller straps in

6  order to stay on the pipe or whatever you were lifting.

7  You couldn't use a great big strap on a small item.

8        That was a lot of the tools that we had to

9  carry.  Also, I carried -- I had a grease gun, electric

10  grease gun with grease so I could grease my crane every

11  other day.

12        Just various bunches of tools that you would

13  use on the job.

14  Q.  Did you need to have these tools with you on the

15  job sites?

16  A.  Yes.  You never knew when this particular fellow

17  over here might ask you -- the company man might say

18  could you lift this piece of pipe up over here.

19        Well, yes, I can go over there and get that

20  strap out of my truck and use that.

21  Q.  Would you regularly use these tools with you at the

22  jobs?

23  A.  Yes, all of them.  You also had to be prepared.

24  That would be one of the reasons that would get you run

25  off.  If you didn't have stuff that you needed to have

**Wayne Eddy - Direct**

1    to perform your job, that would make the company man

2    very upset.

3    Q.   And earlier, and I won't go into any detail on

4    this, but are you familiar with hotshots?

5    A.   Yes.

6    Q.   While you worked at Oil States, did you perform

7    hotshots?

8    A.   Yes, sir, I did.

9    Q.   Were there times you performed hotshots in other

10   states?

11   A.   Yes.

12   Q.   Did you use your company assigned vehicle for those

13   hotshots?

14   A.   Yes, sir, I tried to.

15   Q.   You tried to use your company vehicle, is that what

16   you mean?

17   A.   I liked to use my pickup.  I didn't want to have to

18   haul anything big enough to try the big truck.  I wasn't

19   comfortable with the big truck.

20   Q.   So, when you did hotshots, you preferred the

21   hotshots the smaller equipment instead of the big stuff

22   that goes on a big trailer?

23   A.   Yes.

24   Q.   Is that something you performed fairly frequently

25   as part of your job?

**Wayne Eddy - Direct**

1    A.    Yes.  Actually, we liked to do them, the hotshots.

2    Often they would come out after you already worked the

3    day and irritate you when they would say, hey, we need a

4    piece of equipment to go five hours up the road, and by

5    the way, don't forget to be back here at five o'clock in

6    the morning.  So, yes, I performed lots of the hotshots.

7    Q.    Wayne, when you worked at Oil States, you heard

8    some discussion of tally books?

9    A.    Yes, sir.

10   Q.    Did you use tally books at Oil States?

11   A.    I did.

12   Q.    What information would you record in your tally

13   books?

14   A.    I generally recorded the time that I arrived on

15   location and the time I left.

16   Q.    I'm going to ask you to turn in your binder to Tab

17   No. 18, please.  Please identify what that document is.

18   A.    This is one of my tally book entries.

19            THE COURT:  You may publish.

20            MR. WARREN:  Thank you, Your Honor.

21   Q.    Let's pick one of these entries on the left here

22   and start with the one on the first page.

23            4-23, can you describe for the ladies and

24   gentlemen of the jury what these entries are and what's

25   going on on one of these days?

**Wayne Eddy - Direct**

1    A.    Certainly.  On 4-12, it's 6:00, I was on location.

2    At 1:30 -- and evidently, this job has already been set

3    up with, it was a job in motion.

4              So, I put the lubricator on the well at 1:30.

5    I was off well and I didn't record when I was off well

6    and then I was off location.

7    Q.    If you look, just look around here and you can see

8    left shop, on location, spot the package, set up crane.

9    Are these typical entries of how you described your

10   work?

11   A.    Yes, typical entries and I may have forgotten once

12   in a while but that was the way I generally kept all my

13   tally book entries.

14   Q.    Is this an accurate description of the activities

15   you are performing at the wellsite?

16   A.    This is what was happening throughout the day with

17   me and my crane, yes.

18   Q.    Would your work ever get repetitive in terms of

19   doing the certain things over and over?

20   A.    Certainly, it would.  If a job was going well, it

21   was pick the lubricator up, pick the gun up, put it on

22   the well, take it off the well, set it down and let

23   frack do his.  It would get repetitive.

24   Q.    Could you flip through the document, the paper

25   version real quick and see what date range is covered by

1   this tally book?

2   A.   4-12 of '12 to 1-23 of '12.

3   Q.   Of '13?

4   A.   Of '12 I have.  It must be '13 because it's behind

5   '12.  I'm sorry.

6   Q.   Were these tally books that you still have in your

7   possession?

8   A.   These ones (indicating)?

9   Q.   That's right.

10   A.   Yes.

11   Q.   Did you also keep tally books in 2013 and 2014?

12   A.   Yes, I did.

13   Q.   Do you still have those tally books?

14   A.   No, I don't.

15   Q.   What happened to them?

16   A.   I misplaced them.

17   Q.   Do you remember when you roughly misplaced them?

18   A.   I couldn't tell you.

19   Q.   Sometime around when you left Oil States?

20   A.   After I left Oil States, of course, yes.

21   Q.   Wayne, if you could, did you also -- when you were

22   working at the wellsite, we talked about job activity

23   logs or daily reports.  Did you keep that document when

24   you worked at a wellsite?

25   A.   Yes.

1    Q.    And when would you fill those out?

2    A.    The job activity?

3    Q.    Yes.

4    A.    At the end of the day.

5    Q.    Okay.  What type of information did you put in

6    those?

7    A.    Everything that was in my tally book -- I'm sorry.

8    I said at the end of the day but I meant at the end of

9    the job.

10    Q.    I'm sorry.  I didn't mean to cut you off.

11    A.    I would take the information, what I had for how

12    many days I was on there and I would copy it.  I

13    wouldn't go into details how I made my notes, I would

14    just put, on well, off well, on well, off well, and that

15    would just describe enough.  That's all they need to

16    know in there for me to get paid.

17    Q.    When did you fill out the tally book entries?

18    A.    As they were happening.  If I set the lubricator on

19    the well and went back to my truck, I sat down and tried

20    to keep track of the correct times.  In case we had a

21    problem out there, it was important to know who did what

22    at what time.

23    Q.    Wayne, I think it's the next two tabs to Tab 20.

24    What is that document?

25    A.    That is a pay sheet for a job.

**Wayne Eddy - Direct**

1   Q.   I think it's behind the 20 tab.

2   A.   That is a daily log report there.

3   Q.   Is that your handwriting?

4   A.   Yes.

5           THE COURT:   You may publish.

6   Q.   Very briefly, Wayne, if you could just -- is this

7   your description of what you were doing at the wellsite

8   on this ten-day period?

9   A.   Yes, sir.

10  Q.   Did you keep these daily reports for the entire

11  period that you worked at Oil States?

12  A.   Yes, I did.  If you didn't have one of these, you

13  couldn't get paid.

14  Q.   Okay.  When you turned these into Oil States, did

15  you keep copies of them yourself?

