## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SAMMY MOZINGO, *et al.*** | **: CIVIL ACTION** |
| | : |
| | : |
| **v.** | **: NO. 15-529** |
| | : |
| **OIL STATES ENERGY SERVICES,** | : |
| **L.L.C., *et al.*** | : |

## MEMORANDUM

**KEARNEY, J.**                                                                                    **August 10, 2018**

We trust our juries to reach considered and just verdicts. Parties disappointed with the jury's resolution of genuinely disputed material facts may move for a new trial, to reduce the jury's damage award or obtain a judgment as a matter of law. We today address an employer's disappointment with the jury's verdict the employer wrongly failed to pay overtime to men working as crane or grease operators on fracking sites. The jury found these men working extraordinary long days albeit earning significant income through non-discretionary bonuses are not exempt from the Fair Labor Standards Act requiring their employer pay them overtime. The employer's wide variety of arguments to overturn the jury and justify its "no-overtime" pay structure try to avoid the fundamental truth of our jury's obligation to determine credibility of witnesses and apply the established law provided by the trial judge after hearing from counsel. The employer's challenges to the legal issues lack merit. After study, we deny the employer's challenges to the jury's wisdom based on the evidence adduced by the crane and grease operators and apparently believed by the jury.

**I.     Background for the separate trials.**

Grease and crane operators on fracking sites sued their employer, Oil States Energy Services, L.L.C., for misclassifying them as exempt from overtime under the Fair Labor Standards Act, or "Act". Oil States raised two core defenses: (1) the employees were exempt under the Act's highly compensated exemption because they received annual compensation of over $100,000 a year, their primary duty included office or non-manual work, and they customarily and regularly performed one or more duties of an administrative employee; and, (2) the employees were not covered by the Act but instead covered by Motor Carrier Act because they were employed by a motor carrier under Department of Transportation regulations, their work in whole or part is as a driver/driver's helper/loader/mechanic and their work included driving or loading a vehicle with a gross vehicle weight rating of 10,000 pounds or less.[1]

The first four employees proceeding to the jury—Michael Burchik, Wayne Eddy, Jason Lett, and Robert Pickel—worked as crane operators. The jury in this crane operators' trial returned a unanimous verdict awarding each crane operator overtime wages for two years and found Oil States willfully misclassified them as exempt from the Act.

The remaining four employees proceeding to the jury—Mike George, George Bolen, Stephen Soltesz-Haughton, and Jeffery Steffish—worked as grease operators. After approximately six hours of deliberations, the jury in this grease operators' trial returned a unanimous verdict awarding each grease operator overtime wages for two years. The jury did not find Oil States willfully misclassified their grease operator positions as exempt from the Act.

Repeating an array of arguments largely addressed by us either before or during the trials, Oil States now moves for (1) a new trial for both crane and grease operators; (2) remittitur for damages awarded to both crane and grease operators; and, (3) a renewed motion for judgment as

2

a matter of law for the grease operators.  Oil States has not met its burden to overturn the jury's evaluation of the disputed facts.

**II.    Analysis**

    **A.    We deny Oil States' motions for new trial.**

Oil States moves for a new trial arguing: (1) the verdicts are against the great weight of the evidence: (2) our erroneous evidentiary rulings affected the verdicts; and (3) errors in the jury charges. Oil States also argue the crane operators: violated our *limine* order and Federal Rule of Evidence 407 by eliciting testimony about remedial measures; their counsel made improper arguments in closings; and, unfair surprise at trial with evidence discussed in pre-trial filings.

We may only disregard the jury's verdict and grant a motion for new trial where "the great weight of the evidence cuts against the verdict..."[2] Granting a new trial "because the verdict is against the weight of the evidence [is] proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocked our conscience."[3] Our "power to grant a new trial is limited 'to ensure that [it] does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury.'"[4]

After careful review of the trial record and our rulings, we deny Oil States' motion for a new trial.

    **1.    The verdicts are not against the great weight of the evidence.**

Oil States argues the verdict in favor of the crane operators is against the great weight of the evidence because: (a) there is no evidence to support a willful violation of the Act; and, (b) the jury's damages award for hours worked exceeded a half-time calculation on total compensation.

3

Oil States argues the verdict in favor the grease operators is against the great weight of evidence because the grease operators testified "unambiguously" they each met the elements of the highly compensated exemption.

### a. Evidence supports the jury's finding Oil States willfully violated the Act in defining the crane operators as exempt from the Act.

A willful violation of the Act "includes situations when the employer, at the time of its [Act] violation, either 'knew' its conduct was prohibited by the [Act] or 'showered reckless disregard for the matter.'"[5]

Oil States argues the jury's finding of willfulness in defining the crane operators as exempt from the Act is against the weight of the evidence because evidence Oil States paid each crane operator over $100,000 is "minimal proof" to establish the highly compensated exemption to the Act. The crane operators adduced evidence Oil States knew it willfully violated the Act by classifying them as exempt including Oil States describing the position of crane operator as nonexempt in a job posting and in Mr. Lett's termination paperwork.[6] The jury also heard testimony from Oil States' former vice president of human resources Jill Curry, based on the crane operator's job description, "it would be [her] assumption that Crane Operators were nonexempt."[7] The jury also heard Oil States' current vice president of human resources Terry Woodall testify he believed crane operators are nonexempt.[8]

The jury heard sufficient evidence Oil States "knew" or "showed reckless disregard" classifying crane operators as exempt violated the Act to support their finding of willfulness. Oil States' argument there can be no finding of willfulness because federal regulations "deem" employees making over $100,000 exempt and Oil States paying the employees over $100,000 automatically negates a jury's ability to find a willful violation is not supported by statute,

4

regulation, or caselaw. The crane operators adduced evidence Oil States knew it was not paying overtime to them even though they were not exempt.

### b. The evidence supported the jury's damages to the crane operators.

Oil States argues the jury's damages award to the crane operators is "too high and resulted in a miscarriage of justice" because (1) we incorrectly instructed the jury on how to calculate damages; (2) the damages award for Messrs. Pickel, Burchik, and Eddy exceeded the amount of hours they testified to working; and, (3) the jury's damages award improperly included travel time.[9] We disagree.

#### *Damages calculation*

Oil States argues we incorrectly instructed the jury on how to calculate damages for the crane operators because Oil States "intended to compensate [the crane operators] for all straight time hours worked" when it paid them the salary and job bonuses meaning their recovery should have been a half-time calculation on their total compensation.[10] The parties argued in motions *in limine* whether the proper damages calculation for bonuses is half-time because they are performance-based or one and a half-times because they are time-based. We found a fact dispute whether Oil States paid bonuses to the crane operators based on performance or simply hours worked and deferred our ruling based on evidence adduced at trial.[11]

At trial, Mr. Burchik testified to be paid a job bonus he had to "[b]asically work on a job, frack the well. Once that was complete, we was [sic] eligible for a bonus."[12] Mr. Burchik further testified Oil States never withheld his bonus and the amount of his bonus did not vary based on whether he did a good or poor job.[13] Mr. Lett testified he received a bonus "if Oil States charged the oil company a fee for that day" and the amount of his bonus did not change based on job performance.[14] Mr. Pickel also testified "[a]s long as Oil States was able to get

5

paid, then they would pay us [the job bonus]."[15]  And Mr. Eddy testified his "job bonus worked exactly the same way as the others described."[16]  In addition, Oil States' corporate representative Adam Fowler testified he never recalled reducing, increasing, or refusing a crane operator's bonus based on their job performance.[17]  He testified a crane operator's bonus is paid "per shift" and agreed if a crane operator "worked seven shifts in that week, he gets seven $450 bonuses."[18]

At the charging conference, we found no evidence the four crane operators' bonuses were performance-based, and instead the crane operators' bonuses were non-discretionary and to be calculated at one and half times damages.[19]  While Oil States takes umbrage with our ruling, arguing it "intended" the bonuses to compensate for hours worked, it does not cite trial testimony supporting its argument the bonuses were performance based.  We properly instructed the jury to calculate overtime owed to the crane operators using the salary premium multiplier of one and a half-times.

### *Damages awards for Messrs. Pickel, Burchik, and Eddy are proper.*

Oil States argues the adduced evidence does not support the damages award for Messrs. Pickel, Burchik, and Eddy because the jury awarded damages which "exceeded the maximum possible" amount of hours they testified to working.[20]

Where a party challenges a jury's damage award as "grossly excessive, our review is 'exceedingly narrow' and our 'responsibility [is] to review a damage award to determine if it is rationally based."[21]  While we view facts "in the light most favorable to" Oil States, the "jury's damages award will not be upset so long as there exists sufficient evidence on the record, which is accepted by the jury would sustain the award."[22]

Without citing to crane operators' testimony or elaborating its one sentence argument, Oil States asks us to overturn the jury's award (on which it spent almost 7 hours deliberating).[23]  Oil

States does not describe the maximum award (i.e., its worst case scenario) based on testimony. Each of these crane operators testified they "conservatively" *estimated* their hours because they attempted to recreate their hours from fragmented records, and in Mr. Eddy's case, he estimated his hours off Mr. Burchik's hours because Oil States did not have Mr. Eddy's records.[24]

Oil States does not provide a basis to overturn the jury award. The jury's award of overtime in the amount of $89,194 to Mr. Burchik, $132,844 for Mr. Eddy, and Mr. Pickel for $69,683 is not "grossly excessive" because there is sufficient evidence for the jury to find the crane operators worked more hours than their "conservative" estimates.[25]

### *Travel time*

Oil States argues the jury's damages award to the crane operators is not supported by evidence because the spreadsheets the crane operators used to refresh their recollections included the crane operators' travel time and "the jury accepted and used [these travel time estimates] in their damages calculations.[26]

We "presume that the jury followed [our] instructions when arriving at its verdict."[27] At the charging conference, we heard extensive argument on how to instruct the jury on travel time and Oil States agrees we then "correctly interpreted the law" in instructing the jury explaining which types of travel time may be counted as overtime hours and which types of travel time does not.[28]

The jury heard testimony from each crane operator about their daily routine and travel and had exhibits including their tally books and records. The jury did not see or deliberate using the spreadsheets the crane operators used to reflect their recollections. We have no reason to presume the jury did not follow our instructions and properly compensate the crane operators for time spent traveling. Oil States' previous argument the jury awarded damages beyond what the

7

crane operators estimated in testimony cuts against its present argument the jury relied exclusively on those estimated hours in awarding overtime. Oil States' contradictory arguments reinforce our finding the jury, following our instructions, properly awarded damages based on the testimony they found credible.

### c. Evidence supported the jury's finding the Act's highly compensated exemption did not apply to the grease operators.