16  A.   No, I didn't.

17  Q.   Did you ask Oil States for copies of these

18  documents?

19  A.   Yes, I have.

20  Q.   Have you received them?

21  A.   I have not received them.

22  Q.   You just received this one (indicating)?

23  A.   Yes, this is the only one that I know.

24  Q.   Do you have any way of obtaining the other daily

25  reports that you don't have possession of?

**Wayne Eddy - Direct**

1  A.   No, I don't.

2  Q.   Are you familiar with man hour reports?

3  A.   Yes.

4  Q.   We heard about that.  Briefly, what would you write

5  in your man hour report?

6  A.   A monthly man hour report, you would have to report

7  where you worked at, what job, what company and how many

8  hours that you did throughout a 30-day period.

9       The monthly reports just showed where you were

10  at the whole month.

11  Q.   Wayne, if you could go to the next tab of your

12  binder, it's Tab 21.  Is that one of your man hour

13  reports?

14  A.   Yes, it is.

15       MR. WARREN:  Your Honor, may I publish?

16       THE COURT:  Yes.

17  Q.   This one is -- what month is this for?

18  A.   January 2015.

19  Q.   There's a big X in it.  What does that mean?

20  A.   That means they didn't allow me to go out on any

21  jobs that month.  I didn't make very much money that

22  month.

23  Q.   What were you doing in January '15?

24  A.   I was in the shop.

25  Q.   You were just working in the shop the whole time?

**Wayne Eddy - Direct**

1   A.   Yes.

2   Q.   Did you keep these man hour reports in 2012, 2013,

3   2014?

4   A.   Yes.  They were kept throughout every month I was

5   there.

6   Q.   Did you keep copies of the man hour reports?

7   A.   No, sir, I didn't.

8   Q.   Have you asked Oil States for those?

9   A.   Yes, I have.

10  Q.   Have you received any of the man hour reports other

11  than this one from January 2015?

12  A.   Yes.  This is the only one I know we received.

13  Q.   Do you have any way of obtaining the man hour

14  reports for 2012 through 2014?

15  A.   I sure wish I did.  It would make this so much

16  easier.

17  Q.   So, I'm going to -- let's talk about how you've

18  gone through and tried to estimate the hours that you

19  worked.

20  A.   Yes.

21  Q.   I'm going to do this in two different steps.

22         First, we'll talk about the time period when

23  you had your tally books and then we'll talk about the

24  time period you had no tally book, no daily reports and

25  no man hour reports.

**Wayne Eddy - Direct**

1          The time period that you had your tally book,

2   have you -- I believe you said that was 2012 through

3   January of 2013?

4   A.   Correct.

5   Q.   Have you gone through and tried to calculate the

6   number of hours you worked during that time period?

7   A.   Yes.

8   Q.   What documents or information did you use to do

9   that calculation?

10  A.   My tally book.

11  Q.   Did your tally books tell you the hours you worked

12  at wellsites?

13  A.   Yes.

14  Q.   Did your tall book tell you your days off?

15  A.   Yes.

16  Q.   Would you record the days you worked in the shop in

17  your tally book?

18  A.   Most of them I did.  Sometimes I didn't.

19  Q.   So when you were -- have you actually gone through

20  your tally books and come up with an estimate of the

21  hours you worked in 2012 and the first month of 2013?

22  A.   Yes.

23  Q.   Now, the time period from February of 2013 through

24  when you left in 2015, that two-year period, do you have

25  any documents that you filled out that show the hours

1   that you worked during that two-year period?

2   A.   No documents that I filled out are available to me

3   that I know of.

4   Q.   Have you still gone through and tried to estimate

5   the hours you worked in that period?

6   A.   Heavens, yes.

7   Q.   Can you please explain to the ladies and gentlemen

8   of the jury how you tried to estimate your hours for

9   that two-year period from February 2013 to February

10  2015?

11  A.   Well, during that period he is speaking of, I

12  certainly had all those logs but none of them are

13  available to me, so I had to estimate it.

14          So, Mr. Burchik and I worked a lot of jobs

15  together, so the nearest thing I could come up with was

16  to use his tally book and the hours that he was working

17  and estimate where I was working and if I was working.

18          Now, there was a period when Mike got sick for

19  a three-month period that I had to guess and the way I

20  had to guess that is I kind of went back about to the

21  last prior three months.

22          I don't have any of these records but he kept

23  very good records of his, and I kind of just figured

24  well, him and I worked about the same hours, so that's

25  the best way I had to calculate what hours I had worked.

1   Q.   Do you believe these estimates you came up with

2   using Mr. Burchik's tally book and his information, do

3   you believe that's as accurate and reliable estimate of

4   the hours that you worked?

5   A.   Yes, it's quite accurate I believe and very

6   conservative.

7   Q.   Did you use these same documents and the same

8   process to estimate the job bonuses that you earned at

9   Oil States?

10  A.   Yes.

11  Q.   And can you just briefly describe, please, for the

12  ladies and gentlemen of the jury how you used this

13  process you just described to estimate the number of job

14  bonuses you received?

15  A.   Well, it all occurred with his -- between his and

16  my -- his tally book and my estimates to the best of my

17  recollection is how I come up with all of that.

18  Q.   Okay.  Did you actually go through and estimate the

19  number of job bonuses you received?

20  A.   Yes, I did and actually go through and estimate the

21  job bonus and the time.

22  Q.   Do you remember off the top of your head the number

23  of bonuses that you estimated you received between 2012

24  and 2013?

25  A.   No, but they're in my notes.  If I could have my

**Wayne Eddy - Direct**

1   notes, I could read them to you.

2   Q.   Wayne, flip through that and see if those are the

3   notes you took.  Are those the notes you're talking

4   about?

5   A.   Yes, sir.

6   Q.   Flip through there and let me know if that document

7   refreshes your recollection of the number of bonuses you

8   added up that you think you received between August 25th

9   of 2012 and August 24th of 2013?

10  A.   Yes.  I believe I received 172 bonuses.

11  Q.   What was the dollar value of those bonuses?

12  A.   $77,400.

13  Q.   Have you gone through and done that same estimation

14  for the time period from August 25th of 2013 through when

15  you left the company in February of 2015?

16  A.   Yes.

17  Q.   Could you please tell the ladies and gentlemen of

18  the jury your estimate of the job bonuses you received

19  for that time period?

20  A.   The 272?

21  Q.   What was the dollar value?

22  A.   It's $122,400.

23  Q.   While you got that document, did you also -- this

24  process that you just described of how you estimated

25  your hours, did you go through and estimate the total

1    number of hours you worked during that same time period

2    between August of 2012 and August of 2013?

3    A.    Yes, I did.

4    Q.    What is your best estimate of the total number of

5    hours you worked between August 25 of 2012 and August 24

6    of 2013?