Challenging the jury's award to the grease operators, Oil States argues the verdict is against the great weight of evidence because the grease operators testified "unambiguously" they each met the elements of the highly compensated exemption. Oil States cites to portions of the transcript where the grease operators conceded some of their job responsibilities included non-manual labor, they earned over $100,000 per year, and in some instances exercised discretion. But each of the grease operators testified their job duties included manual labor as well. The jury heard testimony from each grease operator swearing their job responsibilities included non-manual labor. Oil States has not shown the verdict resulted in a miscarriage of justice.

Highly compensated employees are exempt from overtime under the highly compensated employee exemption as defined in federal law. The three elements of the highly compensated employee exemption include (1) the employee's total annual compensation is at least $100,000 or $100,000 annualized in the event of a partial year of employment; (2) the employee's primary duty includes performing office or non-manual work; and (3) the employee customarily and regularly performed an exempt duty defined under the FLSA.[29] Primary duty means "the principal, main, major, or most important duty that the employee performs."[30] Oil States argued the grease operators customarily and regularly performed the exempt administrative duty of exercising discretion and independent judgment with respect to matters of significance.[31]

8

Employees "who perform work involving repetitive operations with their hands, physical skills and energy are not exempt" under the highly compensated employee exemption.[32]

The grease operators offered sufficient testimony their primary duty was manual work. For example, Mr. Bolen testified to the manual work of "rigging up" pressure control equipment and "stabbing" equipment to the well.[33] Mr. Bolen detailed the step-by-step process of each. Mr. Bolen also testified he worked at the "shop" on the site when not working directly on the well. At the shop, Mr. Bolen rebuilt equipment, cleaned equipment, and cleaned work trucks.[34] Mr. Barry Blank, an Oil States manager, described the grease operators' tasks as "[w]e are going to be rigging up. We are going to be stabbing on a well. We are going to be running in hole. We are going to rig down, pull off well. ... Unless they run into a situation where the wire gets stranded ... the job log is not going to deviate. It's fairly boring... [and] a repetitive situation."[35] These were non-office and non-manual duties. While Oil States accurately cites testimony showing the grease operators' job responsibilities requiring non-manual work, the jury had sufficient evidence to conclude the grease operators' primary duty did not include office or non-manual work.[36]

The grease operators also adduced sufficient testimony for the jury to conclude the grease operators did not exercise discretion or independent judgment as pressure control operators. Mr. Bolen testified he did not have "any sort of management responsibilities" as a grease operator."[37] Mr. Bolen also testified "if there was ever a situation where they came up with a plan that I wasn't, you know, prepared for or comfortable with, I would call my manager .... And they would just let me know what to do."[38] He explained, however, only once did situation like that arise where a wireline got stranded.[39] Mr. George also testified his jobs where "98 percent normal."[40] And when he ran into an issue, "[he] always talked to somebody else more

9

experienced" and "[i]t was very clear don't try to do anything on your own without permission..."[41] Mr. Soltesz-Haughton testified on one job, he objected to how the fracking company operated the job and he called his distract manager who told him to "just kind of go along with it."[42] Instead of having ability to exercise judgment, Mr. Soltesz-Haughton had to ask to be removed from the job and Oil States sent a different grease operator to handle it.[43]

The jury's finding the highly compensated exemption did not apply is not against the great weight of the evidence because there is sufficient evidence the grease operators' primary duty did not include non-manual or office work and they did not "customarily or regularly" exercise discretion or independent judgment.

## 2. We correctly ruled on evidence challenges.

Oil States argues we should grant a new trial based on erroneous evidentiary rulings in the trial with crane operators by: (a) allowing the crane operators to refresh their recollections using documents we excluded from being admissible trial exhibits; (b) excluding Adam Fowler from authenticating the GPS spreadsheets and testifying to its contents; (c) excluding Oil States' exhibit showing the weight of the truck used by the crane operators exceeded 10,000 pounds; and, (d) excluding testimony from Oil States' Vice President of Human Resources comparing the crane operators' pay plan to an hourly wage.

Oil States argues we should grant a new trial in the second trial with grease operators by: (a) granting the grease operators' motion *in limine* to preclude Rhonda Totten, Regional Human Resources Manager, from testifying to her involvement in Oil States' decision on whether the grease operators were exempt from overtime pay; (b) preluding Corey Courts from testifying to his conversations with Ms. Totten on the exempt status of grease operators; (c) allowing the grease operators to testify to their hours worked and damages despite disclosing their damages

10

calculations nine months after discovery closed; (d) granting the grease operators' motion *in limine* to preclude evidence of the actual weight of trucks used by the grease operators; (e) excluding testimony from Mr. Fowler and Mr. Courts comparing the grease operators pay plans to a non-exempt employee's pay plan; and, (f) granting the grease operators' motion *in limine* to preclude testimony of the grease operators' activities during nonproductive work hours.

Our inquiry into Oil States' objections to our evidentiary rulings is "twofold: (1) whether an error was in fact committed; and, (2) whether that error was so prejudicial that the denial of a new trial would be 'inconsistent with substantial justice.'"[44] A new trial is granted where "it is highly probable" our erroneous evidentiary ruling affected Oil States' "substantial rights."[45]

### a. Allowing crane operators to refresh recollection.

Oil States argues we improperly allowed the crane operators to refresh their recollections using a document we excluded from being admitted as evidence before trial. We properly allowed the crane operators to refresh their recollections using an inadmissible document because they can refresh the recollection with any document regardless of its admissibility because the underlying document is not admitted into evidence or shown to the jury.

Before trial we ruled the crane operators "may testify from their memory as to their hours worked and damages claims because to the extent [the crane operators] at trial claim to recall their hours worked and damages, their testimony raises credibility issues properly subject to impeachment."[46] During sidebar at trial, Oil States raised a concern the crane operators would refresh their recollection using spreadsheet which counsel helped prepare and we told Oil States its argument is "pretty good cross-examination."[47]

Our court of appeals instructs "[w]itnesses may use any aid to refresh their recollections."[48] A witness may refresh his or her recollection using a document which is

11

otherwise inadmissible because under Fed. R. Evid. 612 "the contents of the documents used solely to refresh a witness' recollection might never be shown in open court because the law does not permit the jury to see them."[49] In *Jackson v. City of Pittsburgh*, Judge Fischer excluded a report from being admitted into evidence because it included inadmissible hearsay statements.[50] At trial, Judge Berry Fischer allowed the plaintiff to refresh his recollection from the excluded report but did not admit it into evidence.[51]

Oil States argues we erred based on *Valdez v. Watkins Motor Lines, Inc.* from the Court of Appeals for the Eighth Circuit.[52] In *Valdez*, the district court ruled the accident report inadmissible before trial based on concerns over the unavailability of the officer who authored the report.[53] Despite this ruling, the district court allowed the defendant to introduce opinions and conclusions from the report into evidence through another officer who reviewed the report of the investigating officer.[54] The court of appeals granted a new trial because "[g]iven the district court's pre-trial ruling that the accident report was inadmissible, [defendant] should not have been allowed to introduce the officer's opinions and conclusions from the accident report."[55]

The court of appeals in *Valdez* does not address the ability to refresh recollections. Unlike *Valdez* where a witness introduced into evidence the conclusions of another non-testifying person from a document previously ruled inadmissible, the crane operators reviewed a document which refreshed their recollection and they testified to their refreshed recollection. There is no error because neither the underlying inadmissible document nor any hearsay statements from the document was not introduced evidence and we deny Oil States' motion for new trial on this ground.

### b. Excluding GPS spreadsheets prepared by a third party.

Oil States argued we erred by improperly excluded Adam Fowler from authenticating the GPS spreadsheets and testifying to their contents because: (1) counsel for the crane operators represented "records produced by [Oil States] were admissible as business records and the testimony of records custodians was not needed"; and (2) because without Mr. Fowler's testimony based on the GPS spreadsheets Oil States could not "refute" the crane operators' testimony to their estimated hours worked.

We properly excluded Mr. Fowler from authenticating and testifying to the GPS spreadsheets because the spreadsheets are third party business records of a company called Fleetmatic and Mr. Fowler could not provide "adequate verification or other assurance of accuracy of" the information is those spreadsheets.[56] Oil States does not argue we erred because Mr. Fowler could properly authenticate the third party business records and curiously does not cite a case to explain how our holding erred as a matter of law.

Oil States also argues the parties stipulated to the admissibility of the GPS spreadsheets on the record before jury selection. At the conference, we discussed the stipulations in the pre-trial memoranda. Neither party refers to a stipulation to admit third party business records of Fleetmatics.[57] The crane operators stipulated certain records from Oil States are authentic business records, as well as records from third parties, WEX Inc. and Ford Motor Company but conspicuously absent is a stipulation concerning the GPS spreadsheets from Fleetmatics.

Because Oil States fails to show how we erred in excluding Mr. Fowler from authenticating and testifying because he could provide independent verification of information in the third party business, we deny its motion for new trial on this ground.

13

### c. Excluding exhibit showing the weight of the truck exceeded 10,000 pounds.

Oil States argues we erred by excluding an exhibit which showed the truck the crane operators testified to using on scale and the weight showed 10,460 pounds. Oil States argues we should have been allowed the evidence because the crane operators showed the same picture of the truck on the scale but without the weight.

Oil States' argument would make sense if the jury decided the weight of the trucks used by the crane operators but they did not. We decided as a matter of law the trucks' gross vehicle weight, not the trucks' actual weight, is the appropriate metric to determine if the Technical Corrections Act applied.[58] Oil States' argument is the crane operators' exhibit showing a truck on a scale somehow converted our pre-trial ruling as a matter of law into a fact question for the jury. It did not. The actual weight of the trucks driven by the crane operators is not relevant evidence and we did not err in excluding Oil States' exhibit showing the truck weighed 10,460 pounds on the scale. The actual weight is not material.

### d. Excluding Ms. Curry's testimony comparing the crane operators' pay plan to an hourly wage.

Oil States argues we improperly excluded Ms. Curry's testimony one employee earned more than $400,000 based on salary and job bonus and it never "crossed [her] mind that these people making hundred, 200-, $300,000 a year, were nonexempt, overtime eligible employees."[59] Oil States argues our pre-trial ruling sustaining the crane operators' objection to this portion of Ms. Curry's testimony because it is a comparing pay plans is an error because (1) later during trial counsel for the crane operators elicited testimony the crane operators are now paid hourly from Mr. Fowler; and, (2) because Ms. Curry's testimony is relevant to whether Oil States acted willfully.