7    A.    2,980.

8    Q.    How many of those did you estimate were overtime

9    hours?

10   A.    1,321.

11   Q.    How did you determine which of the hours were

12   overtime hours?

13   A.    Anything over 40 hours was considered overtime

14   hours.

15   Q.    So, have you actually gone through and added up

16   your hours on a day-by-day and week-by-week basis?

17   A.    Yes.

18   Q.    And you subtracted 40 to figure out overtime hours?

19   A.    Yes.

20   Q.    Can you please provide the ladies and gentlemen of

21   the jury with the same estimate you did for the time

22   period August 25th of 2013 until you left the company in

23   February of 2015?

24   A.    The total hours would be 4,656.

25   Q.    And what about the number of overtime hours?

**Wayne Eddy - Cross**

1   A.   The number of overtime hours would be 2,019.

2   Q.   Thank you, Wayne.  Could I have that document.

3            When you did these estimates, did you go

4   through and figure out a weekly average of the number of

5   overtime hours that you were working every week during

6   that time period based on these estimates that you did?

7   A.   Yes, based on the estimates.

8   Q.   What was the weekly average you came up with?

9   A.   Around 25 hours a week.

10  Q.   Do you believe that is an accurate, reliable

11  estimate of the average number of overtime hours you

12  worked per week between August of 2012 and when you left

13  in February of 2015?

14  A.   Yes, this is as accurate I can get with what I had

15  to deal with and very conservative.

16  Q.   Okay.  What are you asking the ladies and gentlemen

17  on the jury, what are you asking them to award you in

18  this case?

19  A.   Well, I have no idea how this is going to be

20  awarded.  If you have the formula, if Your Honor has the

21  formula, but however that's going to be awarded will be

22  up to the courts, not me.

23           I don't have any idea how that is.  I was just

24  merely asked to figure out some kind of estimate of what

25  to give you.

**Wayne Eddy - Cross**

1   Q.   Those estimates you have given the jury of your

2   overtime hours, is that the best you think you can

3   possibly come up with?

4   A.   That's the very best I could come up with.

5            MR. WARREN.   Thank you.

6            Nothing further, Your Honor.

7            THE COURT:   Thank you.

8            Defense, do you wish to examine?

9            MR. DAVIS:   Yes, Your Honor.

10           THE COURT:   You may proceed.

11                    CROSS-EXAMINATION

12  BY MR. DAVIS:

13  Q.   Good afternoon, Mr. Eddy.

14           I think we met twice.   I have taken your

15  deposition once in March of 2016.   Do you remember that.

16  A.   Yeah.

17  Q.   And again, a couple months ago as well, right?

18  A.   Yes.

19  Q.   We're going to talk about your hours estimate in a

20  minute but I did want to start out with your

21  application, which is Exhibit 4.   I had a few questions

22  about your background.   I don't think Mr. Warren asked

23  you about that.

24           MR. DAVIS:   If you could pop that up on the

25  screen.

**Wayne Eddy - Cross**

1          If you can scroll down, I think the bottom

2    part was cut off when it was put up the first time.

3          Next page, please.

4    BY MR. DAVIS:

5    Q.   You worked for Rush Well Services before you came

6    to work for Oil States, correct?

7    A.   Yes, I did.

8    Q.   Before that you were at J-W Wireline?

9    A.   Yes.

10   Q.   Your job there both places were perforating

11   engineer, correct?

12   A.   No.

13   Q.   I thought you told me in your deposition you had

14   been a perforating engineer in the past?

15   A.   Oh, I have but it was incorrect what you just told

16   me.

17   Q.   When were you perforating engineer?

18   A.   I was a perforating engineer when I was in with J-W

19   Wireline and Superior Well Service many years ago.  Rush

20   Well Service, I was a crane operator.

21   Q.   I apologize.  That's my mistake.

22   A.   That's mine.

23   Q.   You had worked as a perforating engineer.  That's

24   the person who sends the wireline down through the

25   pressure control equipment into the well and does the

**Wayne Eddy - Cross**

1   explosives?

2   A.   Right.

3   Q.   In the oil fields sometimes they use titles that

4   don't exactly match what you do, right?

5   A.   You mean names?

6   Q.   Right.  I mean you weren't a degree engineer like

7   the ones who go down and find where the oil or the gas

8   is, right?

9   A.   Yeah.

10   Q.   You had a perforating engineer job title and you

11   were paid salary and job bonus with no overtime, right?

12   A.   No.  I was paid hourly.

13   Q.   I thought you said -- let's see on your J-W

14   Wireline.  It says $68,000 a year, that's a salary,

15   isn't it?

16   A.   I'm sorry.  Yes.  With J-W Wireline, I was.

17   Q.   Superior Well Service, wireline engineer, $43,000 a

18   year, right?

19   A.   Yes.

20   Q.   That's a pretty technical job sending the

21   explosives down under high pressure and blowing holes in

22   the well, right?

23   A.   Certainly, it is.

24   Q.   That was at Superior, a $43,000-a-year job, and at

25   J-W, $68,000-a-year job, right?

**Wayne Eddy - Cross**

1    A.   Yes.

2    Q.   Then at your next job was Rush and that's where I

3    made my mistake.   If we can go to the page above.

4              That was -- what was your job there, crane

5    operator?

6    A.   Yes.

7    Q.   So, that was a pay cut to go to a crane operator

8    job at $34,000 a year, right?

9    A.   Yes.

10   Q.   You said the reason for leaving that job is you

11   wanted more money, correct?

12   A.   Which job?

13   Q.   You said on your application the reason you left

14   Rush Well Service is because you wanted more money?

15   A.   Okay.

16   Q.   That's what Oil States gave you, you made more than

17   triple what you made at Rush, correct?

18   A.   Yes, it appears.

19   Q.   When you came in and interviewed, I would imagine

20   that salary and job bonus pay plan sounded pretty good

21   to you, didn't it?

22   A.   Yes.

23   Q.   And nobody whipped out a job description and said,

24   hold on, crane operators are nonexempt, so you need to

25   be hourly, did they?

**Wayne Eddy - Cross**

1   A.   I did not know that at the time.

2   Q.   You probably -- you may not have thought of the

3   term "exempt" or "nonexempt" at the time, did you?

4   A.   No, I wasn't considering it at that time.

5   Q.   You were just looking for a pay plan that got you

6   more money just like you put on your application, right?

7   A.   Pretty much, yes.

8   Q.   After you were hired as a crane operator, you would

9   work in the field with Adam Fowler from time to time,

10  right?

11  A.   No, Adam and I never worked together.

12  Q.   So, when you -- he did work in the field?

13  A.   He did work in the field but never with me.

14  Q.   He was on the same pay plan as you were at that

15  time?

16  A.   I couldn't tell you.

17  Q.   Well, what was his job?

18  A.   Adam Fowler at the beginning, at the end, or in the

19  middle?