Oil States did not object when the crane operators' counsel asked Mr. Fowler questions about reclassifying the crane operators to hourly employees. Oil States' counsel raised the issue at sidebar we convened for a different purpose and we told counsel we did not find it prejudicial because our order barred Oil States' testimony comparing the crane operators' pay plan to other alternative pay plans but Mr. Fowler's testimony did not open the door because it only reached the mere fact of reclassification.[60]

Oil States never asked to revisit our exclusion of Ms. Curry's testimony to counter Mr. Fowler's testimony about reclassification of the crane operators to hourly employees. Oil States cannot now argue our pre-trial ruling is an error based testimony at trial when Oil States did not ask to offer Ms. Curry's testimony after Mr. Fowler's testimony allegedly opened the door on our pre-trial ruling.[61]

### e. Limiting Ms. Totten's testimony.

Oil States argues we improperly limited Ms. Totten's testimony at the grease operators' trial by precluding her from testifying to her involvement in Oil States' decision to treat the grease operators as exempt employees.

Oil States disclosed Ms. Totten as a witness in its Rule 26 disclosures but described her as a witness with "knowledge of human resources support for the locations at issue and the circumstances leading up to employee separations."[62] Oil States did not identify Ms. Totten in its witness list. After the crane operators' trial, Oil States moved to amend its witness list to add, among others, Ms. Totten. We allowed Oil States to add Ms. Totten as a witness but explained Oil States may only identify Ms. Totten as a trial witness limited to her knowledge as disclosed in Oil States' Rule 26 disclosures.[63]

15

Oil States argues, through discovery, the grease operators were on notice of Ms. Totten's participation in the decision of whether they were exempt employees. Oil States argues Ms. Totten should have been allowed to testify to her involvement in this decision.

Oil States raised this same argument several times before and during trial. A week before trial, Oil States filed a report of objections to witnesses.[64] Oil States then argued it anticipated the grease operators would object to Ms. Totten testifying to her involvement in the decision whether the grease operators were exempt. Oil States argued, through discovery, the grease operators were on notice of Ms. Totten's involvement in the decision. Before trial, the grease operators moved to preclude Ms. Totten from testifying to her involvement in determining whether the grease operators were exempt employees.[65] We heard oral argument and ordered Ms. Totten "may not testify to actions taken in determining whether the Plaintiffs were subject to the overtime requirements of the Fair Labor Standards Act."[66]

Under Federal Rule of Civil Procedure 37, if a party fails to provide information or identify a witness under Rule 26, the party is not allowed to use the information or witness at trial, unless the failure is substantially justified or is harmless.

During discovery, the grease operators served Oil States with interrogatories inquiring into which Oil States employees determined the exempt classification of the grease operators. The grease operators specifically requested Oil States provide the names of all employees who participated in determining whether the grease operators were subject to the overtime requirements of the FLSA.[67] Oil States identified five employees. Oil States did not disclose Ms. Totten.[68]

After trial, Oil States again cites the same sources of deposition testimony from its report which it believes adequately disclosed Ms. Totten as being involved in the decision of whether

16

the grease operators were exempt from overtime pay. None of the deposition excerpts disclose Ms. Totten as being involved in this decision. The deposition excerpts identify Ms. Totten as being involved in setting employee salaries and drafting job descriptions. But none of the deposition excerpts disclose Ms. Totten as being involved in the ultimate decision of whether employees are exempt from overtime pay. Oil States cites the deposition testimony of Mr. Woodall for the proposition Ms. Totten is one of the persons responsible for ensuring Oil States complied with the Act.[69] The grease operators asked Mr. Woodall whether Ms. Totten held responsibility for overtime compliance and determining exempt classifications. Mr. Woodall testified, "Well I would say not – not specifically, but I would charge the entire HR team with responsibilities for understanding that and making sure we're in compliance."[70]

When directly asked who participated in determining whether the grease operators were exempt from overtime, Oil States did not disclose Ms. Totten. The deposition discovery cited by Oil States in arguing the grease operators were on notice Ms. Totten participated in the decision making of whether the employees were exempt from overtime does not support Oil States' argument. The deposition testimony supports Ms. Totten participated in determining the grease operators' salaries and participated in drafting their job descriptions. We allowed Ms. Totten to testify to her human resources support in those aspects.

Oil States argues the grease operators opened the door during trial to the introduction of Ms. Curry's testimony on Ms. Totten's involvement in determining whether the grease operators were exempt under the FLSA. First, Oil States designated the testimony it cites to be read to the jury over the grease operators' objection, so the grease operators did not open a door. Second, the testimony cited by Oil States does not tie Ms. Totten to the exempt status decision.[71] Ms.

17

Curry testified human resource managers at Oil States prepared job descriptions, but she did not testify Ms. Totten participated in deciding the grease operators' exempt status.

Oil States failed to disclose Ms. Totten's role in determine the exempt status of the grease operators. It offered no basis at trial, and none now, to cavalierly excuse its strategic decision to not disclose her role until the eve of trial.

### f. Limiting Corey Courts' testimony.

Oil States argues we improperly limited Mr. Courts' testimony. First, Oil States argues we improperly prevented Oil States from publishing an exhibit to the jury despite the same exhibit being admitted into evidence earlier at trial. Second, Oil States argues we improperly precluded Mr. Courts from testifying to his interactions with Ms. Totten regarding the legality of the grease operators' payment structure. Third, Oil States argues allowing the grease operators to play excerpts of Mr. Courts' video deposition at trial exacerbated the prejudice of limiting Mr. Courts' testimony.

Oil States argues allowing the grease operators to present the video deposition of Mr. Courts, as the corporate designee of Oil States, exacerbated the prejudice of limiting Mr. Courts' testimony, in his individual capacity. At trial, Oil States closed its case in chief presenting the testimony of Mr. Courts in his individual capacity. Waiving their right to cross examine Mr. Courts in Oil States' case in chief, the grease operators explained they wished to adduce excerpts from Mr. Court's video deposition as Oil States' corporate designee under Federal Rule 30(b)(6) in their rebuttal case.[72] Oil States objected on the basis Mr. Courts could testify in person.[73] Under Federal Rule 32(a)(3), we overruled Oil States objection.[74] We explained a party may use the deposition of anyone who provided testimony as a corporate designee for any purpose under Rule 30(b)(6).[75]

Oil States does not identify how the grease operators' presentation of the deposition testimony of Mr. Courts, as Oil States' corporate designee, caused prejudice. The presentation of Mr. Court's video deposition as Oil States' corporate designee did not prejudice Oil States. The grease operators designated Mr. Courts' video deposition testimony during pretrial memoranda. Oil States did not object to the grease operators' designations of Mr. Court's video deposition testimony and did not counter designate excerpts of the video deposition.

Oil States argues an excerpt of Mr. Courts' video deposition testimony demonstrates the grease operators' notice of Ms. Totten's involvement in determining the exempt status of the grease operators. In the deposition, the grease operators asked Oil States who is responsible for determining whether an employee receives overtime compensation.[76] Mr. Courts, as Oil States, answered human resources and accounting made this decision.[77] Oil States argues based on this deposition testimony, the grease operators knew who to ask during discovery regarding the exempt classification decision.

The grease operators asked during discovery who at Oil States helped make exempt status decision. The grease operators specifically asked for the names of all employees at Oil States involved in the exempt classification decision. Oil States did not disclose Ms. Totten as a person involved in this decision. Oil States now argues the grease operators should have pieced together the puzzle of Ms. Totten's involvement during the discovery period through witnesses' general references to the human resources department in deposition testimony.

Oil States argues the video deposition testimony opened the door for Ms. Totten to testify at trial regarding her involvement in the exempt classification decision. Oil States never disclosed her involvement in the decision despite being directly asked to identify all employees

19

involved in the decision. Mr. Courts did not identify Ms. Totten in his video deposition as a person involved in the decision.

Oil States did not put the grease operators on notice of Ms. Totten's involvement. The presentation of Mr. Courts' video deposition as Oil States' corporate designee did not prejudice Oil States. The grease operators did not open a door for Ms. Totten to testify to her undisclosed involvement in the exempt classification decision.

### g. Allowing grease operators to testify as to damages.

Oil States asks us to grant a new trial because we allowed the grease operators to testify to their hours and damages. Oil States is simply attacking our April 26, 2017 Order denying its motion to strike the grease operators' damages calculations because of delayed disclosure.[78] We ruled the delay did not cause incurable prejudice to Oil States because it had months until the trial to cure prejudice by deposing the grease operators on their belated damages disclosure.[79] We granted Oil States leave to depose the grease operators by July 14, 2017, which means Oil States had just shy of seven months before this trial to prepare for the damages testimony of the grease operators.[80] Oil States, additionally, fails to cite authority supporting why we should reconsider our Order. We deny Oil States' motion for new trial because it is challenging our July 14, 2017 Order in its motion to strike, not conduct at trial.

### i. Comparing compensation to an hourly pay plan.

Oil States argues the grease operators violated our order *in limine* precluding testimony comparing the grease operators' salary and bonus pay plan to other pay plans by eliciting testimony from Mr. Soltesz-Haughton and Mr. Steffish about their comparing their pay plans at other companies to Oil States where then performed similar work. Oil States argues with this testimony the grease operators opened the door to Mr. Fowler and Mr. Courts to testify about the

comparison between salary and job bonus and hourly pay plans and we improperly denied their request to offer this testimony.[81]

We properly excluded Mr. Fowler and Mr. Courts from testifying because the grease operators' testimony as to how another employer paid them for similar work did not open the door to whether the grease operators would have been paid more or less on an hourly or salary plus job bonus pay plan by Oil States.[82] Particularly where the grease operators did not compare testify to their income amounts from those employers or compare their income from those employers to their salary from Oil States.

### j. Excluding testimony regarding activities during non-productive work time.

Oil States argues we improperly excluded testimony about how the grease operators spent their non-productive time. Before trial, we ruled what the grease operators did during non-productive work hours is irrelevant because how they occupied themselves "during non-productive work hours spent waiting for others to complete work does not speak to [the grease operators'] job duties" and because the Department of Labor requires employees be paid for all hours at work regardless of whether they are working.[83]

At trial, Mr. Bolen testified about waiting in his truck and cleaning his tools while waiting for the frack.[84] At sidebar, Oil States argued this testimony opened the door to questions about what the grease operators did during their non-productive time.[85] We clarified our *in limine* order and told Oil States "[y]ou can point out that he wasn't working .... You can point out maybe he watched a movie, but we don't want to do hour-by-hour all the days."[86] We told Oil States to "summarize" what the grease operators did during non-productive hours.[87]

Oil States then elicited testimony from Mr. Bolen about watching movies in his truck during nonproductive hours.[88] Oil States cannot now request a new trial based on our *in limine*

21

Order where we allowed Oil States to introduce the exact type of testimony it claims we improperly excluded.