20  Q.   Around this time period, what was he doing?

21  A.   Adam Fowler was in the field, I believe.

22  Q.   So, he was working in the field around 2011, you

23  just don't know what his job was?

24  A.   I didn't even see Adam Fowler for a long time.  He

25  stayed out on the jobs.

**Wayne Eddy - Cross**

1    Q.   You knew he operated the crane from time to time?

2    A.   I thought he was a grease operator.

3    Q.   You thought he was a grease operator?

4    A.   Yes.

5    Q.   That's one thing I made a note of.  When you came

6    to work at Oil States, you said you wanted the less

7    physical job which was the crane operator job, right?

8    A.   I don't remember saying that.

9    Q.   You would agree it is less physical, isn't it?

10   A.   What, the crane operator job?

11   Q.   Yes.

12   A.   I would agree it was less physical than what?

13   Q.   Than operating the pressure control grease

14   injection machine.

15   A.   Yes.

16   Q.   Because you are sitting in an air conditioned cab

17   using joy sticks and buttons, right?

18   A.   Sometimes.  Not all the time.  I described to you

19   my job.

20   Q.   Well, I understand but there were times when you

21   would get it all set and wireline is doing their job and

22   the crane is not actually operating or running, correct?

23   A.   There are times, certainly.

24   Q.   You were able to get out of the crane, right?

25   A.   Yes.

**Wayne Eddy - Cross**

1  Q.   And like the others, did you leave your pickup

2  truck running the entire 12-hour shift?

3  A.   Generally, we all did.

4  Q.   One reason to do that was you could go into the

5  pickup truck and it's like a little office and you could

6  do your paperwork, right?

7  A.   No.  Generally, why you did that was so you could

8  be comfortable.  It was very noisy on the locations at

9  all times, hot.

10 Q.   I understand.  Mr. Burchik said maybe it would be

11 cold in the winter, hot in the summer, and you want to

12 keep it at a good comfortable temperature so you would

13 keep it running for 12 hours and nobody at the company

14 ever criticized you for that, they said that's fine,

15 right?

16 A.   Not that I know of.

17 Q.   In the spring and fall when it's nice, you could go

18 out and start up your truck and it would be comfortable

19 within a couple minutes like most of us do when we go to

20 work each day, right?

21 A.   In the spring and fall?

22 Q.   One reason to leave it running was it was like your

23 little office where you could do your paperwork, do your

24 tally books, do your job safety reports, do your daily

25 reports, that's kind of what it was, wasn't it?

**Wayne Eddy - Cross**

1   A.   Your pickup is actually your safety zone and your

2   observatory.   I mean you park your pickup where you can

3   see the crane and the wireline operations and that's

4   where you park your pickup so you can observe all that.

5   Q.   What I'm not understanding --

6   A.   It's not an office.   That is your safety zone and

7   also you are not allowed to be out there running around

8   all the time.

9   Q.   What I'm trying to understand if you are either in

10  the crane or down on the ground pulling those hoses out,

11  why do you need your pickup truck running for 12 hours

12  just sitting there idling?

13  A.   It didn't always run 12 hours.

14  Q.   If we look at -- you said you looked at a lot of

15  records and Oil States didn't turn over records.

16           Now, we turned over those GPS reports which

17  said how much time it was idling and you just never

18  looked at them.

19  A.   Well, sir, can you tell me how much time my truck

20  was idling?

21  Q.   It looks to me like it's idling the entire time you

22  are on the wellsite.

23  A.   I don't believe so.   You're saying that's idling

24  every day all day long.   That's not true.

25           MR. WARREN:   Objection, Your Honor.

**Wayne Eddy - Cross**

1        THE COURT:  Well, he answered the question.

2   What's your objection now?

3        MR. WARREN:  Well, I just want to make sure we

4   are not going to keep continuing to talk about a

5   document that's not in evidence.

6        THE COURT:  Well, no.  Overruled.  The witness

7   understands the question and that's the burden that Oil

8   States takes.

9        Overruled.

10  BY MR. DAVIS:

11  Q.   The point is you never looked at those GPS reports

12  to see where you were, for how long, whether you were at

13  a wellsite, your home or restaurant, you never looked at

14  them, have you?

15  A.   I have not.  I didn't have any means to do it.  I

16  went off my tally book entries and Mike Burchik's tally

17  book and the records that I had to deal with.

18       The best of everything I had to deal with or

19  to do this with, I did it.

20  Q.   I understand but if your testimony is you haven't

21  been given the records and the evidence is your lawyers

22  have had them for over a year, are you still blaming

23  that on Oil States that you didn't have this tool?

24  A.   Well, here's what I'm blaming on Oil States and I

25  don't want to get into a contest with you.  It's just

**Wayne Eddy - Cross**

1    that the man hour reports have never been produced to

2    me, none of my tally book entries that go in those daily

3    reports.

4              In order for us to receive a bonus or pay, you

5    had to have that complete sheet on every pay.  One time

6    I did not have that sheet on there and they held my

7    paycheck.  They held that bonus until I made them a

8    daily time or a tally sheet.

9    Q.   I understand.

10   A.   So, therefore, what I am saying is Oil States has

11   all that information but they didn't give it back to me.

12   They didn't produce it to me so I could make my

13   calculations.

14   Q.   I understand, but let's be clear.  Your tally books

15   are something you created and you kept but you say you

16   lost them?

17   A.   I did.

18   Q.   You can't blame that on Oil States.

19   A.   I was not required to keep them.  Oil States is

20   required to keep our records.

21   Q.   But the tally books, Oil States never had them.

22   You had them and you lost them.

23   A.   No.  Excuse me, sir.  The tally books had all my

24   entries that I took from my tally books.  I entered them

25   on this piece of paper that you just showed me a little

**Wayne Eddy - Cross**

1    while ago, the job reports --

2    Q.    Right.

3    A.    -- for every job that I ever did.  Therefore, you

4    people should have had them to give to me so I could --

5    Q.    Well, let's look at the one that you looked at, the

6    daily report.

7    A.    There's only one there.

8    Q.    The daily report you filled out did not have the

9    time you got there and the time you left.

10          It had on location at 6:30, don't know when

11   you left, correct?

12   A.    On some of my entries they will be like that.  The

13   majority of them if you go through my other tally books

14   all have them.

15   Q.    So, if you had every single one of these daily

16   reports, you still probably wouldn't be able to tell

17   what time you got there, what time you left because you

18   don't have all that information.

19   A.    On my tally books if we can go back to them, you'll

20   see I often, almost often every day showed what time I

21   got on location.  Generally, it was before six o'clock.

22   Q.    But the GPS report in the truck tells you exactly

23   what time you got there and exactly what time you left,

24   and you are just saying you never looked at it.