### 3. Our jury instructions are proper.

Oil States argues we should grant a new trial because our jury instructions in both the crane operators' and grease operators' trials are erroneous in light of *Encino Motorcars, LLC v. Navarro* decided by the Supreme Court after our trial.[89] When reviewing objections to jury instructions, "[w]e must determine whether, taken as a whole, the instruction properly apprised the jury of the issues and the applicable law."[90] "[A] mistake in a jury instruction constitutes reversible error only if it fails to 'fairly and adequately' present the issues in the case without confusing or misleading the jury.'"[91] The parties are "entitled to a jury instruction that accurately and fairly sets forth the current status of the law" and not a "right to a jury instruction 'of its choice, or precisely in the manner and words of its own preference.'"[92]

When the Supreme Court "applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the Supreme Court's] announcement of the rule."[93] Because this case is still open on direct review, we examine *Encino Motorcars* holding and Oil States' arguments.

In *Encino Motorcars*, the Supreme Court rejected "the principle that exemptions to the [Act] should be construed narrowly .... Because the [Act] gives no 'textual indication' that its exemptions should be construed narrowly, 'there is no reason to give [them] anything other than a fair (rather than a 'narrow'] interpretation.'"[94] Oil States argues, for the crane operators, we "incorporate[d] narrow construction principles" in our instructions on the (1) highly compensated exception; (2) the motor carrier exception; (3) definition of hours worked; (4) the

22

formula for calculating damages; (5) definition of willful; and, (6) the verdict form on damages. Oil States argues we "narrowly construed" our instructions against Oil States during the grease operators' trial under the (1) highly compensated exception; (2) the Motor Carrier Act exception; (3) damages; and, (4) the verdict form.

### a. Jury instructions for the crane operators' trial.

Oil States does not cite a specific instruction in the crane operators' trial violating the Supreme Court's recent teaching. Our close review of the charging conference shows we never invoked a narrow construction principle in formulating the instructions or verdict form. For example, we rejected the crane operators' request to include "language about construing the exemptions narrowly and in favor of employees…"[95] We refused to "give interpretive tools to the jury. [We] tell them what the law is."[96] We, instead, formulated the instructions to follow the language of the Department of Labor's regulations.[97]

Oil States also complains our refusal to include when an employee is "on leave" in explaining when the jury should annualize income is "consistent with the narrow construction principle rejected by the Supreme Court in *Encino Motorcars*."[98] We, however, rejected Oil States' request because the inclusion would be "so contrary to the [Family Medical Leave Act]" not based on construction of the Act.[99]

Oil States also argues our instruction on "willful" is improper. After the charging conference, we circulated new instructions to counsel including defining willful to require Oil States' knowledge must be more than mere suspicion or possibility. … The employees must show some degree of actual awareness."[100] Neither our court of appeals in *Souryavong* nor we relied on a narrow construction principle in formulating the definition. We also note Oil States did not object to this language.[101]

23

### b. Jury instructions for the grease operators' trial.

Again broadly arguing our instructions in the grease operators' trial were narrowly construed, Oil States now challenges our instructions on the (1) highly compensated exception; (2) the Motor Carrier Act exception; (3) damages; and, (4) the verdict form. Oil States does not cite to specifically where we invoked the narrow construction principle in construing the jury instructions because we never invoked this principle and our instructions are proper under *Encino Motorcars*.

### *Highly compensated jury instruction*

Oil State first objects to the highly compensated jury instruction based on our inclusion of the phrase "the employee customarily and regularly performed the following single exempt duty of an administrative employee..." particularly the phrase "administrative employee."[102] We drew this instruction from the Code of Federal Regulations stating "a highly compensated employee will qualify for exemption if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee."[103] We properly instructed the jury using the phrase "administrative employee."

Oil States argues we erred instructing the jury on annual compensation. Oil States' argument is we improperly instructed the jury in response to its second juror question during deliberations, "[f]rom a W-2 perspective, which box should we be using to calculate total annual compensation?"[104] Oil States sought us to instruct the jury to look at Box 5 of the W-2.[105] We declined to instruct the jury to look at a specific box because there is no definitive answer in the law which box on the W-2 in appropriate to look at in an Act case.[106]

We instructed the jury "not to look to the W2 as the only evidence for determining employee's total annual compensation. You should not look at any box as proof—as definitive

24

proof of the annual compensation. The W2 only provides part of the evidence which you consider, and, as with each of your decisions, you should consider all the evidence given to you to determine whether the first element of the highly compensated employee exemption has been proven."[107]

Oil States does not cite a single case or federal regulation to support its argument our instruction is incorrect, instead it just iterates the argument we should have instructed the jury to look at box 5. Oil States does not identify a clear error of law in our highly compensated exemption instruction or a place we invoked a narrow construction principle with respect to this instruction.

### *The Motor Carrier Act exception*

Oil States objects to our failure to include the phrase "actual weight" when instructing the jury on the Motor Carrier Act exemption. Long before trial, we held as a matter of law the gross vehicle weight of the trucks used by the crane operators, not the trucks' actual weight, is the appropriate metric to determine if the Technical Corrections Act applied.[108] We did not invoke the narrow construction principle in our holding. While we noted the existence of the narrow construction principle, we rejected as persuasive *Gracia v. Western Waste Services, Inc.* where a district court invoked the narrow construction principle to find using actual weight, not gross vehicle weight rating is proper under the Technical Corrections Act.[109]

We properly rejected Oil States' request to include actual weight because we ruled as a matter of law the gross vehicle weight rating is the proper metric under the Technical Corrections Act and Motor Carrier Act.

### *Damages*

Oil States objects to our damages instructions because we (1) instructed the jury to use a 1.5 multiplier and failure to include an instruction the grease operator must prove by the preponderance of the evidence he worked more than 40 hours in a workweek to be entitled to damages.[110]

Oil States argues we incorrectly instructed the jury on how to calculate damages because Oil States intended the salary and bonus to compensate the grease operators for all hours worked meaning their recovery should have been a half-time calculation on their total compensation. Before the first trial, the parties argued in motions *in limine* whether the proper damages calculation for bonuses is half-time because they are performance-based or one and a half-times because they are time-based. We found a fact dispute in whether Oil States paid bonus to the crane operators based on performance or simply hours worked and deferred our ruling based on evidence adduced at trial.[111]

We found no fact issue because there was no evidence Oil States paid bonuses to the four grease operators based on performance. The evidence appeared to the contrary: Oil States did not exercise discretion in paying the grease operators' bonuses. We properly instructed the jury to calculate the automatic bonus at one and half times damages.[112] Oil States' disagreement with our instruction because it claims it "intended" the bonuses to compensate for hours worked is not grounds for a new trial. The jury apparently did not believe their intent.

Oil States also argues we failed to instruct the jury a grease operator must prove by the preponderance of the evidence he worked more than 40 hours in a workweek to be entitled to damages. We instructed the jury the grease operators "must first show you that they work in excess of 40 hours a week to be compensated for overtime in that week."[113] We also instructed

the jury as to the grease operators' ongoing burden of proof.[114] There is no error because we properly instructed the jury on the grease operators' burden to prove they are entitled to overtime.

## *Verdict form*

Oil States argues we failed to include a separate interrogatory for the highly compensated exemption and the Motor Carrier Act exemption because it had the burden of proof for the highly compensated exemption and the grease operators have the burden of proof on the Motor Carrier Act exemption.

We instructed the jury as to differing burdens of each exemption.[115] In *Greenleaf v. Garlock, Inc.*, our court of appeals affirmed a verdict form where the losing party challenged it as "patently insufficient and oversimplified."[116] The court found no abuse of discretion for failing to include "the substantive law's requirements regarding liability" on the verdict form where the jury instruction adequately covered the law.[117]

Our jury instructions read as a whole properly instructed the jury on the applicable law and because we did not narrowly construe any regulations in favor of the crane operators and against Oil States we deny Oil States' motion for new trial on this ground.

## 4. Evidence of post-remedial measures does not warrant a new trial.

Oil States argues we should grant a new trial because the crane operators elicited testimony from Mr. Fowler crane operators are now paid an hourly wage and overtime, violating our *limine* order and Federal Rule of Evidence 407 because it is evidence of Oil States' post-remedial measures.

Before trial, we granted the crane operators' motion *in limine* to preclude Oil States from eliciting testimony whether the crane operators earned more income than under alternative pay

schemes.[118] Our pre-trial order did not address testimony about Oil States' decision to reclassify the crane operators to an hourly wage from salary and job bonus. The crane operators' counsel's questions to Mr. Fowler did not violate our *in limine* Order because Mr. Fowler only testified Oil States now pays hourly wage and overtime but did not reach comparisons to other pay plans prohibited by our *in limine* Order.

Oil States also argues Mr. Fowler's testimony violated Federal Rule of Evidence 407 because testimony Oil States reclassified the crane operators could lead the jury to believe Oil States previously misclassified the crane operators. While Oil States argued it objected, it waived this argument because it did not object to these questions when asked but waited until we called a sidebar on an unrelated issue to raise an issue about the classification questions.[119] Where a party "fails to object in a timely fashion … our [court of appeals'] review is for plain error only."[120] Oil States must show an error, which is plain, and the error affected "substantial rights."[121]

There is no error. When Oil States argued Mr. Fowler's testimony violated Rule 407 because it is a post-remedial measure, Oil States' counsel suggested if post-remedial measures testimony "gets in," it should be allowed to say "[w]e changed something but was safe then and it's safe now."[122] We agreed and allowed Mr. Fowler to testify hypothetically "under that plan [salary and job bonus], you could make more money than based on the number of hours" but did not allow him to testify as to what the pay plan would have meant for the four crane operators.[123] Oil States then asked Mr. Fowler how hourly and salary pay plans compare and he testified crane operators "made more money" when paid salary over hourly.[124]

Oil States cannot argue Mr. Fowler's testimony is plain error warranting a new trial when we allowed it to elicit the exact testimony it argued would cure the offered post-remedial evidence. Oil States' motion for new trial on this ground lacks merit.

### 5. The crane operators' counsel's closing argument is not prejudicial.

Oil States argues we should grant a new trial because the crane operators' counsel's closing argument included a reference to Oil States failing to call a witness to testify were improper and our failure to admonish the jury was an error.

In their closing, crane operators counsel's argued "I would ask you to ask yourselves why didn't the company come in here and just be honest with you and explain why it had these HR policies and why it didn't follow the policies"[125] and after closings and jury instructions, Oil States raised a concern the crane operators' closing argument violated the "missing witness" rule because it inappropriately suggested Oil States did not "call a witness that is equally available to both parties."[126]

Oil States fails to identify a case explaining the missing witness rule in our circuit.[127] Our court of appeals allows a factfinder to draw a "missing witness" adverse inference "based on the simple proposition that if a party who has evidence which bears on the issues fails to present it, it must be presumed that such evidence would be detrimental to his cause."[128] Under this inference, the jury "could infer that the missing witness's testimony would have been adverse, or, at the least, not helpful to the party who decline to procedure the witness."[129] We cannot locate, and Oil States does not cite, a court of appeals case holding a party commits a prejudicial error by drawing attention to the fact the other side did not call a witness equally available to both sides.