25   A.    (No verbal response.)

1   Q.   Backing up just a little bit.  This pay plan you

2   agreed to, you understood that it was a salary with a

3   job bonus with no overtime component, right?

4   A.   At that time, yes.

5   Q.   And you shook hands with Mr. Victor and said that's

6   good for me, right?

7   A.   I don't remember that.

8   Q.   But you agreed to it?

9   A.   I worked there, yes.

10  Q.   And you never complained about it while you worked

11  there?

12  A.   No.

13  Q.   The first time you complained was after you filed

14  this lawsuit, right?

15  A.   Yes.

16  Q.   And this pay plan -- I know you mentioned you

17  worked hourly, but this pay plan paid you the same

18  salary whether you were working or not, right?

19  A.   Yes.

20  Q.   And your tally book had some entries where there

21  were ten days when you didn't work and you got your

22  salary, right?

23  A.   Yes.

24  Q.   And there were times like on Exhibit 20 when you

25  were out at the wellsite for October 31, November 1,

**Wayne Eddy - Cross**

1   November 2, November 3 of 2012 where it just says

2   standby, no indication that you operated the crane or

3   pulled hoses or anything like that.  Not only did you

4   get your salary those days, you got your job bonus those

5   days, right?

6   A.   Yes.  If it said I did, I did.

7   Q.   And you wrote 12 to the side because in the deal

8   that you made with the company, even if you didn't do

9   any work, you got to put down that 12 which meant you

10  got the $450 bonus, right?

11  A.   If the company got paid for their time there, I got

12  paid for my time.

13  Q.   That's right.  During the boom, when things were

14  good and customers were paying a lot of money, they just

15  shared half of it with you even if you didn't do any

16  work at all, right?

17  A.   I wouldn't say half of it.

18  Q.   A lot of it.

19  A.   A portion of it.

20  Q.   And let's just focus, I'm going to talk about a

21  snapshot in time of your hours estimates saying you want

22  overtime.  You worked over 40, because I think you said

23  in your calculation what you would do is say if I worked

24  over 40 for the week, you want to be paid overtime,

25  right?

1  A.   Yes.

2  Q.   Now, this particular week you went four days doing

3  no work at all, right?

4  A.   Yes.

5  Q.   And the day before on October 30, the only work you

6  did was you said on location with crane and package.

7  That means you arrived, you put it there but you didn't

8  do any work, right?

9  A.   Yes.

10  Q.   You still got your 12-hour bonus, is that correct?

11  A.   If it said 12, yes, I did.

12  Q.   Then on November 4, you got there at ten, you

13  checked on the job and the crane, but they apparently

14  weren't ready for you.  All you did that day was check

15  on the job and crane?

16  A.   No, that's incorrect.  Generally, I did -- if I had

17  my tally book entry, I could prove this, but if we were

18  on standby, we may be sitting out there in our pickups

19  just standing by.  That's what it meant.

20          Sometimes you were on standby and you weren't

21  on location but many times, you were on location and you

22  were on standby because you had to be ready if the other

23  operations got fired up.

24  Q.   Okay.  I think I asked you about this in your

25  deposition.  Because of the deal you made with the

**Wayne Eddy - Cross**

1  company that said you would get paid for 12 hours, when

2  you're estimating hours in this case and asking the jury

3  to award you overtime, you are using this 12, 12, 12,

4  12, even on days when you didn't even show up at the

5  job, correct?

6          When I took your deposition a couple months

7  ago, you said that's what you're doing here.

8          MR. WARREN:  Objection, Your Honor.  The

9  characterization --

10          THE COURT:  Hold on.  It's cross-examination.

11  Overruled.  If you are going to ask about a deposition,

12  you got to show him.

13  Q.   Do you recall telling me that?

14  A.   No.

15  Q.   In your mind because the company paid you for 12,

16  that's what you ought to be able to estimate as your

17  hours worked and that's where we get these 12, 12, 12,

18  12.

19          What you testified to earlier, you used that

20  in making your overtime calculations because you were

21  looking at Exhibit 20 as one of your pieces of evidence,

22  right.

23          THE COURT:  I don't know it that's the

24  question.  What's the question?

25  Q.   Did you use the daily reports in making your

1  overtime estimates in this case?

2  A.   Could I have my notes and look and see if I did or

3  not.  I don't recollect right off the bat of those dates

4  what I did put down.  I would like to have my notes.

5  Q.   What your lawyer handed you were not your notes.

6  A.   Sir, they are --

7           THE COURT:  Mr. Eddy, he asks the questions.

8  You answer.  This is not an argument.  I'll give you

9  plenty of time to answer.

10  Q.   What your lawyer handed you was a spreadsheet that

11  they prepared that has lots of errors in it, right?

12  A.   No, sir.

13  Q.   We talked about that in your deposition, error

14  after error after estimate that had no support

15  whatsoever.

16           You don't have any notes other than Exhibit

17  20, the daily report and your tally book, right?

18  A.   Notes, yes.

19  Q.   The only handwritten notes we have in this

20  courtroom are your tally books and this daily report,

21  right?

22  A.   Just one daily report, correct.

23  Q.   And when you just earlier testified about your

24  hours estimates that you want the jury to award you, you

25  weren't looking at Exhibit 20 or your tally book at that

**Wayne Eddy - Cross**

1  time, were you?  You were looking at something your

2  lawyer handed you?

3  A.    No, sir.

4  Q.    Well, can you tell me here today on this period of

5  time when you have 12, 12, 12, 12, 12 on days you didn't

6  work, are you certain you didn't pop those into an

7  estimate that you're asking the jury to award you?

8  A.    I'm certain I didn't.

9  Q.    Okay.  So how many hours are you asking the jury to

10  award you for this week when you did no work at all for

11  those four days?

12  A.    I would have to have my sheet to look at.

13  Q.    The sheet you are talking about is something your

14  lawyers prepared and handed to you which is full of

15  errors, right?

16  A.    No, sir.

17         THE COURT:  No to what?  That question has so

18  many things.  No to what?

19         The jury and I can't follow because the

20  question has too many points to it.  No to what?

21  A.    No, sir -- repeat the question and I'll answer.

22  Q.    Other than Exhibit 20, which is the daily report --

23  A.    Other than this one (indicating).

24  Q.    -- and the tally book, you personally don't have

25  any week-by-week notes that you did in your own

**Wayne Eddy - Cross**

1    handwriting that we could look at to determine the hours

2    estimates, right?

3    A.    No, I don't.

4    Q.    Okay.  What was handed to you was a typewritten

5    spreadsheet that someone at the law firm prepared,

6    right?

7    A.    What was handed to me was the spreadsheet, if

8    that's what you want to call it, with the information

9    that I provided and Mr. Burchik's tally book.

10   Q.    But you didn't actually enter that data into the

11   spreadsheet, did you?

12   A.    Sir, I don't know who entered that into the

13   spreadsheet, no, I don't.