29

Oil States suffered no prejudice. First, the crane operators did not request nor did we give an adverse "missing witness" inference. Our jury instructions also cured any possible prejudice because instructed it may not "make any decisions again simply because there's more witnesses for one or because someone didn't call a witness."[130] We also overruled counsel's objection because Oil States opened the door to this argument by promising, in its opening, it would offer this testimony and then did not call this witness so the crane operators.[131]

We deny Oil States request for new trial on this ground because the crane operators' argument fairly responded to Oil States' promise in its opening and because our instruction regarding missing witnesses cured any possible prejudice.

### 6. The crane operators' use of damages calculations to refresh their recollection is not unfair surprise.

Oil States argues we should grant a new trial because allowing the crane operators to refresh their recollection as to hours worked using excluded exhibits constituted unfair surprise.

Oil States was well aware of the damages spreadsheet's as the subject of a pretrial motion. Oil States was so aware of the damages spreadsheets, it raised its concern the crane operators would use them during sidebar about a different document.[132] During a sidebar, Oil States' counsel stated "[he's] afraid they going to do that with the [damages spreadsheet] document as well."[133]

Oil States cannot now claim unfair surprise so great as to warrant as new trial where it predicted and pre-emptively raised a concern about the very document Oil States claims surprised it at trial.

### B. We deny Oil States' Motion for remittitur.

Oil States move for remittitur arguing (1) we incorrectly instructed the jury on damages calculations; (2) Mr. Bolen, Mr. George, Mr. Soltesz-Haughton did not offer evidence of hours

30

work to support their damages award; and, (3) Oil States is entitled to setoffs for Mr. Eddy, Mr. Bolen, and Mr. Soltesz-Haughton based on amounts paid in their severance agreements.

"[R]emittitur is well established as a device employed when [we] find[] that a decision of the jury is clearly unsupported and/excessive."[134] We "may only disturb a jury verdict if 'the damages assessed by the jury [are] so unreasonable as to offend the conscience of the Court.'"[135]

### 1. Our jury instructions on damages are proper.

Oil States argues we incorrectly instructed the jury to use an overtime premium multiplier of 1.5 and a bonus multiplier of 0.5. Before trial, the parties disputed and fully briefed which overtime premium multiplier applied (1.5 or 0.5) to the fluctuating workweek regulation.[136] In those briefs, Oil States argued it compensated based on a fluctuating work week, however, 0.5 "is appropriate here regardless of the fluctuating workweek."[137] Oil States now says it was "mistaken" and argues the fluctuating workweek regulation does not apply and we incorrectly used the regulation to apply a 1.5 multiplier.[138] Oil States does not cite authority supporting their argument we should grant remittitur based on a legal argument they failed to make at motions *in limine* or at the charging conference of either trial (and in fact, they argued the fluctuating workweek regulation did apply).

Oil States' underlying argument lacks merit. Remittitur is a tool to correct damages awards which are unreasonable or unsupported by the evidence, not a tool for Oil States to re-litigate our rulings as a matter of law.[139] Nor do Oil States' arguments disturb our previous rulings. Before trial, we examined whether Oil States paid a "fixed weekly rate" under the fluctuating workweek regulation and *Overnight Motor Transportation Co. v. Missel*.[140] Relying on *Lalli v. General Nutrition Centers, Inc.*, we concluded if evidence shows Oil States paid bonuses based on performance then salary is "fixed" and a 0.5 multiplier applies but if evidence

31

shows the bonuses are not tied to hours worked then a 1.5 multiplier applies.[141] At the charging conference, we properly found no fact issue because there we lacked evidence Oil States based the bonuses on performance. The evidence showed Oil States paid crane operators' bonuses without discretion. We properly instructed the jury to calculate at one and half times damages.[142]

Remittitur is not the proper vehicle to challenge the jury instructions. We properly instructed the jury on calculating damages based on the law and the evidence adduced at trial. We deny Oil States' motion on this ground.

## 2. Evidence supports the damages awards for Messrs. Bolen, George, and Soltesz-Haughton.

Oil States argues the jury's damages award for Messrs. Bolen, George, and Sotlesz-Haughton are not supported by evidence because they did not testify to total hours worked or salary paid. While we view the evidence "in the light most favorable to" Oil States, "[a] jury's damages award will not be upset so long as there exists sufficient evidence on the record, which if accepted by the jury, would sustain the award."[143] We disagree with Oil States. Each of these employees adduced evidence upon which the jury can properly rely.

### *George Bolen*

Mr. Bolen testified Oil States paid him a fixed salary of "$3,500 a month, but maybe $42,000 a year" and a job bonus ranging from $275-$550 depending on the position he worked.[144] Mr. Bolen also testified he kept track of his hours in a tally book, man hour sheets, and bonus packets admitted into evidence.[145] Mr. Bolen then testified he used his tally book, his man hour report, and bonus packets to estimate he worked 25 hours a week overtime for a total of 3,550 overtime hours and received $200,000 in job bonus compensation from August 2012 until April 2015.[146]

32

### *Michael George*

Mr. George testified Oil States paid him a fixed salary of $38,000 a year and job bonuses ranging from $275-$450 depending on the position he worked.[147]  Mr. George also testified he kept track of his hours in a tally book, bonus packets, and monthly hours worked report admitted into evidence.[148]  Mr. George then testified he used his tally book, his monthly hour report, and bonus packets to estimate he worked a total of 1,610 overtime hours and received $80,000 in job bonus compensation from April 2013 until June 2014.[149]

### *Stephen Soltesz-Haughton*

Mr. Soltesz-Haughton testified Oil States paid him a fixed salary of approximately $47,000 and a job bonus ranging from $450-$550 from 2012-2015.[150]  Mr. Soltesz-Haughton testified he kept track of his hours in a bonus packet, his tally book, and monthly hours report. [151] Mr. Soltesz-Haughton then testified he used his tally book, his monthly hour report, and bonus packets to estimate he worked 28 hours a week of overtime for a total of 3,950 overtime hours and received $289,000 in job bonus compensation from June 2012 until February 2015.[152]

The jury had more than sufficient evidence to calculate damages for Messrs. Bolen, George, and Soltesz-Haughton. Oil States' challenge to the damages award based on its own interpretation of the evidence is not grounds for remittitur. We deny Oil States' motion because "there exists sufficient evidence on the record, which if accepted by the jury, would sustain the awar[s]" for Messrs. Bolen, George, and Soltesz-Haughton."[153]

### 3.    Oil States is not entitled to set-off amounts from release agreements.

Oil States seeks a set-off in the damages awards for Messrs. Eddy, Bolen, and Soltesz-Haughton based on amounts Oil States paid to them in severance agreements.

33

"The FLSA explicitly states when an employer may use certain compensation already given to an employee as a credit against its overtime liability owned to that employee under the Act."[154] Congress limited those certain types of "extra compensation" which may be credited for overtime compensation due in 29 U.S.C. § 207(h).[155]

The three kinds of extra compensation are: (1) "extra compensation provided by a premium rate paid for certain hours worked by the employee in any day or workweek because such hours are hours worked in excess of eight in a day or in excess of the maximum workweek…"; (2) "extra compensation provided by a premium rate paid for work by the employee on Saturdays, Sundays, holidays, or regular days of rest, or on the sixth or seventh day of a workweek…"; or, (3) "extra compensation provided by a premium rate paid to the employee, in pursuance of an applicable employment contract or collective bargaining agreement, for work outside of the hours established in good faith by the contract or agreement as the basic, normal, or regular workday…."[156]

A severance agreement is not a permissible form of extra compensation under the Act which allows Oil States to credit its overtime liability. Oil States does not attempt to argue it is. Oil States instead argues "equitable defenses are recognized under the [FLSA]" relying on three cases from outside the Third Circuit.[157] Oil States relies on *Singer v. City of Waco* from the Court of Appeals for the Fifth Circuit allowing setoff because the employer's method of calculating overtime sometimes resulted in overpayment and sometimes in underpayment of overtime wages to its employees to support its argument equitable defenses apply.[158] The Court of Appeals for the Fifth Circuit has since clarified its precedent in *Martin v. PepsiAmericas, Inc.*, holding "set-offs and counterclaims are inappropriate in any case brought to enforce the FLSA's minimum wage and overtime provisions."[159] The court reversed the district court's dismissal on

34

an Act claim where the severance package paid to an employee exceeded her maximum potential recovery for unpaid overtime wages because set-off is improper under the Act.[160] The court distinguished "the unique character of the set-offs in *Singer*—that they represented overtime obligations already fulfilled—that allowed for a narrow exception to the bright-line rule spelled out in *Heard*."[161]

Our court of appeals is clear "[w]here a credit is allowed, the statute says so."[162] Because Oil States' payment as part of a severance package falls into one of the three categories "explicitly permit[ed]" by the Act, we deny Oil States' request to set off the damages awards to Messrs. Eddy, Bolen, and Soltesz-Haughton.[163]

## C. We deny Oil States' renewed motion for judgment as a matter of law.

Oil States renewed its motion for judgment as a matter of law as to the grease operators (Messrs. Bolen, George, Soltesz-Haughton, and Steffish) arguing it established the highly compensated exemption applied as a matter of law.

In a motion for judgment as a matter of law, we assess "whether, viewing the evidence in the light most favorable to sustaining the verdict "whether, viewing the evidence in the light most favorable to sustaining the verdict, a reasonable jury could have found for the prevailing party."[164] "Entry of judgment as a matter of law is a 'sparingly' invoked remedy..." because "[i]n performing this narrow inquiry, we must refrain from weighing the evidence, determining the credibly of witnesses, or substituting our own version of the facts for that of the jury."[165]

To establish the highly compensated exemption, Oil States must establish each grease operator: (1) received total annual compensation of $100,000; (2) "customarily and regularly performs" the exempt duty of an administrative duty, the exercise of discretion and independent judgment with respect of matters of significance and, (3) his "primary duty includes performing

35

office or non-manual work."[166] Viewing the evidence in a light most favorable to the grease operators, there is sufficient evidence to support the jury's determination the highly compensated exemption did not apply.