14   Q.    I think you testified earlier that you thought

15   operating the crane for you with all your experience is

16   pretty easy?

17   A.    Yes, I believe so.

18   Q.    It's easy because you are good at what you do,

19   right?

20   A.    Yes.

21   Q.    But according to the State of Pennsylvania, you

22   have to have a certification to operate a crane, right?

23   A.    Yes, sir.

24   Q.    They want to make sure you know your stuff, right?

25   A.    Yes, sir.

**Wayne Eddy - Cross**

1  Q.   And you said your son worked in the shop, was a

2  shop hand paid hourly with overtime.  You wouldn't

3  expect that he could just go out to a wellsite and run

4  that crane like you did, would you?

5  A.   Well, sir, there was a certain time when we didn't

6  need a certification.

7  Q.   But you still needed to know your stuff because you

8  are hanging very heavy equipment ten, fifteen thousand

9  pound valves over the top of people's heads and people

10  can get hurt if you don't know your stuff?

11  A.   Yes.

12  Q.   Given your experience as a perforating engineer

13  making forty to sixty thousand dollars a year and a

14  crane operator at another company making $34,000 a year,

15  why in your mind did Oil States pay you over $100,000 a

16  year to do this job if it wasn't a thinking job?

17          MR. WARREN:  Objection.

18          THE COURT:  Sustained.  Lack of foundation.

19  Q.   You were paid over a hundred thousand dollars a

20  year, right?

21  A.   Yes.

22  Q.   But you say that this is not really a thinking job?

23          MR. WARREN:  Objection to the

24  mischaracterization.

25          THE COURT:  No.  It's cross-examination.

1   Whatever he thinks.

2   A.   I don't remember saying it wasn't a thinking job.

3   We all have to think on our jobs.

4   Q.   Right.   It requires some calculations to set up the

5   crane, some judgment calls on how far to extend the

6   boom, some important decisions that can save someone's

7   life?

8   A.   Skills, yes.

9   Q.   And there were occasions when the person operating

10  the grease injection machine would be up on the man lift

11  connecting the device, right?

12  A.   Yes.

13  Q.   And you would need to be down there by the grease

14  injection machine when initial pressure is set, right?

15  A.   No.

16  Q.   You were never standing at those dials watching

17  what the pressure was doing?

18  A.   Not while the grease operator was in the man

19  basket, no, I wasn't.

20  Q.   How can he be up there in the man basket with

21  pressure going on in the well and you say you just left

22  this thing unattended?

23  A.   No.

24  Q.   Who was watching it?

25  A.   I wasn't watching it.   I was the crane operator.

**Wayne Eddy - Cross**

1   Q.   So, even though you had this experience sending the

2   wireline down the well with the explosive, you didn't

3   feel comfortable walking over there to that machine to

4   check the pressure?

5   A.   That wasn't part of my job.

6   Q.   So, if you saw the pressure was spiking and

7   something was about to blow out, you would just walk

8   right by?

9   A.   Unless I was standing right there, I wouldn't see

10  that.

11  Q.   And as far as this paperwork you do, tally book,

12  JSA, daily report, job bonus spreadsheet, working with

13  load charts, you think that's all manual labor stuff,

14  right?

15  A.   Well, I don't think that's all manual labor.

16  Q.   It doesn't take much physical effort to fill those

17  out but you have to know what to put in the reports and

18  you have to know your stuff to do that, right?

19  A.   Yes, sir.

20  Q.   You're going to ask this jury to find that there

21  was a willful, intentional, reckless violation of the

22  Fair Labor Standards Act of 1938.

23        When you came to work there, you never heard

24  of this law, right?

25  A.   Yes, I haven't.

**Wayne Eddy - Cross**

1   Q.   Exempt, nonexempt, never crossed your mind?

2   A.   No.

3   Q.   But you're saying Adam, who worked in the same job

4   under the same pay plan, it should have clicked with him

5   that this pay plan might violate the Fair Labor

6   Standards Act of 1938 and, therefore, when he became a

7   manager and continued to pay you that way, there was a

8   willful, intentional violation of the law, is that what

9   you're claiming?

10  A.   I never said that against Adam.

11  Q.   You didn't have any reason to believe that Adam

12  knew when he was approving your paychecks and signing

13  off on those bonuses that in his mind he knew that the

14  company was violating the Fair Labor Standards Act of

15  1938?

16  A.   I have no idea if he did or not.

17  Q.   This wasn't a case where there is a poster up on

18  the wall to say you have to pay at least minimum wage

19  and you were getting less than minimum wage, was it?

20  A.   No.

21  Q.   While you were at Oil States, you never questioned

22  not getting overtime, did you?

23  A.   I didn't realize that there was any other reason

24  to -- any other way to get paid at that time.

25  Q.   In your last job before you came to Oil States, you

**Wayne Eddy - Cross**

1   were paid overtime?

2   A.   Well, the time prior to that.

3   Q.   Right.  So, you know what an overtime pay plan for

4   a crane operator looked like?

5   A.   No.

6   Q.   You had worked at prior jobs where they paid

7   overtime?

8   A.   Yes, I had.

9   Q.   You knew there were overtime eligible out there?

10  A.   Yes.

11  Q.   Your son worked as a shop hand and was overtime

12  eligible?

13  A.   Yes.

14  Q.   But not once the entire time at Oil States did you

15  come to talk to HR and ask for overtime, did you?

16  A.   No, sir.

17  Q.   And you never contacted Jill Curry or Terry Woodall

18  and said, hold on a minute here.  I think you are

19  violating the Fair Labor Standards Act of 1938 and I

20  ought to get overtime?

21  A.   No, sir, I wasn't aware that Oil States was

22  violating it at that time.

23  Q.   So, let's talk about the end of 2014.  Things are

24  really slowing down in the oil patch, correct?

25  A.   '14?

1   Q.   Correct.  Gas prices have dropped, you're not

2   seeing as many jobs, not being sent out on many jobs,

3   are you?

4   A.   No.

5   Q.   What is your hours estimate for October of 2014,

6   tell me by week or month, tell me what your estimate is

7   for that?

8   A.   Of October of 2014?

9   Q.   Right, when things are slowing down, what is your

10  estimate?

11  A.   Based on my 30 and 10 days off and well, I don't

12  know off the top of my head.

13  Q.   What about November of 2014 when things are even

14  slowing down more, there is hardly any wellsite jobs,

15  what is your estimate for November of 2014?

16  A.   I can't recollect what I did put down.

17  Q.   What about December and January?  We did see

18  Exhibit 21, if we could put that up, I think it's your

19  man hour report, 2015, and you didn't go to a single

20  wellsite then?

21  A.   No.

22  Q.   What is your hours estimate for January of 2015?

23  A.   I don't remember.

24  Q.   Well, if you didn't go to any wellsites, what is

25  the best case scenario on hours?