## 1. Annualized compensation element.

Oil States argues it established the grease operators each made an annualized salary of $100,000 as a matter of law. Messrs. Soltesz-Haughton and Steffish do not dispute Oil States established they received $100,000 in annualized compensation the relevant time period and meet this element.[167] Messrs. Bolen and George, however, argue there is sufficient evidence for the jury to find they did not receive $100,000 for certain years in the relevant time frame.

There is sufficient evidence for the jury to find Mr. Bolen did not make $100,000 in annualized compensation in 2015. Mr. Bolen testified his 2015 W2 showed he made $31,836.39 from January 1, 2015 through April 30, 2015.[168] Viewing the evidence in a light most favorable to Mr. Bolen, the jury could have reasonably concluded Mr. Bolen's annualized salary for 2015 is $95,509.17 and the highly compensation exemption did not apply.

Mr. George, similarly, testified his 2013 W2 showed he made $50,009.88 and he began working for Oil States in April or May of 2013.[169] The jury's verdict slip listed his start as April 22, 2013.[170] Viewing this evidence in a light most favorable to Mr. George, the jury could have reasonably concluded Mr. Bolen's annualized salary for 2013 is somewhere between $66,679.84-75,014.82.[171]

## 2. "Primary duty" includes performing office work or non-manual work.

Viewing the evidence in a light most favorable to the grease operators, they adduced sufficient evidence to find their primary duty did not include office work or non-manual labor. We instructed the jury "primary duty" means "principal, main, major or most important duty

36

performed by the employee based on all the facts."[172] The highly compensated exemption "does not apply to employees who perform work involving repetitive operations with their hands, physical skill and energy, no matter how highly paid the employee might be."[173]

There is sufficient the grease operators' primary duty did not include office or non-manual labor. Barry Blank, an Oil States manager, testified a grease operator's "major responsibility" is setting up the pressure control equipment.[174] Mr. Bolen agreed "what [he] did was pressure control."[175] Mr. George called the work "laborious" and said filling out his reports and job safety analysis paperwork "was a very small part of the job."[176]

Each grease operator testified his work involved manual labor including repetitive tasks using his hands.[177] Mr. Blank agreed. He described the grease operators' tasks as "[w]e are going to be rigging up. We are going to be stabbing on a well. We are going to be running in hole. We are going to rig down, pull off well. ... Unless they run into a situation where the wire gets stranded ... the job log is not going to deviate. It's fairly boring... [and] a repetitive situation."[178]

### 3. "Customarily and regularly" exercised discretion and independent judgment with respect to matters of significance.

The grease operators adduced sufficient evidence for the jury to reasonably conclude they did not "customarily and regularly" exercise discretion and independent judgment with respect to matters of significance.

We instructed the jury "customarily and regularly... means a frequency greater than occasional, but which of course may be less than constant. Tasks or work performed customarily and regularly includes work normally or recurrently performed every work week. It does not include isolated or one one-time tasks."[179] We instructed "exercise of discretion and independent judgment with respect to matters of significance" means comparing and evaluating possible

37

courses of action then deciding and taking action on course of action.[180] It also involves the "authority to make an independent choice free from immediate direction or supervision" but does not exclude situations where his "decisions or recommendations are reviewed at a higher level."[181] Discretion and independent judgment means more than "applying well-established techniques, procedures or specific standards describes in manuals or other sources" and "does not include mechanical, recurrent or repetitive work."[182]

Oil States' manager Mr. Blank testified Oil States provides grease operators with a standard operating procedure which "explains [their] whole job."[183] He also testified his responsibility as manager is to "troubleshoot" the grease operator's issues on the job site; the grease operators did not handle it themselves.[184] Mr. Soltesz-Haughton testified he attended pressure control school after he worked the job for a year and the curriculum "went over basically all the [standard operating procedures] that I had had passed down to me from previous operators."[185] Mr. Bolen said his job is a "pretty easy job to do" and "it's not rocket science."[186] Mr. Steffish testified Oil States sent him out as a grease operator "pretty quickly" without providing formal training and when he had never operated the equipment himself before and his Oil States' supervisors told him "[j]ust don't break anything, and come back in one piece…"[187]

The employees also testified they did not exercise discretion or independent judgment as pressure control operators. Mr. Bolen testified he did not have "any sort of management responsibilities" as a grease operator.[188] Mr. Bolen also testified "if there was ever a situation where they came up with a plan that I wasn't, you know, prepared for or comfortable with, I would call my manager …. And they would just let me know what to do."[189] He explained, however, only once did situation line that arise where a wireline get stranded.[190] Mr. George also testified his jobs where "98 percent normal."[191] And when he ran into an issue, "[he] always

talked to somebody else more experienced" and "[i]t was very clear don't try to do anything on your own without permission…"[192] Mr. Soltesz-Haughton testified on one job, he objected to how the fracking company operated the job and he called his distract manager who told him to "just kind of go along with it."[193] Instead of having ability to exercise judgment, Mr. Soltesz-Haughton had to ask to be removed from the job and Oil States sent a different grease operator to handle it.[194]

## 4. Evidence of hours worked.

Viewing the evidence in a light most favorable to the grease operators, there is sufficient evidence for the jury to determine their overtime hours and damages compensation.

### *George Bolen*

Mr. Bolen testified Oil States paid him a fixed salary of "$3,500 a month, but maybe $42,000 a year" and a job bonus ranging from $275-$550 depending on the position he worked.[195] Mr. Bolen also testified he kept track of his hours in a tally book, man hour sheets, and bonus packets admitted into evidence.[196] Mr. Bolen then testified he used his tally book, his man hour report, and bonus packets to estimate he worked 25 hours a week overtime for a total of 3,550 overtime hours and received $200,000 in job bonus compensation from August 2012 until April 2015.[197]

### *Michael George*

Mr. George testified Oil States paid him a fixed salary of $38,000 a year and job bonuses ranging from $275-$450 depending on the position he worked.[198] Mr. George also testified he kept track of his hours in a tally book, bonus packets, and monthly hours worked report admitted into evidence.[199] Mr. George then testified he used his tally book, his monthly hour report, and

39

bonus packets to estimate he worked a total of 1,610 overtime hours and received $80,000 in job bonus compensation from April 2013 until June 2014.[200]

### *Stephen Soltesz-Haughton*

Mr. Soltesz-Haughton testified Oil States paid him a fixed salary of approximately $47,000 and a job bonus ranging from $450-$550 from 2012-2015.[201] Mr. Soltesz-Haughton testified he kept track of his hours in a bonus packet, his tally book, and monthly hours report [202] Mr. Soltesz-Haughton then testified he used his tally book, his monthly hour report, bonus packets to estimate he worked 28 hours a week of overtime for a total of 3,950 overtime hours and received $289,000 in job bonus compensation from June 2012 until February 2015.[203]

### *Jeffery Steffish*

Mr. Steffish testified Oil States paid him a fixed salary of $44,000 and job bonuses.[204] Mr. Steffish testified he kept track of his hours using job log sheets, bonus packets and monthly hours reports.[205] Mr. Steffish testified he used his job logs, bonus packets, monthly hour reports, and his co-worker's record with whom he worked to estimate he worked an average of 40 hours a week overtime for a total of 5,650 overtime hours and $323,000 in job bonuses from October 2012 until June 2015.[206]

We deny Oil States' motion for judgment as a matter of law on the grease operators' trial as evidence in a light most favorable to them as verdict winners confirms more than sufficient evidence to support the jury's determination the highly compensated exemption did not apply and to award damages.[207] While Oil States cites testimony and interpretations of the evidence to support a favorable verdict should the jury had agreed with it, in this "narrow inquiry, we must refrain from weighing the evidence, determining the credibility of witnesses, or substituting our own version of the facts for that of the jury."[208]

## III. Conclusion

In the accompanying Order, we deny Oil States' motions for new trial, its motion for

remittitur, and its renewed motion for judgment as a matter of law.

---

[1] Other claims and defenses existed for both sides and were either withdrawn or precluded as a matter of law before jury deliberations.

[2] *Leonard v. Stemtech International, Inc.*, 834 F.3d 376, 386 (3d Cir. 2016) (quoting *Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006)).

[3] *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991) (citing *Delaware Dep't of Health & Social Servs.*, 865 F.2d 1408, 1413 (3d Cir. 1989)).

[4] *Leonard*, 834 F.3d at 386 (quoting *Delli Santi v. CAN Ins. Cos.*, 88 F.3d 192, 201 (3d Cir. 1996)).

[5] *Souryavong v. Lackawanna Co.*, 872 F.3d 122, 126 (3d Cir. 2017) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).

[6] Joint Exhibit 47, 7.

[7] N.T. October 18, 2017, p. 225:6-7 (deposition of Jill Curry played to the jury), Deposition of Jill Curry, June 16, 2016, pp. 68:25-69:1.

[8] N.T. October 17, 2017, p. 255:15-16 (deposition of Terry Woodall played to jury), Deposition of Terry Woodall, June 17, 2016, p. 84:08-12.

[9] ECF Doc. No. 496 at 4.

[10] *Id.*

[11] ECF Doc. No. 290 at 5.

[12] N.T. October 16, 2017, p. 119:15-17.

[13] *Id.* at p. 120:4-14.

[14] N.T. October 17, 2017, pp. 53:18-54:4; 159:7-160:16.

[15] *Id.* at p. 246:16-17.

[16] *Id.* at p. 275:18-19.

[17] N.T. October 18, 2017, pp. 62:22-63:9.

[18] *Id.* at pp. 59:22-60:7.

[19] *Id.* at p. 323:10-15.

[20] ECF Doc. No. 496 at 4.

[21] *Leonard*, 834 F.3d at 392 (quoting *Cortez v. Trans Union, LLC*, 617 F.3d 688, 718 (3d Cir. 2010)).

[22] *Id.* (quoting *Cortez*, 617 F.3d at 719 and *Thabault v. Chait*, 541 F.3d 512, 532 (3d Cir. 2008)).

[23] N.T. October 19, 2017, p. 107:3-4 (jury exits courtroom at 10:30am for deliberations); p. 117:1-2 (jury returns to courtroom at 5:30pm with verdict).

[24] *See* N.T. October 16, 2017, pp. 176:13-180:7 (Mr. Burchik testified he estimated his hours based on his tally books but had no similar record for his shop days so "[k]eeping his tally book in mind and the days off schedule, we was able to get a fairly accurate number of hours for the shop"); N.T. October 17, 2017, pp. 225:12-228:9 (Mr. Pickel testified his hours estimate is "way less than we actually worked" and his estimate is less because it seems "fair" and his hours are a "conservative figure."); N.T. October 17, 2017, pp. 302:8-307:15 (Mr. Eddy testified Oil States did not have his logs from two years so he estimated his hours based on Mr. Burchik's records who he often worked with and he believed his estimate is "quite accurate ... and very conservative.").