**Wayne Eddy - Cross**

1    A.   A best case scenario on hours, I would go off my 30

2    and 10, all right.  For 30 days on and 10 days off.

3            On the ten days off, I wouldn't charge them

4    but on the 30 days on -- for instance, this document

5    would only show me getting paid eight hours a day, five

6    days a week.

7    Q.   Mr. Burchik, Mr. Pickel, and Mr. Lett would all

8    write down shop days on their hours report but there is

9    not a single shop day written on there?

10   A.   No.

11   Q.   Are you claiming overtime for the month of January

12   2015?

13   A.   I was told we didn't have to put the shop days down

14   there, only the days we worked on a particular job site.

15   Q.   Okay.  So they must have been told something

16   different because they would write down shop days?

17   A.   No.  I'm sure they were able to write that down,

18   too.

19   Q.   Okay.  Just tell me how many hours you are claiming

20   in overtime for January 2015?

21   A.   For January of 2015, I would say 30 times 8.

22   Q.   So, 120 hours of overtime?

23   A.   No.  30 -- I may not even -- 5 times 8 is 40.  6

24   times 8 is 48.  So, if there is four weeks, it would be

25   32 hours overtime.

**Wayne Eddy - Cross**

1    Q.   So, 32 hours overtime in January when there is no

2    record that you worked at all?

3    A.   Yes.

4    Q.   You didn't look at the Travel and Stop Reports

5    which showed you hardly ever came to the shop during

6    that timeframe, did you?

7    A.   I didn't have that available to me.

8    Q.   Because your lawyers didn't give it to you.

9    A.   Oh, no, sir, I had to come to the shop.

10   Q.   Well, if the GPS on your truck says there were days

11   and days when your truck was sitting at your home, 100

12   miles away, do you have an explanation for why you think

13   you should be paid overtime during January?

14   A.   That would only be the ten days that I would be

15   off.

16   Q.   Which of the ten days in January were you off?

17   A.   I don't know.  I would have to see some type of

18   report.  There's 30 days in January.  If I worked from

19   the 1st to the 30th, then I would be in the shop.

20            On the weekends if we would work Saturday, we

21   would work Sunday or Saturdays, that would be 48 hours

22   in a week.

23   Q.   Well, in January of 2015, nothing is going out.

24   There is no wellsite work to do.  You are saying you

25   worked six days a week?

1    A.    I don't know that.  All I know is that if I did

2    that, I was working at the shop.  I'm pretty sure that I

3    would be working at the shop, not on the job site.

4    Q.    Six days a week?

5    A.    Yes.

6    Q.    When there is no wellsite work going on?

7    A.    Yes.

8    Q.    The shop is closed on Saturday?

9    A.    No, the shop isn't closed on Saturday.

10   Q.    So, if Adam Fowler says he as the manager closed

11   the shop on Saturday --

12   A.    Then I wouldn't go but the reason that I estimated

13   the Saturday for eight hours on every Saturday was

14   because some days we worked Sundays and I never

15   allowed -- I never charged for a Sunday, estimating any

16   time for Sunday but I would charge an eight-hour day for

17   Saturday because often during the week we would work

18   different hours.  We would work a lot longer hours.  I

19   would still only charge for eight hours during that

20   period.

21   Q.    But this is a form the company gave you and it's

22   got a couple of columns there and one is hours worked

23   and at the bottom you wrote zero, right?

24   A.    Well, sir, that was because if you see total for

25   each customer, I put the zero.

**Wayne Eddy - Cross**

1  Q.   So that just means zero hours working at all for a

2  customer?

3  A.   For working for a customer.

4  Q.   That's because there weren't customers to do work

5  for?

6  A.   I didn't get to go out that month.

7  Q.   There is designated shop people like your son, and

8  it's their responsibility to take care of that

9  equipment, get it ready and get it cleaned and get it

10  ready to go out, right?

11  A.   No, sir.

12  Q.   That was his job?

13  A.   That was part of his job.

14  Q.   And if extra work needs to be done, the company

15  brings them in on a Saturday to do that work, right?

16  A.   Sometimes they do.  Sometimes they'll bring us all

17  in.  If a package needs to go out, they would want us to

18  all come in on a Saturday or Sunday, whichever, and get

19  that package ready to go out when it needed to go out.

20  Q.   But there is no packages going out in January?

21  A.   I don't know that.

22  Q.   There are none on wellsites that you worked on,

23  that's about all you can say?

24  A.   Sir, I don't know if there was any packages going

25  out in January or not.  This doesn't display if there

1   was any work going on.  This just says I didn't work any

2   jobs.

3   Q.   And we'll hear some testimony about the GPS reports

4   but you're not saying it's not accurate when it says

5   you're at home most days in January, there was something

6   wrong with the calibration or the GPS or was anything

7   you know of that would be wrong with it where you would

8   be able to say the GPS got it wrong, I was really in the

9   shop six to seven days a week?

10  A.   During January, well, sir, I hit a deer during

11  Christmas or going out on Christmas, and I know my

12  truck, and I can't remember which year it was, my truck

13  sat at my house for two weeks while I was out on a job.

14  That could have been the time I was speaking of.

15  Q.   Well, if you had been out on a job in January 2015,

16  you would have noted it on the report?

17  A.   Yes.

18  Q.   I'm sorry if I come across as frustrated with you

19  but you filed this case two and a half years ago.  We

20  sent you some interrogatories which you answered under

21  oath.  Do you remember what your answer was on how many

22  hours you worked?

23  A.   No.

24  Q.   You said "I don't know."

25          Do you remember when I took your deposition in

**Wayne Eddy - Cross**

1    March of 2016 and I said Mr. Eddy, how many hours are

2    you claiming to work.

3              THE COURT:  Counsel, let's not argue.  Show

4    him something.  It is not you impeaching him.

5    Q.   As of March 2016, did you have an hours estimate?

6    A.   As of March of 2016?  I'm unsure.

7    Q.   When you gave us one and I took your deposition a

8    couple months ago, do you remember what your hours

9    estimate was then?

10   A.   I did have an hours estimate and I had made some

11   errors on it.

12   Q.   That's what we talked about in your deposition?

13   A.   I fixed it.

14   Q.   It had a lot of errors, didn't it?

15   A.   Well, it had a certain amount of errors, and we

16   went back through and fixed all the errors that I felt I

17   made.

18   Q.   Is it possible that the estimate you gave here

19   today still has errors like claiming 30 plus hours of

20   overtime in January?

21   A.   That's possible that there's errors in it,

22   certainly.

23             MR. DAVIS:  Thank you.

24             THE COURT:  Do you wish to redirect?

25             MR. WARREN:  Please, Your Honor.

**Wayne Eddy - Redirect**

1                    <u>REDIRECT EXAMINATION</u>

2    <u>BY MR. WARREN</u>:

3    Q.   Wayne, Mr. Davis blamed you for trying to estimate

4    the shop hours you worked in January of 2015 without any

5    documents showing those hours.