[25] *See Leonard*, 834 F.3d at 392 (quoting *Cortez*, 617 F.3d at 718).

[26] ECF Doc. No. 496 at 4.

[27] *Graboff v. Colleran Firm*, 744 F.3d 128, 135 n.5 (3d Cir. 2014) (citing *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)).

[28] N.T. October 19, 2017, pp. 78:9-79:13.

[29] 29 C.F.R. § 541.601(a).

[30] 29 C.F.R. § 541.700(a).

[31] 29 C.F.R. § 541.202(a).

[32] 29 C.F.R. § 541.601(d).

[33] N.T. March 13, 2018, pp. 153:25-154:1-11; N.T. March 12, 2018, pp. 179:16-180:22. Mr. George, Mr. Soltesz-Haughton, and Mr. Steffish testified agreed with or testified to same manual

work as Mr. Bolen. *See, e.g.*, N.T. March 13, 2018, pp. 178:13-179:12; N.T. March 14, 2018, pp. 48:5-12; N.T. March 14, 2018, pp. 48:5-12; N.T. March 14, 2018, pp. 146:12-150:18.

[34] N.T. March 13, 2018, p. 231:4-19.

[35] *Id.* at p. 137:10-21.

[36] *See, e.g.*, N.T. March 12, 2018, pp. 298:25-299:25 (Mr. Bolen testified he completed a daily job safety analysis report."); *Id.* at pp. 298:25-299:25; (Mr. Bolen admitted completing the daily report requires non-manual work).

[37] N.T. March 12, 2018, p. 240:5-7.

[38] N.T. March 13, 2018, p. 109:5-16. *See also id.* at p. 51:8-9 (Mr. Bolen's managers told him "if [he] had abnormal conditions, [he was] to inform them.").

[39] N.T. March 12, 2018, p. 289: 18-19.

[40] N.T. March 13, 2018, p. 183:9.

[41] *Id.* at p. 185:24-186:9.

[42] N.T. March 14, 2018, pp. 77:25-79:6.

[43] *Id.* at p. 79:2-6.

[44] *Reynolds v. University of Pennsylvania*, 684 F. Supp. 2d 621, 627 (E.D. Pa. 2010) (quoting *Farra v. Stanley-Bostitch, Inc.*, 838 F. Supp. 1021, 1026 (E.D. Pa. 1993) and citing *Bhaya v. Westinghouse Elec. Corp.*, 709 F. Supp. 600, 601 (E.D. Pa. 1989)).

[45] *Id.* (quoting *Bhaya.*, 709 F. Supp. at 601 and citing *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 928 (3d Cir. 1985)).

[46] ECF Doc. No. 281.

[47] N.T. October 16, 2017, pp. 144:7-145:11.

[48] *United States v. Booz*, 451 F.2d 719, 724 (3d Cir. 1971).

[49] *United States v. Lnu*, 575 F.3d 298, 307 (3d Cir. 2009) (citing *Booz*, 451 F.2d at 725).

[50] No. 07-111, 2011 WL 3443951, at *16 (W.D. Pa. Aug. 8, 2011) *aff'd*, 492 F. App'x 297 (3d Cir. 2012)).

[51] *Id.*

[52] 758 F.3d 975 (8th Cir. 2014).

[53] *Id.* at 980.

[54] *Id.* at 978.

[55] *Id.* at 982.

[56] *United States v. Sokolow*, 91 F.3d 396, 403 (3d Cir. 1996) (internal citations omitted); *see also* N.T. October 18, 2017, pp. 190:8-191:21.

[57] *See* ECF Doc. No. 238 at 9 (Oil States stipulates Oil States Energy Services, L.L.C. is the proper party and employed the crane operators and Oil States is covered by the Fair Labor Standards Act); ECF Doc. No. 239 at 30-31.

[58] ECF Doc. No. 286.

[59] ECF Doc. No. 496 at 12.

[60] N.T. October 18, 2017, pp. 73:23-84:17.

[61] We would not have changed our ruling even if Oil States requested to re-designate this portion of Ms. Curry's testimony because her testimony goes to income comparisons between the pay plans. At trial, we ruled Mr. Fowler's testimony had not opened the door to income comparisons between hourly and salary because counsel only elicited testimony from Mr. Fowler as to the fact reclassification occurred but not about how reclassification affected incomes. *See* N.T. October 18, 2017, pp. 76:21-77:22.

[62] ECF Doc. No. 388 at 3.

[63] ECF Doc. No. 388 at 2-3.

[64] ECF Doc. No. 421.

[65] ECF Doc. No. 429.

[66] ECF Doc. No. 430.

[67] ECF Doc. No. 429-1 at 9.

[68] *Id.*

[69] ECF Doc. No. 497 at 5.

[70] ECF Doc. No. 497 at 5.

[71] N.T. March 14, 2018, pp. 108:2 – 111:25.

[72] N.T. March 15, 2018, pp. 114:1 – 115:25.

[73] *Id.* at p. 127:7-9.

[74] *Id.* at p. 127:10-11.

[75] *Id.* at pp. 116:25-117:14.

[76] *Id.* at p. 144:18-145:9.

[77] *Id.* at p. 144:18-145:9.

[78] ECF Doc. No. 237.

[79] *Id.*

[80] *Id.*

[81] Oil States also argues this opening the door renders our pre-trial exclusion of its designation to Ms. Curry's deposition testimony where she did not recall an average income for salary plus job bonus pay plan, she "recall[ed] outliers" including an employee making $400,000 and agreeing it did not "cross [her] mind that these people making hundred, 200-, $300,000 a year, were nonexempt, overtime eligible employees." ECF Doc. No. 497 at 12-13. First, we excluded Ms. Curry's testimony as irrelevant because she is not testifying about the four grease operators just unnamed "outlier" employees of Oil States and second, Oil States never requested to re offer Ms. Curry's testimony after the grease operators allegedly opened the door so any objection is waived.

[82] Oil States also argues designations of Mr. Woodall's testimony opened the door to this issue, however, Oil States designated those portions of Mr. Woodall's testimony, not the grease operators. *See* ECF Doc. Nos. 423, 424.

[83] ECF Doc. No. 279; *see also* ECF Doc. No. 369 incorporating our Order (ECF Doc. No. 279) from the first trial into the second trial.

[84] N.T. March 13, 2018, pp. 21:19-22:18.

[85] *Id.* at pp. 23:7-24:3.

[86] *Id.* at p. 25:18-24.

[87] *Id.* at p. 25:25.

[88] *Id.* at p. 26:13-22.

[89] ___ U.S. ___, 138 S.Ct. 1134 (2018).

[90] *Donlin v. Philips Lighting North America Corp.*, 581 F.3d 73, 78 (3d Cir. 2009) (citing *Dressler v. Busch Entm't Corp.*, 143 F.3d 778, 780 (3d Cir. 1998)).

[91] *Id.* (quoting *United States v. Ellis*, 156 F.3d 493, 498 n.7 (3d Cir. 1998)).

[92] *Agere Systems, Inc. v. Atmel Corp.*, 2005 WL 2994702 (E.D. Pa. Aug. 17, 2005) (citing *McPhee v. Reichel*, 461 F.2d 947, 950 (3d Cir. 1972) and quoting *Douglas v. Owens*, 50 F.3d 1226, 1233 (3d Cir. 1995) (emphasis added)).

[93] *Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 97 (1993).

[94] *Encino Motorcars*, 138 S.Ct. at 1142 (quoting A. Scalia & B. Garner, Reading Law 363 (2012)).

[95] N.T. October 18, 2017, pp. 254:18-255:15.

[96] *Id.* at p. 255:8-12.

[97] *See, e.g.*, N.T. October 18, 2017, pp. 304:18-305:11 (rejecting the crane operators' request to include the word "primary" into the highly compensated regulation where the regulation used "customarily and regularly" because we had no "ability to read in the word 'primary'" where the regulation does not have it).

[98] ECF Doc. No. 496 at 14.

[99] N.T. October 18, 2017, p. 314:1-25.

[100] N.T. October 19, 2017, p 95:8-18 (relying on *Souryavong*, 872 F.3d at 126 (quoting *McLaughlin*, 486 U.S. at 133)).

[101] N.T. October 19, 2017, p. 8:1-2.

[102] N.T. March 15, 2018, p. 259:14-16; ECF Doc. No. 497 ("The jury instructions stated that Defendant must prove that Plaintiffs performed the duties of an 'administrative employees.'").

[103] 29 C.F.R. § 541.601(c).

[104] ECF Doc. No. 447.

[105] N.T. March 16, 2018, p. 2:17-25.

[106] *Id.* at p. 19:4-13; 36:16-37:6.

[107] *Id.* at p. 40:14-25.

[108] ECF Doc. No. 286.

[109] *See* 969 F. Supp. 2d 1252, 1259 (D. Idaho 2013).

[110] ECF Doc. No. 497 at 18-19. Oil States also once again objects to the grease operators testifying to damages at all due to their post-discovery disclosure of damages evidence. Because we addressed this argument numerous times already, we do not address it again.

[111] ECF Doc. No. 290 at 5.

[112] *See e.g.*, N.T. March 13, 2018, p. 129:21 (Oil States manager Barry Blank testified "if he was on the job, he received a job bonus.").

[113] N.T. March 15, 2018, pp. 250:25-251:2.

[114] *See id.* at p. 253:2-4 ("...it's each employee's burden by a preponderance to prove he worked more than 40 hours in a given work week."); p. 254:1-3 ("Each employee claims that Oil States required him to work in excess of 40 hours a week.").

[115] *Compare* N.T. March 15, 2018, pp. 257:25-258:3 (So to avoid being classified as exempt [under the Motor Carrier Act], the employee must show you by a preponderance..." *with id.* at p. 259:5-6 (To establish [the highly compensated exemption], Oil States must prove to you...").

[116] 174 F.3d 352, 363 n.8 (3d Cir. 1999).

[117] *Id.*

[118] ECF Doc. No. 288.

[119] *See Carnegie Mellon University v. Marvell Technology Group Ltd.*, No. 09-290, 2012 WL 6578412, *1-2 (W.D. Pa. Dec. 17, 2012) (quoting *United States v. Nathan J.*, 127 F,3d 1110, * 4 (10th Cir. 1997)) (finding a party waived its objection because the party objected to the testimony "only later at the end of the day" because the court considered "unfairness to the party offering the evidence if the delay in making the objection prevents corrective measures from being taken.").

[120] *United States v. Moore*, 375 F.3d 259, 262 (3d Cir. 2004) (internal citations omitted).

[121] *See id.*

[122] N.T. October 18, 2017, pp. 80:10-82:19.

[123] *Id.* at p. 83:2-17.

[124] *Id.* at pp. 214:11-215:15.