6              Did Oil States require you to keep any records

7    of your shop hours?

8    A.   No, sir.

9    Q.   Did Oil States maintain any records of your shop

10   hours?

11   A.   No, sir.

12   Q.   Do you have any records of your shop hours or

13   anyway to look at records that you completed or time

14   records of when you worked in the shop to figure out

15   what those hours were?

16   A.   None other than the monthly report and I didn't put

17   that down.

18   Q.   So, without the monthly report, without any record

19   of the hours that you worked in the shop, have you tried

20   to come up with a best estimate of the number of hours

21   you worked in the shop?

22   A.   Yes, I have.

23   Q.   Are you asking the jurors to award you overtime for

24   hours that you were not working?

25   A.   No.

**Wayne Eddy - Redirect**

1    Q.   So, Mr. Davis asked you a bunch of questions about

2    whether you would be asking for overtime in these

3    circumstances or these circumstances.

4              Let me go through some of those.  If you were

5    on standby and you were not working at a wellsite, are

6    you asking to be paid overtime?  Are you asking to be

7    paid for those hours?

8    A.   No, I don't believe I charged for that.

9    Q.   Did you include those types of hours in your

10   estimates?

11   A.   Yes.

12   Q.   Do you believe you tried to figure out the hours

13   you are on standby away from the wellsite and exclude

14   those from the estimates you put together?

15   A.   Yes.

16   Q.   Let's talk about these estimates that you created.

17   I think Mr. Davis asked you to kind of recreate these

18   estimates in your head.

19              When you put together these estimates of the

20   hours you worked that you I think described for the

21   jurors in some detail, were you doing those estimates in

22   your head?

23   A.   No.

24   Q.   How did you actually do those estimates?

25   A.   I actually had to take my tally book entries and

1   then Mike Burchik's tally book entries, which we worked

2   back to back, and equal them out.

3   Q.   And Mr. Davis asked you whether these estimates you

4   did are written down.  Were they?

5   A.   Were the estimates written down?

6   Certainly -- well, I wrote them down to keep track of

7   them.

8   Q.   And Mr. Davis asked you whether you received any

9   assistance from your attorneys in doing this process.

10  Did you?

11  A.   No.  I figured out -- but you as my attorney put

12  the sheet together for me but all the information I give

13  you had to be on that sheet.

14  Q.   And have you provided that sheet -- and let me ask

15  that sheet that was put together, was that on a

16  day-by-day basis of every day that you worked between

17  2012 and 2015?

18  A.   Yes.

19  Q.   Have you provided that sheet to Oil States so they

20  can see how many hours you estimated for every single

21  day between 2012 to 2015?

22  A.   Yes.

23  Q.   Mr. Davis asked you after you provided those

24  statements to Oil States, whether Oil States or your

25  lawyers or anyone else pointed out inaccuracies in those

1  estimates.  Do you remember that question?

2  A.   Yes, sir.

3  Q.   Have you, in fact, over the course of preparing

4  these estimates found inaccuracies in the estimates that

5  you did?

6  A.   Yes, I did find inaccuracies.  I went over and over

7  it through my tally book and Mr. Burchik's and I did

8  find some inaccuracies, and I definitely went back and

9  changed them and did it to the best of my knowledge.

10  Q.   When you went back and changed your estimates to

11  fix the inaccuracies, did you then give Oil States the

12  new estimates once you had fixed those inaccuracies?

13  A.   Yes, they were presented with that.

14  Q.   Have you tried to be as transparent as you possibly

15  could be with the way you came up with these estimates?

16  A.   Yes, I have.

17  Q.   Do you stand by the estimates you did?  Do you

18  still believe they are accurate estimates of the hours

19  you worked?

20  A.   Yes, and I believe they are very conservative.

21  Q.   Explain why you think these are accurate and

22  conservative?

23  A.   For instance, when I put down for eight hours for

24  the shop time, I didn't put down ten hours, I put down

25  eight hours and many days we worked way past eight hours

**Wayne Eddy - Redirect**

1 many days.

2          So, I only allowed for six days a week and I

3 allowed the Saturday to be there only to equal out the

4 extra hours that we had worked -- that I would have been

5 working during the week.

6          I didn't gouge them.  I only presented them

7 for eight hours.  I didn't ask for ten hours, just a

8 regular workday of eight hours.

9 Q.   If Oil States pointed out to you any additional

10 inaccuracies, if they showed you something that said,

11 Wayne, you told us you worked on this day and you didn't

12 work on this day, would you fix that?

13 A.   Yes, I did fix that, in fact.

14 Q.   Do you believe you should be paid for hours you

15 didn't work?

16 A.   No, sir.

17 Q.   Would you ask the jurors to award you overtime

18 hours if you didn't actually do work on those days?

19 A.   No, sir.  If there are any inaccuracies, I would be

20 glad to take them off.

21 Q.   One last issue.  Mr. Davis suggested, I believe,

22 that you shouldn't be paid overtime because you are good

23 at what you do.  Do you remember that question?

24 A.   Yes.

25 Q.   I believe you testified that you have been paid

1    hourly and overtime at jobs before, is that right?

2    A.   Yes, sir.

3    Q.   When you worked at those jobs and you received

4    hourly pay and overtime, did you believe you were good

5    at what you did?

6    A.   Yes, sir.

7    Q.   Do you believe even people that are good at what

8    they do could be entitled to overtime?

9    A.   Yes, sir, I do.

10              MR. WARREN:   Thank you.

11              THE COURT:   Any recross on Mr. Eddy, sir?

12              MR. DAVIS:   No, Your Honor.

13              THE COURT:   Mr. Eddy, you may step down with

14   the Court's appreciation.   You are welcome to stay for

15   the rest of the trial.

16              Counsel, I suspect you don't have anything you

17   can do in five or six minutes?

18              MR. WARREN:   No, Your Honor.

19              THE COURT:   All right.

20              Ladies and gentlemen, it's been a long day.

21   Again, I appreciate your efforts today.

22              We'll start again tomorrow at eight a.m.

23   Again, the puzzle is starting to get built.   You are

24   seeing piece by piece.   Please do not reach any

25   conclusions or speak to anybody about what you heard

1    here today.

2            Thank you very much and have a good evening

3    and we'll see you tomorrow.

4            (Whereupon, court was recessed for the day at

5    4:50 p.m.)

6                            - - -

7

8            I hereby certify by my original signature

9    herein, that the foregoing is a correct transcript, to

10   the best of my ability, from the record of proceedings

11   in the above-entitled matter.

12

13

14              S/ Karen M. Earley

15                 Karen M. Earley

16                 Certified Realtime Reporter

17

18

19

20

21

22

23

24

25