[125] N.T. October 19, 2017, p. 56:19-22. Other arguments include "Now, even though the Human Resources Department said those employees are required to be paid overtime, Oil States still could have come in this week and explained their decision as to why they decided not to what the Human Resources Department told them to do..." *Id.* at p. 30:7-12 and "Third, I asked you to pay attention to whether the company brought anyone from their Human Resources Department to explain why the company didn't follow the law as its Human Resources Department had said what it is.... The company didn't do that even after I put it out there." *Id.* at p. 35:12-17.

[126] *Id.* at pp. 103:24-104:1.

[127] Oil States cites to *Gilster v. Primebank*, 747 F.3d 1007 (8th Cir. 2014) to support its argument "[c]omments in closing arguments regarding a party not calling a witness are clearly improper." ECF Doc. No. 496 at 19. It does not. In *Gilster*, the court of appeals found plaintiff's counsel closing argument referencing the counsel's own sexual harassment and commenting on her client's courage in making a claim in a sexual harassment case were unfairly prejudice. *Id.* at 1010-1013. There is no reference to this missing witness rule.

1.

[128] *Lin v. Rohm and Hass Co.*, 685 F.App'x. 125, 132 (3d Cir. 2017) (quoting *United States v. Hines*, 470 F.2d 225, 230 (3d Cir. 1972)).

[129] *Id.* (citing *Hines*, 470 F.2d at 230)).

[130] N.T. October 19, 2017, p. 69:10-14.

[131] *Id.* at pp. 104:19-105:24.

[132] *Id.* at pp. 143:10-145:13.

[133] N.T. October 16, 2017, p. 143:16-18.

[134] *Harker v. Chan*, No. 15-277, 2018 WL 3599734, at *11 (W.D. Pa. July 27, 2018) (quoting *Cortez*, 617 F.3d at 716).

[135] *Id.* ((quoting *Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989)).

[136] *See* ECF Doc. Nos. 265, 270, and 283.

[137] ECF Doc. No. 270 at 2. "The salaries and job bonuses in this case were intended to cover all hours worked in a business where hours fluctuated based on customer needs."

[138] ECF Doc. No. 498 at 6.

[139] *See Harker*, 2018 WL 3599734, at *11 (quoting *Cortez*, 617 F.3d at 716).

[140] 316 U.S. 572, 580 n.16 (1942).

[141] ECF Doc. No. 290 at 6.

[142] N.T. October 18, 2017, p. 323:10-15.

[143] *Leonard*, 834 F.3d at 392 (quoting *Thabault v. Chait*, 541 F.3d 512, 532 (3d Cir. 2008)).

[144] N.T. March 12, 2018, pp. 240:19-242:25.

[145] *Id.* at pp. 247:3-248:23; 259:1-10;

[146] *Id.* at pp. 262:2-269:12.

[147] N.T. March 13, 2018, pp. 205:8-207:24.

[148] *Id.* at pp. 226:4-227:6; 233:9-234:6; 241:22-242:12.

[149] *Id.* at pp. 244:22-250:24.

[150] *Id.* at pp. 313:19-315:5.

[151] *Id.* at pp. 317:18-322:14; 326:23-327:18.

[152] *Id.* at pp. 329:11-335:11.

[153] *Leonard*, 834 F.3d at 392 (quoting *Thabault*, 541 F.3d at 532).

[154] *Smiley v. E.I. Dupont De Nemours and Co.*, 839 F.3d 325, 331-32 (3d Cir. 2016).

[155] 29 U.S.C. § 207(h) ("Extra compensation paid as described in paragraphs (5), (6), and (7) of subsection (e) shall be creditable toward overtime compensation payable pursuant to this section.").

[156] § 207(e)(5)-(7).

[157] ECF Doc. No. 498 at 15.

[158] 324 F.3d 813, 827-28 (5th Cir. 2003).

[159] 628 F.3d 738, 741 (5th Cir. 2010) (citing *Brennan v. Heard*, 491 F.2d 1, 4 (5th Cir. 1974)).

[160] *Id.* at 742.

[161] *Id.* The other two cases Oil States cites are equally unpersuasive. In *Chavez v. City of Albuquerque*, 630 F.3d 1300 (10th Cir. 2011) the court acknowledged employers may credit "certain compensation" to its overtime liability of § 207(h) of the Act but made no ruling because regarding credits because the employees failed to "identif[y] a single instance of an improper credit." *Id.* at 1314. In *Bray v. Dog Star Ranch, Inc.*, No. 08-1005, 2010 WL 89908 (W.D. Mich. 2010) the district court allowed for credits for the employer against its overtime liability for weeks the employer paid its employees for forty hours even though the employees worked less than forty hours. *Id.* at *15. In *Bray*, the district court held § 207(h) is not at issue in its case and relied heavily on *Singer*, so its holding is not persuasive where our court of appeals' unequivocal precedential opinions directly on point instruct us to only consider credits specifically defined in the Act.

[162] *Wheeler v. Hampton Tp.*, 399 F.3d 238, 245 (3d Cir. 2005).

[163] *See Smiley*, 839 F.3d at 332 ("Thus, the FLSA explicitly permits offsetting against overtime only with certain compensation that is statutorily excluded from the regular rate, that is, only three categories of compensation...").

[164] *Graboff v. Colleran Firm*, 744 F.3d 128, 134 (3d Cir. 2014) (quoting *Johnson v. Campbell*, 332 F.2d 199, 204 (3d Cir. 2003) and citing *Lakeside Resort Enterps., LP v. Bd. of Sup'rs of Palmyra Twp.*, 455 F.3d 154, 156 (3d Cir. 2006)).

[165] *Marra v. Philadelphia Housing Authority*, 497 F.3d 286, 300 (3d Cir. 2007) (citing *Lightning Lube Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)).

[166] 29 C.F.R. § 541.601.

[167] ECF Doc. No. 504 at 2.

[168] N.T. March 13, 2018, p. 77:17-25.

[169] *Id.* at pp. 208:10-209:1.

[170] ECF Doc. No. 451 at 2.

[171] *See* § 541.601(b)(4) The Act allows an employer to "utilize any 52-week period as the year, such as a calendar year, a fiscal year, or an anniversary of hire year. If the employer does not identify some other year period in advance, the calendar year will apply." Oil States offered no

evidence it established a different type of "year period" in advance, so we used the calendar year method to annualize compensation.

[172] N.T. March 13, 2018, p. 261:3-5; *see also* 29 C.F.R. § 541.601(d).

[173] N.T. March 15, 2018, p. 261:6-9.

[174] N.T. March 13, 2018, p. 134:14-19.

[175] *Id.* at p. 17:14-15.

[176] *Id.* at p. 216:16-24.

[177] *See, e.g.,* N.T. March 13, 2018, p. 179:6-16 (Mr. George agreeing his work in repetitive because "[w]e showed up, stabbed on, ran your equipment, stabbed off..."); N.T. March 12, 2018, pp. 173:3-191:25 (Mr. Bolen testifying about the manual labor involved in his work, "hook[ing] a strap ... set the lubricator on the stand ..." and "we'll make the connection by hand with the nut and thread" then attached the equipment to the well. Mr. Bolen "turns his unit on and turn the grease on" and then he "stand[s] at the grease unit operating this thing during the entire wireline run" operating knobs to control grease pressure, "monitoring the water that's coming out." After the job, Mr. Bolen takes his equipment off the well then "strap[s] it to a crane leg" waiting for the frack team."); N.T. March 14, 2018, p. 15:9-16 (Mr. Soltesz-Haughton testified "I don't think the act of communication is a manual job, but the tasks that are involved with moving around and making sure that things are put together properly and that we're doing the right this at the right time, that's not a desk job. So once again it's not black and white."); N.T. March 14, 2018, pp. 146:12-150:18. (Mr. Steffish agreeing his tasks as a grease operator were the same as Mr. George, Mr. Bolen, and Mr. Soltesz-Haughton).

[178] N.T. March 13, 2018, p. 137:10-21.

[179] N.T. March 15, 2018, p. 261:18-24; *see also* 29 C.F.R. § 541.202.

[180] N.T. March 15, 2018, pp. 261:25-262:5.

[181] *Id.* at p. 262:6-11.

[182] *Id.* at p. 262:12-19.

[183] N.T. March 13, 2018, pp. 135:2-23. *See also id.* at p. 296:1-5 (Mr. Soltesz-Haughton testifying he using standard operating procedures if he runs into issues with a "sticky well").

[184] *See id.* at p. 130:15-22 ("if you have a broken grease unit, it was my responsibility to get it to work or to supply you with a new one, because you let know, and I make a decision at that point. If you didn't have the right tools, I could get them out to you or explain a different way to

operate. You had a company man that was riding you for no reason, you are doing everything right, he thinks you are doing everything wrong, I would go talk to the company man.").

[185] *Id.* at p. 296:21-297:17. Mr. Steffish also testified he attended pressure control school three or four years after he started as a grease operator with Oil States. N.T. March 14, 2018, p. 153:2-5.

[186] N.T. March 13, 2018, pp. 8:23-9:5.

[187] N.T. March 14, 2018, pp. 143:17-145:10.

[188] N.T. March 12, 2018, p. 240:5-7.

[189] N.T. March 13, 2018, p. 109:5-16. *See also id.* at p. 51:8-9 (Mr. Bolen's managers told him "if [he] had abnormal conditions, [he was] to inform them.").

[190] N.T. March 12, 2018, p. 289: 18-19.

[191] N.T. March 13, 2018, p. 183:9.

[192] *Id.* at p. 185:24-186:9.

[193] N.T. March 14, 2018, pp. 77:25-79:6.

[194] *Id.* at p. 79:2-6.

[195] N.T. March 12, 2018, pp. 240:19-242:25.

[196] *Id.* at pp. 247:3-248:23; 259:1-10;

[197] *Id* at pp. 262:2-269:12.

[198] N.T. March 13, 2018, pp. 205:8-207:24.

[199] *Id.* at pp. 226:4-227:6; 233:9-234:6; 241:22-242:12.

[200] *Id.* at pp. 244:22-250:24.

[201] *Id.* at pp. 313:19-315:5.

[202] *Id.* at pp. 317:18-322:14; 326:23-327:18.

[203] *Id.* at pp. 329:11-335:11.

[204] N.T. March 14, 2018, p. 156:20-22.

[205] *Id.* at pp. 160:6-164:11.

[206] *Id.* at pp. 165:14-170:4.

[207] *Graboff*, 744 F.3d at 134 (quoting *Johnson*, 332 F.2d at 204 and citing *Lakeside Resort*, 455 F.3d at 156).

[208] *Marra*, 497 F.3d at 300 (citing *Lightning Lube*, 4 F.3d at 1166).